FILED
2019 Apr-25  AM 10:37
U.S. DISTRICT COURT
N.D. OF ALABAMA



# VERITEXT
## LEGAL SOLUTIONS

Deposition of:

# Susan Carvalho , Ph.D.

*February 19, 2019*

In the Matter of:

# Amiri, Ali v. The Board Of Trustees Of The University Of Alabama

Freedom Court Reporting
800.808.4958 | calendar-freedom@veritext.com | 205-397-2397

Page 10

1 reporter please swear in the witness.
2        COURT REPORTER: Okay. Ms. --
3 Dr. Carvalho, if you'll raise your right
4 hand, I will swear you in.
5        (WITNESS COMPLIES)
6        COURT REPORTER: Do you
7 solemnly swear or affirm that the
8 testimony you're about to give in this
9 matter will be the truth, the whole
10 truth, and nothing but the truth, so
11 help you God?
12        THE WITNESS: Yes.
13        COURT REPORTER: Thank you.
14        Do the attorneys prefer
15 the standard stip- -- or usual
16 stipulations?
17        MR. DYKES: That's fine.
18        COURT REPORTER: Okay.
19        MR. AMIRI: Yes.
20        COURT REPORTER: Thank you.
21        SUSAN CARVALHO, Ph.D.,
22 having been first duly sworn, was
23 examined and testified as follows:

Page 11

1            EXAMINATION
2 BY MR. AMIRI:
3    Q.  Let's start with some
4 background information. Could you
5 please say your full name.
6    A.  My name is Susan Elizabeth
7 Carvalho Chumney.
8    Q.  And could you please say what
9 is your position in the University of
10 Alabama?
11    A.  Associate provost and dean of
12 the Graduate School.
13    Q.  And for how many years you are
14 in this position?
15    A.  Two and a half.
16    Q.  And how many years you are in
17 the University of Alabama?
18    A.  Two and a half.
19    Q.  Very good. These are the
20 questions which is -- you know, I -- I
21 have to ask. Have you had any medical
22 drug, alcohol, or any other thing which
23 can affect your -- can -- can affect you

Page 12

1 in your testimony?
2    A.  No.
3    Q.  Thank you very much for the
4 special answers.
5        MR. AMIRI: I would introduce
6 Exhibit Number 1.
7        (PLAINTIFF'S EXHIBIT NO. 1
8 MARKED)
9 BY MR. AMIRI:
10    Q.  This is the court order entered
11 on February 13. So you have this court
12 order; I don't need to explain it
13 further.
14        (PLAINTIFF'S EXHIBIT NO. 2
15 MARKED)
16 BY MR. AMIRI:
17    Q.  The second document I'm going
18 to enter to -- is Exhibit Number 2.
19 This is a letter of dismissal and a few
20 other documents you produced.
21        MR. DYKES: Susan, can I see
22 that?
23        THE WITNESS: This one?

Page 13

1 (Indicating)
2        MR. DYKES: Yeah. (Reviews
3 document) Okay.
4    A.  (Reviews document)
5 BY MR. AMIRI:
6    Q.  Can you please explain what is
7 this letter, the first page?
8    A.  Yes. The Graduate School
9 manages registration and continuation of
10 students across all of the graduate
11 programs in the university, but the
12 graduate programs have a balance between
13 centralized and -- and decentralized
14 actions. So, when a department
15 dismisses a student, they notify the
16 Graduate School, the Graduate School
17 sends the official document that
18 suspends the student's registration.
19    Q.  So does the Department of
20 Physics and the Graduate School contact
21 the student independent from each other,
22 or they contact each other first and,
23 once they reach a decision, they contact

4 (Pages 10 - 13)

Page 14

1 the student?
2      MR. DYKES: Object --
3      A. No, they --
4      MR. DYKES: -- to the form.
5      You can answer. You can
6 answer.
7      A. Generally the department acts
8 on its own. They can consult with the
9 Graduate School if they choose to do
10 that, but the Graduate School follows
11 the department's recommendation. This
12 happens at -- at admission, and in the
13 middle, and at the end of a student's
14 career.
15 BY MR. AMIRI:
16     Q. So when a student is dismissed,
17 does he receive a letter from Physics
18 Department or from the Graduate School?
19     A. First from the Physics
20 Department and then from the Graduate
21 School.
22     Q. So you -- it is usual that you
23 send -- the Graduate School, you send

Page 15

1 letters to the students that they are
2 dismissed. Is that correct?
3      A. After they have been notified
4 by the department.
5      Q. I see. So, finally, when a
6 student is dismissed from any program,
7 the Graduate School will send a letter
8 to him. Is that correct?
9      A. Yes.
10     Q. Can you look at the page 2,
11 which is UA production 56? Can you
12 please read the first email that you
13 sent to Jennifer Greer on June 26, 2017?
14     A. You want me to read this part
15 out --
16     Q. Yes.
17     A. -- loud? "As I understand it,
18 we do not send a separate/additional
19 letter of dismissal. We place a hold on
20 their next-semester registration and put
21 the department's letter into their file.
22 That's it. But records here do not show
23 that we were notified. Let me know what

Page 16

1 you and Norma think and whether we
2 should proceed with the hold. Thanks."
3      Q. Yes. Thank you for reading
4 that. Here you are telling that, "As I
5 understand, we do not send a separate or
6 additional letter of dismissal." Is it
7 contrary to your previous testimony?
8      A. We have a registrar who handles
9 these processes. And in cases that are
10 infrequent, I consult with her. And, at
11 this point, she explained to me that we
12 put a hold on the student's record. And
13 so I didn't know at that time that we
14 send a letter documenting that hold.
15     Q. So your final position is that
16 you send a letter. Is that correct?
17     A. We do.
18     Q. And --
19     A. But we are not dismissing the
20 student; the student has already been
21 dismissed, but our letter suspends the
22 student's registration.
23     Q. Yes. But, anyway, you send a

Page 17

1 letter to the student?
2      A. Yes, we do.
3      Q. I see. So on June 26 at 4:42
4 p.m. that you wrote this email, you
5 didn't have adequate knowledge about
6 this process. That is --
7      A. Right.
8      Q. -- why you told "as I
9 understand"?
10     A. Right.
11     Q. Very good. And can you please
12 read the next email in the same page?
13     A. From Jennifer Greer?
14     Q. Yes.
15     A. "I'm meeting with Norma
16 tomorrow. It's interesting that this
17 was sent a month ago and the Grad School
18 was not notified. After a program
19 dismisses a student, does the Graduate
20 School also notify them? In grad
21 school, they are admitted to a program
22 and the Grad School at the same time,
23 contrary to the undergraduate

5 (Pages 14 - 17)

Page 18

1 experience."
2    Q.  Thank you for reading that.
3 And can you explain the meaning of this
4 email?
5    A.  Yes.  The -- what I had just
6 referenced about the -- the parallel
7 processes that are central and
8 decentralized.
9    Q.  Yes.
10   A.  She's explaining that, upon
11 admission, the Graduate School notifies
12 a student that they are admitted, and
13 the department notifies the student that
14 they are admitted.  She says "at the
15 same time."  Generally the department is
16 first, and then they notify the Graduate
17 School, and we follow with the official
18 letter.
19   Q.  But I remember that the
20 Department of Physics should only notify
21 the student, not the Graduate School.
22   A.  About admission or about
23 dismissal?

Page 19

1    Q.  About dismissal.
2    A.  The department notifies the
3 student -- the department makes the
4 decision.
5    Q.  And the --
6    A.  The department notifies the
7 student.  The Graduate School places a
8 hold on the student's registration.  The
9 Graduate School notifies the student
10 that the -- the dismissal from a program
11 results in suspension from the Graduate
12 School and a hold on the registration.
13 So we manage the -- the registration
14 process, and so we put a hold on the
15 registration, and that -- it's the --
16 the bureaucratic part of a dismissal.
17   Q.  I see.  So a person who is
18 being dismissed, the student who is
19 being dismissed will receive two
20 letters, one from Physics Department,
21 the other from the Graduate School?
22   A.  That is the norm.
23   Q.  Very good.  Do you know if I

Page 20

1 have received a letter from Physics
2 Department at that time?
3    A.  I believe that you had.
4    Q.  That I was dismissed?
5    A.  Yes, the email.
6    Q.  I -- I did not receive any
7 email that tells me I was dismissed.
8    A.  (Nods affirmatively)
9    Q.  Have you seen an email that
10 I -- I was dismissed?
11   A.  I have seen an email that
12 contained the committee recommendation
13 and an email from the chair that says
14 that he will follow the recommendation.
15      MR. AMIRI:  So let me introduce
16 that document as Exhibit Number 3.
17      (PLAINTIFF'S EXHIBIT NO. 3
18 MARKED)
19      MR. DYKES:  Susan, let me see
20 that.
21      THE WITNESS:  (Tenders
22 document)
23      MR. DYKES:  Thank you.

Page 21

1 (Reviews document)  Now, this has more
2 than just that one email.
3      MR. AMIRI:  Yes.  This is the
4 same document that I used in
5 Dr. LeClair's deposition.
6      MR. DYKES:  Is it?  Okay.
7      MR. AMIRI:  This is ten pages,
8 and the title is "Contingent
9 Recommendation," so it has all the
10 emails on there.
11 BY MR. AMIRI:
12   Q.  So here is that email that you
13 mentioned.  It's produced on page
14 number 8.  Is -- is it -- is that
15 correct?
16   A.  This one?  (Indicating)
17   Q.  Yes, that one.  Yes, that is
18 correct.
19      MR. DYKES:  That is, yeah, 8
20 of 10.
21 BY MR. AMIRI:
22   Q.  So the title of this email is
23 "Graduate support status," so it is not

6 (Pages 18 - 21)

Page 22

1 about dismissal. And in the email,
2 there is nowhere that it says, "You are
3 dismissed." Is this correct?
4    A.   That is --
5       MR. DYKES:  Object to --
6    A.   -- correct.
7       MR. DYKES:  -- the form. But,
8 yeah, you can answer.
9    A.   It doesn't use the word
10 "dismiss."
11 BY MR. AMIRI:
12    Q.   So do you think that the letter
13 of dismissal should use the word
14 "dismiss" or not?
15    A.   It would have been clearer to
16 you if they had used the word "dismiss,"
17 but they're not required to use a
18 certain word. They're required to
19 communicate the decision, but it would
20 have been clearer to use the word
21 "dismiss."
22    Q.   But he used the word "graduate
23 support status," and he tells that in

Page 23

1 the next semester I will not have
2 graduate support from Physics
3 Department, which means the next
4 semester, I will register -- I will
5 continue my education, but I need to pay
6 the fees and tuitions. Is this correct?
7    A.   That would be correct if he did
8 not have the sentence at the end of
9 paragraph two, but it's the sentence at
10 the end of paragraph two that
11 communicates the decision of the
12 committee and says that he will follow
13 their recommendation. That's -- that is
14 the -- the communication that references
15 the committee's recommendation.
16    Q.   The committee recommended a few
17 options.
18    A.   Did they?
19    Q.   Yes. And it is in pa -- next
20 page, page 9.
21    A.   Um-hum.
22    Q.   Is it their same recommendation
23 you have seen?

Page 24

1    A.   Yes.
2    Q.   Yes. I have objections to the
3 validity of this recommendation. I'm
4 thinking -- thinking that this is
5 illegal and it cannot be produced in
6 this way. I mean, these people who
7 created this document, I think their
8 action is unlawful, against the rules
9 and procedures of UA. But, for the time
10 being, I'm not going to discuss that.
11 This is -- this is a recommendation, and
12 the head of the department, the chair of
13 department, can take recommendation or
14 reject that. And it has different
15 recommendations. It says that the head
16 of department, or a person who
17 considered this, can change the graduate
18 support status or he can dismiss the
19 student. And in the previous page, as
20 you read, Dr. LeClair is taking that "I
21 have to follow the recommendation," and,
22 based on that, he's terminating my
23 graduate support, I mean the one that

Page 25

1 department is supposed to pay to me. So
2 he's following the recommendation by
3 removing my graduate support.
4    A.   That isn't --
5       MR. DYKES:  Object to the form.
6       You can answer the que- -- go
7 ahead and answer.
8    A.   Right. That isn't what he
9 said.
10 BY MR. AMIRI:
11    Q.   So what he said, he said, "I'm
12 following the recommendation." Is this
13 correct?
14    A.   He says that.
15    Q.   So what is their
16 recommendation?
17    A.   The recommendation is the
18 sentence at the end of the first
19 paragraph from the committee.
20    Q.   Can you please read that?
21    A.   It says -- it's a long
22 sentence. It's the whole paragraph.
23 "In the case of graduate student Ali

7 (Pages 22 - 25)

Page 26

1 Amiri, based on the student's
2 demonstrated lack of progress in
3 research and disrespectful conduct
4 toward faculty advisors, colleagues, and
5 members of the academic community, the
6 Physics Department Graduate Advising
7 Committee considers that the student is
8 in violation of the Good Academic
9 Standing clause of the Departmental
10 Graduate Handbook, and, therefore, we
11 recommend that the student should not
12 receive financial support from the
13 Department of Physics and Astronomy and
14 should be dismissed from the Physics
15 graduate program." So --
16    Q.   So --
17    A.   -- that last --
18    Q.   -- this is -- this is --
19    A.   -- part --
20    Q.   -- two --
21    A.   -- is the recommendation.
22    Q.   This is two recommendations,
23 and the person who adopting the

Page 27

1 recommendation have their -- I mean,
2 these two different recommendation are
3 in contrast with each other.  If a
4 student is going to be dismissed, there
5 will be no next semester.
6    A.   That is correct.
7    Q.   Then in next semester, why he
8 talking about the graduate support
9 status?
10    A.   I can't explain the heading --
11 the subject line of the email.  The
12 message of the email is not completely
13 contained in a subject line of the
14 email.
15    Q.   This is not email.  This is
16 that you read is a letter that they gave
17 to Dr. LeClair.
18    A.   I thought you were
19 referencing --
20    Q.   And it is on a pre- --
21    A.   -- the subject line of the --
22 of Dr. LeClair's email.
23    Q.   Yes.  No, I'm talking about

Page 28

1 the letter they gave to Dr. LeClair on
2 April 28, 2017.
3    A.   Yes, they made a
4 recommendation.
5    Q.   So they have recommendation.
6 One is -- the first one is to -- student
7 should not receive financial support
8 from the Department of Physics.  This is
9 one.  But the second one is more severe.
10 Should be dismissed from the Physics
11 graduate program.  So, if the
12 decision-maker adopt the second part,
13 which is to be dismissed, the first part
14 is nonrelevant, so they have one simpler
15 thing that is just remove the financial
16 support.  But the second one is more
17 severe, just dismiss the student, so
18 there would be no next semester.  And in
19 the email Dr. LeClair issues on page 8,
20 and it is on May 26, almost one month
21 later, he's talking about graduate
22 support status.  So when we have -- we
23 are talking about graduate support

Page 29

1 status, it means that the student is not
2 dismissed, but he adopted the less
3 severe punishment, based on the
4 recommendation.
5         MR. DYKES:  Object to the form.
6    A.   He didn't say that.  I think
7 if -- if Dr. LeClair were going to split
8 that recommendation into two
9 recommendations and agree with one half
10 and not agree with the other half, he
11 would have said that.  He would have
12 said, "I will follow the committee's
13 recommendation here but not here."
14 BY MR. AMIRI:
15    Q.   But --
16    A.   He did not say that.
17    Q.   But the two parts are not
18 consistent with each other.  You have to
19 choose one or the other; you cannot
20 choose both.
21         MR. DYKES:  Object to the form.
22    A.   I think you can choose both.
23 You -- you are correct, that, if they

8 (Pages 26 - 29)

Page 34

1  support."
2      Q.  So Dr. LeClair, who sent that
3  email, testifying under oath that I was
4  not dismissed at that time.
5          MR. DYKES:  And I'm going to
6  object to -- that is not his complete
7  testimony and does not include his later
8  testimony.
9          MR. AMIRI:  Yes.  We can go to
10  that.
11  BY MR. AMIRI:
12      Q.  Can you read from line 23 of
13  this page and continue to the next page?
14      A.  "So the e-" --
15          MR. DYKES:  Which page is that?
16          MR. AMIRI:  This is page 58 of
17  the --
18          MR. DYKES:  It's still 58,
19  okay.
20          MR. AMIRI:  -- transcript.
21  Yes.
22      A.  "So the email that you sent me
23  on May 26th, on that day I am not

Page 35

1  dismissed?  I am not in good academic
2  standing.  Is this correct?"
3  BY MR. AMIRI:
4      Q.  And what is the answer?
5      A.  "On that day, yes."
6      Q.  So, in this minute, in this
7  part of testimony, Dr. LeClair says that
8  I was not dismissed.
9          Can you --
10          MR. DYKES:  Same objection.
11  That is not his complete testimony.
12  BY MR. AMIRI:
13      Q.  Can you go to the next page,
14  which is page 77 of transcript -- the
15  transcript?
16      A.  (Witness complies)
17      Q.  So in -- from line 17, can you
18  read on to line 22?
19      A.  "So then let's look at Exhibit
20  Number 4, page 8.  So this email is
21  about graduate support status that is
22  sent on the 26th.  And, at this point,
23  I'm not dismissed.  Is this correct?"

Page 36

1          "On that date, correct."
2      Q.  So he answered twice that, on
3  that date, I was not dismissed, twice.
4          MR. DYKES:  Same objection.
5  BY MR. AMIRI:
6      Q.  Yes.  It is not complete
7  testimony, but he twice testified that I
8  was not -- I was not dismissed on that
9  time.
10          Can you go to next page, which
11  is page 78 of the transcript, and read
12  Dr. -- Mr. Dykes' answer from line 14?
13      A.  "Well, I -- well, I think that
14  this letter that Patrick sent on
15  May 26th and the University's position
16  is that's when you were dismissed.  I
17  understand his testimony.  There's the
18  letter from the dean in June that says
19  you were dismissed from the Physics
20  program, and, as a result, were being
21  suspended from the Graduate School, but
22  you have all the documents that we
23  have."

Page 37

1      Q.  Yes.
2          MR. AMIRI:  So I include your
3  answer as well.
4  BY MR. AMIRI:
5      Q.  When did the --
6          MR. DYKES:  But you included
7  mine.  You didn't include Dr. LeClair's
8  later answers --
9          MR. AMIRI:  Yes.
10          MR. DYKES:  -- did you?
11          MR. AMIRI:  It is in
12  transcript.  We can file it on the -- on
13  the briefs that we will have with the
14  court.
15          MR. DYKES:  Okay.
16  BY MR. AMIRI:
17      Q.  But you see Dr. LeClair is not
18  accepting that I am dismissed, until the
19  attorney -- the counsel of the
20  University tells him that, "Our position
21  is not this."  How will you explain
22  that?
23          MR. DYKES:  Object to the form.

10 (Pages 34 - 37)

Page 38

1    A.  Yeah, I don't think I can
2 explain that.  I would need to be
3 talking with Dr. LeClair and ask him
4 what he meant here and what he meant
5 there and how he understood the term and
6 how he understood the relationship
7 between what the department does and
8 what the Graduate School does.  I -- I
9 would need to ask him that --
10 BY MR. AMIRI:
11    Q.  Yes.
12    A.  -- question.  I don't think I
13 can explain anything, based on what I'm
14 seeing here.
15    Q.  Yes, based on testimon- -- I
16 mean, based on what Mr. Dykes,
17 University counsel, is saying is that --
18 Mr. Dykes is saying, "I understand his
19 testimony.  There is the letter from the
20 dean in June that says that you were
21 dismissed from the Physics program."  So
22 when the head of the department, who
23 wrote the email, and, in his email, he

Page 39

1 doesn't say the word "dismissed" and
2 under oath he doesn't accept that I was
3 dismissed, until the -- until counsel of
4 the University warns him --
5        MR. DYKES:  Object to --
6 BY MR. AMIRI:
7    Q.  -- is it --
8        MR. DYKES:  -- I object to that
9 I warned him.
10        MR. AMIRI:  I mean, you correct
11 him.
12        MR. DYKES:  I placed an
13 object- --
14        MR. AMIRI:  I'm sorry; you
15 correct him.
16        MR. DYKES:  I -- I -- I put an
17 objection and --
18        MR. AMIRI:  No problem.  I
19 mean, the --
20        MR. DYKES:  Yeah, it speaks for
21 itself.
22        MR. AMIRI:  The deposition --
23 deposition is there, yes.

Page 40

1 BY MR. AMIRI:
2    Q.  And is it the position of the
3 dean to tell that, that Physics
4 dismissed you?  The Physics Department
5 are not -- are not telling that "we
6 dismissed you."  Is it your position
7 that you tell me that I was dismissed?
8 I mean, you can speak for Graduate
9 School.  You cannot --
10    A.  I'm --
11    Q.  -- speak for Physics.
12    A.  -- speaking for the Graduate
13 School.
14    Q.  Yes.
15    A.  We reviewed the documents and
16 verified that he was following the
17 recommendation of the committee, as he
18 said in the email, so we verified that.
19    Q.  How did you verify that?
20    A.  I asked Dr. LeClair if he was
21 following the recommendation of the
22 committee, as said -- as he said in the
23 email.

Page 41

1        (Witness hears thunder)  Whoo.
2        We did want to be sure that we
3 were acting in parallel fashion with
4 what the department had decided.
5    Q.  Did you send him email and you
6 asked him?
7    A.  I don't remember.  I know that
8 I asked him; I don't remember if it was
9 email or verbal.
10    Q.  And if it --
11    A.  And if it was email, then you
12 would have it.
13    Q.  Yes.
14    A.  I don't remember --
15    Q.  There is no email that -- I
16 didn't receive any email in the
17 productions that I had.
18        MR. DYKES:  You have all the
19 emails.
20        MR. AMIRI:  Yes.
21    A.  You have all the emails.
22 BY MR. AMIRI:
23    Q.  There is no email that

11 (Pages 38 - 41)

Page 42

1 Dr. Susan --
2   A.  Then it was verbal.
3   Q.  It was verbal.  Do you remember
4 when it was?
5   A.  It was before we sent our
6 letter.
7   Q.  How long before that?
8   A.  There was quite a short time
9 between when we were notified.  When I
10 learned that you had been dismissed, I
11 learned that we had not been notified
12 that you had been dismissed, so that we
13 could follow with our letter about the
14 registration hold.
15   Q.  So --
16   A.  So --
17   Q.  Yes.
18   A.  -- I verified the information
19 before we sent our letter.  I think
20 three days, four days.  I would have to
21 look at the date where my conversation
22 started.  You know, I wou- -- I didn't
23 know you.  And so the first time that I

Page 43

1 heard your name was with this matter,
2 and I verified whether the process had
3 been done correctly, and I saw that we
4 had not issued our letter.  I verified
5 the information, and we issued the
6 letter.
7   Q.  Yes.  In your letter you are
8 telling that -- it is in Exhibit 2, the
9 first page.  "The Graduate" --
10   A.  The June 29th letter?
11   Q.  Yes.  "The Graduate School
12 received notification from Department of
13 Physics that you have been dismissed."
14 What was the form of this notification?
15 Did they send you a letter?  Did they
16 send you an email?  How you was
17 notified?
18   A.  I don't remember how I was
19 notified, whether it was email or
20 verbal.
21   Q.  So probably that was verbal as
22 well?
23   A.  It may be.

Page 44

1   Q.  But why do communications with
2 Physics Department is all verbal?  I
3 mean, you need to communicate with
4 letters or at least emails.
5   A.  At some point they did forward
6 me the decision of the committee and
7 Dr. LeClair's email to you.  So I
8 received those documents before we wrote
9 our letter.
10   Q.  So here you are telling me that
11 the Graduate School received
12 notification from Physics Department.
13 Can you explain how it can be verbal?
14   A.  Notification can be verbal.
15   Q.  Somebody calls from Physics
16 Department to your office and tells that
17 one student is dismissed?
18   A.  That can happen.
19   Q.  So what is your recollection of
20 how -- what -- how it happened in this
21 case?
22   A.  My recollection of how it
23 happened in this case is that there were

Page 45

1 discussions between you and someone, and
2 I don't remember if it was Dr. Han or
3 Jennifer Greer.  We were all in a
4 conversation about your status.
5   Q.  But, if the Physics Department
6 did not notify you, how do you fir- --
7 start this kind of discussions?
8   A.  The Physics Department . . .
9   Q.  So when the Physics -- the
10 question is that how you un- -- how you
11 was notified.
12     MR. DYKES:  And I think she's
13 answered that.
14   A.  I learned of the discussion
15 with you about your status, and I asked
16 for -- I asked for information: "What
17 happened?  Please explain Dr. Amir-" --
18 "Mr. Amiri's situation.  Please explain
19 what's happening with Ali Amiri's
20 situation."  And then --
21   Q.  So --
22   A.  -- Patrick LeClair forwarded
23 me.

12 (Pages 42 - 45)

Freedom Court Reporting
877-373-3660          A Veritext Company          205-397-2397

Page 46

1    Q.  So from whom you learned?  I
2  mean, who was the first person who told
3  you there is a dispute here, there is a
4  problem here?
5    A.  I don't remember if it was
6  Luoheng Han or Jennifer Greer.
7    Q.  I see.  So you --
8    A.  But I generally hear about
9  disputes that involve graduate student
10  status.  So one of them brought me into
11  the conversation.
12    Q.  So it --
13    A.  And I asked for explanation, so
14  I could understand what your status was.
15    Q.  I see.  So the first time that
16  you heard about me, it was not from
17  Physics Department, it was from one of
18  other members, either Dr. Han or
19  Dr. Jennifer?
20    A.  I believe so, yes.
21    Q.  And then you contact probably
22  Physics Department, and they told, yes,
23  I was --

Page 47

1    A.  And I asked for the documents.
2    Q.  And they -- then they forward
3  to.
4    A.  (Nods affirmatively)
5    Q.  So in -- in your email that you
6  are telling that the Graduate School
7  received notification from the
8  Department of Physics, so the correct --
9  it would be better you say the Graduate
10  School contacted Physics Department and
11  learned that you was -- you were
12  dismissed?
13    A.  We could have said that, it is
14  true, but we also -- it is true, that we
15  received the notification.
16    Q.  Later.
17    A.  We acted on the receipt of the
18  notification, so we didn't act on a
19  verbal conversation.
20    Q.  So the --
21    A.  We acted upon receipt of the
22  notification.
23    Q.  And your notification is that

Page 48

1  email communication that is about -- the
2  title is the "Graduate support status."
3    A.  And, in conjunction with the
4  document it references, which is the
5  committee report.
6    Q.  Yes.
7    A.  So I received them both.
8    Q.  I see.  So --
9    A.  That is --
10    Q.  -- is --
11    A.  -- the notification --
12    Q.  -- attachment of the --
13    A.  -- on which I acted.
14    Q.  I see.  So there is no other
15  notification?
16    A.  (No response)
17    Q.  So there is no other written
18  not- -- notification if there is --
19    A.  There is no other written
20  notification.
21    Q.  I see.  So let us talk about
22  this recommendation.  And it is on
23  page 9 of the Exhibit Number 3.

Page 49

1    A.  Oh, 3.  (Reviews documents)
2  Yes.
3    Q.  And can you please tell me what
4  is the graduate advising committee?
5    A.  Can I tell you what is the
6  graduate advising committee?
7    Q.  Yes.
8    A.  No.
9    Q.  So can you explain who they
10  are, what is their duty, what is their
11  responsibility?
12    A.  No.
13    Q.  Why not?
14    A.  Because this is part of the
15  decentralized way that graduate programs
16  operate.  Different programs operate in
17  different ways.  So I can speak very
18  generally about how I know that many
19  graduate advising committees work, but
20  it -- what I say could not be held to
21  scrutiny about how the Physics Graduate
22  Advising Committee works.  I would have
23  to ask them, because it -- they operate

13 (Pages 46 - 49)

1  in a decentralized way. I don't control
2  them. They make decisions because they
3  are the ones who monitor and assess the
4  academic progress of the student. And
5  each department has a different way of
6  doing that. And so, I am not familiar
7  with the details of how the graduate
8  advising committee in Physics works.
9     Q.  May I ask what is your own
10 major?
11    A.  My Ph.D. is in literature.
12    Q.  And you have a Ph.D. I mean,
13 like all disciplines, you have bachelor
14 degree, then master degree, then Ph.D.?
15    A.  Right.
16    Q.  And did you have a dissertation
17 committee in your studies?
18    A.  I did have a dissertation
19 committee, but my department operated
20 quite differently. I could go -- we
21 op- -- they operated often as a
22 committee of the whole, so it had a
23 dissertation committee and a committee

1  of the whole. So that's a unique way of
2  operating that my university had --
3     Q.  So it is different from
4  Physics --
5     A.  -- that other universities
6  don't have.
7     Q.  I see. So it is different
8  from Physics, you are telling me. And
9  then --
10    A.  And -- yes.
11    Q.  Yes. Go ahead.
12    A.  Each department operates in its
13 own way.
14    Q.  So do you have -- did you have
15 any way to see if the Physics Department
16 is following the right procedure, or you
17 just trust them?
18        MR. DYKES: Object to the form.
19    A.  My role is to ensure that
20 process is followed. So when I received
21 this and they referenced the handbook, I
22 read the handbook to make sure that they
23 are operating in -- in concert with

1  their own process.
2  BY MR. AMIRI:
3     Q.  And the handbook was telling
4  that they are right?
5     A.  The handbook is telling that --
6  what the criteria are, and they echo
7  those criteria accurately, so they are
8  acting in accordance with their process.
9     Q.  And so your --
10    A.  So that's my only job.
11    Q.  So your research shows that the
12 graduate advising committee can decide
13 to remove a student from a program in
14 Physics. Yes?
15    A.  No, no, that is not stated in
16 the handbook, and that's not what they
17 are stating here. What they're doing
18 here is making a recommendation to the
19 department chair.
20    Q.  But, if they cannot make a
21 recommendation, it is contrary to the
22 rule, so you cannot accept them.
23    A.  I'm not following you.

1     Q.  Okay. A person who is making a
2  recommendation should be authorized to
3  make a recommendation. Do you see that
4  the graduate advising committee had the
5  power to make such a recommendation?
6     A.  The department chair said that
7  that's how they operate.
8     Q.  So this is how you confirm that
9  it is correct?
10    A.  Yes.
11    Q.  Did you have any other means of
12 fact-checking to check if the head of
13 department is telling the truth or not?
14    A.  No.
15    Q.  So basically you trusted on
16 Dr. LeClair. Is this correct?
17    A.  If Dr. LeClair is acting in the
18 way that the graduate handbook -- the
19 department handbook says he will operate
20 and it doesn't violate any University
21 guidelines as outlined in the graduate
22 catalog, then -- then I trust that the
23 process is appropriate.

14 (Pages 50 - 53)

Page 54

1    Q.   So it is based on trust on
2 Dr. LeClair basically.  Yes?
3         MR. DYKES:  Object to the form.
4    A.   And the faculty.
5 BY MR. AMIRI:
6    Q.   So, if you was not trusting
7 Dr. LeClair for any reason, just suppose
8 that you wouldn't trust Dr. LeClair, how
9 you would evaluate these letters?
10        MR. DYKES:  Object to the form.
11        You can answer if you can.
12   A.   I would ask for the grounds, on
13 what grounds was the decision made.
14 BY MR. AMIRI:
15   Q.   Did you ask them for the
16 grounds in this case?
17   A.   I think the grounds were clear.
18   Q.   Can you tell me what is the
19 grounds?
20   A.   The grounds were demonstrated
21 lack of progress in research and
22 disrespectful conduct toward faculty
23 advisors, colleagues, and members of the

Page 55

1 academic community, referencing the Good
2 Academic Standing clause of the
3 departmental graduate handbook.  So my
4 investigation was to read and understand
5 that.
6    Q.   So how you can verify that the
7 students has lack of progress in
8 research?
9    A.   There we trust the committee
10 and the faculty.  That's a very -- that
11 is a determination where the student
12 seldom agrees with the advisors.
13   Q.   No, it is not the --
14   A.   Often --
15   Q.   -- from the student --
16   A.   -- advisors see lack of
17 progress; the student sees progress.
18   Q.   Very good point.  So here --
19   A.   There is seldom agreement on
20 that point.
21   Q.   Between the student and
22 advisor.  Is this correct?
23   A.   Right.  The student thinks that

Page 56

1 they have made progress; the advisor
2 says that progress is not being made or
3 is not being made in a satisfactory way.
4 There is almost never agreement on that.
5    Q.   But the problem here is that my
6 advisors did not sign this document.
7 The people who signed this document did
8 not have qualification to even
9 understand my research.  They were high
10 energy physicists or particle physicists
11 and astronomers.  They cannot understand
12 my research.  The people who was in
13 my -- who were in my dissertation
14 committee, all of them was specialized
15 in my area.  They did not sign this
16 document.
17        MR. DYKES:  Object to the form.
18        You can answer.
19   A.   I would need to ask the
20 graduate advising committee how they
21 arrived at their determination.
22 BY MR. AMIRI:
23   Q.   So, at that time, you did not

Page 57

1 ask them?
2    A.   No.
3    Q.   Did you ask me if I have any
4 objection to them?
5    A.   No.
6    Q.   Why you did not ask me?
7    A.   It's rare that a student would
8 agree that no pro- -- it -- that
9 unsatisfactory progress has been made.
10 I would not expect that you would agree
11 with that.
12   Q.   Well --
13   A.   But I would expect that the
14 advisor on the dissertation had made
15 some kind of communication about lack of
16 progress.  It is in the end the -- the
17 dissertation advisor who knows whether
18 progress is being made or progress is
19 not being made.
20   Q.   Okay.  Can you please look at
21 next page, page number 10 in that
22 Exhibit Number 3?
23   A.   (Witness complies)

15 (Pages 54 - 57)

Page 58

1    Q.  Can you please explain what is
2  this email?
3    A.  I -- I don't know.  Can I read
4  it?
5    Q.  Yes, please.
6    A.  (Reviews document)  The vice
7  president's faulty report.
8    Q.  Can you please read from
9  beginning, so it is good to -- yeah --
10    A.  "Recently I have received a
11  false document from Dr. LeClair."  Is
12  that --
13    Q.  Yes.  Please continue.
14    A.  Umm --
15        MR. DYKES:  How much do you
16  want her to read?  The whole email?
17        MR. AMIRI:  The -- the first
18  paragraph.
19        MR. DYKES:  Okay.
20    A.  "It seems that the document
21  is created due to the insecurity
22  aroused from the vice president's
23  faulty report.  In that report,

Page 59

1  Dr. LeClair is accused of plagiarism
2  and fabrication.  Obviously such a thing
3  has never been in my report.  My report
4  for research misconduct is only against
5  Dr. Gupta.  And it is a true claim, and
6  I will definitely prove all of the
7  claims, including plagiarism.  The NSF
8  inspector general will handle this
9  case."
10  BY MR. AMIRI:
11    Q.  Have you received this email?
12    A.  I don't think so.
13    Q.  Yes, the emails produced shows
14  that you have received this email.
15    A.  Okay.
16    Q.  So here I'm telling that
17  Vice President Carl Pinkert accused
18  Dr. LeClair on plagiarism based on my
19  report.  This shows that Dr. LeClair
20  has a conflict of interest to make a
21  decision.  Is this correct?
22        MR. DYKES:  Object to the form.
23    A.  I don't know.

Page 60

1  BY MR. AMIRI:
2    Q.  But you have received the
3  email?
4    A.  And you say he is accused of
5  plagiarism and fabrication.  Do you mean
6  by the vice president?
7    Q.  Yes.
8    A.  I haven't seen that report.  I
9  will say that I was aware of
10  conversations between -- with the Office
11  of Research and your situation, but I
12  have not explored, investigated, or gone
13  near that in any way because that is not
14  my area, and so I -- I'm unaware of what
15  you said, what the vice president said,
16  what Patrick said.  I haven't read those
17  documents, I don't have context, and I'm
18  very careful not to interpret from
19  documents I haven't read.  So I would
20  not n- -- n- -- I would not draw a
21  conclusion from this paragraph of any
22  kind, positive, negative.  I would not
23  draw a conclusion from this paragraph.

Page 61

1    Q.  I see.
2    A.  And I would not ask for the
3  report either.  If I needed to know, I
4  would ask for the report and I would
5  study it.
6    Q.  Okay.
7    A.  But I never have asked for that
8  report, haven't seen the report, and
9  don't -- that wou- -- would interfere
10  with my job because this is not my area,
11  and so I have not sought or received any
12  details about what you accused them of,
13  what the investigation showed, what the
14  response was, or who was involved in it.
15    Q.  Okay.  So earlier you testified
16  that the only notification you received
17  from Physics Department was this email
18  change -- chain and the attachment that
19  was the recommendation.
20    A.  That's correct.
21    Q.  This is the same email chain,
22  so when you read that, that email chain
23  has had this email as well?

16 (Pages 58 - 61)

Page 62

1    A.  Hmm.
2    Q.  And this email clearly shows
3  that Dr. LeClair is un- -- under
4  investigation by Vice President Carl
5  Pinkert.  So when the chair of Physics
6  Department --
7    A.  I -- I actually don't see that,
8  but I s- -- I understand what you're
9  saying.
10   Q.  Here on --
11   A.  Yeah.
12   Q.  -- the first paragraph you
13  read.
14   A.  It says that he is under
15  investigation?
16   Q.  He's -- he's --
17   A.  I mean, no, this is the first
18  time I'm hearing that there is an in- --
19  under investigation.  This is so not my
20  area, so I don't interpret this.  I --
21   Q.  But --
22   A.  -- trust that, if the Office of
23  Research has been involved, that they

Page 63

1  are taking care of any issue that I
2  would need to know about, and I would
3  hear from them if any of this impacted
4  my area of responsibility.
5    Q.  The Office of Vice President is
6  conducting an investigation against
7  Dr. Patrick LeClair.
8        MR. DYKES:  Object to the form.
9        MR. AMIRI:  I'm not -- I didn't
10  ask a question to be a form.
11       MR. DYKES:  Well, but --
12       MR. AMIRI:  I'm explaining the
13  situation, and then I will ask a
14  question.
15       MR. DYKES:  I'm objecting, one,
16  you've -- to your interpretation of the
17  document.  I'm just putting an objection
18  on the record.
19       MR. AMIRI:  No, it isn't about
20  the document.  I'm telling the -- what
21  was there.
22       MR. DYKES:  No, you're saying
23  that the -- that Dr. Pinkert is

Page 64

1  investigating Dr. LeClair.  So I am just
2  putting an objection on the record.
3  That's all I was doing.
4        MR. AMIRI:  Okay.
5  BY MR. AMIRI:
6    Q.  So Dr. -- vice president was
7  investigating research misconduct, and
8  he come to the point that Dr. LeClair
9  has plagiarized as well.
10       MR. DYKES:  Object to the form.
11  BY MR. AMIRI:
12   Q.  And then Dr. LeClair is trying
13  to dismiss the student whose work was
14  plagiarized, and you collaborated with
15  Dr. LeClair, and the Pinkert
16  investigation failed.  This is my side
17  of the story; this is my position.
18       So, if you was not
19  collaborating with Dr. LeClair, the
20  Pinkert investigation was going to reach
21  to a result.  But, since you started
22  supporting Dr. LeClair, and, based on
23  your letters, there was some police

Page 65

1  operations; the Pinkert investigation
2  was stopped.
3        MR. DYKES:  Object to the form.
4    A.  The Pinkert investigation was
5  stopped?
6  BY MR. AMIRI:
7    Q.  Yes.  Because, as a result of
8  this police operation, three professors
9  was dismissed.  Two Ph.D. students was
10  terminated.  One of them -- I was
11  terminated; the other one was kind of
12  changed his direction totally, his
13  dissertation --
14   A.  Hmm.
15   Q.  -- changed, and three
16  professors was terminated, either as
17  retirement or other form, and it was in
18  this same time.  It was in July 2017.
19  If you was not adopting the
20  recommendation of Dr. LeClair, it
21  wouldn't happen.
22       MR. DYKES:  Object --
23   A.  If who wasn't --

17 (Pages 62 - 65)

Page 66

1      MR. DYKES: -- object to the
2 form.
3      A.   -- a- -- who -- who? If who
4 wasn't adopting the recommendation of
5 Dr. --
6 BY MR. AMIRI:
7      Q.   Of Dr. LeClair --
8      A.   -- LeClair? Who?
9      Q.   -- yes.
10     A.   If who?
11     Q.   You -- you.
12     A.   I --
13     Q.   That Dr. --
14     MR. DYKES: Are you -- are you
15 trying to say that, as a result of her,
16 there were three Ph.D. students who lost
17 their -- who left the program and three
18 people got fired and -- is that -- is
19 that what you're saying? Is that -- I'm
20 just trying to understand your question.
21     MR. AMIRI: What I told is on
22 the record.
23     MR. DYKES: Okay.

Page 67

1      THE WITNESS: I didn't
2 understand it either.
3 BY MR. AMIRI:
4      Q.   Okay. Let me -- let's read
5 this email.
6      A.   I mean, I didn't understand if
7 there was a question for me.
8      Q.   Yes. Let me ask in smaller
9 questions.
10     A.   Yeah.
11     Q.   So this email chain that you
12 received and you are seeing it as a
13 notification from Physics Department,
14 this same email chain has my objection
15 to the letter and to the recommendation.
16 I objected to the graduate support
17 status, and I objected to the
18 recommendation, and you received it in
19 the same time when they forward it to
20 you. All the email chain was complete.
21 So why you read the part that
22 Dr. LeClair wrote and you didn't read
23 the part that I wrote? It was in the

Page 68

1 same email chain.
2      A.   I knew that you were objecting
3 to the conclusion that the committee
4 reached. Most students do object to the
5 conclusion that a committee reaches when
6 it's unfavorable.
7      Q.   Can you please read the second
8 paragraph of this letter?
9      A.   "From these five people who
10 have signed the false document,
11 Dr. Okada is on my dissertation
12 committee. But the other four people do
13 not have any information about my
14 research, or basically they don't know
15 anything about me. And I don't know
16 them as well. But, based on my general
17 information, all of these people are
18 decent people, and I have heard more or
19 less positive things about them from
20 their students. If they can sign a
21 document without having enough
22 information about the content, what the
23 rest of the people can do?"

Page 69

1      Q.   So is it understandable
2 statement?
3      A.   I understand your view of --
4 yes, your view is clear from that
5 paragraph.
6      Q.   I'm -- I'm not objecting to
7 those people. I'm saying they are
8 totally stranger to me. I don't know
9 them. They don't --
10     A.   That is what you are --
11     Q.   -- and they are astronomers --
12     A.   -- saying, and you are saying
13 that they don't have any information
14 about your research.
15     Q.   Yes. But I have a dissertation
16 committee and all of the people in my
17 dissertation committee are very
18 well-known professors. Why you should
19 adopt a recommendation from a group of
20 people who doesn't have qualifications?
21 They don't know me; they cannot
22 understand my research. And you don- --
23 you didn't ask my dissertation

18 (Pages 66 - 69)

Page 70

1  committee, who all of them was -- or
2  five of them was working on condensed
3  matter physics.
4      One of them was the director of
5  Microfa- -- -fabrication Facility,
6  Dr. Subhadra, so. The other was vice
7  director of the MINT Center, Dr. Arunava
8  Gupta. The other is Dr. LeClair, chair
9  of Physics Department. The other is
10  Sarker Sanjoy, who was the principal
11  investigator of the NSF project. The
12  fifth one is Dr. Gary Mankey, who was
13  the graduate director for four years and
14  recently was -- changed his position.
15      So all these five people was
16  working on condensed matter physics,
17  which is my specialty. It is about
18  computer sciences, material sciences.
19  It --
20      A. Sure.
21      Q. -- has nothing about astronomy.
22  And these people who signed the
23  document, even a person with high school

Page 71

1  information does understand that
2  astronomer doesn't know much about
3  material science. The condensed matter
4  is material science. It is about
5  computer technology, how we can make
6  transistor chips --
7      A. Um-hum.
8      Q. -- those kind of stuff. And I
9  clearly explained to you that these
10  people who signed the document, they are
11  not in my dissertation committee. I
12  don't know them; they don't know me.
13  And I showed to you that I don't have
14  any personal problem. I told you that
15  more or less they are decent people, but
16  I don't know them. So how you can adopt
17  their -- their recommendation when I
18  clearly showed that they don't qualify
19  to make this recommendation?
20      A. I --
21      MR. DYKES: Object to the form.
22      Go ahead.
23      A. -- have not asked the committee

Page 72

1  on what evidence they gather to arrive
2  to a conclusion. I can tell you how
3  such committees generally operate, but I
4  have not asked them, and so I -- I --
5  I'm concerned that -- that you would
6  assume I have more knowledge than I do
7  about how that committee operates. But
8  I can tell you how such committees
9  generally operate.
10  BY MR. AMIRI:
11      Q. You can go ahead and explain
12  it, please.
13      A. Often when decision are made
14  about reviewing a student's progress, a
15  single group reviews all of the students
16  in the department. There is input from
17  the director. In my own past -- this
18  would be better if I -- if I talk about
19  my experience -- such a committee asks
20  each director of students at a certain
21  point in their career, "What is the
22  progress?" And then that committee
23  looks at the progress and makes

Page 73

1  decisions. The reason that it's a
2  separate committee and it is not unusual
3  that you would not know them and that
4  they would not be in your subarea of
5  specialization is because it brings a
6  level of evenness and objectivity to
7  what is a life-changing decision. So
8  one would not want different students
9  treated in different ways based on
10  anything subjective. It's an attempt to
11  be objective, to be one distance
12  removed, and make decisions. The
13  sixth-year decision is simple from that
14  committee's perspective, even though it
15  is life changing and so important. The
16  question is, based on the progress so
17  far, is the student likely to finish
18  within the legal time frame of seven
19  years? "Yes" or "no"? And they look at
20  whatever information they look at -- and
21  I -- tha- -- this is the part that I
22  don't know, so I'm the wrong person to
23  ask this question to. Based on what

19 (Pages 70 - 73)

Page 74

1 they have in front of them, they make a
2 decision, and they attempt to be
3 evenhanded in the way that they assess
4 this, so that they're using a similar
5 rubric for all students. So you're
6 saying that they -- they should be
7 specialists in your subarea, and I'm
8 saying that such a decision has more
9 validity by being one step removed from
10 the content of the dissertation to the
11 question "Is there progress? Is the
12 progress satisfactory? Is the progress
13 sufficient? Is the student likely to
14 finish in seven years?" This is year
15 six, so there is one year left. "Is the
16 student going to finish?" The committee
17 is large, again, to add to the
18 objectivity. So there are multiple
19 people at the table with experience with
20 multiple students.
21     I can tell you that I know very
22 little about your subject area, but I
23 could very comfortably sit on such a

Page 75

1 committee, because the questions are the
2 same for every student in every academic
3 field. "Has there been progress? Tell
4 me about the progress. Is the student
5 likely to finish within the time frame,
6 based on the history? How are we doing
7 here? Is everything moving forward?"
8    Q. Very good.
9    A. "Is this a successful student?"
10    Q. Yes, very good.
11    A. So then that --
12    Q. I understand.
13    A. -- committee makes a decision.
14 And, again, they try to be fair. They
15 try to be even. They try to be
16 objective, and --
17    Q. But --
18    A. -- so --
19    Q. -- but this is your judgment,
20 yeah. So -- so --
21    A. My judgment?
22    Q. -- what -- what -- yeah.
23 Let -- let us get -- I mean --

Page 76

1     MR. DYKES: Before -- can --
2 can we take a -- we've been going about
3 an hour, and I do need to go to the rest
4 room.
5     MR. AMIRI: Just give -- give
6 us five more minutes and then --
7     MR. DYKES: Okay.
8 BY MR. AMIRI:
9    Q. So here --
10     MR. DYKES: That's fine.
11 BY MR. AMIRI:
12    Q. -- what you explain is in
13 general or it is applies to Physics
14 Department?
15    A. That is in general.
16    Q. Does it apply to all
17 universities, or it is in the University
18 of Alabama?
19    A. I don't think I could answer
20 that.
21    Q. I mean, how general it is? Is
22 it general statement for most of the
23 universities or it is only for the

Page 77

1 University of Alabama?
2    A. It is not only in the
3 University of Alabama.
4    Q. So it is more general -- it
5 is --
6    A. It is more general.
7    Q. So it is not specific to my
8 case?
9    A. No. So when I saw the
10 document, it fits the paradigm I know --
11    Q. Um-hum.
12    A. -- which is that a committee,
13 that is fairly large and considered
14 within the department to be
15 representative, has assessed the
16 progress, made a recommendation, so this
17 is consonant with how such decisions are
18 generally made.
19    Q. So this is your general
20 concept; it is not --
21    A. That is correct.
22    Q. -- the specific fact?
23    A. That is correct.

20 (Pages 74 - 77)

Page 78

1    MR. AMIRI: Okay. We can take
2 a break.
3    VIDEOGRAPHER: We are going off
4 the record at 10:10.
5    (A BREAK WAS TAKEN)
6    VIDEOGRAPHER: This begins
7 media unit 2. We're back on the record
8 at 10:22.
9 BY MR. AMIRI:
10   Q. And let's -- let's continue
11 from where we left.
12   A. Where was that? The --
13   Q. The last --
14   A. -- email.
15   Q. -- page of Exhibit Number 3.
16 I- --
17   A. This is your email --
18   Q. Yes.
19   A. -- to Robert Olin, yes.
20   Q. Yes. This is the reply of the
21 email that I received from Dr. LeClair
22 about graduate support status. I
23 appealed it to Robert Olin. I forwarded

Page 79

1 it to dean of Art and Science. This is
2 the email, but I copied Dr. LeClair as
3 well, Dr. Han, and Dr. Henderson. So I
4 copied everybody who was involved, but I
5 appealed it to Dr. Robert Olin.
6    You read -- you read the first
7 and second paragraph of this. Can you
8 please read the third paragraph?
9    A. "I know Dr. LeClair, probably
10 better than all of you. And he knows me
11 as well. Patrick has great leadership
12 skills and can make a group of people to
13 do something he wants to be done. But
14 creating this kind of false documents is
15 not a part of his personality. There
16 are other people behind this document,
17 which their name or signature is not in
18 the document. These people spend a lot
19 of time for these kind of things and are
20 less effective in scientific works. But
21 I don't want to fight with the Shadow.
22 And I think the people who signed this
23 document should be held responsible and

Page 80

1 they have to give their reasons for
2 their actions. And naturally they will
3 see the consequences of their unethical
4 action."
5    Q. Yes. Have you read this
6 statement before?
7    A. Yes.
8    Q. So you have seen this --
9    A. Yes --
10   Q. -- email?
11   A. -- I remember that paragraph,
12 yes.
13   Q. Yes. You previously in- -- I
14 mean --
15   A. I did not remember the first
16 paragraph, I did not remember that, but
17 I -- I -- I intentionally try not to get
18 involved in something --
19   Q. Yes.
20   A. -- that is an investigation, so
21 I did not remember that. But I have --
22 I do remember the third paragraph
23 because I was -- that paragraph

Page 81

1 concerned my area of responsibility in
2 my work.
3    Q. I see. And you take a small
4 break and you go out and --
5    MR. DYKES: All right.
6 BY MR. AMIRI:
7    Q. -- come back (indiscernible) --
8    MR. DYKES: I -- I'm going to
9 object.
10   MR. AMIRI: Yes.
11   MR. DYKES: That's
12 insinuating -- I can tell you we didn't
13 talk about the email.
14   MR. AMIRI: Yes.
15   MR. DYKES: And if you want to
16 do something to file with the court and
17 address if you think that I have coached
18 my witness, you do it, but I take that
19 very seriously. I don't do that. And
20 you saw the documents were left here.
21 You saw us outside. We didn't have any
22 documents. So make those allegations --
23 you -- those are very serious, so you

21 (Pages 78 - 81)

Page 82

1 better have something to support that,
2 and you don't because it didn't happen.
3         MR. AMIRI: Which sentence I
4 told that you are that much concerned?
5         MR. DYKES: What I'm concerned
6 is what you have accused me of is going
7 out there and coaching my witness on
8 what to say.
9         MR. AMIRI: Did I use the
10 word --
11         MR. DYKES: Yo- --
12         MR. AMIRI: -- "coach"?
13         MR. DYKES: -- you said
14 you've -- and you've been out with your
15 lawyer on a break, so that insinuates
16 coach. So, we talked, which I can talk
17 to my witness. We didn't talk about the
18 email, and I have not in any way told
19 her anything to say, so.
20         MR. AMIRI: Well, if I want to
21 make such an allegation, I do it in the
22 form of a -- a summation later --
23         MR. DYKES: Yeah.

Page 83

1         MR. AMIRI: -- on. Can you
2 please let us continue?
3         MR. DYKES: Well, don't --
4 don't accuse me of wrongdoing --
5         MR. AMIRI: I'm thinking
6 that --
7         MR. DYKES: -- and expect me
8 not to --
9         MR. AMIRI: -- you are --
10         MR. DYKES: -- respond.
11         MR. AMIRI: -- attacking me.
12         COURT REPORTER: I -- I cannot
13 get two people talking at the same time.
14         MR. AMIRI: Yes. Yes, I'm
15 sorry.
16         COURT REPORTER: That's okay.
17         MR. AMIRI: Mr. Counsel, I'm
18 thinking you are trying to postpone
19 the -- I mean, you delay the deposition.
20         MR. DYKES: I'm not telling
21 her -- she can answer the question. I
22 just -- you insinuated that I was doing
23 something that is unethical, and I take

Page 84

1 my ethical -- ethical obligations very
2 seriously. So I'm saying, don't accuse
3 me of that, unless you have something to
4 back it up on --
5         MR. AMIRI: Mr. Counsel --
6         MR. DYKES: -- and you don't.
7 So I'm done sa- -- I'm done talking. Go
8 ahead.
9         MR. AMIRI: Mr. Counsel, would
10 you please let us continue deposition?
11         MR. DYKES: I just said I'm
12 done talking. Go ahead.
13         MR. AMIRI: And thank you --
14 A. I don't --
15         MR. AMIRI: -- for that.
16 A. -- remember that paragraph
17 because I took a break; I remember this
18 paragraph because I read it very
19 carefully at the time.
20 BY MR. AMIRI:
21 Q. I see. So this paragraph you
22 just read --
23 A. Yes.

Page 85

1 Q. -- do you see there is any
2 threat in this paragraph, any bad
3 language, anything that is concern for
4 you?
5 A. It is a concerning paragraph to
6 me. It's ambiguous, and it could be
7 read as a threat or not a threat. But,
8 because it is ambiguous, I read it very
9 carefully. It caught my attention, and
10 it concerned me, because I didn't know
11 what you meant by these words.
12 Q. Well, I -- what I meant is
13 written there.
14 A. Well, no, the words can mean
15 many things, and this could mean one of
16 two things, and I wasn't comfortable
17 with the language because it could mean
18 one of two things.
19 Q. Um-hum. So what you did as a
20 consequence of reading this document?
21 Did you take any action based on this?
22 A. (Nods affirmatively)
23 Q. What you did?

22 (Pages 82 - 85)

Page 86

1    A.  I consulted with the person on
2  the campus who assesses threat because I
3  said -- I read this as a paragraph that
4  could mean one of two things.
5    Q.  So what is that person?  Who is
6  that person?
7    A.  That's Charlie Dorsey.
8    Q.  And what he told you?
9    A.  He told me that the threat --
10 he considered the threat to be low, and
11 I was relieved to hear that.  I'm glad
12 to hear that.  That's his job.  It's my
13 job to ask and his job to assess.
14   Q.  Is this the only thing you did?
15   A.  I think it is.  Did you have a
16 question that --
17   Q.  Well, your -- I am reporting to
18 you that there are some other people
19 behind this document, and you talked to
20 the police department, and they told you
21 that I'm credible person, the
22 possibility --
23       MR. DYKES:  Object to the form.

Page 87

1  BY MR. AMIRI:
2    Q.  -- of danger is low.  Did you
3  verify that the other people who made
4  this document is there any problem from
5  their side?
6    A.  I did not.
7    Q.  Why?
8    A.  Because they didn't present a
9  threat.
10   Q.  But did you see the picture?
11   A.  I did see the picture.
12   Q.  Can you explain what is that
13 picture?
14   A.  I cannot.
15   Q.  Why?
16   A.  I don't know what it is.
17   Q.  You don't know what is the
18 picture?
19   A.  I don't.
20   Q.  And you have a small picture in
21 that page.
22   A.  Yes.
23   Q.  Can you tell me what is in the

Page 88

1  picture?
2    A.  It's a -- a man in a robe
3  carrying a scythe.
4    Q.  Yes.  It is called "Grim
5  Reaper."  Is this true?
6    A.  Possibly.
7    Q.  So do you know who created
8  that?
9    A.  He also carries an hourglass.
10 I thought it was Father Time.
11   Q.  You had bigger --
12   A.  I don't know -- yes, I did, but
13 I don't -- but I don't know the image.
14 I don't recognize the image.
15   Q.  So does that image create any
16 concern on you who created this image?
17   A.  It did not.
18   Q.  Why?
19   A.  Because I -- I -- I don't draw
20 conclusions based on the image that in
21 itself is not threatening.  I was much
22 more concerned with your paragraph than
23 I am with that drawing.

Page 89

1    Q.  So this image based on your --
2  you are telling me that this image is
3  not threatening?
4    A.  The image by itself -- the name
5  is "The Shadow."  That's more
6  threatening than the image.
7    Q.  Well, so --
8    A.  I -- I don't think I would draw
9  a conclusion on this image.
10   Q.  But you did not do any
11 investigation on the person who created
12 this image?
13   A.  No, that would definitely not
14 be my job.
15   Q.  So whose job is that?
16       MR. DYKES:  Object to the form.
17   A.  I would ask Charlie Dorsey
18 whose job that is.  I don't know if it's
19 Charlie Dorsey's job, or if Charlie
20 Dorsey would trigger an investigation,
21 but it would not be my job.
22 BY MR. AMIRI:
23   Q.  So you receive an email that

23 (Pages 86 - 89)

Page 90

1 shows there is a conflict between a
2 graduate student and a professor, or a
3 group of professors, and your job is
4 only to assess the student and not the
5 professor. Is this correct?
6      MR. DYKES: Object to the form.
7      A. I make sure that the s- --
8 professors have followed a process that
9 has been codified. That's my job. And
10 I did do that. I didn't simply believe
11 them. I checked to make sure that they
12 had followed a process.
13     Q. Can you tell me what is that
14 process?
15     A. The process is that the
16 committee makes a recommendation that
17 does -- is aligned with criteria that
18 are laid out in the handbook, the
19 department handbook, so the student is
20 aware of the criteria that are being
21 used.
22     Q. No. We are not talking
23 about -- you are changing subject.

Page 91

1      MR. DYKES: No, she's answering
2 your question.
3      MR. AMIRI: No.
4      A. You asked what I did. That is
5 what --
6 BY MR. AMIRI:
7      Q. Yes, what --
8      A. -- I did.
9      Q. -- you did about professor who
10 created this image.
11     A. I don't know who created the
12 image.
13     Q. The name is all there. It is
14 Gary Mankey.
15     A. I see that -- that this picture
16 is under a sign with his name, but I
17 wouldn't assume that he created the
18 image. Someone walking by could create
19 the image. You could create the image.
20 I don't know who created the image.
21     Q. Did you do any investigation to
22 find out who created the image?
23     A. No. My job is to consult with

Page 92

1 the appropriate people, who would
2 investigate if they -- if it would be
3 appropriate to investigate. It's not
4 something I would ever investigate, who
5 created the --
6      Q. Can you please --
7      A. -- image.
8      Q. -- read the last paragraph?
9      A. "Finally, I have attached a
10 picture of a piece of art to this email.
11 Usually these artworks are erased in a
12 couple of days. But this special
13 artwork was untouched for more than five
14 months in fall 2015 and spring 2016. I
15 have some other artworks of this artist,
16 which will be presented later on in the
17 right time."
18     Q. So this doesn't create any
19 concern with you?
20     A. I don't know what that
21 paragraph means.
22     Q. Which part you don't know what
23 it means? Can you explain it?

Page 93

1      A. "Usually these artworks are
2 erased." I don't know what that means,
3 what genre of artworks these are. "This
4 special artwork was untouched for more
5 than five months." I don't know why --
6 I don't know what you -- what you are
7 implying by that observation. It's
8 "fall 2015 and spring 2016," I don't
9 know what that time period has to do
10 with what we're talking about. "I have
11 some other artworks." I don't know if
12 you took pictures or if you have
13 artworks. "Which will be presented
14 later on in the right time," I don't
15 know what that means. So no part of
16 this is clear to me in terms of -- of
17 the relevance or -- or what you intend
18 to communicate by that. None of it is
19 clear.
20     Q. Yes, what I am communicating is
21 clear. A group of professors get
22 together and created a contingent
23 recommendation, and the chair of Physics

24 (Pages 90 - 93)

Page 94

1 Department created that recommendation
2 to me one month -- almost one month
3 later. And I appealed this action to
4 the dean of Art and Science, and I
5 explained to him that this is not the
6 only image they are making out of these
7 kind of images, which has improper
8 content, which is not -- it should not
9 be in the academic setting. We
10 shouldn't have Grim Reaper in academic
11 setting. We shouldn't have anything
12 that shows any kind of improper content.
13 But I told that they usually erase that.
14 But, in 2015 and '16, for five months,
15 they did not erase this, this image. It
16 was meaningful. So do you think that
17 somebody should talk to me and say me --
18 tell me, so what was the story? Why you
19 are objecting this to grievance
20 procedure? Why you are telling it to
21 the higher authorities that there is
22 something wrong in this situation?
23      MR. DYKES: Object to the form.

Page 95

1      A. No.
2 BY MR. AMIRI:
3      Q. Why "no"?
4      A. Because if -- if there were
5 something that you're trying to
6 communicate, then the student should say
7 it.
8      Q. What do you mean by "say it"?
9 I wrote the email.
10      A. These are very vague sentences.
11 What is it you're trying to --
12      Q. So, if --
13      A. -- say?
14      Q. -- if the sentence is vague,
15 you should ask for clarification. You
16 should reply to the email, tell me,
17 "Here this sentence is vague. Here this
18 sentence is vague. Explain," and I
19 would explain more. But nobody replied
20 to this.
21      A. I would never do that.
22      Q. Why you never do that?
23      A. Because I don't -- I'm -- I'm

Page 96

1 not editing your email for clarity. If
2 you ask me something, I act on it. If
3 there is some action I should take that
4 I needed clarification on, I would ask.
5      But this is a kind of
6 insinuation made by a student who's
7 being dismissed from a program, who is
8 not saying that something should be
9 done, an action should be taken. I can
10 go back to the fact that -- that we have
11 a grievance process.
12      Q. Which is Dr. Robert Olin, the
13 highest authority who does the
14 grievance --
15      A. We don't start with the highest
16 authority. We start -- we have a very
17 defined grievance process. And sending
18 a picture of hallway art to the dean of
19 the college goes against everything we
20 try to do with the grievance process,
21 which is to --
22      Q. Do you know --
23      A. -- handle situations --

Page 97

1      Q. -- if I followed --
2           MR. DYKES: Would you please
3 let her finish her --
4           MR. AMIRI: Yes.
5           MR. DYKES: -- answer?
6 BY MR. AMIRI:
7      Q. What i- -- please make your
8 statements of this. Go ahead. Go
9 ahead. You finish, and then I will ask
10 my question.
11      A. The grievance process is
12 designed to give the student an
13 opportunity to explain the perspective
14 at the right levels with the right
15 investigation, the right documentation,
16 one level at a time, and most students
17 find that process to be fair and
18 equitable. And this email is not in
19 that process, and so it's not an
20 allegation that I would act on. I would
21 say to a student who wrote this -- and
22 you know that this is not addressed to
23 me -- I would say, "Follow the grievance

25 (Pages 94 - 97)

Page 98

1  process." That's what I would respond.
2  I wouldn't ask any questions. I
3  wouldn't draw any conclusions. I would
4  say to the author of this email, "Follow
5  the grievance process."
6      Q.  Did you tell me that?
7      A.  This email wasn't written to
8  me.
9      Q.  Okay. Are you part of
10  grievance procedure?
11     A.  I'm actually at the -- at
12  the -- beyond the college level, the
13  OAA, the Office of Academic Affairs
14  level. I would have been part of the
15  grievance process. But the grievance
16  process specifically involves not
17  skipping levels, so I would not skip a
18  level. I would say to the person who
19  wrote this email, "Follow the grievance
20  process."
21     Q.  So the question is, are you
22  part of the grievance procedure?
23     A.  I am at -- at the point that

Page 99

1  the grievance would come to me in the
2  chain.
3      Q.  So you are familiar with the
4  grievance procedure?
5      A.  I am familiar with it.
6      Q.  And do you know in 2016, I
7  started the grievance procedure
8  step-by-step from the bottom, and I've
9  been up to Dr. Olin, Robert Olin? Do
10  you know that?
11     A.  I did not remember that. If I
12  knew it, I don't remember it. Well --
13     Q.  But -- but, I mean, you are
14  telling me that I should follow
15  step-by-step. Yes?
16     A.  Yes.
17     Q.  And I'm telling you I did it
18  the previous year?
19     A.  Were you grieving something
20  different than this --
21     Q.  No. It was the actions of
22  these professors who was not letting me
23  to graduate because they was trying to

Page 100

1  steal my intellectual property. And I
2  went to Lisa Dorr. This is the first
3  step. Is this correct?
4      A.  Yes.
5      Q.  The second step is --
6      A.  Yeah, the first step is at the
7  department level, but sometimes people
8  talk with Lisa to understand the
9  process.
10     Q.  Who is the highest in the
11  department?
12     A.  The -- in the department?
13     Q.  Yes.
14     A.  The chair.
15     Q.  The chair is trying to steal my
16  intellectual property. Then what is the
17  next step?
18     A.  I'm -- I think -- I am unsure
19  about whether theft of intellectual
20  property would be handled through the
21  grievance process or through the Office
22  of Research --
23     Q.  But --

Page 101

1      A.  -- Misconduct.
2      Q.  No, not this step --
3      A.  I would ask that question. I
4  don't know the answer to that. I don't
5  know the answer to that.
6      Q.  No, the question was, who is
7  the highest rank in the Department of
8  Physics?
9      A.  The chair.
10     Q.  If the chair has a misconduct,
11  which in this case he's not letting me
12  to graduate because he's trying to steal
13  my intellectual property, but the
14  misconduct is not stealing intellectual
15  property; the misconduct is that he's
16  not letting me to graduate. I'm ready
17  to graduate from 2015, and he's not
18  letting me to graduate. So what is the
19  grievance procedure in this matter?
20     A.  That is a difficult question
21  because you can't disentangle the
22  academic grievance, which has to do with
23  graduation, from an accusation of

26 (Pages 98 - 101)

Page 102

1 misconduct. You can't disentangle them.
2 In the sentence you just said presents a
3 very complex situation.
4    Q. I -- I'm not saying it is
5 simple situation. I'm telling what is
6 the procedure?
7    A. I would have to ask someone
8 that. This is what I'm saying.
9 You're -- you're asking something quite
10 complicated, and I don't know the
11 answer.
12    Q. But you told in the grievance
13 procedure, you are on top. So you know
14 the grievance procedure.
15    A. Situations are tricky, and this
16 one involves two things, an academic
17 grievance and an accusation of
18 misconduct, of research misconduct, the
19 intellectual property. So that I would
20 have to ask someone, "Are we handling
21 this through the grievance process, or
22 are we handling this through the office
23 of research investigation?"

Page 103

1    Q. Well --
2    A. I would ask that question, and
3 then I would understand. If -- if it's
4 purely a grievance, I know the process.
5 But what you have just said involves
6 something else, and in that --
7 accusations about intellectual property
8 theft are not handled through the
9 grievance process. That's my point. So
10 once you bring that piece in, it's no
11 longer an issue that would be handled
12 through the grievance process. But your
13 dismissal from the program would be
14 handled through the grievance process.
15 When you bring in the question
16 intellectual theft, that has to be
17 investigated, and then the grievance
18 process can proceed once that is
19 resolved. Do you see?
20    Q. Yeah, I understand that. Very
21 good.
22    A. And -- and the reason that it's
23 set up that way is to make sure that

Page 104

1 students are treated fairly.
2    Q. Yes. But you didn't follow
3 that procedure. Let me tell you. In
4 2016 when I followed the grievance
5 procedure step by step, the only
6 accusation I put forward is that the
7 head of Physics Department is not
8 letting me to graduate. I did not put
9 any allegation of intelpro- --
10 intellectual property, so it was only
11 about not letting me graduate, not
12 following the graduate handbook, not
13 following the graduate catalog, and I
14 only appealed that from the -- using the
15 grievance procedure. So you told me the
16 highest rank person in the Physics
17 Department is the chair of Physics
18 Department, Dr. LeClair. And
19 Dr. LeClair is not letting me to
20 graduate. Then I start grievance
21 procedure only for not letting me to
22 graduate. What was the next step?
23       MR. DYKES: Object to the form.

Page 105

1 BY MR. AMIRI:
2    Q. What is the correct way of
3 starting grievance procedure?
4    A. I don't know.
5    Q. But you told you are in the
6 highest rank of grievance procedure and
7 you know the hierarchy. What is the
8 bottom of that hierarchy?
9    A. What is the bottom of the
10 hierarchy?
11    Q. Yes. Who is the first person
12 that a graduate student should go and
13 file a grievance procedure?
14    A. If the accusation is against
15 the chair, then the grievance would
16 start at the college level.
17    Q. So who is that person?
18    A. That might be Lisa Dorr; I'm
19 not sure.
20    Q. Yes, I -- I'm sure. It was
21 Lisa Dorr, and I've been to her, and I
22 filed a grievance procedure. What
23 happened next? Do you have any

27 (Pages 102 - 105)

1 information?
2    A.  I don't think so.
3    Q.  And then he reported this
4 situation to Dr. Han, and I went to
5 Dr. Han.  And Dr. -- I talked to
6 Dr. Han.  I asked him to talk to
7 Dr. LeClair and continue the grievance
8 procedure.  Do you know what he told me?
9    A.  No.
10    Q.  But you are working very
11 closely with Dr. Han.  You should know
12 that.  In my case, you had -- had a
13 meeting with Dr. Han, didn't you have?
14    A.  I met with Dr. Han about the
15 dismissal.
16    Q.  Well --
17    A.  I did not talk with Dr. Han
18 in --
19        MR. DYKES:  2016.  Right?
20    A.  -- a year earlier --
21        MR. DYKES:  Is that when
22 you're . . .
23        MR. AMIRI:  Please let us -- if

1 you have ob- --
2        MR. DYKES:  I'm trying to
3 understand --
4        MR. AMIRI:  -- objection --
5        MR. DYKES:  -- where your
6 questions are.  Are you talking about
7 2016, or are you now talking about 2017?
8        MR. AMIRI:  You are distracting
9 us.  Please, if you don't have
10 objection, let us continue.
11    A.  I have the same question.  I --
12 BY MR. AMIRI:
13    Q.  Yeah, yeah, you can --
14    A.  -- my -- my conversation --
15    Q.  -- ask me.  That is fine.
16    A.  -- with Dr. Han about you --
17    Q.  So --
18    A.  -- was in 2017.
19    Q.  2017.
20    A.  I was not --
21    Q.  When you are -- when you are --
22    A.  -- involved in any grievance --
23    Q.  -- sitting --

1    A.  -- in 2016.  What month?
2    Q.  I think you met with Dr. Han in
3 June and July --
4    A.  2017.
5    Q.  -- 2017.  Yes.
6    A.  When was your -- yeah, when was
7 your grievance?  I only came in July
8 2016.
9    Q.  Yes, it was -- the grievance
10 procedure, whenever it was, if you
11 talked to Dr. Han, he should pro- --
12 provide you with some information about
13 the past.
14    A.  He did not.
15    Q.  He did not tell anything?
16    A.  He did not.
17    Q.  Do you know why he didn't
18 provide any information about this
19 pro- -- problem that was?
20    A.  No.
21    Q.  So Dr. Han did not tell you
22 that I followed the grievance procedure
23 and I'm told that I'm ready to graduate;

1 my advisor is not letting me to publish
2 my papers and get graduate?
3    A.  I don't remember that.
4    Q.  Do you think I followed the
5 right procedure as I am telling you?
6        MR. DYKES:  Object to the form.
7    A.  As you're telling it to me,
8 there was this research intellectual
9 property issue that would cloud the
10 situation.  So, if that was not in the
11 picture, then you did follow the right
12 procedure.
13 BY MR. AMIRI:
14    Q.  It was not in the picture.
15    A.  If that is in the picture, it
16 becomes more -- more murky.
17    Q.  No, it was not in the picture.
18 In 2016 --
19    A.  Then it sounds to me, from what
20 you've said, that you followed the
21 correct procedure in 2016.  But I don't
22 have all the facts.
23    Q.  Yes.

28 (Pages 106 - 109)

Page 110

1   A.  But it does sound to me like
2 you followed the correct procedure.
3     Q.  Yes.  So I followed that --
4 that correct procedure, but they didn't
5 let me to graduate.  So what I could do?
6     A.  In -- in 2016, what could you
7 do?
8     Q.  Yes.
9     A.  You could ask your directors
10 what you need to do to graduate and
11 then --
12     Q.  Can you please give the name of
13 the people?  Can you explain a little
14 more clear I understand exactly what you
15 mean by -- by "director"?
16     A.  I don't actually know if
17 Dr. LeClair was your only director of
18 your dissertation.  Is he?
19     Q.  In dissertation, we have
20 advisor.  We have advisor --
21     A.  You have a chair of the
22 committee.
23     Q.  Chairperson, yes.

Page 111

1     A.  Yes.
2     Q.  Chairperson is advisor.
3     A.  Okay.
4     Q.  Yes.
5     A.  (Nods affirmatively)
6     Q.  So which other information do
7 you need for me to provide?
8     A.  Sometimes there are -- there
9 are multiple directors of a project who
10 determine the direction, the shape that
11 the dissertation should take, and I
12 don't know what your committee structure
13 was.
14     Q.  The question we are trying to
15 answer now is that I followed the
16 grievance procedure in --
17     A.  Um-hum.
18     Q.  -- 2016 step by step, and the
19 only --
20     A.  What was the outcome?  What was
21 the -- the final step in -- in that
22 grievance procedure?
23     Q.  Dr. Han told me that, "These

Page 112

1 people" -- Dr. LeClair and other
2 people -- "are my people; I trust them."
3     A.  That was the official verdict?
4     Q.  That was the ver- -- they
5 didn't give me --
6     A.  Or is that your version of --
7 of the verdict?  That's --
8     Q.  I have --
9     A.  -- the --
10     Q.  -- I have -- I have the voice
11 recording, but they didn't le- -- give
12 me a letter.  Do you think that they
13 should give me a letter at the
14 conclusion of the grievance procedure?
15     A.  I -- I would not speculate on
16 how that --
17     Q.  No, but in the --
18     A.  -- process was --
19     Q.  -- procedure?
20     A.  -- going.  I don't know the
21 circumstances there.  The procedure
22 would generally be a decision, but I
23 don't know whether you-all stopped

Page 113

1 before you got to that point.  So I
2 wouldn't say that they were wrong
3 without a lot more information.
4     Q.  No.  I'm asking that the
5 procedure for grievance.
6     A.  Sometimes the process stops.
7 Sometimes the student stops.  Sometimes
8 the resolution is reached, and there's
9 no letter.
10     Q.  So it is variable?
11     A.  It can be.
12     Q.  But I followed all the steps to
13 graduate.
14     A.  What do you mean you followed
15 all the steps to graduate?
16     Q.  I followed all the steps in the
17 grievance procedure to let me graduate,
18 to ask them to let me to graduate, but
19 they didn't --
20     A.  Do you mean to let you defend
21 your dissertation?
22     Q.  Yes.
23     A.  Because that's different.

29 (Pages 110 - 113)

1  Q. Yes. The only part that is
2 left is my dissertation defense. So --
3  A. And your committee said the
4 dissertation is defensible?
5  Q. Yes.
6  A. They did?
7  Q. Yes.
8  A. What is defens- -- the -- I --
9 I guess I would need more information.
10 I would ask a question about that.
11  Q. But you --
12  A. But I'm not here to ask the
13 questions.
14  Q. But you -- you sent me the only
15 letter that I'm dismissed. The only
16 letter that actually I received from the
17 University is from you, so you should
18 have information.
19  A. I have the committee report.
20 I...
21  Q. But it is not the right
22 committee. The other committee, which
23 is the dissertation committee, is the

1 right committee.
2  A. We already talked about that
3 earlier this morning.
4  Q. Yeah, but you are --
5  A. Can I --
6  Q. -- repeating the same thing.
7  A. I am, yes.
8  Q. So why you are repeating the
9 same thing?
10  A. Because it's what I know to be
11 true.
12  Q. So I passed all the courses --
13 let me tell you the whole story. I
14 passed all the courses, so the
15 coursework I'm done. I started my
16 dissertation research in 2013, and I was
17 very, very successful. And, by the end
18 of 2015, I should be graduated. And my
19 dissertation committee, I just -- in
20 previous section, I told you that I have
21 five people who are condensed matter,
22 high-rank people in the University, and
23 they are thinking that I should

1 graduate, I'm ready to graduate. But --
2 and I passed all of the dissertation
3 courses as well because you need to
4 take 24 credit hour for dissertation.
5 In addition to the coursework that I
6 have finished, by the end of 2015, I
7 finished 24 credit hour for
8 dissertation, but they deny my defense.
9 The Physics Department did not let me do
10 my defense.
11  A. They didn't let you schedule
12 the defense.
13  Q. Exactly.
14  A. And why is that?
15  Q. Why is that?
16  A. Usually it's because the
17 manuscript is judged deficient in some
18 way.
19  Q. What is the manuscript?
20  A. Do you have a dissertation?
21  Q. Based on the graduate handbook,
22 the student who is going to defend his
23 dissertation needs to submit his

1 dissertation manuscript -- manuscript
2 two weeks prior to defense, so the
3 student should schedule his defense, and
4 he has time no later than two weeks
5 before defense itself, he should provide
6 the manuscript to the people who are in
7 the dissertation defense.
8  A. Minimum of two weeks.
9  Q. Yes.
10  A. A director can ask for more,
11 and the director has to agree that the
12 defense can be scheduled.
13  Q. Yes.
14  A. Um-hum.
15  Q. Director means the chair of the
16 Physics Department?
17  A. No, I mean the dir- -- it --
18 the chair of the dissertation committee.
19  Q. Yes. He's Dr. Patrick LeClair.
20 It is the same --
21  A. So --
22  Q. -- so.
23  A. -- that person has to agree

30 (Pages 114 - 117)

1 that the dissertation is of sufficient
2 quality to proceed to a defense.
3    Q.  Yes.  And that person is not
4 agreeing.  What I should do?
5    A.  There is no recourse when a
6 director deems that a manuscript is not
7 defensible.
8    Q.  There is no manus- -- it is not
9 necessary to have a manuscript, based on
10 the graduate catalog and graduate
11 handbook.
12    A.  It i- --
13    Q.  You need to --
14    A.  What?
15    Q.  You need to have -- you need to
16 pass 24 credit hours, then you schedule
17 your dissertation, and you submit your
18 manuscript two weeks before the defense.
19    A.  Minimum of two weeks before the
20 defense.
21    Q.  But nobody submits it much
22 longer than two weeks.
23    A.  Okay.

1    Q.  Then you do the -- the student
2 does the defense.
3    A.  I think what you're -- what you
4 left out in that process is that the
5 chair of the dissertation committee
6 approves the dissertation for defense.
7    Q.  The chair, if he doesn't
8 approve, the student who does the
9 defense will fail, but he still has to
10 have a defense.
11    A.  No.
12    Q.  Why?
13    A.  The committee has to deem that
14 the dissertation is potentially
15 defensible before defense is scheduled.
16    Q.  And if he deems it is not,
17 can the school deny the student for
18 defense?
19    A.  Yes.  It happens all the time.
20    Q.  Where in the graduate catalog
21 or in the graduate handbook it is
22 written?  Do you have that written in --
23 somewhere in the graduate handbook of

1 the Physics Department?
2       MR. DYKES:  Object to the form.
3    A.  Yeah, I'd have to -- I'd have
4 to do some research on that.  But I can
5 tell you that in 100 percent of Ph.D.
6 defenses, the committee has to approve
7 the manuscript.
8 BY MR. AMIRI:
9    Q.  Well, I have the graduate
10 handbook.  I will give you a copy of
11 that.
12       (PLAINTIFF'S EXHIBIT NO. 5
13 MARKED)
14 BY MR. AMIRI:
15    Q.  Exhibit Number 5.  Please show
16 me where it is.
17       THE WITNESS:  Do you need this?
18       MR. DYKES:  Yeah, no, I've --
19 I've got the handbook, but thank you.
20 But take time to look through it.
21    A.  (Reviews document) "Student
22 must keep his or her advisor fully" --
23 I'm on page 13.

1 BY MR. AMIRI:
2    Q.  Yes.
3    A.  "The student must keep his/her
4 advisor fully and regularly informed of
5 the progress of his/her research.
6 Failure to do so could result in the
7 dissertation not being approved."
8    Q.  Yes.  We was having weekly
9 meetings all the time.
10    A.  And it was -- so the
11 dissertation has to be approved.
12    Q.  But they did not approve it.
13    A.  Ah.  That is the crux of it.
14    Q.  Can you explain more?
15    A.  The advisors are in an
16 evaluative position over a doctoral
17 student.  They have to approve that the
18 data is sound, that the methodology is
19 sound, that the writing is clear, that
20 the document is at the standard that
21 they require.  The advisors have to
22 approve the dissertation.  If they do
23 not approve, then they need to give

31 (Pages 118 - 121)

Page 122

1 guidance to the student till the student
2 fixes the dissertation, or nothing goes
3 forward. The -- so this is a point
4 where there is often disagreement
5 between a student and the advisor. The
6 advisor says, "I don't see what I need
7 to see." Now, I don't know -- I did not
8 ask your advisor about the quality of
9 your work. That's the advisor's domain.
10 But if the advisor is not satisfied with
11 the quality of your work, the
12 dissertation does not move forward.
13     Q. So did you ask my advisor about
14 quality of my work or --
15     A. I did not.
16     Q. Why you did not ask? What was
17 the reason that you didn't ask my
18 advisor about quality of my work?
19     A. Because I would not
20 second-guess your advisor about the
21 quality of your work. That is your
22 advisor's domain.
23     Q. But you did not ask?

Page 123

1     A. I did not. That would be seen
2 as my second-guessing.
3     Q. Second --
4     A. It -- it --
5     Q. -- second-guessing what?
6     A. The quality of your work. I
7 trust that the advisor is the one who
8 knows whether the manuscript is
9 defensible --
10     Q. So the --
11     A. -- whether the quality of your
12 work is sufficient for the progress.
13     Q. So, if the advisor is thinking
14 that the quality of work is very high
15 and I can defense, can I defense?
16         MR. DYKES: Object to the form.
17     A. I would need more information.
18 BY MR. AMIRI:
19     Q. So what you was looking at that
20 handbook?
21     A. In my experience, the advisor
22 reads the dissertation and makes an
23 assessment of the quality and says that

Page 124

1 a defense can proceed or cannot proceed.
2 It's not uncommon at that stage that an
3 advisor would say that the defense
4 cannot proceed until certain adjustments
5 are made to the manuscript or to the
6 data or to the conclusions. It's not
7 uncommon.
8     Q. But these --
9     A. And the student makes changes.
10 A dissertation is an iterative process.
11 No student does their own work and
12 presents a defense without an evaluative
13 step by the advisor.
14     Q. Yes. Dr. Carvalho, we are
15 talking about a specific case, that is
16 my case. We are not talking about
17 general cases that is applying --
18     A. Well, see, yeah, and that's one
19 of the issues, you know. I'm not on
20 your committee, I'm not in your
21 department, and so I only talk about
22 general issues.
23     Q. But --

Page 125

1     A. So you're --
2     Q. -- we are here, so please do
3 not talk about general issues. If you
4 don't know the answer about my specific
5 issue, tell, "I don't" -- say, "I don't
6 know."
7     A. I don't know.
8     Q. That is the best answer
9 because --
10     A. Okay.
11     Q. -- we are -- we are --
12         MR. DYKES: But then don't ask
13 her a follow-up question asking her to
14 explain or what she does know, because
15 when --
16         THE WITNESS: Right.
17         MR. DYKES: -- she's gone into
18 those areas, it's been as a result of
19 your asking a question.
20         MR. AMIRI: I'm entitled to ask
21 the questions --
22         MR. DYKES: Right.
23         MR. AMIRI: -- and you are

32 (Pages 122 - 125)

1 entitled to object.
2        MR. DYKES: No, and --
3        THE WITNESS: And --
4        MR. DYKES: -- I'm just telling
5 you --
6        THE WITNESS: -- I --
7        MR. DYKES: -- you've been --
8 you've told my witness, "Don't tell
9 what" -- you've instructed her to do
10 something which you've been asking her
11 questions that ask her to explain things
12 to you. So, if you don't want her to
13 answer those things, don't ask her.
14        MR. AMIRI: No.
15 BY MR. AMIRI:
16      Q. I'm asking -- every question
17 that I'm asking is about my case. I'm
18 not talking about how the University
19 should work. I'm not talking about
20 general questions. So, from now on, any
21 question I'm asking, please answer only
22 about this case. If you know the
23 answer, please tell that. If you don't

1 know that, please you say, "I don't
2 know."
3      A. Well, this should speed up.
4      Q. Yes, it is.
5      A. All right.
6      Q. Yeah, it is very good.
7      A. Good.
8      Q. So, as I told you, I was -- I
9 requested that I should defend my
10 dissertation because I passed all of my
11 coursework, I passed 24 hour of credit
12 for the dissertation research by the end
13 of 2015, and, in that point, we
14 scheduled that I should defend. But it
15 did not happen. The Physics Department
16 did not let me to defend. So why it did
17 not happen?
18      A. I don't know.
19      Q. And in 2016, one year later, I
20 started the grievance procedure, why
21 they are not letting me to do my
22 dissertation defense. Is it about the
23 right time that I waited for one year

1 before I started the grievance
2 procedure. Is it good courtesy time
3 that I wait for one year, I gave them
4 one more year, and then I started the
5 grievance procedure requesting, "Please
6 let me defend my dissertation." Is --
7 did I follow the right steps or not?
8        MR. DYKES: Object to the form.
9      A. Yeah, I don't know. I can only
10 speak generally about how the process
11 works. I don't know in your situation.
12 I wasn't involved, and I don't know.
13 BY MR. AMIRI:
14      Q. But you send me a letter for my
15 dismissal from the --
16      A. Well, yeah, I --
17      Q. -- program.
18      A. -- knew about that.
19      Q. So why -- if you don't know,
20 why you should send me letter for
21 dismissal?
22        MR. DYKES: Here's the problem
23 with your instruction. You tell her you

1 just want your -- it's about you.
2        MR. AMIRI: Yes.
3        MR. DYKES: But you can't
4 address you without talking about how
5 things operate at the University. So
6 your question there asks her -- is
7 goin- -- is going to require her to talk
8 about things with the University, which
9 you don't want her to do. So I'm -- I'm
10 not s- --
11        MR. AMIRI: Mr. Counsel, can I
12 explain your -- can I answer you?
13        MR. DYKES: Yes, that's fine.
14        MR. AMIRI: I'm not -- I never
15 asked her not to talk about the
16 procedures in the University. I talked
17 to her not to speak about the general
18 person. If she's going to describe the
19 procedures that are applicable to my
20 specific case --
21        MR. DYKES: Okay, then that's
22 fine.
23        MR. AMIRI: -- I want to hear

33 (Pages 126 - 129)

1 that.
2       MR. DYKES: Okay. Good.
3       MR. AMIRI: Okay.
4    A.  Are you asking me why I sent
5 the letter of suspension?
6 BY MR. AMIRI:
7    Q.  Yes.
8    A.  Again, I received the email
9 from Dr. LeClair to you and the
10 recommendation of the committee, which
11 is their right to make, and I made sure
12 that the process had been followed, and
13 I issued the letter because that's what
14 we do in such cases.  When the
15 department determines that progress,
16 sufficient progress, is not being made,
17 they have the right to dismiss a
18 student.  They did that.  And then it's
19 my job to put a registration hold on
20 that student and send a letter notifying
21 the student that we have done so.
22    Q.  Can you explain the steps that
23 you took to make sure that the letter

1 you are sending me, the dismissal
2 letter, is not based on the wrong
3 information, it is based on correct
4 information?
5       MR. DYKES: We've gone through
6 this like three times as to what she did
7 already today.
8       MR. AMIRI: Could you please
9 let her answer.
10    A.  Do you want me to say it again?
11 BY MR. AMIRI:
12    Q.  Yes.
13    A.  I reviewed the letter from the
14 committee.
15    Q.  But --
16    A.  This is the -- (Reviews
17 documents) Let me find it again.
18       THE WITNESS: Where's my
19 letter?
20       MR. DYKES: I think it's
21 Exhibit 3, 8 and 9, I believe.
22       THE WITNESS: So I can use the
23 right name for the committee.

1 BY MR. AMIRI:
2    Q.  It -- it is page 8 of that
3 exhibit.
4    A.  (Reviews document)  The
5 graduate advising faculty committee -- I
6 wanted to use the correct term.
7    Q.  Yes.
8    A.  I received the email.  I read
9 the criteria.  It referenced the
10 Department of Physics Graduate Handbook.
11 I looked at the Department of Physics
12 Graduate Handbook, it was available
13 online, and made sure that the criteria
14 outlined there were clear and that they
15 aligned with what the committee had
16 determined.  It's the committee's right
17 to make the determination; it's my job
18 to make sure that the criteria are
19 clear.
20    Q.  So did you study the hand- --
21 graduate handbook and you see that this
22 graduate advising committee can make
23 this determination.  Is this correct?

1    A.  No.
2    Q.  So what you did when you looked
3 up in the online -- you looked up for
4 the graduate handbook?  What do you look
5 at in that?
6    A.  I looked at the section related
7 to good academic standing, which
8 is . . . Do you remember where that is?
9 I can find it.  There it is, 6, page 6.
10 (Reviews document)  No, that's not it.
11       MR. DYKES: Page 4.
12       THE WITNESS: That's it.
13    A.  Pages 4 and 5.
14 BY MR. AMIRI:
15    Q.  Yes.
16    A.  The part of this that was
17 determinative in my review was the
18 bullet that says "make timely progress
19 toward completing the research component
20 of their degrees."  You mentioned that
21 you completed 24 hours of dissertation
22 research, but that's not the
23 requirement.  The requirement is timely

Page 134

1 progress toward completing the research
2 component of their degrees. The reason
3 that sixth-year review is done is
4 because the time limit is seven years,
5 so timely progress means that you will
6 finish in one more year.
7    Q. So I'm telling that, in 2015, I
8 made timely progress toward completing
9 the research component of my degree, and
10 I was ready to defend.
11    A. That is your view.
12    Q. And that is the view of my
13 dissertation committee members who are
14 in my special area.
15    A. I would need to ask --
16      MR. DYKES: Object to the form.
17    A. -- them that. That is a point
18 that is often a disagreement between a
19 student and the faculty members.
20 BY MR. AMIRI:
21    Q. But we did not --
22    A. That is --
23    Q. -- disagree.

Page 135

1    A. I -- I would have to ask them
2 if you disagreed.
3    Q. But --
4    A. I -- I understand that you
5 didn't disagree. I would ne- --
6    Q. And they didn't disagree.
7    A. -- I would need to ask them
8 that. You -- you told me only to speak
9 about what I know.
10    Q. Yes.
11    A. I would not speculate that you
12 agreed with them --
13    Q. Please do not speculate.
14    A. -- and that they agreed with
15 you.
16    Q. Yes.
17    A. I would have to ask them that.
18 It's -- it's a good question.
19    Q. Yes. The -- the question is
20 that, you look at this handbook, and you
21 decided that the procedure is followed
22 correctly. Is it that -- what you --
23 what I understand?

Page 136

1    A. That they acted within their
2 bounds to make a determination, they
3 determined that timely progress was not
4 being made.
5    Q. Okay.
6    A. And they quoted that,
7 "demonstrated lack of progress." And I
8 look at this, "timely progress," and I
9 say, "Okay." That was their right.
10    Q. But they are astronomers and
11 they are particle physicists. They are
12 not --
13    A. We've talked about this.
14    Q. Yes, that is the -- that is
15 that you are not answering. They are
16 not the peo- -- people who can make a
17 decision whether I'm making timely
18 progress toward completing the component
19 on -- of my research or not. The
20 correct --
21    A. Are you asking me a question?
22    Q. No. I'm explaining to you, and
23 I will a- -- ask you a question about

Page 137

1 that.
2      MR. DYKES: I object to his
3 explanation, so.
4      MR. AMIRI: Okay.
5 BY MR. AMIRI:
6    Q. It is the members of
7 dissertation committee who make a
8 determination whether I am making timely
9 progress or not. You cannot ask from
10 other committee who doesn't know me, how
11 they can de- -- come to that
12 determination.
13    A. Are you asking me a question?
14    Q. Yes. Why you trust in these
15 people that they can come to the
16 determination that I'm not making
17 progress?
18    A. Oh, I thought I explained that
19 in -- in good detail, and I can repeat
20 it, but it will be talking about general
21 policy and practice about how --
22    Q. Please --
23    A. -- students are --

35 (Pages 134 - 137)

1    Q. -- please speak about my
2  situation.
3    A. I have no idea. I don't know.
4    Q. In my situation, you don't know
5  why this happened?
6    A. That's correct. Yes.
7       MR. DYKES: If -- if it
8  requires you to give your background and
9  your knowledge to answer a question,
10 whether or not it relates specifically
11 to him, you need to give a complete
12 answer.
13      THE WITNESS: Right.
14   A. I -- I assume that I'm here
15 because I have some expertise in how
16 students progress through graduate
17 programs and how their progress is
18 assessed, how rigor is maintained, how
19 departments operate in their
20 education --
21 BY MR. AMIRI:
22   Q. Yes.
23   A. -- of students. And so I've

1  explained why a committee that is
2  somewhat distant from the student's own
3  dissertation committee makes such a
4  weighty decision as whether a student
5  can continue in the program or not. One
6  step removed guarantees that all
7  students are treated evenly.
8    Q. Is this true in the Department
9  of Physics in the University of Alabama,
10 or it is your general concept?
11   A. I have seen no evidence that
12 the Department of Physics operates
13 differently than any other program in
14 this way. So --
15   Q. You -- so -- so you are se- --
16   A. -- I watch. I see no evidence
17 that they are operating any differently.
18 Your question was, how can they make the
19 determination when they are not your
20 dissertation committee, and I've told
21 you why they are empowered to make that
22 determination and why it's better that
23 they make the determination, why it's a

1  better academic structure, why
2  departments operate in the way that they
3  do.
4    Q. Have they made such a decision
5  in the prior time for any other student?
6    A. I don't know.
7    Q. Yes, I know the answer. The
8  answer is "no."
9    A. I can tell you that other
10 departments have.
11   Q. But the Physics Department
12 doesn't have such a committee.
13   A. Hmm.
14   Q. In our department, the
15 dissertation committee is the only
16 reference who makes decisions about
17 progress and dissertation defense.
18   A. I guess I would ask you for
19 evidence of that, and I would ask them
20 for evidence of that, and . . .
21   Q. Did you ask from me or from
22 them for evidence about this --
23   A. No.

1    Q. -- at the time you sent that
2  letter?
3    A. No, because it's standard
4  operating procedure.
5    Q. It is -- it is standard
6  operating procedure everywhere or in
7  some or in most cases?
8    A. I don't know. You're asking me
9  to speculate.
10   Q. No, I'm not asking you. I'm
11 telling you, is this the procedure in
12 the Department of Physics --
13   A. I don't know.
14   Q. -- and Astronomy?
15   A. I don't know. But it is their
16 right, and it would be operating within
17 University procedure and practice to do
18 this.
19   Q. So basically you didn't have
20 information whether the graduate
21 advising committee can make such a
22 decision or not --
23      MR. DYKES: Object to the form.

36 (Pages 138 - 141)

Page 142

1 BY MR. AMIRI:
2    Q. -- in this specific case in
3 my -- in the Physics Department?
4    A. It is always the right of the
5 faculty to assess --
6    Q. But which faculty?
7    A. -- a student's progress.
8 You're -- you're asking a question that
9 I would need more information to answer.
10    Q. Okay. Then let's continue.
11 Please look at Exhibit Number 3, page 3.
12    A. (Reviews document)
13    Q. Please let us start with page 2
14 of that.
15    A. Page 2.
16    Q. Yes.
17    A. Exhibit 3.
18    Q. Can you please read this email.
19 This is the email Dr. LeClair sent at
20 April 27, 2017, at 4:34 p.m.
21    A. "The graduate advising
22 committee needs to meet before
23 lunchtime on Monday to discuss an

Page 143

1 urgent and serious matter. I will
2 brief as many of you as I can on it
3 individually."
4    Q. Yeah. Have you seen this
5 message -- email before?
6    A. No, I don't think so. If I
7 have, I don't remember it.
8    Q. What is your impression on
9 this? What is your understanding of
10 this email?
11    A. My understanding of this --
12 you're --
13       MR. DYKES: I'm going to object
14 to the form of the question.
15    A. -- asking me to speculate.
16 Right?
17 BY MR. AMIRI:
18    Q. No, just what --
19    A. I -- I --
20    Q. I mean, you read the other
21 email and you told that it was
22 threatening, for example. There was one
23 email that you read, and you say it is

Page 144

1 improper language.
2    A. I said "ambiguous language."
3    Q. Ambiguous language. So which
4 kind of language it is using here? Can
5 you explain anything about this?
6    A. I would assume that -- that
7 there was a s- -- an issue that the
8 graduate advising committee needs to
9 meet and discuss.
10    Q. Yes. And it is serious and
11 urgent. Yes?
12    A. So then I would assume that it
13 relates to a student because that's
14 usually what is serious and urgent. If
15 it relates to some bureaucratic process,
16 it's not usually serious and urgent, it
17 could be, but I wouldn't draw a
18 conclusion that anything was improper,
19 only serious.
20    Q. Yes. It is serious. And what
21 about the last sentence, "I will brief
22 as many of you as I can on it
23 individually"?

Page 145

1    A. I would assume that there's
2 background knowledge that they need.
3    Q. Yes. So it is about one
4 specific student?
5    A. Maybe. It could be multiple
6 students. It could be a group of
7 students.
8    Q. But -- but --
9    A. But definitely I would assume
10 that it's about students.
11    Q. But when it is urgent and
12 serious matter and --
13       MR. DYKES: All right.
14 Mr. Amiri --
15    Q. -- he will --
16       MR. DYKES: -- you've had the
17 opportunity to depose Dr. LeClair who
18 sent the email.
19       MR. AMIRI: But this is the
20 email that was forwarded to Dr. Car- --
21 Carvalho.
22       MR. DYKES: Okay. Yeah, that
23 she test- -- okay.

37 (Pages 142 - 145)

1    Q.  How it is?
2    A.  Because, as dean, it is not my
3 role to second-guess the evaluative
4 decisions of a department about student
5 progress.
6    Q.  But I'm asking did you have
7 enough information to make such a
8 decision?
9    A.  I don't evaluate your progress,
10 so more information would only put me in
11 a position where I am evaluating your
12 progress, but I -- I don't evaluate your
13 progress.
14    Q.  Not my progress, but you can
15 evaluate the validity of the document
16 that you got from Physics Department.
17 Did you try to validate that document?
18    A.  I validated the document
19 against the Physics Graduate Handbook
20 only.
21    Q.  But you studied -- I gave you
22 the Physics Graduate Handbook, and you
23 did not show anything specific that

1 shows you validated that.  You just told
2 that the student should make timely
3 progress.  And I told you that my
4 dissertation committee agreed that I'm
5 making very good progress.  And, as a
6 matter of fact, we -- we brought half a
7 million dollar money from National
8 Science Foundation based on my
9 dissertation.  So it was very
10 successful.  I discovered a new memory
11 device, which is state of art, and some
12 other university tried to steal that
13 from me.  So I was very successful.  I
14 had weekly meeting with my professors.
15 And these professors, one of them was
16 chair of Physics Department.  The other
17 was vice director of the MINT Center.
18 And continuously we had weekly meetings.
19 In this meeting, it is -- it was me and
20 two professors.  If you don't make good
21 progress, these meetings would not last
22 long.  Is this correct?
23        MR. DYKES:  Object to the form.

1    A.  I don't know.
2 BY MR. AMIRI:
3    Q.  We have these meetings for a
4 few years.  We had these meetings until
5 April 2017.  What I know is that, if
6 somebody doesn't make progress, he
7 cannot take the time of the vice
8 director of the MINT Center and the
9 chair of Physics Department in a very
10 continuous basis every week.  In my
11 understanding, if I don't make good
12 progress for one month, two months,
13 those professors does not come and sit
14 with me to discuss my progress.  Is this
15 correct?
16        MR. DYKES:  Object to the form.
17    A.  I can only speak to general
18 practice of how dissertations are
19 directed.
20 BY MR. AMIRI:
21    Q.  No, I'm sa- -- talking about
22 what I'm telling you.  So you --
23    A.  Well, I wasn't in the room --

1    Q.  -- you --
2    A.  -- so I can only talk about how
3 dissertations are directed.  That's all
4 I can do.
5    Q.  You suppose what I'm telling
6 you is correct because you don't have
7 those information.  If the information
8 I'm telling you correct, is my
9 conclusion correct or not?
10    A.  Yes.
11        MR. DYKES:  Again, that goes to
12 general -- answer -- just -- I object to
13 the form.  If you can answer the
14 question, answer the question.
15    A.  It is very common that a
16 student thinks that progress is being
17 made, but the directors, the chairs of
18 the dissertation, do not agree with the
19 direction of the work.  So there is
20 disagreement.
21 BY MR. AMIRI:
22    Q.  But my professors --
23    A.  Disagreement --

39 (Pages 150 - 153)

Page 154

1   Q.  -- did not disagree.
2   A.  Well, I would have to ask them.
3 So I would have to ask them that. You
4 are saying they didn't agree. My
5 assumption is that they did because they
6 said you weren't making timely progress.
7 And it's very common for there to be
8 disagreement on this issue.
9   Q.  Yes. Please --
10  A.  So, but I only --
11  Q.  -- don't let -- let us not talk
12 about general. In this specific case --
13      MR. DYKES:  Then stop asking
14 her general questions.
15      THE WITNESS:  Right. You're
16 a- -- you're --
17      MR. AMIRI:  No, I'm --
18      THE WITNESS:  -- you're --
19      MR. DYKES:  Okay?
20      MR. AMIRI:  -- I'm --
21      THE WITNESS:  -- you're
22 telling --
23      MR. AMIRI:  -- asking --

Page 155

1      THE WITNESS:  -- me what
2 your --
3      MR. AMIRI:  -- specific
4 questions.
5      THE WITNESS:  -- professors
6 think, and then you're asking me to make
7 a judgment on it. But you are telling
8 me what they think, and I would need to
9 hear it from them.
10 BY MR. AMIRI:
11  Q.  Well --
12  A.  So you're asking me a question
13 that I cannot answer because you are
14 asking me to base it on what you tell me
15 they think.
16  Q.  Well --
17      MR. DYKES:  I ditto what she
18 said.
19 BY MR. AMIRI:
20  Q.  In this case, you do not have
21 the information in my specific case. Is
22 this correct?
23  A.  That is correct.

Page 156

1   Q.  Then I'm giving you the
2 information and I'm asking you to
3 suppose that these information are
4 correct, so we can come to some
5 conclusion. Is it possible?
6   A.  No.
7   Q.  Why not?
8   A.  Because there is seldom a
9 shared view of a student's progress
10 between the student and the directors.
11 Seldom. So --
12  Q.  So, if you --
13  A.  -- acting on what I know to be
14 true, which is that a student sees great
15 progress where often the directors would
16 like to see the work going in a
17 different direction, I would want to
18 hear the conversation.
19      I could perhaps adjudicate such
20 a conversation, if you were here and
21 they were here, and you said something
22 and they said something. I could draw
23 an opinion, I could draw a conclusion

Page 157

1 based on having seen many, many, many
2 dissertations brought to fruition, and
3 many, many dissertations not brought to
4 fruition.
5      I could draw a conclusion, and
6 I could help you see each other's
7 perspective. But, without them here, I
8 can only hear you say that they agree
9 with you that you were making progress.
10  Q.  Do you have any evidence or
11 any -- do you have any information that
12 my advisors was not satisfied with my
13 progress?
14  A.  I do not. But I have the
15 statement of this committee that timely
16 progress was not being made.
17  Q.  But I told that those committee
18 did not know me and I did not know them;
19 they just met in an urgent meeting to
20 discuss a serious matter, as you read
21 yourself, and they notified in a fourth
22 notice there were six of them. Five of
23 them signed the document, and one of

40 (Pages 154 - 157)

Page 158

1 them did not sign.

2   A.   I wonder . . .

3   Q.   The one who did not sign was
4 Dr. San- -- Sar- -- Sarker Sanjoy, who
5 was terminated by the University two
6 months later --

7      MR. DYKES:  Object to the form.
8 BY MR. AMIRI:

9   Q.   -- as retired.  Yes, go ahead.
10      MR. DYKES:  And we're -- we've
11 been going about an hour, so you can
12 answer, and then we need to take a
13 break.

14      THE WITNESS:  Yeah.

15   A.   So, I just wonder why I'm here
16 to answer questions about the committee
17 level work.  It seems that --

18 BY MR. AMIRI:

19   Q.   Because you are the only person
20 who sent me a letter of dismissal.

21   A.   But you -- all of our questions
22 are about the committee letter, not my
23 letter.  And so, to understand what is

Page 159

1 behind the committee letter, you would
2 have to ask the people who were involved
3 at that level, at the committee letter,
4 what evidence they had on which to base
5 their determination that timely progress
6 is not being made.  But it wouldn't be
7 from my level; it would be from them.

8   Q.   So basic- --

9   A.   So we would have to ask them
10 the -- these questions.  These are not
11 questions I can answer.

12   Q.   So basically you did not have
13 information about my specific case.  You
14 just followed the procedure as a dean of
15 Graduate School.  Is it correct?

16      MR. DYKES:  Object to the form.

17   A.   I ensured that the criteria
18 they used to evaluate you were in
19 alignment with the criteria as it's
20 spelled out in the department handbook,
21 to which you have access.

22   Q.   But --

23      MR. DYKES:  Okay.  Let's take a

Page 160

1 break.

2      MR. AMIRI:  Let me five
3 minutes -- five more minutes.
4 BY MR. AMIRI:

5   Q.   But the criteria that they
6 used, how you made sure that they used
7 the criteria?

8      MR. DYKES:  We're --

9   A.   We have --

10      MR. DYKES:  -- we've been going
11 through -- we've -- you've --

12   A.   We have talked about this.

13      MR. DYKES:  -- that question
14 has been asked a dozen times, so
15 we're -- we're going to take a break.

16      MR. AMIRI:  Okay.  No problem.

17      VIDEOGRAPHER:  We are going off
18 the record at 11:31.

19      (A BREAK WAS TAKEN)

20      VIDEOGRAPHER:  This begins
21 media unit number 3.  We're back on the
22 record at 11:37.

23      (PLAINTIFF'S EXHIBIT NO. 6

Page 161

1 MARKED)

2      MR. AMIRI:  I will introduce
3 Exhibit Number 6.

4      MR. DYKES:  Let me see that.

5 (Reviews document)

6      THE WITNESS:  (Tenders
7 document)

8 BY MR. AMIRI:

9   Q.   Can you please read the first
10 paragraph of this?

11   A.   "Dear Mr. Amiri:  The
12 information you submitted to the Office
13 of Research Compliance the week of April
14 24th for allegations of misconduct has
15 been carefully reviewed.  The
16 information you provided was in support
17 of your allegations of plagiarism and
18 fabrications again-" -- "fabrication
19 against Dr. Arun Gupta and Dr. Patrick
20 LeClair.  At this time, it has been
21 determined that the information provided
22 does not support claims of plagiarism
23 and fabrication.  However, if you would

41 (Pages 158 - 161)

1 like to submit any additional
2 documentation related to this matter to
3 support your claim, I am willing to
4 review the additional information to
5 provide an assessment."
6    Q. Yes. This is the letter of
7 Dr. Pinkert to me, and he's telling that
8 I accused Dr. Arun Gupta and Dr. Patrick
9 LeClair of misconduct, and he's asking
10 me to submit any further documentation
11 if I have. The investigation is -- did
12 have other aspect. One aspect was this.
13 Can you please tell me what is the date
14 of that?
15    A. May 23rd, 2017.
16    Q. And I submitted those documents
17 on April 24th?
18    A. Yes.
19    Q. When the contingent document
20 was created, it was on April 28. So on
21 April 28, the Physics Department had
22 that serious and urgent matter. They
23 had a meeting, and they created the

1 document to dismiss me. It is four days
2 after I submitted these documents to the
3 office of Vice President -- President
4 Carl Pinkert. Is this correct?
5    A. Yes.
6    Q. And when Dr. LeClair sent me
7 his letter, it was on May 26. Is it --
8 it is three day after this letter. Do
9 you think that Dr. Patrick LeClair,
10 which I officially made allegation of
11 misconduct against him, can make a
12 decision about my status, or he should
13 not be allowed to do that?
14         MR. DYKES: Object to the form.
15    A. In the document -- that's not a
16 simple question. He asked the committee
17 to make a determination. He -- right?
18 BY MR. AMIRI:
19    Q. He met them individually. He
20 send them email -- we read that, that
21 there is a serious and urgent matter.
22 He send that email on 27 --
23    A. Yes.

1    Q. -- three day after I submit
2 these documents that proves that there
3 is allegation of misconduct.
4    A. Right.
5    Q. And they told there is an
6 urgent and serious matter, which is
7 possibly could be this matter.
8    A. Right.
9    Q. And they dismissed me.
10 Actually, they signed the doc- --
11 recommendation document against me.
12    A. Right.
13    Q. So can you accept such a
14 document while the professor who created
15 that document is under investigation?
16    A. Can I -- can I draw a
17 conclusion based on --
18    Q. Yes.
19    A. -- the context?
20    Q. You are welcome to do that.
21    A. I'm -- I'm seeing things that I
22 have not seen before, so you're asking
23 me to use my judgment to assess this, so

1 I'm going to -- but recognizing that
2 I'm -- I'm seeing these things for the
3 first time. In Exhibit 3 on page 4,
4 there's an email from Patrick LeClair to
5 Luoheng Han where he charges the
6 committee -- where he --
7    Q. Yes.
8    A. -- says what the committee
9 charge is.
10    Q. Yes.
11    A. It seems valid to me that he
12 could charge the committee with what he
13 has charged them while he is under
14 investigation, because what he's asking
15 them is valid. He's asking them to make
16 valid judgments. He --
17    Q. Are they correct people?
18    A. We've been through this.
19    Q. Okay. No problem.
20    A. So he is not acting on it. I
21 assume that the reason he waited to send
22 you the letter -- I knew there had been
23 a time delay there. I had no basis to

42 (Pages 162 - 165)

Page 166

1 judge why there was a time delay. Was
2 he -- I would assume -- from this
3 chronology, not having had conversations
4 about this, and so, again, you're asking
5 me to use my analysis here on the spot
6 to make a -- a judgment -- that he was
7 waiting until that matter was closed
8 before deciding to act on the
9 recommendation. But, again, the
10 recommendation that was requested, as it
11 is described in this email, is valid,
12 and that committee is empowered to make
13 that determination. So the committee
14 made a determination that in --
15 according to this charge, is valid. He
16 didn't act on it until later. By the
17 time he acted on it, I assume that this
18 matter was closed.
19     Q. No, it was not closed.
20     A. Okay. Well, as I -- you know,
21 I don't have that context. So --
22     Q. So it was continuing.
23        MR. DYKES: Object to the form.

Page 167

1 BY MR. AMIRI:
2     Q. Yes. As you see, and the
3 letter is long letter, but, even in the
4 first paragraph, he's asking me, "If you
5 have further document, we are interested
6 to study them." So it is not saying
7 that the matter is closed. So --
8        MR. DYKES: Object --
9 BY MR. AMIRI:
10     Q. -- so then there is an active
11 investigation against Dr. Patrick
12 LeClair. If he is the only
13 decisionmaker -- let's assume that he is
14 the only decisionmaker -- is his
15 decision credible or not?
16        MR. DYKES: Object to the form.
17     A. Yeah, you're -- you're -- there
18 are two suppositions there that aren't
19 valid.
20 BY MR. AMIRI:
21     Q. So let's suppose that that
22 recommendation --
23     A. And you can't ask me

Page 168

1 about hypothetical situations, so -- so
2 that --
3     Q. No, you -- you can -- you can
4 do that.
5        MR. AMIRI: Can we do that?
6        MR. DYKES: I'm going to object
7 to it. I mean, you can ask.
8        MR. AMIRI: Yes, so we can do
9 that.
10        MR. DYKES: I'll -- I'll
11 object.
12        And, if you can answer, you can
13 answer.
14 BY MR. AMIRI:
15     Q. You can assume that. If you
16 assume that Dr. LeClair is the only
17 decisionmaker, is his decision valid or
18 not?
19        MR. DYKES: Object to the form.
20 That's calling for speculation.
21     A. If he were the only
22 decisionmaker and there were no
23 committee involved, I would not assume

Page 169

1 that to be sufficiently objective. But
2 when you bring a committee into the
3 decision process, a degree of
4 objectivity is attained that I would
5 find acceptable. Does that make sense?
6 BY MR. AMIRI:
7     Q. Very good. Yes. Then let's
8 ask this question. Dr. LeClair is the
9 chair of the Physics Department. He's a
10 professor. He knows this statement that
11 you just told. Is it plausible that he
12 wanted to ask from a committee to make a
13 recommendation, so it become more
14 validatable, more valid?
15     A. That would --
16        MR. DYKES: Object to the form.
17     A. -- be the right and appropriate
18 thing to do, to bring a committee in who
19 is sufficiently removed from the
20 entanglement to make a decision based on
21 the progress of the student.
22 BY MR. AMIRI:
23     Q. But --

43 (Pages 166 - 169)

Page 170

1   A.  So I think that it was the
2 appropriate thing to do, to step back
3 and recuse himself.
4   Q.  But the motivation is because
5 of this investigation, because it is
6 just --
7   A.  The motivation?
8   Q.  To bring that committee in.
9       MR. DYKES:  Object to the form.
10 BY MR. AMIRI:
11  Q.  The reason that Dr. LeClair
12 asked that committee is the allegation
13 of misconduct against himself.
14      MR. DYKES:  Object to the form.
15  A.  I don't know, but even if it
16 were, he's turned it over to a
17 committee.
18 BY MR. AMIRI:
19  Q.  Does --
20  A.  But you're in your sixth year,
21 so, if the timely progress was not being
22 made and he turns it over to a
23 committee, that is appropriate.

Page 171

1   Q.  And he turns it over to
2 committee just three days after
3 allegation of misconduct is provided to
4 the Vice President Carl A. Pinkert.
5       MR. DYKES:  Object to the form.
6 BY MR. AMIRI:
7   Q.  But still it is valu- -- I mean
8 it is valid?
9   A.  I wouldn't draw a conclusion
10 based on that. It's also the end of the
11 semester. So, if any action is going to
12 be taken related to funding and
13 progress, it does have to be done before
14 the end of the semester. But I can -- I
15 can understand what you're saying, but I
16 wouldn't say that that's definitely the
17 case.
18  Q.  So what is your information
19 about the funding?
20  A.  I don't have any information
21 about the funding. My concerns are all
22 based on good academic standing as
23 defined in the Physics Handbook. So --

Page 172

1 so I don't have any information about
2 how you were funded. Tha- -- that
3 wouldn't be my domain. I'm only
4 concerned about good academic standing
5 as it's defined in the handbook.
6   Q.  Okay. That is as much as you
7 want to answer. That is -- let us
8 introduce the --
9       MR. DYKES:  Okay. I'm going to
10 object to the statement that "as much as
11 you want to answer." She answered your
12 question and said she doesn't know, so.
13      MR. AMIRI:  Okay. That
14 is okay.
15      (PLAINTIFF'S EXHIBIT NO. 7
16 MARKED)
17      MR. AMIRI:  I am introducing
18 Exhibit Number 7.
19      MR. DYKES:  Can I see that?
20      THE WITNESS:  (Tenders
21 document)
22      MR. DYKES:  Thank you.
23 (Reviews document)

Page 173

1 BY MR. AMIRI:
2   Q.  This is the email you sent on
3 June 23rd, 2017, to Charles Dorsey.
4   A.  (Nods affirmatively)
5   Q.  Can you please explain who is
6 Charles Dors- -- Dorsey?
7   A.  He is the director of the
8 Office of Threat Assessment.
9   Q.  Can you give some more
10 information what he does?
11  A.  When anyone in the University
12 is concerned about a situation involving
13 a threat, they -- they are wise to
14 consult with Charlie Dorsey, who's --
15 who has expertise in assessing whether
16 the threat is to be taken seriously,
17 whether any action needs to be taken or
18 not.
19  Q.  And is he a police officer or
20 he's a faculty member?
21  A.  I do not -- I don't believe
22 he's a faculty member. I don't actually
23 know that. I don't know.

44 (Pages 170 - 173)

Page 174

1    Q. I see. Have you contacted
2 him in another occasion in the past
3 two --
4    A. I --
5    Q. -- and a half year?
6    A. Um, let me think. I certainly
7 have been involved with conversations
8 with him. I -- I don't remember if I
9 initiated or if someone in my office
10 initiated those conversations, but I
11 have been involved in conversations that
12 relate to him.
13   Q. And have you directed any other
14 student for evaluation to him?
15      MR. DYKES: Object to the form.
16   A. I remember of a situation
17 involving --
18      MR. DYKES: Susan, don't use --
19      THE WITNESS: -- no --
20      MR. DYKES: -- names of
21 students.
22   A. -- an applicant, but not an
23 enrolled student.

Page 175

1 BY MR. AMIRI:
2    Q. Can you please repeat that?
3    A. I remember of a situation
4 involving an applicant to programs who
5 was making statements that -- that we
6 considered threatening and contacted
7 him. But I don't remember of other
8 situations where I have contacted him.
9    Q. I see. So he was not a
10 student?
11   A. The other case was someone we
12 were dealing with professionally but not
13 a student.
14   Q. Oh. He -- he was Af- --
15 American-African. Yes?
16   A. (No response)
17   Q. You told he was
18 American-Afri- -- African-American?
19      MR. DYKES: No, no.
20   A. No.
21      MR. DYKES: She said
22 "applicant."
23      MR. AMIRI: "Applicant."

Page 176

1      THE WITNESS: Yes, "applicant."
2      MR. AMIRI: "Applicant."
3      THE WITNESS: Someone who was
4 applying and was --
5      MR. AMIRI: I see.
6      THE WITNESS: -- making
7 threats.
8 BY MR. AMIRI:
9    Q. Can you please read in this
10 document the first underlined part of it
11 that you wrote.
12   A. "The College of A&S is
13 concerned that Mr. Amiri has not
14 responded to messages that direct him
15 toward appropriate academic grievance
16 channels and is instead reaching out
17 directly to the president and provost
18 with his repeated accusations of
19 misconduct."
20   Q. What is your inform- -- source
21 of your information?
22   A. Associate Dean Cathy Pagani is
23 in my office and handles most student

Page 177

1 issues. I consult with her on any issue
2 involving a student. I don't remember
3 whether she reached out to Dean Olin or
4 whether I reached out to Dean Olin. I
5 don't remember that part. I know I
6 talked with Luoheng Han, but I don't
7 remember talking with Dean Olin, but I
8 may have. So I would -- I had seen your
9 emails. I talked with them. I was
10 advised that we should assess how to
11 move forward, given the accusations that
12 you were making.
13   Q. Yes. Did you contact me to get
14 some information from myself?
15   A. No.
16   Q. What was the reason?
17   A. I don't insert myself into
18 conversations between a student and the
19 student's department. I explained at
20 the beginning of the day the ways in
21 which we are centralized and
22 decentralized. Conversations between a
23 student and the department is part of

45 (Pages 174 - 177)

Page 178

1 the decentralized way that we operate.
2 I do not insert myself into
3 conversations between a student and the
4 department.
5    Q.  So -- so this statement you
6 wrote, do you think it confirms that
7 College of Art and Science is right or
8 not?
9    A.  What? That the College of Arts
10 and Sciences is right?
11    Q.  Yes.  In this --
12    A.  In --
13    Q.  -- statement that you read
14 that --
15    A.  That they are --
16    Q.  -- I'm -- I'm n- --
17    A.  -- concerned that you have not
18 responded?
19    Q.  Yes.  Do you think when you
20 write this to the -- another authority,
21 you are kind of endorsing that
22 statement, you are confirming that
23 statement?

Page 179

1    A.  The statement that you were not
2 using appropriate academic grievance
3 channels?
4    Q.  Yes.
5    A.  Yes.
6    Q.  So you are endorsing the
7 College of Art and Science, but you
8 don't have adequate information whether
9 I did it or not.
10        MR. DYKES:  Object to the form.
11    A.  In 2017, you were writing to
12 the president. That's not the
13 appropriate grievance channel.
14 BY MR. AMIRI:
15    Q.  But --
16    A.  So when the college told me
17 that you were not using the appropriate
18 grievance channel, I had your
19 communication with the president, which
20 is not the appropriate grievance
21 channel. So, yes.
22    Q.  Do you think if the president
23 or provost took any action in this

Page 180

1 regard? I'm writing them a lot of
2 emails. Yes? Did president or provost
3 investigate the situation? I mean, I am
4 an adult person. I'm a Ph.D. applicant,
5 it's my sixth year, and I know the
6 procedures. I'm directly -- directly
7 reaching to the president. Does it
8 create some concern in the president
9 that something in the university
10 probably is wrong, at least from the
11 student's point of view? Did they do
12 any investigation in this regard?
13    A.  They would not --
14        MR. DYKES:  Object to the form.
15    A.  -- do investigation in that
16 regard.
17 BY MR. AMIRI:
18    Q.  Did they --
19    A.  They would direct you to the
20 grievance process.  We have 38,000
21 students.
22    Q.  But if the --
23    A.  The president does not

Page 181

1 adjudicate the situations of all the
2 students. He directs them to the
3 grievance process.  The reason the
4 grievance process is constructed the way
5 it is, is because the situation is
6 resolved closer to where the action is
7 happening, not at the president's level.
8    Q.  Okay. How many student- --
9 Ph.D. students directly reaching to the
10 president in a year for this kind of
11 accusations?
12        MR. DYKES:  Object to the form.
13        THE WITNESS:  Should I answer
14 that?
15        MR. DYKES:  If you -- if you
16 can.
17    A.  I know of three.
18 BY MR. AMIRI:
19    Q.  So --
20    A.  But I wouldn't necessarily know
21 of them all, but I know of three.
22    Q.  Good answer.  So we have only
23 three student in one year who directly

46 (Pages 178 - 181)

| Page 182 | Page 184 |
|---|---|
| 1 want to reach to the president. So -- | 1 making such a guess -- |
| 2    A. Who are Ph.D. students. | 2    Q. Okay. |
| 3    Q. Yes. | 3    A. -- because I would never hear |
| 4    A. But the -- all students' | 4 about it. |
| 5 concerns are valid, so they, then, would | 5    Q. So I'm thinking, if only three |
| 6 not be taken more -- they would not be | 6 student is reaching to president, |
| 7 treated differently because they are | 7 probably the president should put ten |
| 8 Ph.D. students. Generally Ph.D. | 8 minute time to respond to them. It |
| 9 students don't have as many of these | 9 is 30 minute in one year. |
| 10 kinds of difficulties. | 10       MR. DYKES: Object to the form. |
| 11    Q. Do you think if I am a | 11 If there's a -- |
| 12 sixth-year Ph.D. student who contributed | 12 BY MR. AMIRI: |
| 13 to bring National Science Foundation | 13    Q. Do you think it is a right |
| 14 money of about half a million dollars to | 14 expectation or not? |
| 15 this university, when I'm directly | 15    A. No. |
| 16 reaching to the president, my voice | 16       MR. DYKES: Object to the form. |
| 17 should be a little bit more valuable | 17 BY MR. AMIRI: |
| 18 than, for example, undergraduate student | 18    Q. Why not? |
| 19 who may reach him? | 19    A. Because I -- it's not only |
| 20       MR. DYKES: Object to the form. | 20 three, and, even if it were only three, |
| 21    A. I -- I think that all student | 21 the thoughtful process of dealing with a |
| 22 concerns are treated equally, and we | 22 student who perceives that he or she is |
| 23 work hard not to let extra details or | 23 being treated unjustly is to follow |

| Page 183 | Page 185 |
|---|---|
| 1 extra information change a fair process. | 1 the -- the fair hearing process. As I |
| 2 So I would not think there would be any | 2 said that I would not step into the |
| 3 circumstances you could put on the table | 3 communications between a department and |
| 4 that should change the way we address | 4 a student, the president also does not |
| 5 having a student be fairly heard. | 5 do that. The grievance process is |
| 6 BY MR. AMIRI: | 6 designed to give a student a fair |
| 7    Q. Okay. You told about three | 7 hearing at every level. And the -- the |
| 8 student directly reached -- Ph.D. | 8 president and the provost in -- whether |
| 9 student reached to the pre- -- president | 9 they receive three or 300 such messages |
| 10 and provost. | 10 will always direct a student to use the |
| 11    A. Or provost, yeah. | 11 process that gives that student a fair |
| 12    Q. Do you -- do you know how many | 12 hearing and also gives the department a |
| 13 student in general reached to the | 13 chance to express their side. I feel in |
| 14 president in this condition? | 14 this situation like you think you -- you |
| 15    A. No. | 15 know both sides, but one -- one person |
| 16       MR. DYKES: Object to the form. | 16 never knows both sides, and the |
| 17 BY MR. AMIRI: | 17 grievance process is designed to allow |
| 18    Q. Do you -- can you give an | 18 both sides to speak, and then to -- to |
| 19 estimated number how much? | 19 reach a -- a conclusion. |
| 20    A. No. | 20    Q. Well -- |
| 21    Q. Do you think it is more than | 21    A. And so the president |
| 22 ten or less than ten? | 22 interfering with that, without having -- |
| 23    A. I wouldn't have any basis for | 23 and it's not -- no, it's not ten minutes |

47 (Pages 182 - 185)

Page 186

1 at all. It would be treated -- it has
2 to be treated deeply and seriously and
3 thoroughly, and that would happen
4 through the grievance process.
5    Q. Well, I told you that
6 previously. I told you that, in 2016, I
7 followed the grievance procedure and I
8 followed it step by step from the very
9 first person to the highest person in
10 that college, College of Art and
11 Science. They did not give me a letter,
12 but I recorded these very voices. And, in
13 2017, when I was sending these emails to
14 professors -- prof- -- to provost and to
15 the president, I attached those
16 communications I had with those
17 officials in the grievance procedures.
18 So they could hear the conversation I
19 had with those people in the grievance
20 procedure. Do you think they should --
21 this should make a difference?
22    A. No.
23       MR. DYKES: Object to the form.

Page 187

1 BY MR. AMIRI:
2    Q. But I -- I'm proving that I
3 followed the grievance procedure, and
4 their answers was very much rude. The
5 person who is in the grievance procedure
6 is telling me, "You are wasting my time.
7 These people are my people. I don't pay
8 attention to you. I pay attention to my
9 people. No matter what" -- "what" --
10 "what is the situation, I support my
11 people. I don't support you."
12       MR. DYKES: Object to the form.
13 BY MR. AMIRI:
14    Q. And he's telling me, "You are
15 wasting my time." And that is Dr. Han.
16 You have talked to him. And I sent his
17 voice recording to the president. Does
18 it -- should it make a difference or
19 not?
20    A. No.
21       MR. DYKES: Object to the form.
22 BY MR. AMIRI:
23    Q. Why it shouldn't make a

Page 188

1 difference?
2    A. Well, the -- today is, um,
3 you're telling me things about 2016 that
4 I -- I don't have a thorough knowledge
5 of. But I would say this: You --
6 the 2017 grievance would be about the
7 action that the faculty committee took,
8 and it would be a new issue. I don't
9 thoroughly understand the issue you
10 raised in 2016. It could be that that
11 issue was not appropriate for the
12 grievance process, or it could be that
13 it was wasting someone's time or it
14 could be that you were right. I don't
15 know. But the 2017 issue would be new.
16 You would be raising a question that you
17 have raised this morning: Did that
18 committee have the standing to make the
19 determination it made? You could take
20 that through the grievance process. I
21 understand from what you're saying that
22 you lost faith in the grievance process.
23 That doesn't invalidate the grievance

Page 189

1 process. You needed to use it, and
2 that's what you were directed to do when
3 you contacted the president. You have
4 to use the grievance process.
5    Q. Yes.
6    A. You -- you can use the
7 grievance --
8    Q. Can we --
9    A. -- process or litigation --
10 that's why we're here -- but those are
11 the processes. And -- and --
12    Q. Well --
13    A. -- those processes are designed
14 to give you a fair hearing.
15    Q. Well, okay. In 2017, I copied
16 my objection to this recommendation
17 letter to all of the people in the
18 hierarchy of the grievance procedure.
19    A. Yes, you did.
20    Q. So this is counted as using
21 that grievance procedure, but not from
22 the bottom. I contacted all of them.
23 That is first.

48 (Pages 186 - 189)

Page 190

1    Second. When I am copying --
2 when I'm sending the voice recording of
3 the people in the hierarchy of the
4 grievance procedure to the president, it
5 means that the grievance procedure is
6 not functioning. When it is not
7 functioning, I cannot follow through
8 that. So the purpose of sending the
9 voice recording, that you can hear and
10 you can identify the person who is
11 talking, is to show that the people in
12 the hierarchy of grievance procedure are
13 not following the UA procedures. They
14 are not follow- -- following the
15 graduate handbook. They are not
16 following the graduate catalog. They
17 are not following the procedures
18 determined for grievance procedure.
19 Their name are on the side, but they are
20 not following them. And, to prove that,
21 I sent their exact voices to the
22 president.
23    A. I understand that.

Page 191

1    Q. Yes. So it means that --
2    A. Is that a question --
3    Q. -- the griev- --
4    A. -- for me?
5    Q. I -- I will ask it. Does this
6 mean that the grievance procedure is not
7 functioning?
8    A. No.
9        MR. DYKES: Object to the form.
10    A. It doesn't mean that. It means
11 that you feel that it's not functioning.
12 BY MR. AMIRI:
13    Q. So should president listen to
14 those audiotapes --
15        MR. DYKES: Okay. Mr. Amiri,
16 we -- you -- you've asked this question
17 a half a dozen times and she's answered
18 it a half a dozen times. I mean,
19 can . . .
20        MR. AMIRI: What is that
21 question that I asked?
22        MR. DYKES: About whether he
23 should listen to the tapes, whether the

Page 192

1 grievance -- I mean, you've been down
2 this road for the last 15 minutes of the
3 same -- the same thing. I . . .
4    A. And my answer is, the grievance
5 process is functioning. The president
6 should not have listened to the tapes.
7 You feel that the grievance process
8 isn't functioning. The grievance
9 process is designed to give the student
10 a fair hearing and to hear all sides of
11 an issue. When you're the only one
12 talking, that doesn't mean the grievance
13 process is broken.
14 BY MR. AMIRI:
15    Q. Okay. Let's move to next --
16    A. Oh, thank goodness.
17    Q. -- question. The next line
18 that I underlined, can you please read
19 that?
20    A. "The two faculty members who
21 have been directing Mr. Amiri's doctoral
22 research no longer wish to direct his
23 project." Can I read the rest of the

Page 193

1 sentence or not?
2    Q. That is enough. So -- so this
3 is your -- you are reporting this to
4 Mr. Dorsey, that the two faculty
5 members who have been directing
6 Mr. Amiri's doctoral res- -- research no
7 longer wish to direct his project. My
8 question is that, can a faculty member
9 not wish to direct a student? Is it
10 possible that a faculty member can,
11 "Okay, from now on, I'm not going to
12 direct you"?
13    A. Yes. That happens a lot.
14    Q. Did -- does anybody ask from
15 faculty member why? Does any- --
16    A. Yes.
17    Q. -- anybody --
18        MR. DYKES: Object to --
19    A. Yes.
20        MR. DYKES: -- the form.
21 BY MR. AMIRI:
22    Q. Does anybody in the University
23 of Alabama ask from the faculty member

49 (Pages 190 - 193)

Page 194

1 why you are not wishing to advise this
2 student anymore?
3    A. When --
4       MR. DYKES: Object to the form.
5    A. When a faculty member wishes
6 not to advise a student -- and, again,
7 you're asking me about general
8 University procedure. Right? Are you
9 asking me about your situation or
10 general procedure? Because you told me
11 not to --
12 BY MR. AMIRI:
13    Q. Please provide a short answer.
14 You can give --
15       MR. DYKES: Well, don't --
16 BY MR. AMIRI:
17    Q. -- general information, yes.
18 Go ahead.
19       MR. DYKES: An- -- answer the
20 question in any way --
21       MR. AMIRI: Yes.
22       MR. DYKES: -- you want to
23 answer.

Page 195

1 BY MR. AMIRI:
2    Q. Yes. Answer the question any
3 way you want.
4    A. When a faculty member wishes no
5 longer to direct a dissertation, a
6 decision has to be made about the
7 student's future. So at some point the
8 question would be asked about what is
9 the next step for the student. Will we
10 assign a new director, or would that be
11 unproductive?
12    Q. So my question is, does anybody
13 ask from the professor that, "You was
14 directing this student for four years.
15 Why you don't want to direct him
16 anymore?"
17    A. Yes.
18    Q. Did anybody ask my advisors why
19 they don't wish to direct me anymore?
20    A. I --
21       MR. DYKES: Object to the form.
22    A. -- asked the question about
23 your progress.

Page 196

1 BY MR. AMIRI:
2    Q. No, I'm asking about --
3    A. I asked and received sufficient
4 information to satisfy me about why your
5 director no longer wished to direct your
6 dissertation.
7    Q. What was the reason?
8    A. Failure to progress.
9    Q. But you just read that I made
10 allegation of misconduct against my
11 advisors.
12    A. I did see that today.
13    Q. Do you think is it primary
14 reason or not making progress?
15    A. I'm not in a position to --
16       MR. DYKES: Object to the form.
17    A. -- judge that, but, if you
18 failed to progress, the allegations
19 might not be relevant to that, or i- --
20 the que- -- my question was --
21 BY MR. AMIRI:
22    Q. Yes.
23    A. -- a narrower one: Is the

Page 197

1 student progressing? And that is the
2 question also that the committee in the
3 department was asked to evaluate. So
4 you are asking whether other questions
5 complicate that question. To me, as
6 dean of the Graduate School, they --
7 they do not because the question, "Is
8 progress being made?" "Is progress not
9 being made?" is a clean question, and I
10 believe that is the question that I
11 asked Dr. LeClair. And I believe, from
12 what I'm seeing here, that is the
13 question that Dr. Clair asked the
14 committee to ascertain.
15    Q. And --
16    A. So that is the question that is
17 central here. We've spent a lot of
18 time. That's the question that is
19 central here.
20    Q. So the answer of Patrick
21 LeClair is admissible for you?
22    A. Yes.
23    Q. And I'm telling you that, for

Page 198

1 four years, we had weekly group
2 meetings --
3     A.  Yes, we talked --
4     Q.  -- with these two professors.
5     A.  -- about this and --
6     Q.  Is it admissible for you or
7 not?
8     A.  No.
9     Q.  Why?
10    A.  I don't know what the
11 professors' evaluation of your progress
12 is.  I only know what you are telling me
13 their evaluation of your progress is.  I
14 would need to understand from them
15 whether they felt that those
16 conversations were productive, not
17 productive, progressing, not
18 progressing.
19    Q.  My question is --
20        MR. DYKES:  It's -- it's 12:10.
21        MR. AMIRI:  Can we continue --
22        MR. DYKES:  I mean, I -- yeah,
23 I --

Page 199

1        MR. AMIRI:  -- for five
2 minutes, please?
3        MR. DYKES:  -- you had asked me
4 to tell you five minutes.
5        MR. AMIRI:  Yes.  Thank you.
6 BY MR. AMIRI:
7     Q.  My question is, the mere
8 existence of a group meeting for four
9 years, that two professors are --
10    A.  Yes.
11    Q.  -- coming to -- I mean, we are
12 having meetings --
13    A.  Yes, no, that -- that in
14 itself --
15    Q.  I am --
16    A.  -- does not constitute evidence
17 of progress.
18    Q.  So, even if we don't make
19 progress, you -- you are telling that
20 the --
21    A.  Yes.
22    Q.  -- head of the Physics
23 Department will come to the MINT Center

Page 200

1 to sit down with the vice director of
2 the MINT Center and with one Ph.D.
3 student, talk for four years, even if
4 there is no progress?
5     A.  The first part of the answer is
6 "yes."  The second part is, "no
7 progress" isn't what we were talking
8 about.  We were talking about timely and
9 continuous progress.  But I would say
10 that the meetings in themselves don't
11 constitute evidence of progress.
12    Q.  So you mean, without progress,
13 the meeting with -- between two
14 high-rank professor and a Ph.D.
15 student -- student can be continued for
16 four years, even if there is no
17 progress?
18    A.  I don't -- what -- I don't
19 think anyone said there was no progress,
20 but I don't know.  I don't know at what
21 point there might have been progress.
22    Q.  My understanding is that, if
23 the Ph.D. student can have --

Page 201

1     A.  The meetings in themselves do
2 not constitute evidence of progress.
3     Q.  My understanding is that, if a
4 Ph.D. student has a meeting with two
5 high-rank faculty members for four
6 years, it means that the student, not
7 only is a -- is making very good
8 progress, but he is very high-rank
9 student who can get time from two
10 professors every week to come sit down
11 and study his progress and see how much
12 progress, how much experiments was done
13 in one week, to comment on it, ask him
14 what to do for the next week, and next
15 week get the result.  If the student
16 cannot produce those -- that -- those
17 results in one week, the next week or a
18 few weeks after that, these meetings
19 would not be continued.  The -- when we
20 see that there is a meeting going on for
21 four years, it means that the
22 expectation of the -- those two
23 high-rank professors, which both are

51 (Pages 198 - 201)

Page 202

1 professors with very high rank, are
2 being achieved, so the student is able
3 to satisfy those expectation, that
4 people are coming and sitting down and
5 talking for one hour, two hour every
6 week, this is my logical conclusion, but
7 you are entitled, I mean, to your own
8 judgment as well. I respect that.
9        MR. AMIRI: Okay. We can take
10 a break.
11       MR. DYKES: Object to the form.
12       VIDEOGRAPHER: We are going off
13 the record at 12:14.
14       (A LUNCH BREAK WAS TAKEN)
15       VIDEOGRAPHER: We are back on
16 the record at 1:09.
17 BY MR. AMIRI:
18   Q. Yes. Let's continue from where
19 we left. We was on Exhibit Number 7.
20   A. Yes.
21   Q. And can you please read the --
22 read the last part that I underlined,
23 that one line?

Page 203

1   A. "Or do you consider that he is
2 still an enrolled doctoral student, but
3 without a lab?"
4   Q. Can you please explain what is
5 meant?
6   A. Yes. My question to Charles
7 Dorsey related to the fact that -- that
8 you would no longer have a position in
9 the MINT lab because of the decision
10 that the committee made and the failure
11 to progress. And my question was, if
12 you don't have access to a lab, can you
13 still be an enrolled student? He wasn't
14 the right person to ask that question
15 to, but I didn't know that at the time.
16 I was trying to discern what the next
17 steps needed to be, and he directed me
18 back to say this, you know, doesn't move
19 past the Physics Department. It's still
20 the Physics Department's decision, which
21 was correct, but I didn't know that at
22 the time. I had been here less than a
23 year at that time, and so -- well, in --

Page 204

1 in -- in the field I come from, there's
2 no lab, so these questions are -- are
3 self-evident, but it was more
4 complicated with -- in terms of lab
5 access, so that was what I was asking
6 him about.
7    Q. So -- so the conclusion was
8 that not having access to lab is fine?
9    A. Well, I couldn't see how you go
10 forward that way. It seemed like you
11 couldn't go forward with your research
12 without a lab. So I was trying to
13 figure out what -- what your options
14 could even possibly be at that point
15 without a lab.
16   Q. Do you know how many labs I had
17 access to?
18   A. No, I don't.
19   Q. So the reason that I didn't
20 have these two professors told that I --
21 they don't wish I work with them. Each
22 of these professors have two labs.
23 Dr. Arun Gupta has two labs, and Dr. --

Page 205

1 Dr. Patrick LeClair has two labs. It is
2 four lab. When you send that police
3 officers on 26 June to take the keys,
4 they --
5        MR. DYKES: Object to the form.
6 BY MR. AMIRI:
7    Q. -- they took ten keys from me.
8 So I had access to ten traditional labs.
9 It leaves six other traditional labs
10 that are operating with keys that these
11 two professors does not have control
12 over them. In addition to that, there
13 are internal labs that are acting --
14 their door is acting based on action
15 cards --
16   A. Um-hum.
17   Q. -- which is our student card.
18   A. Right.
19   Q. So I don't need to have a
20 traditional key. And there are some
21 labs that we need to enter a code.
22 Counting them, I had access to more
23 than 15 labs, and two of them does

52 (Pages 202 - 205)

1 belong to Dr. LeClair and two of them
2 does belong to Dr. Arunava Gupta. So
3 even if I wouldn't access to those labs,
4 I had access to more than ten other
5 labs, so it was not a concern.
6    A.  No.
7        MR. AMIRI:  I'm introducing
8 Exhibit Number 8.
9        (PLAINTIFF'S EXHIBIT NO. 8
10 MARKED)
11       MR. DYKES:  Susan, let me see
12 that.
13       THE WITNESS:  (Tenders
14 document)
15       MR. DYKES:  Thank you.
16 (Reviews document)
17 BY MR. AMIRI:
18    Q.  This is an email that Dr. Han
19 forwarded to you. Can you please read
20 the first paragraph for me?
21    A.  But this is from Patrick to
22 Luoheng.
23    Q.  Yes, it is on --

1    A.  And Luoheng forwarded it to me.
2    Q.  Correct.
3    A.  Okay. You want me to just read
4 the underlined part?
5    Q.  Yes. Just the fir- -- the full
6 first paragraph. And the date is 27
7 June 2017.
8    A.  Yes.
9    Q.  Both of the emails dated that
10 date. Yes, go ahead, please.
11    A.  "Luoheng, we do not have much
12 in writing unfortunately. Most of the
13 assessment, until the seventh year is
14 approaching, has been done in
15 face-to-face discussions with research
16 advisors, the dissertation committee
17 members, et cetera. I usually met with
18 Ali about once a week to discuss
19 research in my office. I will see if I
20 can find some relevant emails, but I
21 doubt there is much that will be
22 helpful. I can say that one of the
23 main metrics the department uses is the

1 number of publications the student has,
2 which is zero in Ali's case."
3    Q.  Well, in the part that I have
4 underlined, he is telling, "We do not
5 have much in writing unfortunately."
6 At that time I was sending a lot of
7 emails to officials, including provost,
8 which you are associate provost, and
9 the pro- -- I mean, it is rationale
10 that you knew about those emails. And
11 in those emails there was a lot of
12 communications in writing, which I was
13 turning into PDF, and I was explaining
14 them, and I was sending them -- them
15 to provost. Did you forward any of
16 those emails to Dr. Han or Dr. LeClair
17 and tell, "So what is this written
18 doc-" -- "document that he's forwarding
19 to us?"
20       MR. DYKES:  Object to the form.
21    A.  I don't know. I'm not -- I --
22 I don't see what the question is that --
23 that --

1 BY MR. AMIRI:
2    Q.  Okay. The question is --
3    A.  Which documentation -- I mean,
4 the question that Patrick is answering
5 here when he says, "We don't have much
6 in writing," what is he -- what -- what
7 was the question that Luoheng asked him?
8    Q.  Yes.
9    A.  Because it wasn't whether we
10 have anything in writing; I'm sure it
11 was whether we have anything in writing
12 related to something. What . . .
13    Q.  Yes. It is about assessment of
14 the research --
15    A.  Of your --
16    Q.  -- progress.
17    A.  -- research progress. And so,
18 are you asking me if I saw emails that
19 assessed your research --
20    Q.  Yes.
21    A.  -- progress? No.
22    Q.  But I sent a lot of emails and
23 I organized them very, very well. That

53 (Pages 206 - 209)

|  | Page 210 |
| --- | --- |

1  those emails was showing that I had
2  considerable -- not considerable --
3  excellent progress in five different
4  topics. There --
5      A.  And those were from you or they
6  were from your directors? I mean, is
7  that . . .
8      Q.  The first one was from me. I
9  worked on it for two years, and that was
10  strain effect on VO2. The second one
11  was again strain effect but using
12  bending method. That -- that --
13      A.  I guess what I mean is, do you
14  have any emails where the advisors were
15  telling you that your progress was
16  great, excellent?
17      Q.  Yeah.
18      A.  That's -- that's --
19      Q.  Yes, I have --
20      A.  Yeah --
21      Q.  -- I have --
22      A.  -- so I haven't seen those, no.
23      Q.  I have those, but, in addition

Page 211

1  to them, I am referencing to emails that
2  I wrote to provost, which you are in his
3  office and you are associate provost.
4  And, in those emails, I showed my
5  progress. I showed the international
6  conferences I attended, the posters I
7  presented --
8      A.  Um-hum.
9      Q.  -- the papers I wrote, the
10  weekly reports. Every week I had a
11  report, and I forwarded those reports to
12  provost, and those reports had very high
13  quality images and research result.
14  Provost is mechanical engineer. He can
15  exactly understand them. And, I mean,
16  everybody can understand them. It was
17  very excellent work. So, in addition to
18  the fact that we had meetings for four
19  years, I had my PowerPoints for every
20  week that I presented. I wrote down the
21  questions they asked. I wrote down what
22  they asked me to do for the next week,
23  and I did those experiments, and the

Page 212

1  next week I showed them. We compared
2  our results with other universities.
3  For example, we did -- we did some work
4  with Northwestern University. Our work
5  was much better than them, their
6  results, and I showed them in those
7  emails. We had a collaboration with
8  Oakland University.
9      A.  Right. So --
10      Q.  And so you had those --
11      A.  -- so --
12      Q.  -- emails. Why you didn't show
13  what -- some of those emails to Dr. Han
14  to say then, "We have something in
15  writing"? Why you are not telling --
16      A.  The question --
17          MR. DYKES:  Object to the form.
18      A.  -- here is what does the --
19  does -- have the faculty members
20  assessed your progress. So you going
21  around that and showing your progress
22  isn't what -- what we would want. What
23  we would want is for the faculty members

Page 213

1  to judge that progress and tell us.
2  BY MR. AMIRI:
3      Q.  Even --
4      A.  So, in other words, it's your
5  directors who have to say whether that's
6  excellent or not excellent. All
7  students think their work is excellent,
8  so we rely on the professors to say,
9  "Yes, indeed it is," or "This is not
10  leading to a defensible dissertation."
11  It is or it isn't.
12          And -- and so we ask them to
13  tell us that. We don't make an
14  independent judgment. So you can't give
15  it to other people and ask them, "Is
16  this good progress? Isn't this good
17  progress?" It has to come back to your
18  advisors.
19      Q.  But we have a meeting every
20  year with members of dissertation
21  committee, and they sign a document that
22  shows what is their opinion. We have
23  those reports. So it is not that we

54 (Pages 210 - 213)

Page 214

1  don't have anything in record. A State
2  university that has almost 40,000
3  student cannot work based on
4  face-to-face, verbal communications.
5  You need to have documentation. Yeah?
6  And we had those documentations. We had
7  yearly reports. We had our reports to
8  National Science Foundation, because we
9  brought money from there. And, before
10 we get to National Science Foundation
11 money, I did a lot of experiment, and I
12 produced the results that we put in the
13 application. The application we sent
14 for National Science --
15    A.  Um-hum.
16    Q.  -- Foundation was rejected two
17 times before.
18    A.  So this says, "The only
19 department assessment of his research
20 progress was his preliminary
21 examination."
22    Q.  Then, after that, the yearly
23 examination of the department as well.

Page 215

1     A.  And it says, "In March 2015, we
2  did consider that Ali was making good
3  progress, but he has not progressed
4  since then."
5     Q.  But we had another meeting
6  in 2016 as well.
7     A.  With written?
8     Q.  Yes, with written report.
9     A.  So you have that.
10    Q.  And I have even their verbal
11 evaluation at the conclusion of that. I
12 recorded their voices. So how -- I
13 mean, we have everything in the report
14 as well, but in addition to that, I
15 report -- recorded their voices.
16       My question for you as
17 associate provost, when you have those
18 communications from me that I'm sending
19 to you, and you are trying to stop me,
20 those are information. You can look at
21 them and tell, okay, you are telling we
22 don't have any face to face. Well,
23 everything is face to face; we don't

Page 216

1  have any document. But the student send
2  us documents. What are these documents?
3     A.  I don't have --
4        MR. DYKES: Object to the form.
5     A.  Yeah, I don't -- I'm not sure
6  what you think my role here would be as
7  dean.
8  BY MR. AMIRI:
9     Q.  I mean, you are --
10    A.  You think I should have --
11    Q.  You are receiving this email,
12 and you are accepting it as true.
13    A.  Yes.
14    Q.  But you have evidence that it
15 is not true.
16    A.  I ha- -- I -- he says that
17 you've not progressed since March 2015.
18 So I suppose that, if you had gone
19 through the grievance process, someone
20 would have asked, "Has he made progress?
21 Have you made progress?" and come and
22 weigh the two things side by side, what
23 you say, what they say. That would have

Page 217

1  happened in the grievance process.
2     Q.  As I mentioned to you, the
3  grievance process was not functional and
4  they didn't ask, because they didn't ask
5  that question that you are mentioning, I
6  recorded their voice and I send the
7  voice record to president and provost
8  that the people in grievance process are
9  not asking me any question. They are
10 not asking from the professor anything.
11 They're just telling, "We are not" --
12 "we don't buy that." The exact word is
13 Dr. Han, "We" -- "I don't buy it." I
14 mean, they --
15    A.  So that was --
16       MR. DYKES: Object to the form.
17    A.  -- in 2016?
18 BY MR. AMIRI:
19    Q.  2016.
20    A.  In 2017, you didn't try the
21 grievance process.
22    Q.  As I told to you, I re- -- I
23 provided --

Page 218

1    A. You had lost faith in the
2 grievance process.
3    Q. -- to everyone. I provided to
4 all of them. I think when email
5 communication is -- should be
6 acceptable, I provided the email to all
7 the people who -- I talked to them in
8 person. They know me. I provided it to
9 them. In addition to that, I appealed
10 to the president and provost.
11    A. Yes. Right.
12    Q. So you didn't have those email
13 communications that shows my progress
14 that they have signed, then?
15    A. I don't know if I had them or
16 not. Even if I had them, I would not
17 have relied on those in the absence of
18 the professor speaking. I -- I wasn't
19 evaluating that. That wasn't my role.
20 My only role was to see if the
21 committee, which did evaluate your
22 progress, acted in line with the
23 criteria they had established. So what

Page 219

1 you're asking me is how many ways could
2 we have done something different than
3 that, but --
4    Q. No, I'm telling that you
5 rec- --
6    A. -- that is the process that --
7 that I follow.
8    Q. Yeah. I'm telling you that you
9 received an email that you told it is
10 true, but you had evidence in your hand
11 that it is not true.
12       MR. DYKES: Object to the form.
13 BY MR. AMIRI:
14    Q. The evidence was the emails
15 that I sent to provost's office that
16 shows my progress and shows the
17 professors' signatures on those
18 documents. It shows their voice
19 records. Everything is completely
20 ad- -- admissible. And you are
21 accepting a false email as true, and you
22 are not paying any attention to the
23 documents I sent --

Page 220

1       MR. DYKES: Mr. Amiri --
2 BY MR. AMIRI:
3    Q. -- to you.
4       MR. DYKES: -- you're here to
5 ask her questions. You're preaching to
6 her about your case, which you have your
7 opinions in your case, and that's fine.
8 But it's not your -- this is -- the
9 deposition is not your time to tell her
10 your case and how she's wrong; it's your
11 time to ask her questions, so.
12       MR. AMIRI: Yes. But because
13 she's telling that she doesn't have much
14 information. I'm presenting those
15 information to her --
16       MR. DYKES: No, you're not --
17       MR. AMIRI: -- to refre- --
18       MR. DYKES: -- you --
19       MR. AMIRI: Yeah.
20    A. It wouldn't matter what you
21 sent me. I wasn't going to second-guess
22 the opinion of that committee, unless it
23 came up to me through the grievance

Page 221

1 process, level by level. I wasn't going
2 to investigate it from any side avenue.
3 That's not my role, and it's not the way
4 the grievance process works. So we're
5 back to the same point. You didn't
6 trust the grievance process.
7    Q. I did trust.
8    A. I would insist --
9    Q. I send you email.
10    A. -- on the grievance -- you
11 trusted it in 2016; you didn't trust it
12 in 2017, because you wrote to all levels
13 at the same time. That's what you said.
14    Q. Yes.
15    A. That's not the grievance
16 process. That's a -- that's the
17 opposite of the grievance process. So
18 we're back to the same point. I would
19 only tell you, no matter what you -- you
20 could bring me your Nobel Prize, and I
21 would say, look, it's got to come
22 through the grievance process. I'm not
23 going to evaluate it apart from the

56 (Pages 218 - 221)

Page 222

1 grievance process. So my role was to
2 look at what the committee said and see
3 whether it was within their purview to
4 make those determinations, and then to
5 act in response. And if that wasn't
6 right, I trust the grievance process.
7 So those are -- those are the choices,
8 those are the options in front of me.
9 Either everything is fine, or we use the
10 grievance process. So the kind of
11 series of emails, it doesn't -- doesn't
12 help.
13     Q. It says --
14     A. Doesn't hurt, doesn't help.
15 It's irrelevant to the choices that we
16 had, which were to go with what the
17 committee said or investigate further
18 through the grievance process.
19     Q. I see. And this series of
20 emails had a lot of attachment, which
21 was documents.
22         MR. AMIRI: I enter this
23 Exhibit Number 9.

Page 223

1         (PLAINTIFF'S EXHIBIT NO. 9
2 MARKED)
3         MR. DYKES: (Reviews document)
4     A. (Reviews document)
5 BY MR. AMIRI:
6     Q. This is an email that you sent
7 on July 3rd, 2017, and you send it to --
8     A. Admissions staff.
9     Q. Yes. And can you explain who
10 are these people?
11     A. The Admissions staff, each are
12 in charge of different programs, and
13 they report to me.
14     Q. And can you name some of those
15 programs?
16     A. All of the programs. All of
17 the master's programs and all of the
18 doctoral programs.
19     Q. So they are in different
20 departments?
21     A. They -- they're in my office.
22 So you remember I said that we --
23     Q. Yes.

Page 224

1     A. -- have central and
2 decentralized processes. This is how
3 Admissions works. Students apply --
4 applicants apply to the Graduate School.
5 That's my office. These people work
6 with the application, and so you
7 corresponded with them when you applied,
8 and they say, "We need the transcript,"
9 and they say, "We need the TOEFL score,"
10 and they say, "We need all of this."
11 When it's all together, they make sure
12 it meets the University's minimum
13 requirements, and then the departments
14 have access to it. Then the
15 departments, which are decentralized,
16 make a decision and they let us know.
17 And when they let us know, these people
18 notify the student. So we're the
19 intermediaries in the admissions
20 process. So no student applies to a
21 department; a student applies to the
22 Graduate School, and so this is the
23 staff.

Page 225

1     Q. I see. And can you please read
2 the email?
3     A. It says, "Hi, all. The student
4 referenced above has been dismissed from
5 his doctoral program, physics. He is an
6 international student. If he submits an
7 application to any other graduate
8 program in the coming weeks, please let
9 me know."
10     Q. Can you please tell me what was
11 the purpose of this email?
12     A. Yes. Because you are an
13 international student, your visa status
14 is interrelated with your academic
15 status. So, because the standard letter
16 of dismissal says that you may apply to
17 another program at the University to
18 continue your studies, I thought that
19 you might well take advantage of that
20 option, because, otherwise, you lose
21 your visa. That is what many
22 international students do when their
23 program ends and they don't want to be

57 (Pages 222 - 225)

Page 226

1 finished; they apply to a different
2 program. And so I wanted to know if you
3 would do that. I was concerned about
4 your visa status. Also about your
5 progress --
6   Q. And --
7   A. -- so I wanted to know. So
8 it -- so that's why I did it.
9   Q. So, if --
10   A. I wanted to know.
11   Q. -- if I would apply and they
12 notify you, what would be the result of
13 that you knowing that I have applied?
14   A. Then I would communicate with
15 the international office to let them
16 know. It wou- -- I guess it would
17 depend on what program you applied to.
18 But, generally, I don't know when a
19 student -- when -- when someone is
20 applying; I don't see all the
21 applications. But I wanted to know,
22 because of your situation, and I knew
23 you were facing a very big decision,

Page 227

1 not -- you know, a domestic student
2 faces a big decision; you were facing a
3 bigger decision. International students
4 all face a bigger decision, and my
5 assumption was, without knowing you,
6 that you would either apply to another
7 program here or apply to a physics
8 program somewhere else, so that you
9 would not have to discontinue your
10 studies. That was my assumption.
11   Q. So was you -- were you intended
12 to give me a positive recommendation to
13 them, to get me or not to get me?
14   A. I di- --
15      MR. DYKES: Object to the form.
16      You can answer.
17   A. I don't make a recommendation
18 to departments. As I was saying about
19 being decentralized, the departments
20 make their decision and I don't make --
21 BY MR. AMIRI:
22   Q. No, I want to under- --
23   A. -- recommendations.

Page 228

1   Q. I want to understand the
2 purpose of the email, because --
3   A. Yeah.
4   Q. -- if I get admitted, I mean,
5 automatically I will communicate with
6 international office. I don't need --
7   A. And with the department.
8   Q. Yes.
9   A. And I wanted -- I wanted to
10 know what decisions you were making
11 next.
12   Q. And you are providing some
13 information that I have been dismissed
14 from Physics. Do you think it will have
15 effect on their decision to get me to
16 another department?
17   A. These folks wouldn't be making
18 a decision. If another department knew
19 that you were dismissed from the Physics
20 Department, it might impact their
21 decision, but they would see your
22 transcript anyway, and they would ask.
23 They would ask you. They would ask the

Page 229

1 department.
2   Q. Um-hum. So my understanding is
3 that you just was curious to see what is
4 happening; you don't want to influence
5 in one way or the other.
6   A. I didn't want to influence in
7 one way or the other. I did want to
8 stay aware of what decisions you were
9 making at this critical point, whether
10 you would continue your s- -- I -- I
11 assumed you would continue your studies.
12 My only question is, would you con- --
13 continue your studies in another program
14 at UA or would -- you know, might you
15 apply somewhere else, which I would
16 never know about. That was my question
17 that I had in my mind.
18   Q. Yes. And in your letter that
19 you send me, the option you are giving
20 me to apply to another program, and I'm
21 already in my sixth year in Ph.D., and I
22 am a well-established scientist. I'm
23 attending inter- -- international

58 (Pages 226 - 229)

Page 230

1 conferences, I know a lot of high-rank
2 professors. Even here I have a lot of
3 high rank. I have access to more
4 than 15 labs. Usually a Ph.D. student
5 have access to one, two, three labs. Do
6 you expect me, as a result of your
7 letter, I change my discipline and apply
8 for another program?
9    A. Many people do if they
10 prioritize staying in the country over
11 their professional field. I didn't know
12 what your priority would be. Many
13 people might apply to another program,
14 so that they could have more time in the
15 U.S. to make their decision, and then
16 they would think about it and make a
17 decision. You could very easily, for
18 example -- I'm just conjecturing -- you
19 could go into science education, and
20 then you're not leaving your field
21 completely. You're not going into, you
22 know, cooking, but you would be using
23 your background in a different way where

Page 231

1 you might be more successful. And
2 that's an option that was open to you,
3 and many people do such things. Many
4 people do such things.
5    Q. And so you are thinking, if I
6 go to another field, I can be probably
7 more successful. Yes?
8    A. You could start over and maybe
9 you would be successful, maybe not, but
10 the clock would start over, and so you
11 would have the chance.
12    Q. But I'm telling you that at
13 that point, I was a good scientist.
14 After --
15    A. Now we're back to the point
16 of --
17    Q. -- after getting my -- let me
18 finish -- after getting my ownership
19 document, I filed three patents. All
20 those three patents are single author.
21    A. But --
22    Q. I am the only author of them.
23    A. Right. But none of that

Page 232

1 relates to progress toward the Ph.D.
2    Q. But the word that you are
3 repeating, we have gone over that.
4 So --
5    A. Because, again, you're
6 second-guessing the committee's
7 evaluation of your timely progress
8 toward the degree.
9    Q. No, I'm thinking those
10 committee's members should be prosecuted
11 by the rule of law. That is my view,
12 because they are criminals because they
13 signed a document that the document is a
14 fake document.
15    A. So I understand --
16    Q. So I'm thinking --
17    A. -- that you feel that way.
18    Q. I don't feel that way; I
19 proved that.
20    A. I understand --
21       MR. DYKES: Okay.
22    A. -- that you --
23       MR. DYKES: You're arguing. If

Page 233

1 you have questions, ask the questions.
2       MR. AMIRI: No, I'm just asking
3 my -- yes.
4       THE WITNESS: Yeah.
5 BY MR. AMIRI:
6    Q. So what was you -- finish, and
7 I ask my next question.
8    A. What was -- you were a proven
9 scientist; did I think you would start
10 over in a new program? Yes. Many
11 people do that when they realize that
12 they're not going to succeed in their
13 program, they start a new program.
14    Q. Okay. That is your answer. No
15 problem.
16       Can you go to the next page?
17    A. (Witness complies)
18    Q. Can you please read this email?
19    A. Yes. My -- the associate dean
20 had said, "Is a hold on the student?"
21       "Yes, it has now. The
22 department did not notify us at the time
23 of dismissal. They just notified us

59 (Pages 230 - 233)

Page 234

1 last week. Beth has sent the letter
2 informing him of the hold. Charter
3 spoke with him by phone and thinks he
4 will want to find a way to stay in the
5 U.S. Other issues in this case make me
6 want to stay informed. Thanks."
7    Q. Can you please tell me what was
8 the other issues in this case?
9    A. The other issues were that you
10 had not been successful in the Physics
11 program. Now, again, that's my view
12 based on the committee decision. I
13 understand that you feel that you were
14 successful. But the committee felt that
15 you were not successful, and, because of
16 that, I wanted to stay informed.
17    Q. So what was the use of this
18 information?
19    A. I wanted to see what program
20 you would apply to, and it might be
21 relevant and it might not.
22    Q. You are saying you were
23 notified last week.

Page 235

1    A. Yes.
2    Q. And you create a situation that
3 I need to find a way to stay in the U.S.
4 So --
5    A. I created that situation?
6    Q. You sent me the letter.
7    A. Yes.
8    Q. So --
9    A. So your visa would be
10 terminated.
11    Q. Why you -- your information is
12 about one week. Why you terminate my
13 staying in U.S.? Why you just get the
14 notification one week ago?
15    A. Because Charter would be
16 terminating your visa in SEVIS as a
17 result --
18    Q. That is the procedure.
19    A. -- of the letter. (Nods
20 affirmatively)
21    Q. That is procedure. I'm not
22 asking you about the -- what is the
23 procedure. I'm asking you got the

Page 236

1 notification just one week ago. And,
2 based on that notification, which we
3 argued a lot, you are terminating my
4 status in U.S. Is it correct?
5    A. That is the consequence of the
6 determination that was made by the
7 committee. If we had known about it in
8 May, we would have terminated it in May.
9 We found out about it in June, but
10 our -- our responsibility, once you are
11 no longer in a program, is to terminate
12 the visa. So you are right; the result
13 was the termination of the visa.
14    Q. In one week. And --
15    A. Upon dismissal.
16    Q. Well, did you terminate a
17 professor in June?
18    A. No.
19    Q. Do you know who was the
20 principal investigator of the National
21 Science Foundation award?
22    A. No.
23    Q. He was Dr. Sarker Sanjoy.

Page 237

1    A. But you're asking me questions
2 that -- that don't relate to what I --
3 my responsibility here, or my area of --
4 of action or work.
5    Q. Do you --
6    A. I don't know anything about
7 your NSF grant. I have intentionally
8 learned nothing about your NSF grant,
9 because it's not my area of
10 responsibility. My area of
11 responsibility has to do with your
12 progress toward getting a Ph.D., only
13 that. The NSF grant is separate for me.
14    Q. What about Dr. Pinkert
15 stepping -- stepping down? Do you have
16 information about that?
17    A. No.
18    Q. You don't know why Dr. Pinkert
19 stepped down?
20    A. No.
21    Q. When Dr. Pinkert stepped down,
22 do you know what procedure was taken to
23 find a replacement?

60 (Pages 234 - 237)

Page 238

1   A.  Yes, I do.
2   Q.  What was that procedure?
3       MR. DYKES:  I -- I'm just --
4   for the record, I'm going to object.
5   This is -- the procedure for how a
6   replacement for Dr. Pinkert is well
7   beyond the scope of anything that this
8   case is about.  I've let you talk about
9   Dr. Pinkert based on what the court did
10  last week and his investigation, but the
11  process for his replacement that was
12  done after all these decisions had been
13  made has absolutely nothing to do with
14  the claims in this case.
15      MR. AMIRI:  Mr. Counsel, I'm
16  entitled to ask any question calculated
17  to lead to the discovery of admissible
18  evidence.
19      MR. DYKES:  You are.  But it's
20  admissible evidence, based on the
21  court's scheduling order that relate to
22  whether you had a protected property
23  interest in continued enrollment at the

Page 239

1   University of Alabama, which that has
2   nothing to do with that.  The reasons
3   for plaintiff's dismissal from the
4   University of Alabama, including whether
5   his dismissal was for academic or
6   disciplinary reasons, the replacement
7   for Dr. Pinkert has -- is not reasonably
8   calculated to lead to any discovery --
9   anything that might be admissible on
10  that or the procedures followed in
11  determining whether you should be
12  dismissed from the University in Alabama
13  and in effectuating his dismissal.  So
14  the procedures used in selecting a
15  replacement for Dr. Pinkert are not in
16  any shape, form, or fashion relevant to
17  what we are here for today.
18      MR. AMIRI:  But, Mr. Counsel,
19  that is your point of view.
20      MR. DYKES:  Tell me how in the
21  world the procedures used for
22  Mr. Pinkert's selec- -- his replacement
23  selection are related in any way to what

Page 240

1   we're here for today.
2       MR. AMIRI:  If you wait to get
3   my answer, you will know that.  If I
4   give it to you --
5       MR. DYKES:  Well, I'm not going
6   to waste the time going down that --
7   that line of questioning --
8       MR. AMIRI:  But --
9       MR. DYKES:  -- if you can't
10  tell me how it relates.
11      MR. AMIRI:  Mr. Counsel, your
12  objections are slowing down the
13  deposition --
14      MR. DYKES:  Okay.  Then, let's
15  call the judge.
16      MR. AMIRI:  -- and distracting
17  my focus off the topic.
18      MR. DYKES:  Okay.
19      MR. AMIRI:  Can you please let
20  me ask my questions --
21      MR. DYKES:  No.  I have
22  given --
23      MR. AMIRI:  -- without

Page 241

1   distraction?
2       MR. DYKES:  -- you a lot of
3   leeway on your questions today, and
4   if -- if you -- I'm -- I'm -- the --
5   the -- the process and procedure for
6   selecting Dr. Pinkert's re- -- I'm --
7   no.  If we need to call Judge Proctor's
8   office, let's call him now.
9       MR. AMIRI:  No.  It is being
10  recorded, and we will follow the
11  proceedings later on on this.  You are
12  asking that --
13      MR. DYKES:  I'm telling her not
14  to answer a question related to that
15  because it is in no shape, form, or
16  fashion relevant to anything that we're
17  here for today, so.
18      MR. AMIRI:  Then I will ask the
19  court's opinion later on because I want
20  to continue with my other questions.
21      MR. DYKES:  Okay.  That's fine.
22  BY MR. AMIRI:
23   Q.  Could you please tell me what

61 (Pages 238 - 241)

Page 242

1 is the pass-and-fail course and what is
2 a credit course?
3    A. Um, there's such a broad answer
4 to that. When a course is proposed, the
5 proposal contains a request that it
6 either be a graded course or a pass/fail
7 course. So there are different reasons
8 why a course might be deemed a pass/fail
9 course. Often it's because it doesn't
10 have a specific syllabus, specific
11 assignment, and it's up to the person
12 grading that course to say the
13 expectations were roughly met or not
14 met.
15        In the case of dissertation
16 research, the criteria are less specific
17 because dissertations and doctoral
18 programs operate so differently from
19 each other. So the purpose of that
20 course is to maintain a student's access
21 to the library, to the university
22 facilities, to the faculty, and so it's
23 pass/fail because it's a mechanism for

Page 243

1 keeping students enrolled. Does that
2 make sense?
3    Q. Yes. Can a pass-and-fail
4 course affect the GPA?
5    A. If the student passes, the P
6 grade does not affect the GPA. If a
7 student fails, it does affect the GPA.
8    Q. How it can affect?
9    A. Because it's calculated in as
10 an F. A P is just cal- -- not
11 calculated in, because imagine you have
12 a 3.0 and you get P, P, P, P, P, you
13 still have a 3.0. If you had a 4.0, and
14 then you get P, P, P, P, P, you still
15 have a 4.0. But, if you fail, then
16 the zero is calculated in. So, if you
17 fail, your grade point average drops.
18    Q. If the course to be continued,
19 it is not finished, what would be the
20 effect?
21    A. Then you receive a grade of
22 incomplete, if the professor is willing
23 to give an incomplete. The professor

Page 244

1 can make a decision to give an
2 incomplete or an F.
3    Q. So it is possible that somebody
4 failed a dissertation research course,
5 and his six credit hours every semester,
6 and he will get F grade or zero in that?
7    A. That can happen.
8    Q. Do you know if it happened in
9 my case?
10    A. I don't. I tho- -- I thought
11 you had an "I" grade. That's my
12 recollection, an incomplete.
13    Q. In my transcript, I had zero
14 for this course. And --
15    A. What does zero mean? Zero is
16 not a grade. Is it an incomplete?
17    Q. My understanding is that the
18 GPA courses are counted different from
19 pass-and-fail courses. So the GPA
20 courses can affect GPA, but the
21 pass-and-fail courses, because they are
22 counted differently, they cannot affect
23 GPA?

Page 245

1    A. The F affects your GPA; a P
2 does not affect your GPA. So pass/fail
3 courses can affect your GPA if they're
4 Fs.
5    Q. But --
6    A. But if they are Ps, then they
7 do not affect your grade point --
8    Q. But --
9    A. -- average.
10    Q. -- let's assume that -- that
11 the student has 50 GPA courses, 50
12 credit hour, and he had 30 credit hour
13 dissertation research. So, if the
14 student fails si- -- six credit in his
15 dissertation research, in order to count
16 it in GPA, you need to decrease 30 to 24
17 and add that six credit into GPA to make
18 it more -- in order to account for that
19 change.
20    A. I'm -- I'm not following that,
21 but also I think you'd have to ask a
22 registrar that question. This is not
23 my -- these calculations are not in my

62 (Pages 242 - 245)

Page 246

1 area of expertise, so I'm not --
2    Q.  Okay.
3    A.  -- sure how to calculate --
4    Q.  So your answer is that it can
5 affect?
6    A.  An F can affect.
7        (PLAINTIFF'S EXHIBIT NO. 10
8 MARKED)
9        MR. AMIRI:  I'm introducing
10 Exhibit Number 10.
11       MR. DYKES:  (Reviews document)
12 BY MR. AMIRI:
13   Q.  In this page, you sent an email
14 on June 23rd, 2017, to Dr. Han.
15   A.  Um-hum.
16   Q.  Can you please read that email?
17   A.  "Hi, Luoheng.  Can you briefly
18 tell me the specific grounds on which
19 his access to the lab was taken away?
20 Was it because of failure to make
21 progress on the research, or what was
22 the justification I should convey to
23 legal counsel?  Brevity is fine here."

Page 247

1    Q.  Can you please tell me what it
2 means when you tell that "brevity is
3 fine here"?
4    A.  It means that I don't need to
5 know the whole story; I just need to
6 know whether failure -- was there
7 failure to make progress or was there
8 something else.  Is this a dispute?  Is
9 this a difference of opinion?  Is
10 there -- what -- what -- what's going
11 on?  This is my way of asking what's
12 going on here --
13   Q.  Yes.
14   A.  -- because I didn't have the
15 details at that time, and I needed to
16 know the grounds because, as I said, my
17 job is to make sure that the committee
18 acted in -- in accordance with its
19 scope.  I don't remember if I wrote this
20 email before or after I saw the report
21 from the committee, but that was my
22 question, because, at this time, I was
23 confused about the lab and what that had

Page 248

1 to do with all the other pieces.  I was
2 getting a lot of pieces of this at the
3 same time on that day, and I was making
4 sure that everyone acted within the
5 scope of their responsibilities.  And I
6 was trying to understand it to make that
7 judgment.
8    Q.  Yes.  My question is about
9 brevity.  I mean, does he need to be
10 brave to give you the truth or --
11   A.  No, brief.  Brief.  That --
12 that's the -- "brevity" means be brief.
13   Q.  I see.  Okay.
14   A.  Not brave.
15   Q.  I see.  Can you go to the next
16 page?
17   A.  Yes.
18   Q.  Here you send an email on
19 June 23rd, 2017.  It is two lines.  Can
20 you please read that?
21   A.  The one to Director Dorsey?
22   Q.  Yes.
23   A.  "Dear Director Dorsey:  One

Page 249

1 further item on Amiri.  The letter from
2 the lab director, containing rationale
3 for denial of access to the lab."  So I
4 was giving it to him.  Right?  "Can you
5 let me know whether I should proceed to
6 consult with legal counsel on the
7 academic options at this point?"
8        So this is where I was asking,
9 if you can't get in the lab, what does
10 this mean for your research?  What does
11 it mean for your student status?  So
12 that- -- that's what I was trying to
13 understand at this time.
14   Q.  Yes.  Can you please explain
15 what was the rationale, the rationale
16 that you are referencing here?
17   A.  I would need to see the letter.
18   Q.  It is next page.
19   A.  Okay.  (Reviews document)  So
20 this is the rationale.  Number one, you
21 don't have a supervisor in MINT.  Right?
22 Number two, you're not being supported
23 by any research funds.  So you -- you

63 (Pages 246 - 249)

1 had mentioned that you have access to 15
2 labs, but, you know, the question is, do
3 you have the right to use the labs. And
4 he's saying here, if you don't -- if not
5 being supported by research funds, you
6 don't have a right to access in the lab.
7 That's what the lab director is saying.
8    Q.  So that is acceptable rationale
9 for you?
10    A.  (Nods affirmatively)
11    Q.  But the correct information is
12 that I had an advisor and I had a fund
13 that I contributed to that fund, so I
14 had a portion in that fund my- --
15 myself.  The fund that I was using was
16 the --
17    A.  Those aren't -- those aren't
18 your funds --
19       MR. DYKES:  Object to the form.
20    A.  -- when you're not a student
21 anymore.
22 BY MR. AMIRI:
23    Q.  But I am a student at this

1 time --
2    A.  On June 20th.
3    Q.  I -- my position is that I was
4 still in until 2018, until I find --
5 filed the lawsuit.  That time you
6 dismiss me.
7    A.  2017?
8    Q.  2018.  You dismi- -- dismissed
9 me on February 2018, not in 2017.  That
10 is my position.
11    A.  Okay.
12    Q.  In 2017, you gave me verbal
13 warning that I should not enter to any
14 building, and I did take it serious
15 because I knew that you incarcerated
16 another physics student based on --
17    A.  Are you -- are you talking to
18 me?
19    Q.  I'm explaining to you that you
20 reference that --
21    A.  Are you speaking to Dr. Suzuki
22 right now?
23    Q.  Okay.

1    A.  I'm --
2    Q.  Let's get back to this.
3    A.  Yeah.
4    Q.  So the rationale that you are
5 telling here is not correct.  I'm --
6    A.  Okay.
7    Q.  -- rejecting that.
8    A.  Okay.  That's --
9    Q.  I'm ha- --
10    A.  -- that is your right to --
11    Q.  I --
12    A.  -- reject that.  I was --
13    Q.  And I have evidence --
14    A.  -- accepting that and
15 forwarding it to Dr. -- to Director
16 Dorsey.  That's -- that was what I did
17 at this time.
18    Q.  You did not get my side of
19 view; you just forwarded the email of
20 Dr. Suzuki?
21    A.  I did.
22    Q.  And I have evidence that the
23 email is wrong?

1    A.  And that evidence would have
2 come up in a grievance process.
3    Q.  Okay.  We get back to that
4 point --
5    A.  Yes --
6    Q.  -- again.
7    A.  -- we keep getting back to that
8 point.
9    Q.  No problem.  That is your
10 answer.
11    A.  Yeah.
12    Q.  So did you know that just a few
13 days before this, on June 19, President
14 Bell asked from provost and Vice
15 President Carl Pinkert to investigate a
16 theft incident in the MINT Center?
17    A.  No.
18    Q.  But President Bell asked from
19 Provost Whitaker, and you're associate
20 provost.
21    A.  Yeah, but I sure don't know
22 everything that happens with Provost
23 Whitaker.

1    Q.   But --
2    A.   I have a very specific set of
3 jobs.
4    Q.   But I reported that theft.  You
5 are the dean --
6    A.   A theft, you say?
7    Q.   Yes.
8    A.   Um-hum.
9    Q.   I -- I reported --
10    A.   Yeah, no, I wouldn't know about
11 it.  I don't know about everything that
12 goes to Provost Whitaker.
13    Q.   So when you talked to Dr. Han,
14 he didn't tell you that I reported this
15 theft incident in the lab?
16    A.   I don't remember it, but I
17 wouldn't remember it because it wouldn't
18 have to do with my area.  So I don't
19 remember it, no.
20    Q.   I'm thinking that, if I report
21 a theft incident in the MINT Center, the
22 letter from MINT need to be considered a
23 little bit more diligently.

1    A.   Hmm.
2    Q.   More carefully.
3       MR. DYKES:  Object to the form.
4    A.   And that would have come up in
5 the grievance process.  If we were
6 deliberating this, it would be in a
7 grievance process.  I did not -- we were
8 not in a grievance process, so I took
9 this --
10 BY MR. AMIRI:
11    Q.   But when the president directly
12 gives an order --
13    A.   I wasn't in that loop.
14    Q.   But it is over a grievance
15 procedure.
16    A.   No, it isn't.
17       MR. DYKES:  No --
18    A.   See this is --
19       MR. DYKES:  -- object to the
20 form.
21    A.   -- fundamental
22 misunderstanding, fundamental to our
23 conversation all day.  You can't go --

1 skip the levels and say that the
2 president can control the grievance
3 process.  That's not the way the process
4 works.
5 BY MR. AMIRI:
6    Q.   Dr. Carvalho, theft incident
7 cannot go through grievance procedure.
8 Theft incident need to be handled
9 immediately.
10    A.   So I -- that certainly wouldn't
11 be my area.  So, if you have a question
12 for me, it probably wouldn't be about
13 the theft incident.
14    Q.   But you are in contact with
15 police department.  You are report- --
16    A.   I was giving him information
17 related to the questions I had asked
18 him, which were not related in any way
19 to what you're talking about now.
20    Q.   No, I'm -- it is all related to
21 each other.  You are reporting to police
22 department the communication I have with
23 MINT Center.

1    A.   I did.
2    Q.   And couple of days before that,
3 I reported a theft incident in MINT
4 Center to president, and president asked
5 from provost and vice president to
6 investigate the situation.
7    A.   Well, you would know more about
8 what happened next than I would.  I
9 don't know what happened next.
10    Q.   What happened next is that a
11 group of professors send the police
12 officers to my door.  They took the keys
13 and they stepped down Vice President
14 Carl Pinkert.  They terminated a few
15 professors who was doing investigation.
16    A.   Okay.
17       MR. DYKES:  I'm going to
18 object.
19    A.   Is there a question for me?
20 BY MR. AMIRI:
21    Q.   No.
22    A.   Okay.
23    Q.   You -- you asked; I --

65 (Pages 254 - 257)

Page 258

1      MR. DYKES: I still object to
2  his --
3  BY MR. AMIRI:
4      Q. -- volunteered that answer,
5  but.
6      MR. DYKES: -- soliloquy.
7      MR. AMIRI: I will introduce
8  Exhibit Number 11.
9      (PLAINTIFF'S EXHIBIT NO. 11
10 MARKED)
11     MR. DYKES: (Reviews document)
12 BY MR. AMIRI:
13     Q. This is one-page exhibit. Can
14 you --
15     A. Yes.
16     Q. -- please tell me what is the
17 content of this exhibit?
18     A. This was related to, I believe,
19 an email that you sent to the Office of
20 the Governor. Is that -- I believe.
21 And the Office of the Governor reached
22 out to our government liaison official,
23 R.B. Walker, and asked him, "Can you

Page 259

1  confirm who this is?"
2      And R.B. Walker asked me, "Can
3  you confirm who this is?"
4      Q. Can you please read the email
5  that was sent to you? It is one line.
6      A. He -- R.B. asked me --
7      Q. Yes.
8      A. -- "He enrolled?" which is a
9  short way of asking, "Is he enrolled?"
10     Q. Yes. And the next answer?
11 The -- the next line is?
12     A. Bryan Taylor had asked, "R.B.,
13 can you confirm whether this person is
14 in fact a doctoral candidate at UA
15 Department of Physics?"
16     So then R.B. forwarded that to
17 me and asked, "Is he enrolled?"
18     Q. Could you please tell me did
19 you answer through this email?
20     A. I think I did. I generally
21 answer R.B. Walker. But I don't have
22 the answer in front of me. I assume
23 that I wrote back to him and said, "He

Page 260

1  was and is no longer an enrolled
2  student," because this was July 20th.
3      Q. Is this the only email you
4  received from Office of Governor Kay
5  Ivey?
6      A. Yes. About you? Yes.
7      Q. You did not receive any other
8  email from them in the coming months --
9      A. Related to you?
10     Q. Yes.
11     A. I don't believe I did, no.
12     Q. So in September 2017 and
13 October 2017, you did not get any email
14 or any communication with Governor Kay
15 Ivey's office?
16     A. I don't remember. I know that
17 I read something that you had sent to
18 the governor's office related to job
19 creation in Alabama and a discovery you
20 had made. What I don't remember -- and
21 so, because you're asking me this, I'm
22 questioning, was that attached to this
23 or did it come later? I don't remember.

Page 261

1  But I know that I had that
2  communication. I -- I never had any
3  direct -- I never answered the
4  governor's office directly --
5      Q. Thi- --
6      A. -- so I don't have
7  correspondence with the governor's
8  office, and I don't remember when I saw
9  that letter, and I'm -- I'm assuming
10 that letter was the one that you sent to
11 the governor where I saw that.
12     Q. Yes. This communication here
13 is on July 17th.
14     A. (Nods affirmatively)
15     Q. My question is, in August,
16 September, or October 2017, have you
17 received any email that being forwarded
18 even to you?
19     A. If I did, I don- -- I'm not
20 remembering. So. if you have one that I
21 should look at, I'll gladly review it.
22 But I'm -- I'm not remembering any --
23     MR. DYKES: And, if there was

66 (Pages 258 - 261)

Page 262

1 one that was to her about you, and it
2 was not privileged -- and I'm -- I'm not
3 saying that one has been withheld
4 because of privilege -- but, if there
5 was one to her that was not privileged,
6 you've got it, so.
7 BY MR. AMIRI:
8    Q.  So --
9    A.  So you --
10   Q.  -- you remember that you
11 answered this email?
12   A.  I am assuming that I answered.
13 I don't remember answering it, but I
14 always answer, so.
15   Q.  And it is not produced.
16   A.  An answer to R.B. Walker?
17   Q.  Yes. It was not produced based
18 on the court's order on February 13.
19       MR. DYKES:  If there were
20 privileged emails that she was involved
21 with that involved counsel, they were
22 not produced, because, if they're
23 privileged, you're not entitled to

Page 263

1 those.
2       MR. AMIRI:  But the court order
3 on February 13 --
4       MR. DYKES:  Correct.
5       MR. AMIRI:  -- tells that you
6 should produce all of them, but you can
7 black them. You can black the parts
8 that are privileged. When you are not
9 producing, it means that he -- she did
10 not respond. Is this correct?
11      MR. DYKES:  I -- I do not
12 re- -- I -- I'm just telling you in
13 general, because I don't have the emails
14 in front of me, every email that she
15 sent that had related to you, she
16 sent/received, pursuant to the court's
17 order, we produced. And if it was -- as
18 you can see, we redacted a -- or there
19 because it was privileged. If the
20 entire email was privileged, we did not
21 produce the email.
22      MR. AMIRI:  But, based on this
23 court order, you can produce the email

Page 264

1 and redact all of the content. Is this
2 correct?
3       MR. DYKES:  If it's involved
4 counsel, we -- we did not -- we -- no,
5 we -- we did not produce it if it is a
6 privileged email.
7       MR. AMIRI:  So she's telling
8 that she answered this --
9       THE WITNESS:  No, I said --
10      MR. AMIRI:  -- email.
11      THE WITNESS:  -- I don't
12 remember it, but I always answer emails.
13 That's all I'm saying.
14      A.  I don't --
15 BY MR. AMIRI:
16      Q.  So it is --
17      A.  -- remember answering it.
18      Q.  -- most probably you answered
19 that. What is your best guess? What is
20 your best?
21      A.  I -- I -- I assume that I
22 answered it. I can't really guess.
23 Maybe I -- I don't know.

Page 265

1       MR. DYKES:  As I said, if she
2 responded and it was not privileged, we
3 would have produced it. And if she had
4 responded directly to them without a
5 lawyer involved, we would have produced
6 it. So, if there's not a -- if she
7 responded or if there was a response and
8 it involved lawyers and it was
9 privileged, we did not produce it, no.
10      MR. AMIRI:  At the time of this
11 email, there was no lawsuit --
12      MR. DYKES:  But --
13      MR. AMIRI:  -- so there is no
14 attorney/client --
15      MR. DYKES:  There is
16 attorney/client --
17      MR. AMIRI:  -- privilege.
18      MR. DYKES:  -- privilege when
19 you are asking advice of counsel. There
20 is a privilege there. So you're not
21 entitled to emails between our client
22 and our office, so.
23      MR. AMIRI:  At which time?

67 (Pages 262 - 265)

1  THE WITNESS: At any time.
2  MR. DYKES: At any time. If it
3  involves them seeking legal advice,
4  you're not entitled to those.
5  MR. AMIRI: But the court
6  order.
7  MR. DYKES: And the court
8  ordered that, but the court's order does
9  not preempt an attorney/client
10 privilege.
11  MR. AMIRI: But the court order
12 reads that, for the time period between
13 January 1st, 2016, and February 28,
14 2018, as plaintiff re- -- requested in
15 his first request for production.
16  MR. DYKES: Yeah.
17  MR. AMIRI: And my lawsuit
18 started in March 2018. That is the
19 first time I filed that. So this period
20 that court entered order is outside of
21 the time that --
22  MR. DYKES: Does not mean that
23 the emails are not privileged.

1  MR. AMIRI: So . . .
2  MR. DYKES: We have produced --
3  and I -- I was lenient and actually
4  included emails where counsel is
5  referenced, where whether or not they
6  were going to talk to counsel about
7  issues related to you. I -- I erred on
8  the side of producing more than I
9  normally would. But if it was an email
10 where it discussed legal -- where it was
11 seeking legal advice and counsel was
12 there, those are privileged emails and
13 you're not entitled to -- to those
14 emails. And, again, if you want to call
15 Judge Proctor's office and talk about
16 it, I'm happy to do it. But the --
17  THE WITNESS: Maybe that
18 happened and maybe I called him; I don't
19 know.
20  MR. DYKES: But those emails --
21  THE WITNESS: But, if I wrote
22 an email, you'd have it, unless it was
23 privileged.

1  MR. DYKES: That's correct.
2  MR. AMIRI: I'm producing
3  Exhibit Number 12.
4  (PLAINTIFF'S EXHIBIT NO. 12
5  MARKED)
6  THE WITNESS: Sorry. Forgot.
7  (Tenders document)
8  MR. DYKES: (Reviews document)
9  BY MR. AMIRI:
10  Q. So Exhibit Number 12 is two
11 pages. The first page, there is an
12 email that you sent to --
13  A. -- the registrar in my office.
14  Q. Yes. On June 28, 2017. Can
15 you please read that email?
16  A. "Hi, Beth. Mr. Ali Amiri was
17 dismissed from the Physics doctoral
18 program on 5/26, see email below,
19 following the department advisory
20 committee's April review attached. Will
21 you place a hold on his registration for
22 fall 2017, if he has not already
23 registered? I'll let you know when we

1 can send the letter to him informing him
2 of this hold. We should not send it
3 yet."
4  Q. What is the reason that you
5 should not send it yet?
6  A. Because I had not yet involved
7 the Capstone International. I didn't
8 have all the information in front of me.
9 I wanted to make sure that we did not
10 misstep with a letter that's so life
11 changing.
12  Q. How you could make a mistake in
13 sending that letter? I mean, if you
14 inform me earlier, it is better, isn't
15 it?
16  A. On- -- only once the facts are
17 all in front of me.
18  Q. You mean in -- in that point in
19 June 28, it was possible that you make
20 your -- change your decision and not to
21 send this letter?
22  A. I was still learning facts. I
23 was still learning facts, and I did not

| Page 270 | Page 272 |
|---|---|
| 1 want to send the letter until I learned | 1 are asking her wait and not send the |
| 2 all the facts. | 2 letter? |
| 3    Q. So my question -- | 3    A. Yes. |
| 4    A. But I also didn't want you to | 4    Q. Can you see the next page? In |
| 5 register for fall classes if you had | 5 the bottom you send an email on Tuesday, |
| 6 been dismissed. So we were putting a | 6 August 29 to Morris Charter. |
| 7 hold on the record while we figured all | 7    A. (Nods affirmatively) |
| 8 of that out. But I did not want to send | 8    Q. Can you please this -- read |
| 9 the letter until I knew what all of the | 9 this email? |
| 10 pieces were. | 10    A. This is in August, and he -- |
| 11    Q. So wha- -- when -- | 11 you -- he emailed you on 6/30. Right? |
| 12    A. I was learning a lot in these | 12    Q. I -- I don't remember what the |
| 13 days. | 13 exact -- |
| 14    Q. My question is, you tell that | 14    A. "Since your email to him on |
| 15 we should not send it yet. Does it mean | 15 6/30." So it says, "Hi, Charter. Can |
| 16 that it is possible that you make | 16 you update me on whether you have had |
| 17 your -- change your decision and not to | 17 any further conversations with Ali |
| 18 send it, or it was not possible? | 18 Amiri, Physics student dismissed in |
| 19    A. It means I needed to make sure | 19 July" -- it was actually the end of |
| 20 the department was acting appropriately | 20 June. Right? -- "since your email to |
| 21 before I endorsed it and in the ways | 21 him on 6/30/2017? And has the |
| 22 that I have described to you, consulting | 22 information of his dismissal been |
| 23 the Physics Handbook, understanding the | 23 communicated to SEVIS? I ask because he |

| Page 271 | Page 273 |
|---|---|
| 1 chain of emails, and then I would send | 1 is seeking for the provost to reinstate |
| 2 the letter. But I knew the letter would | 2 him as a student. I wonder if he will |
| 3 have a significant impact. It's life | 3 have received any communication from |
| 4 changing. I wanted Capstone | 4 SEVIS himself?" |
| 5 International involved. I wanted to | 5    Q. Did I ask from provost to |
| 6 know whether you would understand the | 6 reinstate me? |
| 7 consequences that it brought. So I | 7    A. I don't know. I assume so from |
| 8 wanted to have those conversations. | 8 this. I don't remember what prompted |
| 9    Q. And how long it took for you | 9 this email. Something must have |
| 10 to -- to have those conversations? | 10 prompted this email. I don't remember. |
| 11    A. I -- we sent the letter the | 11    Q. And in the first part of this |
| 12 next day. Right? | 12 email, you are telling that "Physics |
| 13    Q. Yes. | 13 student dismissed in July." |
| 14    A. I was already having the | 14    A. It was actually June. |
| 15 conversations on this day. The -- | 15    Q. It was in June? |
| 16 you've seen the conversations. | 16    A. The let- -- the date of my |
| 17 Conversations with Director Dorsey, | 17 letter was June. Right? |
| 18 conversations with Luoheng, | 18    Q. Can you go back to the previous |
| 19 conversations with Charter in the | 19 let- -- page? |
| 20 Capstone International. Those were the | 20    A. (Witness complies) |
| 21 conversations I had. That puts all the | 21    Q. It reads, "Hi, Beth. Mr. Ali |
| 22 pieces together for me. | 22 Amiri was dismissed from the Physics |
| 23    Q. So that is the reason that you | 23 doctoral program on 5/26." |

69 (Pages 270 - 273)

Page 274

1    A.  Um-hum.  I was referencing here
2  my letter.
3    Q.  So what is the date on your
4  letter?
5    A.  I thought it was 6/29, wasn't
6  it?
7    Q.  It is Exhibit Number 2.
8    A.  Six/29.
9    Q.  So we have three date?
10    A.  Yes.  Yes, I should have said
11  "June" here.  Charter spoke -- emailed
12  you on 6/30.  I had spoken with Charter,
13  before we sent this, to make sure that
14  you would have all the information.  So
15  when I sent you this --
16        MR. DYKES:  And when you're
17  saying "this," that's the June 29th --
18    A.  The June 29th letter -- and
19  then Charter emailed you on June 30th.
20  BY MR. AMIRI:
21    Q.  Now can you look at these three
22  dates and let me know what is your final
23  decision?  What was the date for my

Page 275

1  dismissal?
2    A.  July -- June 29th.
3    Q.  Are you sure?
4    A.  I guess I am.  I don't know
5  what -- why you're asking.  I feel like
6  something might come -- some new piece
7  of information, but thi- -- this is the
8  date.
9    Q.  The date of dismissal from your
10  point of view is June 29?
11    A.  This is the date that would
12  have terminated your visa, that would
13  have triggered the termination of your
14  visa.  You were dismissed from the
15  Physics program when Patrick LeClair
16  sent you the email.
17    Q.  Um-hum.  That is 5/26.  Is this
18  right?
19    A.  I think so.
20    Q.  You have all --
21    A.  Do you want me to look?
22    Q.  -- the dates in front of you.
23    A.  Well, okay.  I'll verify.

Page 276

1  (Reviews documents)  Which -- which one
2  is that?  Where's the -- Exhibit 3,
3  page 8.  April 28th was the committee
4  report, and then Dr. LeClair's email to
5  you was May 26th, 5/26, yes.  Do you
6  want me to leave it out?
7    Q.  So can you tell me when I was
8  dismissed from University of Alabama?
9    A.  June 29th.
10    Q.  So when you're writing to
11  Mr. Charter the "student dismissed in
12  July," this is not correct?  This is --
13    A.  That is not correct; it was
14  June.
15        MR. DYKES:  If -- are you done
16  with that docu- -- if you're done with
17  that document, we've been going about an
18  hour, and I'd like to take a break.  If
19  you want -- have more questions on that
20  document, go ahead and ask.  I don't
21  want to interrupt your train of thought.
22        MR. AMIRI:  Just give me five
23  more minutes.

Page 277

1        MR. DYKES:  Okay.
2  BY MR. AMIRI:
3    Q.  But in these dates, there was
4  another incident when you told that, "We
5  should not send that letter yet."
6    A.  No, that was in June.
7    Q.  Yeah.  Please look at Exhibit
8  Number 12.
9    A.  Yes.
10    Q.  In June 28, yes.
11    A.  Yes.
12    Q.  You are telling that, "We
13  should not send the letter."  Yes?
14    A.  On June 28th, but we sent it on
15  June 29th.
16    Q.  Yes.  But there was some other
17  incidents going around that time.  Most
18  of your emails was on June 26 in the
19  afternoon, most of the emails we heard
20  today.
21    A.  Um-hum.
22    Q.  In the morning of June 26,
23  there was an armed police operation that

70 (Pages 274 - 277)

Page 278

1  the police officers come to my door and
2  took the key, and most of your
3  communications, most of your meetings,
4  are after that one, aft- -- in the
5  afternoon of June 26. And in June 30,
6  there was another armed police operation
7  that they attacked my residence again,
8  and they entered my house, into my
9  apartment, without any warrant or court
10 order. When you are telling that, when
11 you are saying that, "Don't send the
12 letter yet," is it possible that it is
13 connected to the coordination with the
14 police department?
15    A.  No, no.
16    Q.  So, on June 28, you knew that
17 there was a police operation on June 26?
18    A.  I knew they had taken --
19        MR. DYKES: Object to the form.
20    A.  -- your keys, denied you access
21 to the lab. That I knew.
22 BY MR. AMIRI:
23    Q.  And gave me a warning that I

Page 279

1  should not enter to any building.
2    A.  (Nods affirmatively)
3    Q.  You knew that?
4    A.  I don't remember if I knew that
5  or not. I was only concerned with my
6  part, which had to do with the lab.
7    Q.  So your statement is that, on
8  June 28, when you are telling that,
9  "Don't send the letter yet," it is not
10 related to the police operations --
11    A.  No.
12    Q.  -- which was going to happen
13 on 30?
14    A.  Definitely not.
15    Q.  Did you know that there is a
16 schedule to attack my resident- --
17 residence again on June 30?
18    A.  I had --
19        MR. DYKES: Object to the form.
20    A.  -- no knowledge of any police
21 action that would happen that week, no.
22 No.
23        MR. AMIRI: Okay. We can go

Page 280

1  for the break.
2        VIDEOGRAPHER: We are going off
3  the record at 2:18.
4        (A BREAK WAS TAKEN)
5        VIDEOGRAPHER: This begins
6  media unit number 4. We're back on the
7  record at 2:31.
8        (PLAINTIFF'S EXHIBIT NO. 13
9  MARKED)
10       MR. AMIRI: Yes. I'm
11 introducing Exhibit Number 13.
12       MR. DYKES: (Reviews document)
13 BY MR. AMIRI:
14    Q.  This is an email that you sent
15 to Mr. Morris Charter on June 30 at 9:23
16 a.m.
17    A.  (Nods affirmatively)
18    Q.  Can you please read the first
19 paragraph?
20    A.  "Hi, Charter. Just FYI, I
21 learned today that the letter from the
22 Graduate School to Ali Amiri confirming
23 the hold on his fall registration and

Page 281

1  his dismal from UA, attached, was sent
2  via regular mail, not email, yesterday,
3  so he will not have received it. He
4  only received the communication from his
5  department chair." Do you want me to
6  read the next par- -- line?
7    Q.  No. So, in June 30, you
8  informed that you learned that the
9  letter that you send in 29 will not
10 reach to my hand by a -- a few days at
11 least.
12    A.  Right. By the time Charter was
13 communicating with you.
14    Q.  Yes. And the two police
15 operations, which was done on 26 and 30,
16 would be finished before that letter
17 comes to me. Is this correct?
18       MR. DYKES: Object to the form.
19    A.  That's what you're telling me,
20 but I really had no -- zero knowledge of
21 the police operations, none. What I was
22 concerned about here was Charter's
23 communication with you and making sure

71 (Pages 278 - 281)

Page 282

1 that you understood the situation you
2 were in.
3 BY MR. AMIRI:
4    Q. Yes. But do you confirm that,
5 by the end of June 30 in the afternoon,
6 I would not received your letter?
7    A. Unless the mail was very fast,
8 I would assume that you would not have
9 received the letter, and I wanted you to
10 receive the letter at the time you were
11 communicating with Charter, so that you
12 would have the information you need.
13    Q. Yes. Can you please read the
14 second paragraph?
15    A. "Because there was some
16 ambiguity in the way the department
17 email was written, I hope he understands
18 that the department did not just
19 withdraw financial support for the
20 coming year, but actually dismissed him
21 from the program."
22    Q. Can you explain this statement?
23    A. Yes. In Dr. LeClair's email,

Page 283

1 the phrase that dismisses you is the
2 phrase that says, "I am obliged to
3 follow their recommendation." That
4 isn't clear enough for someone who
5 doesn't want to hear that news, and I --
6 I wished it had been a sentence that
7 says, "You are dismissed from the
8 program." This is a softer way of
9 saying it, but I didn't know if you
10 understood it, because you were still
11 going to the lab as if this hadn't
12 happened, and I wanted you to understand
13 the situation.
14        As I said in the third
15 paragraph, my letter was unambiguous.
16 It would clarify the situation, but you
17 wouldn't have received it yet. And so,
18 at this time when I wrote this, I didn't
19 know if you understood fully what the
20 situation was, that you had been
21 dismissed. I wasn't sure if you knew or
22 didn't know, and I wanted you to know
23 before you were talking to Charter, so

Page 284

1 that you could make the decisions you
2 needed to make.
3    Q. Okay. So you are aware of the
4 ambiguity in the email. You are aware
5 that I am using the lab still.
6    A. The -- well. I knew they took
7 the keys, so I assumed that meant
8 something.
9    Q. Um-hum.
10    A. I was asking about your denial
11 of access to the lab. So, no, I didn't
12 know you were in the lab, but I assumed
13 that you were acting as you had acted
14 before, pursuing your research.
15    Q. Can you read, please, the last
16 paragraph?
17    A. "The Graduate School letter
18 would clarify that, but he hasn't
19 received it. So, if you can assess
20 whether he understands the situation or
21 not, that would be helpful all around.
22 I just didn't want you to assume that he
23 is fully aware, as he might not be. If

Page 285

1 I need to clarify this with him right
2 away, please let me know."
3    Q. Thank you. So, based on these
4 emails that -- and you didn't know about
5 police operations, as you are --
6    A. That's correct.
7    Q. -- claiming -- so, when I
8 received your email, and, after that
9 time, I was not -- I didn't know that
10 your position is that I am dismissed,
11 after that time there was two police
12 operations. Both of them broke into my
13 apartment without any search warrant and
14 without any court order, and they
15 even -- I mean, I was student at that
16 time. We -- everybody's position, at
17 least on the surface was that. Nobody
18 notifies me, and you -- the only email I
19 received is from Physics Department,
20 that in your letter you are telling it
21 is ambiguous. So it was possible that
22 there was some bad incident happens.
23 For example, if I was confronting those

72 (Pages 282 - 285)

Page 286

1 police officers, they would get me into
2 custody. Do you think that the Un- --
3 the University should be careful about
4 these in- -- incidents?
5        MR. DYKES: Object to the form.
6    A. I -- I would be speculating
7 about that. I -- I don't -- I -- I
8 can't make any judgment about what the
9 police are doing. I don't have any
10 basis.
11 BY MR. AMIRI:
12    Q. When we -- after here, we come
13 to the point that, by the evening of
14 June 30, I was not clearly understood
15 that the University want to dismiss me.
16 I wasn't clear I lost my financial
17 support. Yes?
18    A. (Nods affirmatively)
19    Q. And up to that point, there is
20 two police operations entering into my
21 apartment. And if I was a little bit
22 younger -- I'm a mature man. I'm -- I
23 have a little experience. If I was a

Page 287

1 little bit younger, I would confront
2 those police officers, and they would
3 take me into custody, and it is not
4 fair. So the UA should consider these
5 incidents and make some changes.
6        MR. DYKES: Is there a question
7 there?
8        MR. AMIRI: No, it is -- it was
9 my statement.
10        MR. DYKES: Okay. Then I
11 object to his soliloquy.
12 BY MR. AMIRI:
13    Q. Do you agree with my statement,
14 that UA should change some procedures?
15    A. Umm --
16        MR. DYKES: Object to the form.
17    A. -- no. I don't have auth- --
18 I'm s- -- I wouldn't be able to agree or
19 disagree with that --
20 BY MR. AMIRI:
21    Q. So you think that --
22    A. -- statement.
23    Q. -- the UA should continue in

Page 288

1 this way that they are doing their
2 procedures with police officers.
3 Every- -- everything that they are doing
4 is correct.
5        MR. DYKES: Object to the form.
6    A. I -- I don't have an opinion
7 one way or the other. I really don't.
8 I would need a lot more information --
9 BY MR. AMIRI:
10    Q. Okay. So do you think --
11    A. -- before I could draw a
12 conclusion. I don't have an opinion.
13    Q. That is fine. Do you think I
14 was treated unfairly or not?
15        MR. DYKES: Object to the form.
16    A. By the Physics Department or by
17 the police?
18 BY MR. AMIRI:
19    Q. By the University of Alabama as
20 a whole.
21    A. I think -- the short answer,
22 no. I think if you were treated
23 unfairly, it would have come out in a

Page 289

1 grievance process. But you did not
2 follow a grievance process, so then I
3 have to assume that -- that the --
4 everyone acted within their scope.
5    Q. So --
6    A. Had you followed a grievance
7 process, you might have more comfort
8 with where we are now. But you chose
9 not to follow that; you chose to take
10 other avenues because your 2016
11 experience had caused you to lose faith
12 in the grievance process.
13    Q. I already made it clear that I
14 did grievance procedure in both years,
15 in my point of view at least.
16    A. Right, in your point of view.
17 But --
18    Q. Yes.
19    A. -- unfortunately your point of
20 view on this is not the same as the
21 University's point of view, which is
22 that you did not follow the grievance
23 process at all in 2017. In 2016, you

73 (Pages 286 - 289)

Page 290

1 did not continue the grievance process,
2 but that -- I don't have all the facts
3 about that, so I don't have -- I can't
4 speak with authority on that. I can
5 only say that, in 2017, you chose not to
6 follow the grievance process.
7    Q. And . . .
8    A. And the grievance process is
9 designed to ensure that everyone is
10 treated fairly.
11    Q. So we have different opinions
12 because I am thinking in both years I --
13    A. Yes.
14    Q. -- followed that; you are not.
15       Still do you think it is fair
16 to incarcerate a student who fails to
17 follow grievance procedure?
18       MR. DYKES: Object to the form.
19       You were not incarcerated.
20       MR. AMIRI: But another
21 student --
22       THE WITNESS: Nor did it have
23 anything to do with failing to follow

Page 291

1 the grievance process.
2       MR. AMIRI: Another student
3 from Physics Department was
4 incarcerated.
5       MR. DYKES: Okay. We're not
6 talking about another student in the
7 Physics Department.
8       MR. AMIRI: But I was in danger
9 of becoming incarcerated.
10       MR. DYKES: Okay. I -- I
11 understand that you feel that way, but
12 your question was about incarcerating --
13 umm -- okay.
14       MR. AMIRI: I mean, my
15 question, I -- I will change my
16 question.
17 BY MR. AMIRI:
18    Q. Is it fair that you put a Ph.D.
19 student in the danger of becoming
20 incarcerated because of not following
21 the grievance procedure?
22    A. Well --
23       MR. DYKES: Object to the form.

Page 292

1    A. -- it's not because of not
2 following the grievance procedure.
3 You're asking about two separate things,
4 and you're pushing them together, and
5 they're no- -- they're not together.
6 BY MR. AMIRI:
7    Q. Can you tell me what is those
8 two things that are separate?
9    A. The incarceration, which is a
10 complicated issue having to do with the
11 keys to the lab and things that I don't
12 know anything about, and the grievance
13 process, which is about your dismissal
14 from the program for failure to make
15 progress toward the degree, which I do
16 know something about. So you're asking
17 me about something I don't know anything
18 about, and then its connection to
19 something that I know quite a lot about,
20 and I can't connect them.
21    Q. Can you tell me which part you
22 know quite a lot about?
23    A. The -- that I know that the

Page 293

1 department committee made a decision
2 that you should be -- a recommendation
3 that you should be dismissed from the
4 program, and that you were told that, if
5 you did not agree with that, you could
6 use the grievance process, and that you
7 chose not to use the grievance process,
8 and that you were then suspended from
9 the University. That is what I know.
10 That's what I knew this morning and
11 still know.
12    Q. Do you know -- do you consider
13 this amount of knowledge quite a lot of
14 information?
15    A. I do.
16    Q. And you did not read my email
17 in the same email change -- chain, and
18 you did not read any of the attachments
19 I sent to your office, to provost's
20 office, and -- and still you are
21 thinking that you have adequate
22 knowledge, quite a lot of knowledge, in
23 this matter?

74 (Pages 290 - 293)

Page 298

BY MR. AMIRI:

1 Q. In the first page, there is an
3 email sent Tuesday, June 27, 2017. You
4 sent this email to Jennifer Greer. Can
5 you please read this email?
6 A. "Hi, Jennifer. The attached
7 grad committee's assessment and the
8 chair's email below effectively
9 terminate Ali Amiri's student status.
10 Do you want to run this by Norma during
11 your regular meetings, do we do this by
12 email, or shall I consult with her? Let
13 me know best next step in making sure we
14 are able to communicate this clear
15 decision to him and make sure he
16 understands it, as well as notifying the
17 visa office."
18 Q. Here you are talking about a
19 clear decision.
20 A. It was clear to me. What I
21 said to Charter is, there's ambiguity in
22 the way the department email was
23 written. The message is not ambiguous,

Page 299

1 but the way it was written is ambiguous.
2 I -- I can see that. I can see that you
3 might not have realized, but it was
4 clear to me what they did, because, if
5 you read the two documents together, it
6 becomes more clear.
7 Q. So the reason that you were
8 thinking that it was ambiguous was that
9 you didn't read two documents together?
10 A. No, it's ambiguous because
11 Dr. LeClair didn't repeat the word
12 "dismiss" in his email. He only
13 referenced the dismissal by saying,
14 "Follow their recommendation." And that
15 is a -- a soft phrase.
16 Q. How it become clear decision
17 later?
18 A. It's clear to me; I could see
19 how it would not be clear to you. It's
20 clear to me by -- because as soon as he
21 says, "Follow their recommendation," I
22 turn to what is their recommendation.
23 The recommendation is that, "We

Page 300

1 recommend that the student should not
2 receive financial support and should be
3 dismissed." That's the recommendation.
4 Q. So it is --
5 A. And he says, "Follow their
6 recommendation." So it's -- it --
7 the -- the way it is written can mask
8 what it says, which is that he's going
9 to follow the recommendation.
10 Q. And so I'm -- my question is
11 that, is it a clear decision or it is
12 ambiguous letter?
13 A. It's a -- both. It's a clear
14 decision ambiguously written.
15 Q. Letter. Yes?
16 A. It's an ambiguously written
17 letter conveying a clear decision. The
18 decision is clear; the writing is not so
19 clear.
20 Q. Okay. And you read that "and
21 the chair's email below effectively
22 terminate Ali Amiri's student status."
23 What is the meaning of the word

Page 301

1 "effectively terminating"?
2 A. It means that the decision has
3 been made. My letter was the -- a
4 process piece, but I was- -- it was --
5 the decision had been made. But it was
6 apparent to me that you might not have
7 understood it, and that's what -- I was
8 trying to figure out the best way to
9 tell you this -- what I knew would be
10 very disappointing information to you.
11 Jennifer has a lot of experience. I had
12 been there less than a year, and I was
13 asking her what exactly would be the
14 next step, given that you had been
15 terminated and might not know it yet.
16 Q. So what is the meaning of the
17 word "effectively" in more specific way?
18 That -- what is the uneffective
19 termination?
20 A. "Effectively" means -- it
21 means -- how do I explain that? "The
22 chair's" -- "effectively" -- it's over,
23 but the processes hadn't all been

76 (Pages 298 - 301)

Page 302

1 followed to make sure that was clear to
2 you. We hadn't put a hold on your
3 registration yet. We hadn't sent the
4 letter. We hadn't terminated your visa.
5 So while in effect you had been
6 terminated, there were process pieces
7 that had not yet been done, and I didn't
8 know who had talked to you and how clear
9 it was to you. So while in effect --
10 that's what "effectively" means -- in
11 effect the action had been taken, I
12 wasn't sure what the next step should be
13 to make sure you knew.
14    Q.  So, if the termination was not
15 effective --
16    A.  No, it was ef- -- it -- it was
17 in ef- -- it's an English --
18    Q.  -- I mean, the other option --
19    A.  -- issue. It means "in fact."
20 While in fact you had been terminated.
21    Q.  Oh, so "effectively" here means
22 "in fact"?
23    A.  That's a better way to -- yeah.

Page 303

1    Q.  But you know that I was using
2 the lab after that date?
3    A.  I understood that from the fact
4 that they were asking you to give the
5 keys back. Then I assumed that you
6 still had the keys.
7    Q.  But even --
8    A.  But that was an assumption on
9 my part. I don't really know what you
10 were doing in the lab. All of that is
11 not known to me.
12    Q.  But there is per- -- time
13 period between that letter that you are
14 telling me that effectively terminated and
15 the time that they asked me to return
16 the keys. They asked me to return keys
17 after President Bell ordered that
18 Provost Whitaker and Vice President Carl
19 Pinkert should investigate this theft
20 incident in the --
21    A.  Umm.
22    Q.  -- MINT Center.
23    A.  Umm.

Page 304

1       MR. DYKES: Object to the form.
2    A.  I -- I -- I really don't know
3 anything about that.
4 BY MR. AMIRI:
5    Q.  Okay.
6    A.  Not my area of knowledge.
7    Q.  Then let's look at the next
8 page. This is a long email, but can you
9 tell who sent this email?
10    A.  This is from Charter Morris in
11 the International Office on June 30th.
12    Q.  And I underlined a few lines.
13 Can you please read that?
14    A.  "Based on my understanding that
15 you aren't being immediately dismissed
16 but rather won't be allowed to continue
17 in the program this fall, you have a
18 little time to make some decisions."
19    Q.  So Mr. Charter is telling that
20 I'm not immediately dismissed?
21    A.  He is saying "which will likely
22 lead to dismissal from the Ph.D.
23 program."

Page 305

1    Q.  Yes. And -- okay. If you want
2 to get that information, that paragraph,
3 can you please read that whole
4 paragraph?
5    A.  "To follow up on what I had
6 hoped to discuss, as I noted, I have
7 been informed that you have been
8 dismissed from your program in Physics,
9 which will likely lead to dismissal from
10 the Ph.D. program."
11    Q.  Yeah. Can you please continue,
12 "As you know"?
13    A.  "As you know, your F-1 student
14 visa status is tied to your studies and
15 program. What I wanted to do is explore
16 your options."
17    Q.  Yes. Could you please
18 continue? You read the previous
19 paragraph. Yes.
20    A.  "I hope everything is okay"?
21 That paragraph?
22    Q.  Yes. And he -- later on he
23 tells that, "We won't have to terminate

77 (Pages 302 - 305)

Page 318

1 going the wrong way.
2 BY MR. AMIRI:
3    Q. Can you please read the next
4 paragraph?
5    A. "From minute 3 to minute 5, I
6 am talking about a great discovery I
7 have made in correlated electron
8 systems. This is not from any of those
9 five research topics. I have found
10 these results based on my own
11 theoretical studies and few simple
12 experiments. I have some good data on
13 this research. To get a complete set of
14 data, I have designed another
15 experiment, which should prove my
16 theory, and it will take two to three
17 weeks to be done."
18    Q. Yes. Can you please read the
19 next?
20    A. "In minute 5, Dr. Gupta reminds
21 me 'the strain paper,' which is rejected
22 two times. It was a combination of two
23 unrelated sets of data, and Dr. Gupta

Page 319

1 did not let me write two papers or
2 dismiss one set of those data."
3    Q. Yes. Here are these papers
4 that was rejected in 2017. In 2016, one
5 of the matters that I brought into
6 grievance procedure was these papers. I
7 was able to write two papers, one on the
8 strain effect, the other on bending
9 effect. The bending creates some strain
10 but it is totally different thing,
11 different approach.
12    Dr. Gupta told me, "You have to
13 combine them because I am advisor."
14    I did that. We send the
15 publication; it was rejected.
16    I asked him, "Can I separate
17 them and submit two papers?"
18    He didn't let me.
19    The second -- second time, I
20 submitted the same paper. I improved it
21 a little bit, based on what Dr. Gupta
22 told me, and submitted it again, and it
23 was again rejected. And he -- he still

Page 320

1 didn't let me to separate them and
2 publish two papers.
3    Do you think this is misconduct
4 or not?
5    A. No.
6    Q. Why it is not misconduct?
7    A. Because when there's a
8 difference of agreement between a
9 student and an advisor, the student
10 needs to follow the guidance of the
11 advisor.
12    So, in such a case, the student
13 should say to the advisor, "Then what
14 should I do?"
15    And the advisor should say,
16 "This is a dead end. You should stop
17 working on this and do something else,"
18 or "Here's some advice that can help you
19 get this" -- "move it" --
20    Q. That is not true.
21    A. -- "forward," one or the other.
22 But there are many differences of
23 opinion between students and advisors.

Page 321

1 This is the crux of the issue we're
2 talking about here. You did not agree
3 with your advisor. This happens in many
4 situations.
5    Q. That is not true.
6    A. Okay.
7    Q. The truth is that Dr. LeClair
8 talked to Dr. Gupta and asked him,
9 "Please let him separate these two set
10 of data because it is not publishable.
11 You know that."
12    A. But Dr. Gupta didn't agree.
13    Q. He didn't agree. So he
14 rejected Dr. LeClair's suggestion. Then
15 we had another meeting. We invited
16 Dr. Sanjoy Sarker to come to our
17 meeting. So two professors can convince
18 Dr. Gupta to let me separate these two
19 papers and publish both of them. And
20 Dr. Gupta still did not accept. Do you
21 think this is a misconduct or not?
22    A. I would not --
23    MR. DYKES: Object to the form.

81 (Pages 318 - 321)

Page 322

1    A. -- judge until I heard
2 Dr. Gupta explain why he felt that way.
3 I certainly could not make a
4 determination based on what you're
5 telling me without hearing what
6 Dr. Gupta's rationale was.
7 BY MR. AMIRI:
8    Q. Can you suppose that the
9 information I gave to you is correct?
10    A. It's one side. It might be
11 very correct, but it's one side.
12    Q. No. It is -- I mean, we cannot
13 come to ano- -- another date. This is
14 deposition, and it is proper that you
15 assume that my information that I gave
16 to you are correct.
17    A. I do assume --
18       MR. DYKES: She does not have
19 to assume --
20    A. -- that the information --
21 BY MR. AMIRI:
22    Q. (Indiscernible)
23    A. -- you gave me is correct, but

Page 323

1 I can't make a judgment on half of a
2 case. I would need to understand why he
3 said that, and you can't tell me why he
4 said that because you disagree with him.
5 So your representation of his view --
6    Q. I do not disagree.
7    A. Okay. Well, I can't judge.
8 So --
9    Q. Well --
10    A. -- the answer is, "I don't
11 know." I don't know if that's
12 misconduct because I wouldn't have all
13 the facts.
14    Q. Well, in June 23, 2017, I sent
15 you this email --
16    A. The key piece is still missing.
17    Q. The audiotape is over there,
18 the full audiotape without any change.
19    A. Again --
20    Q. You didn't listen --
21    A. Again --
22    Q. -- to that.
23    A. -- you're asking that we solve

Page 324

1 this outside the grievance process. The
2 grievance process was your chance to
3 have this heard and to make this case.
4 That was your chance to make this case.
5    Q. Well --
6    A. You didn't use the grievance
7 process.
8    Q. I did use the -- the grievance
9 process. I told it several times, and
10 you are just repeating your own point of
11 view.
12       MR. DYKES: All right. We're
13 just -- we're arguing at this point, so,
14 if there's questions --
15       MR. AMIRI: No, I'm just
16 correcting that, that no
17 misinformation --
18       THE WITNESS: From your
19 perspective you've used --
20       MR. AMIRI: -- will be
21 recorded.
22       THE WITNESS: -- the grievance
23 process, yes.

Page 325

1       MR. AMIRI: Yes. I -- I'm just
2 correcting it, not to have
3 misinformation in the record.
4 BY MR. AMIRI:
5    Q. May I ask you a question
6 that -- did you receive any information
7 in regard to Dr. Carl Pinkert that I'm
8 trying to reach him or his link in the
9 investigation or any kind of
10 information?
11    A. I -- I knew that an inquiry had
12 been made, but I did not have details
13 and didn't want to know details, unless
14 they impacted what I was doing.
15    Q. So you was not trying to have
16 any effect on Dr. Pinkert --
17    A. No.
18    Q. -- investigation?
19    A. No.
20       (PLAINTIFF'S EXHIBIT NO. 16
21 MARKED)
22       MR. AMIRI: I'm introducing
23 Exhibit Number 16.

82 (Pages 322 - 325)

Page 326

1      MR. DYKES:  (Reviews document)
2 BY MR. AMIRI:
3    Q.  Here there is two emails.
4    A.  Um-hum.
5    Q.  The email that is in the middle
6 is the email you sent at June 29, 2017,
7 at 1:14 p.m.  Can you please that --
8 read that email?
9    A.  "Hi, Jennifer.  Regarding the
10 attached email from Ali Amiri from 6/1,
11 he mentions that," quote, "'The NSF
12 inspector general will handle this
13 case,'" end quote.  "Do you think I
14 should forward this email to Carl
15 Pinkert, both because of our own
16 internal investigation and because of
17 the reference to NSF involvement?"
18    Q.  Thank you.  And can you please
19 read his -- her answer, which was in the
20 same day at 2:08 p.m.?
21    A.  "I would think it best that
22 Carl nor anyone in his office sees this.
23 That way they can't be accused of

Page 327

1 mishandling the second claim he has made
2 because he calls the first report
3 'faulty.'  If the NSF inspector general
4 wants to look into it, we could tell
5 Carl at that time.  My general stance is
6 not to share criticisms and threats of
7 lawsuits or grievances with those who
8 will ultimately make the decision,
9 unless there's a compelling reason to do
10 so."
11    Q.  Thank you for reading the
12 statement.
13      Here there's an email that you
14 have in your hand, and you want to
15 forward to Dr. -- Vice President Carl
16 Pinkert, and you was advised not to send
17 it.  Did you send that email?
18    A.  No.
19    Q.  Do you think that not sending
20 that email will affect the Pinkert
21 investigation?
22      MR. DYKES:  Object to the form.
23    A.  The reason that I was asking is

Page 328

1 because I -- I felt that you were making
2 a threat.
3 BY MR. AMIRI:
4    Q.  No, my question, do you think
5 it will affect the Pinkert --
6    A.  Do I think it would have
7 affected --
8    Q.  Yes.
9    A.  -- the investigation?
10    Q.  Yes.
11    A.  I didn't have details of the
12 investigation to know one way or
13 another.
14    Q.  No, my question is clear.
15      MR. DYKES:  Your question is --
16 BY MR. AMIRI:
17    Q.  "Yes" or --
18      MR. DYKES:  -- not clear.
19    A.  I don't know.
20 BY MR. AMIRI:
21    Q.  -- "no"?  "Yes" or "no"?  I
22 mean, do you think not providing this
23 email to Mr. Pinkert, Carl Pinkert, will

Page 329

1 affect his investigation or not?  "Yes"
2 or "no"?
3      MR. DYKES:  I object to the
4 form.
5    A.  I -- I can't an- -- I -- I
6 can't answer "yes" or "no" to that.  I
7 don't know.  I don't have enough
8 information about the investigation to
9 know how it would influence it one way
10 or another.
11      What alarmed me was a threat
12 that the NSF would become involved, and
13 then it's Carl Pinkert's shop that would
14 be involved.  And I needed to know, does
15 he need a heads-up about this.  It
16 wasn't really about any current
17 investigation; it was about the NSF
18 being involved.
19 BY MR. AMIRI:
20    Q.  And you did not submit this to
21 Dr. Pinkert to protect his interest?
22    A.  I didn't submit it because
23 Jennifer said not to submit it, because

83 (Pages 326 - 329)

| Page 330 | Page 332 |
|---|---|
| 1 it was -- it was better for him not to | 1      MR. DYKES: I'm going to object |
| 2 be involved with that. | 2 to the form. |
| 3      Q. Do you think that the NSF | 3 BY MR. AMIRI: |
| 4 inspector general would be involved in | 4      Q. But, based on these quotations |
| 5 this matter? | 5 of threat, you convinced the police |
| 6      A. I have no idea. | 6 officers to attack my residence -- |
| 7      Q. So, if -- | 7      MR. DYKES: Okay. Is this -- |
| 8      A. I have less than no idea about | 8 BY MR. DYKES: |
| 9 that. | 9      Q. -- because I'm making threat. |
| 10      Q. If the accusations are not | 10      A. Remember -- |
| 11 true, they wouldn't come to be involved. | 11      MR. DYKES: Mr. A- -- |
| 12      A. I don't know. | 12      A. -- that I didn't have anything |
| 13      MR. DYKES: Object to the form. | 13 to do with that. |
| 14      A. I -- I don't know how they | 14      MR. DYKES: Is this -- is there |
| 15 operate. When they would receive an | 15 a question? Are you asking her a |
| 16 email from you, I don't know what they | 16 question? |
| 17 would do next. I don't know how they -- | 17      MR. AMIRI: Well, but you are |
| 18 they probably have a process, and I | 18 not letting me finish. |
| 19 don't -- I'm unfamiliar with it. | 19      MR. DYKES: I know. It didn't |
| 20 BY MR. AMIRI: | 20 sound like a question. If you're asking |
| 21      Q. Do -- do you expect that the | 21 her a question, finish the question. If |
| 22 NSF inspector general would come to UA | 22 you're making another -- |
| 23 to investigate the situation -- | 23      MR. AMIRI: Mr. Counsel -- |

| Page 331 | Page 333 |
|---|---|
| 1      A. No, I don't expect that. | 1      MR. DYKES: -- soliloquy -- |
| 2      Q. -- if there is no malconduct? | 2      MR. AMIRI: -- should you let |
| 3      A. I don't know what -- I would | 3 me finish my statement, then you see |
| 4 expect that they have a process to look | 4 if it's a question or not. You are |
| 5 into the merit. I would expect that, | 5 cutting my -- me in the middle of my |
| 6 but I don't actually know. | 6 statement. |
| 7      Q. Here she writes to you that | 7      A. Because you made an incorrect |
| 8 "not to share criticism and threats of | 8 statement. You said, "Because of this, |
| 9 lawsuit." Is a lawsuit a threat? | 9 you" something "the police." And |
| 10      A. People threaten to sue, so a | 10 remember that I didn't have anything to |
| 11 lawsuit itself is not a threat, but one | 11 do with police action. It was happening |
| 12 can threaten a lawsuit, and many people | 12 separate from anything I was doing. |
| 13 do. | 13 BY MR. AMIRI: |
| 14      Q. When -- | 14      Q. But Ms. Jennifer Greer write |
| 15      A. They say, "If you don't do what | 15 this to you, and she's talking about |
| 16 I want, I'll sue you." | 16 threat of lawsuit. |
| 17      Q. When -- | 17      A. Yes. |
| 18      A. So that's a threat of lawsuit. | 18      Q. And there are other documents |
| 19      Q. I understand that. But when a | 19 that we will reach to them that you |
| 20 student is telling you that, "I will | 20 finally become able to convince the |
| 21 file a lawsuit," it means that he's | 21 police officer that I'm a threat, and |
| 22 demanding you follow the rule of law. | 22 that is why they come to my apartment. |
| 23 It is not any kind of threat. | 23      MR. DYKES: Object to the form. |

84 (Pages 330 - 333)

Page 334

1 BY MR. AMIRI:
2   Q. So you was not involved in any
3 of that?
4   A. My conversations with Charles
5 Dorsey were not about the police coming
6 to your apartment. It was about whether
7 you represented any threat because of
8 the tone of that email, that paragraph.
9 So what I was talking to him about was
10 assessing the threat. It wasn't about
11 taking police action related to access
12 to the lab. These are separate things,
13 again, that you are pushing together.
14   Q. Do you think if the police
15 officers will be convinced that I am a
16 threat to the campus they would not come
17 to -- I mean they would not address the
18 issue, they would not come after me?
19       MR. DYKES: Object to the form.
20   A. You're way out of my area of
21 expertise there. That's why we have
22 Charles Dorsey. I ask the question:
23 "Is this person a threat?" My knowledge

Page 335

1 stops right there. I do not go past
2 that que- -- I ask the question, and I
3 trust that he will give me an answer
4 that I need, and that is s- -- my -- I
5 feel like you think that my area of
6 action or responsibility is bigger than
7 it is, and it's not.
8 BY MR. AMIRI:
9   Q. Have you tried to convince
10 Charles Dorsey that I'm a threat or not?
11   A. I was not trying to convince
12 him; I was asking him to assess, so that
13 I could go by what he says.
14   Q. Were you --
15   A. I trust him to assess whether
16 you're a threat or not. I was not
17 trying to convince him that you're a
18 threat.
19   Q. Were you providing him with
20 correct information?
21   A. With what information?
22   Q. With the right information.
23   A. I was just forwarding the

Page 336

1 email.
2   Q. But you was providing the
3 emails that was receiving from one group
4 of people in conflict, not the other
5 group. You did not forward any of my
6 emails to them.
7   A. I did forward --
8       MR. DYKES: Object to the form.
9   A. -- your email.
10       MR. DYKES: She -- the first
11 one -- yes.
12   A. Yes. Your email where you
13 said, "They shall see the consequences
14 of their action," that's the email I
15 forwarded to him. That's the one that
16 seemed to me to represent a threat. It
17 could be a threat, or it could be just a
18 statement about the way the world works.
19 I didn't know, so I asked him.
20 BY MR. AMIRI:
21   Q. So you forwarded some of my
22 emails and not --
23   A. Just that one.

Page 337

1   Q. -- the others?
2   A. I di- --
3   Q. So, for example --
4   A. He wasn't adjudicating; he was
5 only deciding if you were a threat, if
6 that paragraph was representing any
7 danger to anyone.
8   Q. But do you think that you
9 should provide with the whole truth, not
10 part of the truth?
11       MR. DYKES: Object to the form.
12 BY MR. AMIRI:
13   Q. You are providing one of my
14 emails to Mr. Charles Dorsey, not the
15 other emails that shows the whole truth.
16   A. The rest of the situation is
17 irrelevant to the question of whether
18 you were making a threat of harm with
19 that paragraph.
20   Q. And what was their answer?
21   A. Your -- your threat level was
22 deemed low.
23   Q. How did they come to that

85 (Pages 334 - 337)

1 conclusion?
2    A.  I have no idea, and I never
3 asked.
4    Q.  Did they send you email to
5 explain to the procedure?
6    A.  No.
7    Q.  They never send you email to
8 describe what --
9    A.  No --
10    Q.  -- they did?
11    A.  -- no, and I don't ask.  They
12 just said the threat assessment is low.
13 I was happy about that.
14        MR. AMIRI:  I'm introducing
15 Exhibit Number 17.
16        (PLAINTIFF'S EXHIBIT NO. 17
17 MARKED)
18        MR. DYKES:  (Reviews document)
19 BY MR. AMIRI:
20    Q.  This is an email that you sent
21 to a couple of people, including
22 Dr. Han, on June 23rd, 2017.
23        (CELL PHONE RINGS)

1        MR. AMIRI:  I'm sorry.
2 BY MR. AMIRI:
3    Q.  Can you please read this email?
4    A.  "Hi, Luoheng, cc Cathy.  Cathy
5 Pagani will be attending a behavioral
6 assessment team, BIT, meeting today at
7 3:30, and it would be best to discuss
8 Ali Amiri's situation with them if you
9 feel he is in any way a danger to
10 himself or others.  As context for that
11 conversation, can you forward Cathy any
12 of the emails that you consider to
13 indicate that he is reaching a danger
14 level in his behavior, threats, et
15 cetera?  She just needs one example.
16 Thanks so much.  Susan."
17    Q.  Can you please explain to me
18 what you mean when you -- you are
19 telling that, "She just needs one
20 example"?
21    A.  What I mean is, there was a lot
22 of emails going around, and all she
23 needed was a sample of your tone to --

1    Q.  Just one sample?
2    A.  Just one sample.
3    Q.  And what was the consequence if
4 they -- there was one email of that
5 kind?
6    A.  I don't know the -- each
7 situation is handled very differently.
8    Q.  Okay.
9    A.  I'm not part of the behavioral
10 assessment team.  I've never been to the
11 meetings, so I don't know exactly what
12 happens there.
13    Q.  And so do you know whether she
14 find one example or not?
15    A.  I don't remember.  The only
16 paragraph I remember is the one in the
17 email we've been discussing where you
18 talked about consequences.
19    Q.  So based on my -- on the
20 documents you produced, she did not find
21 even one example?
22    A.  I don't know if Luoheng sent
23 her anything or not.

1    Q.  So you was not trying to find
2 evidence to prove --
3    A.  Against you, no.
4    Q.  -- specific --
5    A.  No.
6        (PLAINTIFF'S EXHIBIT NO. 18
7 MARKED)
8        MR. AMIRI:  I'm introducing
9 Exhibit Number 18.
10        MR. DYKES:  (Reviews document)
11 BY MR. AMIRI:
12    Q.  So this is a letter on the
13 first page from Charles Dorsey sent to
14 you --
15    A.  Ah, yes, we looked at part of
16 this before, yes.
17    Q.  -- yes -- in June 30.  Can you
18 please read that email.
19    A.  Which one?  "AMA is meeting
20 this morning"?
21    Q.  No, this one here.
22 (Indicating)
23    A.  Yes.  "AMA is meeting this

86 (Pages 338 - 341)

Page 342

1 morning" -- this is from Charles Dorsey.
2 "AMA is meeting this morning with UA's
3 International Services Director
4 Char-" -- "Charter Morris to discuss his
5 options based on the F-1 visa. I spoke
6 with Charter and briefed him on the
7 current status of AMA. I also notified
8 UAPD to ensure their situational
9 awareness. More to follow."
10    Q. Okay. Can you please explain
11 what this email is talking about?
12    A. I can tell you what I think he
13 is talking about. We wanted to make
14 sure that someone had the conversation
15 with you about your options, about the
16 seriousness of the situation you were
17 in. And the person to have that
18 conversation was Charter Morris. And
19 the reason is, that he's the most
20 informed one about what next steps would
21 best allow you to maintain your visa
22 status.
23        So I could talk to you about

Page 343

1 what you can't do, but I couldn't really
2 talk to you about what you can do.
3 Charter can have that conversation and
4 has had it with many students over the
5 years.
6        So what Charles Dorsey is
7 saying here is that he let him know
8 whatever the current status is, which is
9 based on what I had said to him, this
10 understanding that Dr. LeClair did not
11 reiterate the program dismissal --
12 remember, he didn't use the word
13 "dismissal," and so what I was saying
14 is, that you might not realize, and so
15 this might be new news to you.
16    Q. This is an email that was sent
17 to you, so you didn't answer -- I mean,
18 this is an email that -- the email that
19 we are talking is these three lines that
20 you just read.
21    A. Yes, but below that was my
22 email --
23    Q. We will get to that.

Page 344

1    A. -- to Charles that he was
2 answering --
3    Q. Yes.
4    A. -- that he was responding to.
5 Right? So what I was saying to him is,
6 you might be surprised by this news when
7 you go to Charter's office, that it
8 might be new news to you.
9    Q. Okay.
10    A. And --
11    Q. Can we get back to this
12 email --
13    A. So he said --
14    Q. -- and I asked you a
15 question --
16    A. -- "I spoke with Charter and
17 briefed him on the current status. I
18 also notified UAPD to ensure their
19 situational awareness."
20    Q. Okay. Here "AMA" is my name --
21    A. Yes.
22    Q. -- that police officer gave.
23 Why you should notify UAPD for a

Page 345

1 scheduled -- for a scheduled meeting? I
2 mean, Mr. Charter scheduled a meeting
3 with me, as you mentioned, to explain to
4 me some facts. Why the UAPD is
5 informed?
6    A. I contacted Charles Dorsey
7 because I was aware that you had written
8 an email that talked about consequences,
9 possibly before you even knew that you
10 were actually going to be dismissed from
11 the University, and I thought you would
12 already know because you would have
13 received my letter, then I realized you
14 wouldn't have the letter. If you were
15 surprised by this news and you were
16 someone who had written an email about
17 consequences, is that a threat? Is that
18 a dangerous situation for the person
19 who's about to give you very bad news?
20    Q. Do you consider your answer as
21 the answer to my question, or it is
22 different subject?
23    A. Maybe you better repeat the

87 (Pages 342 - 345)

1 question.

2 Q. The question is, why you should
3 notify UAPD, the police department, for
4 a scheduled meeting?

5 A. I notified Charles --

6 MR. DYKES: She answered that.

7 A. -- Dorsey. I did not notify
8 UAPD. I notified Charles Dorsey.

9 BY MR. AMIRI:

10 Q. Okay.

11 A. Because, in a situation where a
12 student is going to get very bad news, I
13 want Charles Dorsey to know about it.
14 And Charles Dorsey knows about it and
15 says, "I have notified UAPD to ensure
16 their situational awareness."

17 Q. The very bad news was on
18 June 26, that the police officers
19 attacked my apartment.

20 A. That wasn't the bad news I was
21 referring to. The bad news I was
22 referring to is that you were dismissed
23 from the University.

1 Q. I think my statement was clear
2 as well, so please let me tell you.

3 A. No, ask me a question.

4 Q. Yes.

5 A. As I'm getting again conflating
6 these things I -- I have something to do
7 with and things I have nothing to do
8 with.

9 Q. Well, so let me ask you a
10 question --

11 A. Okay.

12 Q. -- and you answer it.

13 A. Um-hum.

14 Q. On June 26, my apartment was
15 busted --

16 A. Right.

17 Q. -- and I get a notification
18 from police, a warning, that I should
19 not enter any building in the campus.
20 And this email chain shows that
21 Mr. Morris scheduled a meeting with me.
22 And I was going to attend that meeting,
23 but, about one hour before meeting, I

1 was thinking that I -- they notified me
2 not to enter to the building, so I
3 didn't go to that meeting. But UAPD was
4 informed about this meeting, and, if I
5 was going to go to that meeting that
6 Mr. Charles [sic] Morris has scheduled
7 with me and I was trusted him, the UAPD
8 was going to take me into custody
9 because I entered one of the buildings?

10 A. Hmm.

11 Q. And this email shows that. You
12 was informed about this incident. Do
13 you accept that?

14 A. No.

15 MR. DYKES: Object to the form.

16 A. Again, I was not involved in
17 anything related to UAPD and your
18 apartment in the same sentence. As soon
19 as you say "UAPD" and "apartment," I'm
20 out of it.

21 BY MR. AMIRI:

22 Q. But --

23 A. What --

1 Q. -- but this --

2 A. I understand what you're saying
3 about why you couldn't attend the
4 meeting. I understand that.

5 Q. But that is not the point. You
6 are --

7 A. Okay.

8 Q. -- I mean, my point is very
9 clear.

10 A. Yes.

11 Q. In this three line that you
12 read, there is a meeting set up with me
13 that --

14 A. Yes, there was.

15 Q. -- I need to enter into a
16 building. And the UAPD was informed
17 that I'm about to enter that building.
18 And I had a warning from UAPD not to
19 enter to any building. So my rational
20 conclusion is that, if I was going into
21 there, the plan was to incarcerate me,
22 to just take me into custody because I
23 did not pay attention to the warning.

1    A.  Hmm.  I can see why you would
2  think that, but do- -- I -- I di- -- I
3  was not aware of that --
4    Q.  Yes.
5    A.  -- and you didn't tell Charter
6  that.
7    Q.  But now that you have this
8  information, do you think I was right or
9  not?
10    A.  Now that I --
11      MR. DYKES:  Object to the form.
12    A.  -- have this information that
13  you're giving me today, I think you were
14  right not to go.  But you should have
15  called him and kept the appointment by
16  phone, because you had important
17  decisions to make, information to
18  receive and decisions to make.  And you
19  didn't email him and you didn't call him
20  and you didn't go, and so we could not
21  help you with next steps.  We were
22  moving forward with how to help you
23  understand your situation.

1  BY MR. AMIRI:
2    Q.  But you know that I called him
3  and I emailed him both.  I both emailed
4  him and called him, and those emails and
5  the call was forwarded to you in the
6  email that Charter wrote to you --
7    A.  The one where he said you
8  didn't come to the meeting?
9    Q.  But I called.  Yes, he tells
10  you that A- -- Ali Amiri didn't come to
11  the meeting, but he called me and he --
12    A.  Later.
13    Q.  -- he made clear that he will
14  make a lawsuit against the University,
15  and he did not take any of the options I
16  gave to him, and he made -- he made it
17  very clear.
18    A.  I do remember that.
19    Q.  So I called him --
20    A.  Later.
21    Q.  -- in the same time.  I didn't
22  go there, but I did call him in the time
23  of meeting, maybe --

1    A.  Okay.
2    Q.  -- 15 minutes later.
3      MR. DYKES:  We've been going
4  about an hour and ten minutes, so let's
5  take a break.
6      MR. AMIRI:  Okay.  Let's take a
7  break.
8      VIDEOGRAPHER:  We are going off
9  the record at 3:36.
10      (A BREAK WAS TAKEN)
11      VIDEOGRAPHER:  This begins
12  media unit number 5.  We're back on the
13  record at 3:43.
14  BY MR. AMIRI:
15    Q.  Yes.  Let's start with Exhibit
16  Number 18 that we have.  In the first
17  page in the bottom, you send the email
18  to Charles Dorsey.  That is on June 29,
19  2017, at 5:44 p.m.  Can you please read
20  the first paragraph of that email?
21    A.  "Hi, Charles.  AMA has been
22  dismissed from the university in
23  addition to the denial of funding.

1  While Dr. LeClair did not reiterate the
2  program dismissal in his email, he did
3  reference that he would follow the
4  recommendation of the committee, and he
5  attached the committee recommendation,
6  which I attach here to this email.  That
7  document contained the names of the
8  faculty members who made the
9  recommendation for dismissal, and that
10  is the reason that both Dr. Henderson
11  and Dr. Townsley expressed their
12  concerns about the implicit threat in
13  the email of," quote, "'seeing the
14  consequences,'" unquote, "of the action.
15  I hope this helps clarify the chain of
16  communication.  Glad to answer any
17  further questions."
18    Q.  Yes.  You are talking about
19  Dr. Henderson and Dr. Townsley
20  expressing their concerns about the
21  implicit threat in the email.
22    A.  (Nods affirmatively)
23    Q.  And this is the only thing

89 (Pages 350 - 353)

| Page 354 | Page 356 |
|---|---|
| 1 that you are sending, "seeing the | 1 a threat, and those two people was kind |
| 2 consequences"? | 2 of threatened by this email? |
| 3  A. (Nods affirmatively) | 3  A. (Nods affirmatively) |
| 4  Q. Do you have the full sentence | 4  Q. Well, the second paragraph |
| 5 of this, because you are quoting just | 5 reads, "From these five people who have |
| 6 three words? | 6 signed the false document, Dr. Okada is |
| 7  A. Yes. But below this on the | 7 on my dissertation committee, but the |
| 8 bottom of that same page was my email to | 8 other four people do not have any |
| 9 Charles Dorsey where I said, "who shared | 9 information about my research, or |
| 10 with me the attached email he received | 10 basically they don't know anything about |
| 11 from Ali Amiri on June 1st, in relation | 11 me. And I don't know them as well. |
| 12 to the notification of his dismissal. | 12 But, based on my general information, |
| 13 Yesterday or today Dr. LeClair also | 13 all of these people are decent people. |
| 14 shared this email and photograph with | 14 And I have heard more or less positive |
| 15 the faculty members on the advisory | 15 things about them from their students. |
| 16 committee who wrote the recommendation. | 16 If they can sign a document without |
| 17 Two of the faculty members, Dr. Dean | 17 having enough information about the |
| 18 Townsley and Dr. Conor Henderson, told | 18 content, what the rest of the people can |
| 19 him they felt threatened by the content | 19 do?" |
| 20 of the email, the tone, and the | 20  A. Right. That paragraph is not |
| 21 reference to the artwork. Specifically | 21 threatening. It's the next paragraph -- |
| 22 they pointed to his statement that 'they | 22  Q. Okay. |
| 23 will be held responsible,'" quote, "and | 23  A. -- that is more threatening |

| Page 355 | Page 357 |
|---|---|
| 1 that," quote, "'they will see the | 1 where you say -- |
| 2 consequences of their unethical | 2  Q. But it is in the same email. |
| 3 action,'" unquote. | 3  A. -- "the f-" -- "people who |
| 4      "As a result, Dr. LeClair | 4 signed this document should be held |
| 5 reported the email and the faculty | 5 responsible, and they have to give the |
| 6 members' concern to Officer Davis at | 6 reasons for their actions. And, |
| 7 UAPD, as this relates to MINT Center | 7 naturally, they will see the |
| 8 research." | 8 consequences." That's the sentence that |
| 9      So, I sent him that. Then he | 9 references directly the people who |
| 10 asked the question, "Can you clarify? | 10 signed that document, and you -- |
| 11 Is he dismissed or is the funding | 11  Q. Let me -- |
| 12 pulled?" And then I answered that | 12  A. -- can see now, I'm sure, how |
| 13 question, and I referenced the implicit | 13 that could be frightening. |
| 14 threat in the email of "seeing the | 14  Q. Let me read that exact sentence |
| 15 consequences," but he already had that. | 15 you just quoted three letter- -- three |
| 16 He had your full email. | 16 words of it in that -- in your letter. |
| 17  Q. And can you please look at | 17 So that part is, "And I think the people |
| 18 Exhibit Number 3, page 10, the last | 18 who signed this document should be held |
| 19 page? | 19 responsible and they have to give their |
| 20  A. (Reviews document) Yes, that's | 20 reasons for their actions. And |
| 21 the email that he had, the June 1st | 21 naturally, they will see the |
| 22 email. | 22 consequences of their unethical action." |
| 23  Q. So you considered this email as | 23 Do you think this is threatening? |

90 (Pages 354 - 357)

Page 358

1    A.  I think it could mean one of
2  two things.
3    Q.  No.  Do you think it is
4  threatening?  "Yes" or "no"?
5        MR. DYKES:  It -- it's not a
6  yes-or- --
7    A.  These are not yes-or-no
8  questions.  I'm a complexed thinker.
9  Listen to me.  It might be a threat; it
10  might not be a threat.  If I knew you,
11  if I grew up with you, I would know how
12  to read that.  But that sentence alone,
13  I would say that could be a threat.  Or
14  you might mean that, naturally, life
15  will show them the consequences of their
16  action, or it could mean consequences
17  are coming, watch out.  I don't know
18  which thing it meant.
19  BY MR. AMIRI:
20    Q.  When you're reading an email,
21  you should consider the email.  You
22  don't need to know me.  Everything is
23  written there.  The email I wrote, I

Page 359

1  think the people who signed this
2  document should be held responsible.
3  This is the way I'm thinking.  It is
4  clear.
5    A.  It's not clear.
6    Q.  Why it is --
7    A.  Does that mean that you're
8  going to hold them responsible or that
9  they should be held responsible by the
10  University?  Which does it mean?
11    Q.  The University should --
12    A.  That isn't what you said.
13    Q.  But --
14    A.  What you said was quite vague,
15  they --
16    Q.  No.
17    A.  -- should be held responsible.
18  That could mean that you were going to
19  hold them responsible, or it could mean
20  the University.  If you had written it
21  the other way, I wouldn't have read it
22  as a threat.
23    Q.  Well --

Page 360

1    A.  But it --
2    Q.  -- other people can -- I mean,
3  the -- we will go to the court and jury
4  will judge.  If a person is telling
5  that, I think the people who signed this
6  document should be held responsible, and
7  I'm writing it to higher authorities, it
8  means that those higher authorities I'm
9  telling them should -- I'm telling to
10  higher authorities that these --
11        MR. DYKES:  And if you're
12  explaining --
13  BY MR. AMIRI:
14    Q.  -- people --
15        MR. DYKES:  -- yourself, you
16  have every right to do it.  But if --
17  if -- if your explanation is leading
18  into a question, then continue and --
19        MR. AMIRI:  No, I'm making a
20  statement, and you are stopping me.
21        MR. DYKES:  And I understand.
22  Deposition is not the time for you to
23  make a statement of your case.

Page 361

1        MR. AMIRI:  But deposition is
2  not --
3        MR. DYKES:  You're making a
4  statement and then -- and you're asking
5  your statement as part of a question.
6  Okay.  But if you're just making a
7  statement explaining why you don't think
8  that is threatening, that -- that's not
9  a deposition.
10        MR. AMIRI:  Mr. Counsel, I have
11  the right to make a statement and you --
12        MR. DYKES:  You -- you don't
13  have a right --
14        MR. AMIRI:  -- should not
15  interrupt me in the --
16        MR. DYKES:  No.
17        MR. AMIRI:  -- middle of my --
18        MR. DYKES:  You do not have a
19  right to make a statement as pa- --
20  as -- in your deposi- --  you have the
21  right to ask her questions, and she
22  answers your questions.  But you -- the
23  deposition is not the time to go into a

91 (Pages 358 - 361)

Page 362

1 collo- -- soliloquy about your views of
2 why or why that was not a threat.
3     If you noticed, when I deposed
4 you, I did not -- I asked you questions.
5 I didn't -- I didn't give two-minute
6 intro statements into a question. I
7 asked you a question. I've given you a
8 ton of leeway to give an explanation and
9 then ask a question. This one sounded
10 like you were just making your
11 explanation as part --
12     THE WITNESS: And so what is
13 the question?
14     MR. DYKES: -- of a statement.
15 So, if there's a question, ask the
16 question.
17     MR. AMIRI: Are you finished?
18     MR. DYKES: I -- I am.
19     MR. AMIRI: In the last five
20 minute, Mr. Counsel, you cut my talking,
21 my statement, few times. When I'm
22 waiting for you to finish, it is
23 appropriate if you wait for me to finish

Page 363

1 and not to jump into the middle of my
2 statement, whether that statement is in
3 response to your question or your
4 argument or it is another statement I'm
5 making in another occasion. So it is --
6 please, if it is possible for you, do
7 not cut my -- me when I'm talking.
8     MR. DYKES: Ask her a question.
9 If you ask her a question, I'm not going
10 to cut your question off.
11     MR. AMIRI: Yeah. Would you
12 please not to cut my statements when I'm
13 making a statement? Can you please wait
14 until the end --
15     MR. DYKES: I can't --
16     MR. AMIRI: -- of that?
17     MR. DYKES: -- agree that I'm
18 not going to cut a statement off because
19 this isn't the time or the place to make
20 statements; it's your time to ask
21 questions. I'm not trying -- I -- and
22 I -- I would like to stop talking, so
23 you can ask questions and we can get

Page 364

1 done. So I'm done talking. Ask a
2 question.
3     MR. AMIRI: No, I'm asking you,
4 would you please all the time that --
5 whether I am talking or witness is
6 talking, you wait the person who is
7 talking finish, because in some
8 occasions, you are coming into the
9 middle of the testimony of the witness
10 and sometimes you are cutting my words.
11 When I'm talking, you are coming in, and
12 you are not waiting I finish or the
13 witness finish. Could you please since
14 now you do not come in the middle of the
15 talk.
16     MR. DYKES: I -- if I have come
17 into a middle of your answer during the
18 course of the day, I apologize. I do
19 not think I have done that.
20     I know I've objected to form.
21 I've tried to do that quietly, so that I
22 did not interrupt you. I -- I've not
23 interrupted -- I've tried not to

Page 365

1 interrupt a question, other than to put
2 an objection on the record when you were
3 done. When you start talking and you go
4 on for 30 seconds, a minute, yes, I -- I
5 will try not to interrupt there, but, if
6 it's not leading to a question, I am
7 going to object.
8     MR. AMIRI: Well, now you made
9 a statement and you was pointing to
10 witness, and you are apologizing from
11 the witness for cutting her testimony.
12 Is this correct?
13     MR. DYKES: I did apologize to
14 her if I cut her off.
15     MR. AMIRI: Okay. Because your
16 voice only is being recorded and your
17 picture is not being recorded, so
18 from -- based on the transcript, they
19 don't know that you --
20     MR. DYKES: Okay.
21     MR. AMIRI: -- did apologize
22 for the wit- --
23     MR. DYKES: For --

92 (Pages 362 - 365)

Page 366

1 MR. AMIRI: -- from the
2 witness.
3 MR. DYKES: -- for the record,
4 I ra- -- I raised my hand, and I did
5 point at the witness when I said, "I
6 apologize if I have cut you off. I
7 didn't think that I had today."
8 So, again, my hand now is
9 pointing toward Dr. Carvalho. If I have
10 cut you off today, I am sorry. I didn't
11 think that I had.
12 MR. AMIRI: And then you rotate
13 to me and continued your answer. Is
14 this correct?
15 MR. DYKES: And then I did
16 rotate in my chair and faced you
17 directly because I was facing
18 Dr. Carvalho when I was talking to her.
19 I do try to look at the person that I'm
20 talking to.
21 MR. AMIRI: Okay. Can we
22 continue, please?
23 MR. DYKES: Please go ahead.

Page 367

1 MR. AMIRI: Yes.
2 BY MR. AMIRI:
3 Q. The next email in this same
4 page in the bottom is an email from you,
5 Dr. Susan Carvalho, sent to Charles
6 Dorsey. Can you tell me what is the
7 subject of the email?
8 A. (Reviews document)
9 Q. Re- -- you -- you can read it,
10 the subject --
11 A. I have to read -- well, I have
12 to read --
13 Q. No, just one --
14 A. -- from the bottom. It's --
15 Q. The subject is "Five Topics for
16 One Dissertation."
17 A. Yes, I believe that was your
18 subject line.
19 Q. No, pr- -- please - --
20 A. Yes, it was --
21 Q. -- look at --
22 A. -- your subject line, and we
23 forwarded your emails on, so they all

Page 368

1 carry that subject line.
2 Q. Does it mean that you have this
3 email?
4 A. Yes. I sent it to Charles
5 Dorsey.
6 Q. This email had about ten
7 attachments that describes five
8 different topics. Did you look -- take
9 a look at those attachments?
10 A. I don't remember.
11 Q. But you wrote this email to
12 Mr. Charles Dorsey and this email
13 contains huge amount of information that
14 previously in your testimony --
15 A. Yes.
16 Q. -- you told you don't have.
17 A. I don't remember if I read
18 them. I don't remember if I opened
19 them. If they related to your research,
20 they would not be relevant to me. If
21 they were voice recordings, I didn't
22 listen to them. Were the voice
23 recordings part of the attachments?

Page 369

1 Q. Yes.
2 A. I didn't listen to them. I
3 heard your voice for the first time
4 today. But I did forward it. It says
5 here, "The email chain below and its
6 attachments." But remember, I'm not
7 judging your case. You're not pleading
8 your case to me, and I am not reading
9 all of that.
10 Q. But I received the only
11 official email from you, and you did not
12 read any of my email- -- any of my
13 emails.
14 A. That is correct. Because,
15 again, the grievance process would have
16 been where I would have heard all of
17 that.
18 Q. And you did not listen to any
19 of the audiotapes I sent.
20 A. Again, I don't know if I had
21 them or not, but I would not have
22 listened to them because we were not in
23 a grievance process.

93 (Pages 366 - 369)

Page 370

1    Q.  But you are sending my
2  dismissal letter based on exaggerated
3  emphasis on your version of grievance
4  procedure, because I am saying I did
5  grievance procedure.
6    A.  So what is the question, for
7  me?
8    Q.  Do -- do you think your
9  decision is correct or not?
10   A.  Yes.
11   Q.  In the next page, there is an
12 email from Charles Dorsey.  It is dated
13 Friday, 23rd, 2017, and he -- he sent it
14 to you, to Susan Carvalho.
15   A.  The one at 6:26 p.m.?
16   Q.  Yes.  Could you please read the
17 first paragraph?
18   A.  Yes.  "On 4/26/2017, the Office
19 of Threat Assessment, OTA, became
20 involved in this matter at the request
21 of UA's Compliance, Ethics, and
22 Regulatory Affairs Coordinator Dr. Marcy
23 Huey.  Based on this inquiry, the OTA

Page 371

1  conducted its standard background
2  examination regarding AMA, CWID
3  11342916, from a behavioral threat
4  assessment perspective.  After a
5  thorough review of all available
6  documented information, AMA's risk of
7  committing a violent and/or assaultive
8  act was placed at the low level.  On
9  4-" -- how many -- how much?  Keep
10 reading?
11   Q.  That is okay.
12   A.  Oh, good.
13   MR. DYKES:  Can I see that
14 again?
15   THE WITNESS:  (Tenders
16 document)
17   MR. DYKES:  (Reviews document)
18 BY MR. AMIRI:
19   Q.  So in this letter, Mr. Charles
20 Dorsey is explaining to you which
21 procedure they took and it is on 23rd.
22 And he's telling you that my threat
23 level is low.  So the accusation are not

Page 372

1  correct, so I'm not a threat.  But the
2  previous emails that we just read was
3  dated after this.  You are insisting to
4  him that I -- two professors considered
5  my email a threat.  Is it a correct
6  action that you did?
7    MR. DYKES:  Object to the form.
8  BY MR. AMIRI:
9    Q.  You are --
10   A.  When I wrote to him, I was
11 informing him that I had learned that
12 those professors felt that email to be a
13 threat, and I shared their concern.  I
14 also felt that it could be threatening,
15 and he said they had already looked into
16 your situation -- which I did not
17 know -- and that you were not a threat.
18 I was not insisting to him; I was only
19 explaining, "Thank you for your note."
20   Q.  But your emails to Mr. --
21   A.  So when I wrote to him, I did
22 not raise the question of threat.  He
23 wrote to me and said your threat level

Page 373

1  was low, and I sent to him the email I
2  said why those people felt threatened.
3  I was not insisting to him; I was making
4  sure that he had that information,
5  because he was referencing an earlier
6  look at your situation.  So I was making
7  sure that he saw this.
8    Q.  Please take a look at dates.
9  In 4/26/2017, they did an assessment.
10   A.  Yeah, that was a long time
11 before.
12   Q.  Yes.  And they told that it is
13 a low level.  Is this correct?
14   A.  Yes.
15   Q.  And on June 23rd, the answer
16 that -- to you that this person is not a
17 threat to campus, but you are continuing
18 your emails to him until June 30.
19   A.  I wrote to him on June 23rd
20 about your email of June 1.
21   Q.  Yes.  I believe we started from
22 later dates and we go -- we went back.
23   A.  Right.  You have to read from

94 (Pages 370 - 373)

Page 374

1 the back.
2    Q.   Actually, it was good that we
3 started from later time --
4    A.   Okay.
5    Q.   -- so we can reach to some
6 point.  So can you please continue from
7 where you read, continue the rest of the
8 email.  There is one more paragraph.
9    A.   "Based on the provided
10 information to date, the OTA has no
11 reason to change AMA's behavioral risk
12 level.  Regarding your other questions,
13 the stated mission of the OTA has no
14 responsibility to become involved in
15 academic misconduct decisions.  The
16 current policies of the Department of
17 Physics and Astronomy should dictate the
18 status/future status of AMA within that
19 department.  The OTA would be happy to
20 meet and further discuss this matter if
21 deemed appropriate.  Please advise of
22 any additional questions and/or
23 comments.  Regards, Charlie Dorsey."

Page 375

1    Q.   So basically they are telling
2 that the academic situation should be
3 done through grievance procedure.  So
4 grievance procedure is not only for the
5 student, the professor should have a
6 grievance procedure as well.  If there
7 is an academic problem between a
8 professor and the student, the
9 professor cannot just dismiss the
10 student; he can start the grievance
11 procedure as well.
12        MR. DYKES:  Object to the form.
13 BY MR. AMIRI:
14    Q.   The police department is not
15 here to solve the academic problems.
16    A.   Is that a question?
17    Q.   My question is that, do you
18 accept that the faculty members who
19 doesn't like a student for any reason,
20 is there any procedure that that faculty
21 member should go through that?
22    A.   No.  He wasn't talking here
23 about the grievance process.  He was

Page 376

1 talking about the questions I asked him.
2 I asked him four questions, and he said,
3 "Those are not my job."
4    Q.   Yes, that is --
5    A.   "Ask the department."
6    Q.   -- that is exactly.  When it
7 is -- it is not the jo- --
8    A.   He said, "Ask the department."
9    Q.   So when it is not the job of
10 police officers, then you should have a
11 procedure to solve those problems.  Is
12 this correct?  This is --
13    A.   We do, yes.
14    Q.   -- this is academic problem.
15 You need to have a procedure for
16 academic problem.
17    A.   The pol- -- current policies of
18 the department dictate the status.  The
19 policies of the department are, the
20 committee will meet, determine whether
21 you're making timely progress toward a
22 degree.  If you are not, you are
23 dismissed from the program.  The

Page 377

1 handbook says it.  Those are the current
2 policies.  We followed those policies.
3 If you don't like the decision, then you
4 use the grievance process.
5        But that's not what he's
6 talking about here, and it's not what
7 the professors would do.  The professors
8 would follow the handbook.  If you don't
9 like it, you initiate grievance.
10    Q.   But --
11    A.   But that's not -- he's not
12 talking about grievance.  Here he's
13 saying the policies of the department,
14 which means the handbook.  See?
15    Q.   Do you think you addressed the
16 question or you give more broader answer
17 to me?
18    A.   I think I addressed the
19 question.
20    Q.   So the quest- -- the police
21 department is telling you that the
22 academic problems should be solved
23 through academic means.  The police will

95 (Pages 374 - 377)

Page 378

1 not come to solve --
2    A.   I -- I -- I think we would
3 understand each other better if we used
4 their words.
5    Q.   Yes.
6    A.   Okay.
7    Q.   Yes.
8    A.   He said, "The current policies
9 of the department should dictate the
10 status of AMA." That's what it says.
11    Q.   Yes.
12    A.   And that's what we did.
13    Q.   No, that is not what you did.
14    A.   Okay.
15    Q.   You continued --
16        MR. DYKES:  Again, it's not
17 an --
18        MR. AMIRI:  Can you --
19        MR. DYKES:  -- argument.
20        MR. AMIRI:  It is not --
21        MR. DYKES:  If you have a
22 question, ask a question.
23        MR. AMIRI:  Okay.

Page 379

1 BY MR. AMIRI:
2    Q.   Then, if you -- it is what you
3 did.  What -- why in June 29 you wrote
4 another email to him saying that, Two of
5 the faculty members, Dean Townsley and
6 Dr. Conor Hen- -- Henderson, told him
7 that they felt threatened by the content
8 of the email, the tone, and the
9 reference to the artwork.  Specifically,
10 they pointed to his statement that 'they
11 will be held responsible' and 'they will
12 see the con-'" -- "'consequence of their
13 unethical action.'"
14    A.   Um-hum.
15    Q.   So this is in June 29, one week
16 later you are sending to him --
17    A.   -- your June 1st email, yes.
18    Q.   Yes.  June 1st.  So you are
19 trying to convince him that this is a
20 matter that should be handled by police
21 department because there is a threat.
22    A.   Are you asking me?
23        MR. DYKES:  Object to the form.

Page 380

1 BY MR. AMIRI:
2    Q.   Do you accept this statement as
3 correct?  Was you trying to convince the
4 police officers that --
5    A.   No.
6    Q.   -- this is a threat?
7    A.   I wasn't trying to convince the
8 police officers it was a threat.  I was
9 trying to make sure Charlie Dorsey had
10 read this.  That's the only thing I was
11 trying to do.  "Charlie" --
12    Q.   But --
13    A.   -- "did you read this
14 paragraph?"  That's all.
15    Q.   You didn't say -- you quoted
16 few words from --
17    A.   And I sent --
18    Q.   -- an email.
19    A.   -- him the email.
20    Q.   Yes.  In the email, you --
21    A.   I sent him the full email, and
22 I referenced that paragraph.
23    Q.   And you choose few words to

Page 381

1 show that this is a threat, this is
2 not --
3    A.   That's the part that's a
4 threat, yes.
5    Q.   So the police department is
6 telling you on June 23rd that the
7 current policies of Department of
8 Physics and Astronomy should dictate the
9 status of AMA --
10    A.   Again, they are --
11    Q.   -- and you are --
12    A.   -- answering about these four
13 bullet points.  These four bullet points
14 are not about that paragraph.  These
15 four bullet points are about your access
16 to labs.  It's a totally separate
17 question.  So --
18    Q.   My -- my question is very
19 clear.
20    A.   Yes.
21    Q.   Did you try to convince police
22 officers --
23    A.   No.

96 (Pages 378 - 381)

Page 382

1    Q.  -- to attack my apartment or
2  not?
3    A.  No.
4    Q.  Okay.  That is answer.
5      Let's go to the next page.
6  (Reviews document) I don't think we
7  need to continue on this --
8    A.  Ah.
9    Q.  -- document.
10    A.  Let's turn in that one, and
11  let's go to 19.
12    Q.  Okay.
13    A.  Do you have another page of
14  stickers? Oh, you do.  Excellent.
15      (PLAINTIFF'S EXHIBIT NO. 19
16  MARKED)
17      MR. AMIRI:  Exhibit Number 19.
18      THE WITNESS:  Um-hum.
19      MR. DYKES:  (Reviews document)
20  BY MR. AMIRI:
21    Q.  This Exhibit Number 19 is two
22  pages.  Can you please tell me what is
23  there in the first page?

Page 383

1    A.  "Hi, Luoheng.  Can I call you
2  at 2:30 to discuss Ali Amiri?  Thanks.
3  Susan."
4    Q.  Yes.  But this is showing a
5  meeting between you and the counsel,
6  Jared Miller.
7      MR. DYKES:  No, that's because
8  your emails were downloaded onto Jared's
9  computer, and, when he forwarded them to
10  be copied -- or to be put into PDF to
11  produce, his name stayed at the top.  So
12  he was not involved in the stuff back
13  in 2017.  That ended up there when -- as
14  part of the production.
15      MR. AMIRI:  And will you let me
16  to read that document?
17      MR. DYKES:  Right.
18  BY MR. AMIRI:
19    Q.  The "Subject" is "Phone call re
20  Ali Amiri." "Location" -- "Location:
21  Susan will call." "Start: Monday,
22  6/26/2017, 2:30 p.m." "End: Monday,
23  6/26/2017, 3:00 p.m." "Meeting Status:

Page 384

1  Meeting organizer." "Organizer" is
2  Susan Carvalho.  "Required Attendees" is
3  Dr. Han.
4    A.  (Nods affirmatively)
5    Q.  So you had a meeting with your
6  counsel, Jared Miller.
7    A.  No.  No.
8    Q.  What --
9      MR. DYKES:  I just explained to
10  you --
11    A.  As he just explained --
12      MR. DYKES:  -- why Jared
13  Miller's --
14    A.  -- that just ended up --
15      MR. DYKES:  -- name is there.
16  Jared was not involved in the meeting.
17  That was -- ended up there because Jared
18  reviewed your emails, they're on his
19  computer, and forwarded them to be put
20  into PDF by our paralegal.  When it
21  forwarded from his computer, it put his
22  name at the top.  So that is the reason
23  his name is there.  It has nothing to do

Page 385

1  with the email itself or the calendar.
2  It's purely a result of the review was
3  done on his computer, and he forwarded
4  it to be put into a PDF and produced.
5  BY MR. AMIRI:
6    Q.  So you claim that these two
7  meetings is not with the counsel; it is
8  with the professors?
9    A.  Absolutely.  This was a phone
10  call between myself and Luoheng, and
11  this was a meeting with Luoheng and
12  Patrick.  Jared Miller, I don't know who
13  that is.
14      MR. DYKES:  That's Jared.
15  (Indicating)
16      THE WITNESS:  Oh.
17      (LAUGHTER)
18      THE WITNESS:  I'm sorry.
19  That's Jared.
20      MR. DYKES:  That's right.  And,
21  yes --
22      MR. AMIRI:  He is your counsel.
23      MR. DYKES:  -- I pointed at

97 (Pages 382 - 385)

Page 386

1 Jared Miller, who is sitting to my
2 right.
3      THE WITNESS: Sorry.
4      MR. DYKES: No, it's fine.
5      MR. MILLER: Okay.
6      THE WITNESS: I knew you were
7 Jared. I just didn't --
8      MR. DYKES: Yeah.
9      THE WITNESS: -- connect it
10 with this. Yeah.
11     MR. AMIRI: I will introduce
12 Exhibit Number 20.
13     (PLAINTIFF'S EXHIBIT NO. 20
14 MARKED)
15     MR. DYKES: (Reviews document)
16 BY MR. AMIRI:
17    Q.  Exhibit Number 20 is two pages,
18 and it is two pictures from the same
19 bulletin. The bulletin is the bulletin
20 for the MINT Center. The name of the
21 professor who usually uses this bulletin
22 is Dr. Gary Mankey, and his name is
23 visible on top of the bulletin. And I

Page 387

1 will ask you a few questions.
2      The first page, this is an
3 email that forwarded to you, and it is
4 from UA Production, so you have seen
5 this email. You have seen this picture.
6 Is it true?
7      A.  It was -- yeah, it came to me
8 with this email.
9      Q.  So have you seen this email
10 before?
11     A.  Yes.
12     Q.  Have you discussed the content
13 of this picture with other people
14 involved in this matter?
15     MR. DYKES: Other than -- well.
16     A.  I forwarded this email to
17 Charlie Dorsey, and I talked about this
18 email with Patrick and Luoheng. But I
19 wasn't as concerned with the picture as
20 with that paragraph, so I don't believe
21 I discussed this picture.
22     Q.  So this is a picture of a Grim
23 Reaper that was there for five months.

Page 388

1 So what was --
2      A.  Yes, you mentioned.
3      Q.  What was your discussion with
4 Dr. Han and Dr. LeClair about this
5 picture?
6      A.  We didn't discuss this picture.
7 If we did, I don't remember it. My
8 concern with Patrick LeClair and Luoheng
9 was about your status as a student.
10 This picture was not a big part of my
11 thinking.
12     Q.  But why it is not a big part of
13 your thinking? It is a Grim Reaper --
14     A.  Because I don't know how Gary
15 Mankey was involved or who drew this or
16 why you're including it or why it's
17 related. I didn't see any explanation.
18 You said you attached it, but then the
19 things you said about it were -- were
20 vague and unconnected to the issues at
21 hand. You said "special artwork," and
22 "I have some other artworks of this
23 artist." I didn't know who that is, but

Page 389

1 that's a line of inquiry that didn't
2 concern any decision I was making, any
3 action I was taking. So I -- this was
4 not a big part of my decisions.
5      Q.  Can you explain why a poster of
6 a Grim Reaper should be in the bulletin
7 board of the MINT Center for five
8 months? Doesn't it concern you?
9      A.  No.
10     Q.  But he has a sand clock in his
11 hand.
12     A.  Yeah.
13     Q.  And he has another weapon in
14 his hand.
15     A.  I thought it was --
16     Q.  Doesn't --
17     A.  -- Father Time.
18     Q.  Doesn't that threaten you?
19     A.  It did not threaten me.
20     Q.  But my email that I'm saying
21 these people are decent people and they
22 should be held responsible by higher
23 authorities, it is threatening, but this

98 (Pages 386 - 389)

Page 390

1 Grim Reaper with a sand clock in his
2 hand and a called weapon in -- in his
3 other hand is not threatening, but my
4 email I'm already telling I think these
5 people are good people, I have --
6    A. Is that a question?
7    Q. No --
8    A. I mean, I would interpret all
9 of that differently. I could tell
10 you --
11    Q. No, no, I don't --
12    A. -- why I think this is not
13 threatening, and I can tell you why I
14 think this paragraph is threatening.
15    Q. So --
16    A. But the way you just
17 represented it is not the way I see --
18    Q. Then let's make --
19    A. -- either one of those things.
20    Q. Then let's make it concise. Do
21 you think this picture is threatening
22 for an academic university -- for a
23 university?

Page 391

1    A. No.
2    Q. So it is okay to have this
3 picture in the bulletin?
4    A. Without further context that
5 would make it nefarious, I think it's
6 okay. If there were any context that
7 made it nefarious, like someone, you
8 know, put it on your desk or put your
9 name on it or you knew who did it or it
10 was aimed at you in some way, maybe I
11 could -- I would read it differently,
12 but by itself on a wall in a hall, no.
13    Q. Do you think this specific
14 image was intended for a specific person
15 or do you think it is just a general
16 picture?
17    A. I have no idea or information
18 about it being intended for a specific
19 person.
20    Q. Do you know why I take a
21 picture from that?
22    A. I don't.
23    Q. Don't you think logically -- I

Page 392

1 mean, you are a professor -- that if I'm
2 taking a picture from that, probably it
3 is related to me, and I took this
4 picture in 2015. If I'm keeping it for
5 two years, it should mean something.
6 Isn't it correct?
7       MR. DYKES: Object to the form.
8    A. Again, I wasn't judging your
9 case. You weren't presenting a case to
10 me. I wasn't drawing a judgment about
11 it.
12 BY MR. AMIRI:
13    Q. But -- but the --
14    A. So, no, this was not a part of
15 my decision-making. It was not a
16 question I asked of myself or of others.
17 No. Do I think I should have? No. If
18 it happened again, would I? No. Do you
19 think I should have? Probably.
20    Q. Okay. Please take a look at
21 the next page.
22       MR. DYKES: Can I see that one
23 again? I'm sorry.

Page 393

1       THE WITNESS: (Tenders
2 document) Yeah, have I seen this one?
3       MR. DYKES: (Reviews document)
4       MR. AMIRI: No, you didn't see
5 this one.
6 BY MR. AMIRI:
7    Q. Can you please read what is
8 written in the bulletin?
9    A. It says, "The pain is part of
10 the reward."
11    Q. Do you think that this
12 statement should be written in the
13 bulletin of a research center?
14    A. I don't have a specific problem
15 with it, unless it were aimed at --
16 related to some specific situation that
17 I don't have a context for. By itself,
18 I don't have a problem with it.
19    Q. Do you know that I took a
20 picture from that?
21    A. I -- I know that you're telling
22 me now that you took a picture of that.
23    Q. So, it means that it was

99 (Pages 390 - 393)

Page 394

1 directed to somebody and most probably
2 that person was me that I'm taking the
3 picture to have in my record. Is it
4 correct?
5     MR. DYKES: Object to the form.
6     A. If you say so.
7 BY MR. AMIRI:
8     Q. Why --
9     A. I don't know the -- I don't
10 have any reason to think it was directed
11 at you besides you telling me that you
12 think it was.
13    Q. So this professor is talking
14 about "the pain."
15    A. Who is this? I don't even know
16 who it is.
17    Q. And you don't care, as well.
18    A. It doesn't --
19        MR. DYKES: Object to the form.
20    A. -- have anything to do with
21 decisions I make.
22 BY MR. AMIRI:
23    Q. But, as a high-rank official in

Page 395

1 the University of Alabama, when you see
2 this poster, do you take any action?
3     A. No.
4     Q. So these kind of posters is
5 commonplace in University of Alabama and
6 it is okay. Yes?
7         MR. DYKES: Object to the form.
8     A. I would not take any action. I
9 don't -- you're asking me if it's
10 commonplace. I don't know.
11 BY MR. AMIRI:
12    Q. Okay. You wouldn't take
13 action. That is correct. And you
14 didn't take action.
15    A. I -- but I don't think I saw
16 this. But, if I did, I wouldn't take
17 action.
18    Q. Yes. Do you know if anybody
19 asked from Dr. Mankey what he means by
20 this statement?
21    A. I don't know.
22    Q. What is your understanding of
23 this statement? A general

Page 396

1 understanding, what do you understand
2 from this?
3     A. What I would assume is that
4 writing a dissertation is hard, but you
5 get a Ph.D. at the end. That's my
6 interpretation, if I knew they were
7 talking about a dissertation.
8     Q. But why write it --
9     A. Maybe they're talking about
10 exercise. How do I know? But.
11    Q. But the pain is different from
12 difficulties. Difficulty is not pain.
13 Pain is when you cannot do anything
14 about something.
15    A. Well, we're -- we're parsing
16 this quite a lot now. I'm not an
17 analyst of that kind.
18    Q. Okay. No problem.
19    A. Interesting to talk about, but.
20    Q. And do you think this
21 environment is a healthy academic
22 environment?
23    A. I would need more than that to

Page 397

1 judge whether this is a healthy academic
2 environment.
3     Q. Would you search for those
4 information?
5     A. No.
6     Q. Why?
7     A. If a student had an issue, they
8 would present it in the grievance
9 process and present this as part of the
10 evidence and explain why they think this
11 relates to them.
12        And then Professor Gary Mankey
13 would say, "Who wrote it and why and
14 when?" and this would be heard. And if
15 at some point that came to me, I would
16 hear all of that and derive some
17 conclusion. But that's not where we
18 are.
19    Q. Dr. Carvalho, I'm not asking
20 about a student. My question was that,
21 do you think this environment is a
22 healthy academic environment? It is
23 both --

100 (Pages 394 - 397)

Page 398

1   A.   I s- -- I can't -- I --
2   Q.   It is --
3   A.   -- cannot draw a conclusion
4   about the health of this academic
5   environment based on this picture.
6   Q.   Given the relation between
7   professors, you cannot judge that there
8   is some problem going on, because a
9   professor is talking about pain, Grim
10  Reaper, and nobody asking him anything.
11  The -- and on the bulletin is a place
12  that you communicate with other people.
13  The communication is about pain.  Is
14  it -- it is about the sand clock that
15  the Grim Reaper has in his hand.  Do you
16  think this kind of environment is an
17  environment that should be recognized as
18  an academic environment?
19       MR. DYKES:  Object to the form.
20  A.   And I would, again, not draw a
21  conclusion about something as important
22  as healthy academic environment based on
23  these pictures.

Page 399

1   BY MR. AMIRI:
2   Q.   Well --
3   A.   Absent a broader context.
4   You're asking me a question I can't
5   answer.
6   Q.   Okay.  But, then, at least let
7   me make a statement on the record.
8       MR. DYKES:  Okay.  If you're --
9   are you making a statement or asking her
10  a question?
11      MR. AMIRI:  I'm ask- -- I'm
12  making a statement on the record to
13  make --
14      MR. DYKES:  Okay.
15      MR. AMIRI:  -- sure all the
16  information are on the record.
17      MR. DYKES:  The -- again, this
18  is not -- you don't make statements in a
19  dep- -- when you are taking a
20  deposition.  You ask questions.  So, if
21  you're going to make a statement, I
22  object to you making a statement.  I
23  have no objection if you want to ask

Page 400

1   her a question, but I do have an
2   objection if you're going to make a
3   statement.
4       MR. AMIRI:  I see.
5   BY MR. AMIRI:
6   Q.   Do you know in this environment
7   three professors was terminated after --
8   A.   No.
9   Q.   -- June --
10      MR. DYKES:  Object to the form.
11  BY MR. AMIRI:
12  Q.   -- 2017?
13  A.   No.
14  Q.   Do you know in this environment
15  three people --
16      MR. DYKES:  Object to the form.
17  BY MR. AMIRI:
18  Q.   -- one professor and two
19  students, who was working on National
20  Science Foundation project, was
21  terminated?
22  A.   No.
23      MR. DYKES:  Object to the form.

Page 401

1   BY MR. AMIRI:
2   Q.   Do you think you should try to
3   find information about this situation?
4   A.   No.
5   Q.   Why do you think that you --
6       MR. DYKES:  Again, object to
7   the form.
8   BY MR. AMIRI:
9   Q.   -- shouldn't find more
10  information?
11  A.   Why?  Because it doesn't relate
12  to my area of responsibility.
13  Q.   Do you think who should take an
14  action in this regard in the University
15  of Alabama?
16  A.   I think the appropriate people
17  are watching those processes.
18  Q.   Who are they?
19  A.   Well, it depends on why they
20  were terminated.  Probably the dean of
21  the college.
22  Q.   No, we are not talking about
23  termination.

101 (Pages 398 - 401)

Page 402

1    A. Oh, I thought we were --
2        MR. DYKES: You ju- -- no --
3    A. -- talking about the faculty --
4        MR. DYKES: -- you just talked
5    about --
6    A. -- members who were terminated.
7        MR. DYKES: -- three people
8    being terminated.
9        MR. AMIRI: Oh, I was
10   thinking --
11       MR. DYKES: That you said were
12   terminated.
13       MR. AMIRI: -- we talking about
14   my termination.
15   BY MR. AMIRI:
16   Q. So, I'm talking about June
17   2017. Okay? You are high-rank official
18   in the University of Alabama. Do you
19   have information who should take action
20   in these cases? When there is a clash
21   between two professors, who should enter
22   and stop this confrontation between two
23   group of professors? So --

Page 403

1    A. If there's a confrontation
2    between two groups of processors, the
3    department chair handles it. If the
4    department chair is too involved, then
5    the college dean handles it.
6    Q. If the dean of college is
7    involved himself, who should handle
8    that?
9    A. If the dean of the college is
10   involved, then the provost would handle
11   it.
12   Q. Did the provost handle that?
13   A. Was the dean of the college
14   involved?
15   Q. Yes.
16   A. I -- I haven't seen that.
17   Q. I sent direct emails to provost
18   informing him --
19   A. That's not --
20   Q. -- that --
21   A. -- sufficient.
22   Q. What is sufficient? I sent the
23   audiotape of the people in that -- in

Page 404

1    the Department of Art and Science,
2    including the vice -- I mean what is
3    that? -- Associate Dean Han, which
4    he's -- now he's --
5        A. In 2016? Or are we talking
6    about 2017?
7    Q. The audio record of him that I
8    recorded was in 2016 that he was
9    associate dean.
10   A. Yes, sir.
11   Q. When I sent --
12   A. When you said the dean was
13   involved, did you mean the associate
14   dean?
15   Q. I recorded the voice of
16   associate dean. The dean himself didn't
17   give me a meeting time. And I reported
18   this situation to provost and president,
19   telling them that there's --
20   A. Right.
21   Q. -- a confrontation --
22   A. We're back to the same point.
23   Q. Yes. So -- so -- so you

Page 405

1    believe that provost should take action
2    in these cases. Is it correct?
3    A. No.
4    Q. So --
5    A. Again, because what you did was
6    send a pile of information to someone
7    who was not next in the grievance
8    process. The grievance about your
9    dismissal needed to start again.
10   Q. Dr. Carvalho, I'm not talking
11   about grievance. I'm talking to you
12   about confrontation between two group of
13   professors.
14   A. They -- then they needed to
15   handle that.
16   Q. Who needed to handle that?
17   A. The groups of professors need
18   to initiate a grievance --
19   Q. Well, they handled --
20   A. -- if they want to do that.
21   Q. -- it very perfectly. One
22   group terminated the other group.
23       MR. DYKES: Okay. I'm going to

102 (Pages 402 - 405)

Page 406

1 object. You --
2      THE WITNESS: Okay. I --
3      MR. DYKES: -- there is ab- --
4 you --
5      THE WITNESS: -- we're way
6 out of my range here, way out of my
7 range.
8      MR. AMIRI: Okay.
9      MR. DYKES: Out of your range,
10 and it's pure speculation, and you
11 have --
12      MR. AMIRI: I prove --
13      MR. DYKES: -- no basis --
14      MR. AMIRI: -- by the
15 documents.
16      MR. DYKES: Yeah. Okay.
17      What time do you have to start
18 shutting down?
19      VIDEOGRAPHER: Four -- at
20 about 4:45.
21      MR. DYKES: Okay.
22      (PLAINTIFF'S EXHIBIT NO. 21
23 MARKED)

Page 407

1      MR. AMIRI: I'm introducing
2 Exhibit Number 21.
3      MR. DYKES: Can I see that?
4      THE WITNESS: (Tenders
5 document)
6      MR. DYKES: (Reviews document)
7 Okay. No. Thi- -- this is a news
8 article from January the 17th of 2019.
9 Tell me how this has anything to do with
10 the procedures for your dismissal or
11 your dismissal in 2017.
12      MR. AMIRI: The procedure that
13 this person is selected took more than
14 one year.
15      MR. DYKES: Okay.
16      MR. AMIRI: So when the
17 procedure for selecting this person is
18 started, I was still a student in the
19 University of Alabama.
20      MR. DYKES: Okay. No. I'm not
21 going to let her answer any questions
22 about that.
23      MR. AMIRI: So this will be on

Page 408

1 the record, but you are not letting
2 answer.
3      MR. DYKES: Well, that goes
4 back -- I'm assuming you're saying that
5 he's the one who replaced Dr. Pinkert,
6 and I already said earlier I wasn't
7 going to let her ask [sic] questions
8 about that procedure.
9      (PLAINTIFF'S EXHIBIT NO. 22
10 MARKED)
11      MR. AMIRI: I'm introducing
12 Exhibit Number 22.
13      THE WITNESS: (Tenders
14 document)
15      MR. DYKES: (Reviews document)
16 Have we not already talked about the
17 April 27th, 2017, emails today?
18      THE WITNESS: Yeah --
19      MR. AMIRI: That is --
20      THE WITNESS: -- we have.
21      MR. AMIRI: -- the exhibit. Do
22 you have any objection?
23      MR. DYKES: I object to the

Page 409

1 fact that you've already asked her a
2 good number of questions over half an
3 hour about those emails from -- or a
4 string of emails from April twenty- --
5 from April of 2017 that she's not copied
6 on and hadn't seen at the time, but go
7 ahead and ask questions.
8      MR. AMIRI: Yes. My question
9 is, does it create a right for you to
10 make an objections for one minute, two
11 minute, and use the time of deposition?
12 I did not ask any question about this.
13 You are making objection. What is
14 the --
15      MR. DYKES: You offered --
16      MR. AMIRI: -- reason?
17      MR. DYKES: -- you -- you
18 offered it to her to -- as an exhibit.
19 I have the right to object to an
20 exhibit. I objected to the exhibit.
21 Ask a question if you want to ask
22 questions about it.
23      MR. AMIRI: Okay.

103 (Pages 406 - 409)

Page 410

1 BY MR. AMIRI:
2    Q.  Dr. Susan Carvalho, what is the
3 small picture in the first page?
4    A.  I don't know who that is.
5    Is --
6    Q.  It is a picture of a person.
7 Is this correct?
8    A.  Yes, it is a picture of a
9 person.
10         MR. DYKES: (Reviews document)
11         MR. AMIRI: Mr. Counsel, why
12 you want to see the document?
13         MR. DYKES: Well, it is -- I'm
14 representing the University of Alabama.
15 You're asking my witness about an
16 exhibit. I'm enti- -- you -- most of
17 the time, counsel provides the other
18 attorney a copy of the exhibits they're
19 using, so that the attorney can look at
20 it along with their witness.
21         MR. AMIRI: But you already
22 looked at -- in that document.
23         MR. DYKES: I glanced at it to

Page 411

1 realize they were emails. I didn't see
2 the picture because it is very small.
3 So you asked her about the picture; I
4 wanted to look at the picture. I have
5 the right to do that.
6         MR. AMIRI: Do you think when
7 you are looking at the document or
8 interacting with the witness, it is
9 giving some suggestive?
10         MR. DYKES: You just asked her
11 a question about the picture. I did not
12 notice the picture. I didn't say
13 anything to her about who it was, what
14 it was. I just wanted to see what the
15 picture was.
16         MR. AMIRI: Okay. May I
17 continue --
18         MR. DYKES: I -- yes.
19         MR. AMIRI: -- please?
20 BY MR. AMIRI:
21    Q.  So that picture is a profile
22 picture. Is this correct?
23    A.  I assume so.

Page 412

1    Q.  So the picture -- the email has
2 a profile picture, which is a picture of
3 that person. Is this right?
4    A.  I assume so.
5    Q.  Can you look at page 2?
6    A.  (Witness complies)
7    Q.  What is that profile picture?
8    A.  Is it a mask?
9    Q.  Which kind of mask it is?
10   A.  I don't know. I've never seen
11 anything like it.
12   Q.  Does it threaten you?
13   A.  No.
14   Q.  Can you look at page 3?
15   A.  (Witness complies)
16   Q.  What is on the profile picture?
17   A.  The same image.
18   Q.  What is this email
19 communication about?
20   A.  About the meeting.
21   Q.  What is that meeting for?
22   A.  This is the meeting that
23 reviewed student status.

Page 413

1    Q.  And offered my dismissal. Is
2 this correct?
3    A.  Ultimately, yes.
4    Q.  Not ultimately; in the same
5 day. Do you see --
6    A.  What is the question? Is the
7 meeting about your dismissal?
8    Q.  Yes.
9    A.  The meeting was about reviewing
10 your status.
11   Q.  These people gave a
12 recommendation for my dismissal.
13   A.  That is correct.
14   Q.  And the profile picture is a
15 mask.
16   A.  Yes.
17   Q.  Does it concern you?
18   A.  No.
19   Q.  Does it threat you?
20   A.  No.
21   Q.  Do you have any statement why
22 there should be a mask on that --
23   A.  No.

104 (Pages 410 - 413)

Page 414

1    Q.  -- email?
2    A.  No, I think you're --
3    Q.  Do you think it is related in
4 any way to the Grim Reaper image that I
5 show you previously?
6    A.  No.  I don't have any evidence
7 to think that.
8         (PLAINTIFF'S EXHIBIT NO. 23
9 MARKED)
10        MR. AMIRI:  I introduce Exhibit
11 Number 23.
12        THE WITNESS:  (Tenders
13 document)
14        MR. DYKES:  (Reviews document)
15        MR. AMIRI:  Mr. Counsel, did
16 you review the document correct- --
17 completely?
18        MR. DYKES:  I reviewed that
19 document, just like I've reviewed every
20 other document you have given her today.
21        MR. AMIRI:  After I ask a
22 question, will you come back and review
23 the document again, or it is final

Page 415

1 review?
2        MR. DYKES:  If I think I need
3 to review it again, I'm going to review
4 it again.  You didn't give me a copy of
5 it, so, if I think I need to review it
6 to determine whether or not to make an
7 objection, or I need to know something,
8 I'm going to look at it again.
9        MR. AMIRI:  But we
10 speculated [sic] that at the -- you
11 can object anytime in the future.  You
12 don't need to object here.  You have the
13 right to object to anything in this --
14        THE WITNESS:  Can we just go on
15 with the questions?  I want to get done.
16        MR. AMIRI:  Okay.  We -- we
17 both want that, but I want to do it
18 correctly.
19        MR. DYKES:  Well --
20        MR. AMIRI:  I don't want --
21        MR. DYKES:  -- if we do it
22 correctly, I have the right to look at
23 the document --

Page 416

1        MR. AMIRI:  Yes --
2        MR. DYKES:  -- so.
3        MR. AMIRI:  -- you looked at
4 that.  And after questions --
5        MR. DYKES:  And I can look at
6 it again.
7        MR. AMIRI:  Yes.  Could you
8 please not to look at the document after
9 question.  Let her answer the question,
10 and then you can look at that.
11        MR. DYKES:  I'm going to -- I
12 will -- if I need to look at the
13 document again, I'm going to look at the
14 document again.
15        MR. AMIRI:  Even after I ask
16 the question and the witness does not
17 answer?
18        MR. DYKES:  I'm going to try
19 not to inter- -- I will not interrupt
20 her if she's looking at the document to
21 answer a question, but, if I need to
22 look at it again, I'll look at it again.
23        MR. AMIRI:  I'm afraid that it

Page 417

1 is a suggestive move, because, when you
2 are looking at that, you are suggest- --
3        MR. DYKES:  How in the world is
4 my looking at a document suggestive in
5 any way?  All you -- I -- I want you to
6 ask her a question.  She wants you to
7 ask your question, so we can move
8 forward.
9        MR. AMIRI:  Okay.
10 BY MR. AMIRI:
11    Q.  Could you please look at the
12 first page.
13    A.  Yes.
14    Q.  This is an email that you
15 received from Cathy on 2018, February
16 2018, to be exact, February 12, 2018.
17 Can you read this email, please?
18    A.  This one?  (Indicating)
19    Q.  Yes.
20    A.  "I am waiting on the department
21 chair, Dr. LeClair, to call me back."
22    Q.  Can you please, the other email
23 as well?

105 (Pages 414 - 417)

Page 418

1 A. "We definitely do not want to
2 send a new one to the student, as this
3 is likely to go to litigation. We will
4 just leave it as it is and produce the
5 corrected letter if asked. I have
6 already sent in the current version to
7 our legal counsel. It may not make any
8 difference; we do know that the student
9 was notified of his suspension, and that
10 is the primary thing."
11 Q. And this is the email that you
12 wrote?
13 A. Yes.
14 Q. And you are telling that, "This
15 is likely to go to litigation." You
16 have information that I'm going to file
17 a lawsuit --
18 A. (Nods affirmatively)
19 Q. -- on February 12, 2018. Could
20 we please take a look at --
21 A. I don't know --
22 Q. -- the next page.
23 A. -- if I had information --

Page 419

1 MR. DYKES: I object --
2 A. -- that you were going to
3 file --
4 MR. DYKES: -- to the
5 statement.
6 A. -- a lawsuit.
7 MR. DYKES: There wasn't a
8 question there, but.
9 BY MR. AMIRI:
10 Q. Can you go -- can you take a
11 look at the second page.
12 A. (Witness complies)
13 Q. This is a "University
14 Registrar, November 2017." Can you read
15 from this part? (Indicating)
16 A. Okay. "Advising status: You
17 must see your advisor prior to
18 registration. You have holds which will
19 prevent registration. Your academic
20 standing is good standing which permits
21 registration. Your student status
22 permits registration. Your class for
23 registration purposes is graduate

Page 420

1 student."
2 Q. Yes. Can you please read the
3 date of this?
4 A. "Spring 2018, November 23rd,
5 2017, 10:42 p.m."
6 Q. Can you please take a look at
7 the next page?
8 A. (Witness complies)
9 Q. This is the "University
10 Registrar, March 2018." Could you
11 please read this?
12 A. All of it? "Registration
13 Status. You have no registration time
14 ticket. You may register at any time.
15 Advising status: Advising requirement
16 cleared. You require readmission prior
17 to registration. You have holds which
18 will prevent registration. Your
19 academic standing is good standing which
20 permits registration. Your student
21 status permits registration. Your class
22 for registration purposes is graduate
23 student."

Page 421

1 Q. And what is the time for that?
2 A. What is the time?
3 Q. Yes.
4 A. March 13th, 2018, 12:30 a.m.
5 Q. So this is one month after you
6 s- -- you send that letter in first
7 page, that this case is going to go to
8 litigation, because that email that you
9 wrote in first page, you read that.
10 A. Um-hum.
11 Q. It was on February 12.
12 A. Um-hum.
13 Q. And the "University Registrar"
14 in March 13, 2018, shows that you
15 require readmission prior to re- --
16 registration. But the page 2 shows that
17 I don't need readmission. I need
18 permission from -- "You must see your
19 advisor prior to registration." You
20 have holds which will prevent
21 registration." So, in November 13
22 [sic], 2017, I was not dismissed. You
23 dismissed me after you know that I filed

106 (Pages 418 - 421)

Page 422

1 the lawsuit.
2    A.  No, that's not accurate.
3    Q.  It is the "University
4 Registrar."  You have the document in
5 front --
6    A.  It --
7    Q.  -- of you.
8    A.  Yes, it is.  It's your
9 interpretation.  The -- the key sentence
10 in all of this, for me, is, "You have
11 holds which will prevent registration."
12 And that is a direct echo of the letter
13 that you were sent on June --
14    Q.  We are not talking about
15 letter.
16    A.  -- 29th that said, "We're
17 putting a hold on your fi-" -- "on your
18 record."  That's what the letter said:
19 "We are hol-" -- "putting a hold."  And
20 so what you see there is that there's a
21 hold.  Why the sentence about
22 readmission came up, I don't know.  We'd
23 have to ask the registrar that

Page 423

1 question --
2    Q.  But if --
3    A.  -- and get back to you.
4    Q.  Why in November 23rd, 2017,
5 which is long after June, the only
6 problem is I need to see my advisor?
7    A.  No, the problem is you have
8 holds.
9    Q.  And I have holds.
10    A.  The holds --
11    Q.  But I don't need to --
12    A.  -- are the key point.
13    Q.  -- re-admit.  I don't need
14 re-admission.
15    A.  I don't know what that sentence
16 means.  We'd have to ask the registrar.
17    Q.  Good --
18    A.  I don't know what it means.
19 These are --
20    Q.  But --
21    A.  -- computer-generated screens
22 that I'm not familiar with.
23    Q.  But the hol- --

Page 424

1    A.  So we would have to ask the
2 registrar why that sentence didn't
3 appear earlier, why it appears there.
4 But I don't believe that any action was
5 taken at that point at all --
6    Q.  Do you --
7    A.  -- so.
8    Q.  -- confirm that the holds that
9 will prevent registration are correct?
10    A.  Yes.
11    Q.  Do you confirm that I must see
12 my advisor prior to registration?
13    A.  That sentence is not one I'm
14 familiar with.
15    Q.  Okay.
16    A.  But what your --
17    Q.  Do --
18    A.  -- letter of dismissal said is,
19 "You will not be permitted to register
20 for fall 2017 or any future semester,
21 unless you have first been re-admitted
22 to the Graduate School in a different
23 program."

Page 425

1    Q.  That is another s- -- document.
2 This document that we are talking --
3    A.  Um-hum.
4    Q.  -- in March 2018 --
5    A.  Right.
6    Q.  -- it shows that I need to be
7 re-admitted.
8    A.  So what is your question?  "Why
9 does it say that?"
10    Q.  Yes.  Why --
11    A.  I don't know.  The only thing I
12 know about is the sentence that says you
13 have holds.  That -- all the rest of it,
14 I don't know.
15    Q.  So there is a change from
16 November to March.  What is the cause of
17 that change?
18    A.  I do not know.
19    Q.  It is the litigation.
20        MR. DYKES:  Object to the
21 form -- or object to the statement.
22        MR. AMIRI:  Okay.
23        THE WITNESS:  But --

107 (Pages 422 - 425)

Page 426

1       MR. AMIRI: I think we are --

2       THE WITNESS: -- the letter of

3 June 29th said that you needed to be

4 re-admitted.

5       MR. AMIRI: I think we are out

6 of time. The reporter told me that we

7 are out of time, so we have to go off

8 the record.

9       MR. DYKES: Okay.

10       VIDEOGRAPHER: We are going off

11 the record at 4:40.

12

13       (DEPOSITION CONCLUDED AT 4:40 P.M.)

14

15

16

17

18

19

20

21

22

23

Page 427

1       CERTIFICATE
2 STATE OF ALABAMA
3 COUNTY OF WALKER
4       I, Suzanne Lee, Certified Court
     Reporter and Notary Public in and for
5 the State of Alabama, hereby certify
     that the foregoing pages, and including
6 this page, contain a true and correct
     transcript of the testimony of the
7 witness, as taken by me at the time and
     place heretofore stated, and later
8 reduced to typewritten form by
     computer-aided transcription under my
9 supervision and to the best of my skill
     and ability.
10
     I further certify that I placed the
11 witness under oath to truthfully answer
     the questions in this matter under the
12 power vested in me by the State of
     Alabama.
13
     I further certify that I am not in
14 the employ of or related to any counsel
     or party in this matter, and have no
15 interest, monetary or otherwise, in the
     final outcome of the proceedings.
16
     Witness my signature and seal this
17 the 5th day of March 2019.
18
19
20   Melanie S. Lee
     Certified Court Reporter
21   ACCR No.: 476 Expires: 09/30/19
22 Notary Public, State of Alabama at Large
     My commission expires January 3, 2021
23

108 (Pages 426 - 427)

**[& - 27]**

Page 428

| & |
| --- |

**&**   1:22 4:16

| 0 |
| --- |

**000899**   7:2
**00425**   1:5
**01/17/19**   7:5
**02/12/18**   7:14
**04/27/17**   7:10
**05/23/17**   4:21
**06/23/17**   5:1,13 6:8
 6:15
**06/26/17**   6:23
**06/27/17**   5:4 6:5
**06/28/17**   5:21
**06/29/17**   4:8 6:12
**06/30/17**   6:1,19
**07/03/17**   5:9
**07/20/17**   5:17
**09/30/19**   427:21

| 1 |
| --- |

**1**   3:3 4:4 9:4 12:6,7
 305:13 306:1 342:5
 373:20
**10**   5:10 21:20 57:21
 246:7,10 355:18
**100**   120:5
**10:10**   78:4
**10:22**   78:8
**10:42**   420:5
**11**   3:10 5:14 258:8
 258:9
**11342916**   371:3
**11:31**   160:18
**11:37**   160:22
**12**   4:4,8 5:18 268:3
 268:4,10 277:8
 417:16 418:19
 421:11
**120**   4:17

**12:10**   198:20
**12:14**   202:13
**12:30**   421:4
**13**   5:22 12:11
 120:23 262:18
 263:3 280:8,11
 421:14,21
**1315**   2:4
**13th**   421:4
**14**   6:2 36:12 297:20
 297:21
**15**   6:6 33:11 192:2
 205:23 230:4 250:1
 315:8,10 352:2
**16**   6:9 94:14 325:20
 325:23
**160**   4:21
**17**   6:13 35:17 317:2
 338:15,16
**172**   5:1
**17th**   261:13 407:8
**18**   6:16 341:6,9
 352:16
**18-00425**   9:8
**18497**   427:20
**19**   1:14 6:20 253:13
 382:11,15,17,21
**19th**   9:3
**1:09**   202:16
**1:14**   326:7
**1st**   266:13 354:11
 355:21 379:17,18

| 2 |
| --- |

**2**   3:4 4:5 12:14,18
 15:10 43:8 78:7
 142:13,15 274:7
 412:5 421:16
**20**   4:11 7:1 147:15
 386:12,13,17
**200**   33:4

**2005**   1:13
**2013**   115:16
**2015**   92:14 93:8
 94:14 101:17
 115:18 116:6
 127:13 134:7 215:1
 216:17 392:4
**2016**   92:14 93:8
 99:6 104:4 106:19
 107:7 108:1,8
 109:18,21 110:6
 111:18 127:19
 186:6 188:3,10
 215:6 217:17,19
 221:11 266:13
 289:10,23 319:4
 404:5,8
**2017**   15:13 28:2
 65:18 107:7,18,19
 108:4,5 142:20
 152:5 162:15 173:3
 179:11 186:13
 188:6,15 189:15
 207:7 217:20
 221:12 223:7
 246:14 248:19
 251:7,9,12 260:12
 260:13 261:16
 268:14,22 289:23
 290:5 295:13 298:3
 312:16 313:23
 315:16 316:6 319:4
 323:14 326:6
 338:22 352:19
 370:13 383:13
 400:12 402:17
 404:6 407:11
 408:17 409:5
 419:14 420:5
 421:22 423:4
 424:20

**2018**   251:4,8,9
 266:14,18 417:15
 417:16,16 418:19
 420:4,10 421:4,14
 425:4
**2019**   1:14 9:3 407:8
 427:17
**2021**   427:22
**206**   5:4
**20th**   251:2 260:2
**21**   7:3 406:22 407:2
**22**   7:6 35:18 408:9
 408:12
**222**   2:8
**223**   5:9
**23**   7:11 34:12
 323:14 414:8,11
**23rd**   162:15 173:3
 246:14 248:19
 306:8,15 307:11,15
 308:2,3 309:2,7,11
 309:15 310:15,22
 338:22 370:13
 371:21 373:15,19
 381:6 420:4 423:4
**24**   116:4,7 118:16
 127:11 133:21
 148:8 245:16
**246**   5:13
**24th**   161:14 162:17
**258**   5:17
**26**   15:13 17:3 28:20
 163:7 205:3 277:18
 277:22 278:5,17
 281:15 346:18
 347:14
**268**   5:21
**26th**   34:23 35:22
 36:15 276:5
**27**   142:20 146:7
 147:16 163:22

207:6 298:3
**27th** 408:17
**28** 28:2 146:9
162:20,21 266:13
268:14 269:19
277:10 278:16
279:8
**280** 6:1
**28th** 276:3 277:14
**29** 272:6 274:8
275:10 281:9
314:11 326:6
352:18 379:3,15
**297** 6:5
**29th** 43:10 274:17
274:18 275:2 276:9
277:15 306:19
309:23 310:1
422:16 426:3
**2:08** 326:20
**2:18** 280:3
**2:30** 383:2,22
**2:31** 280:7
**2nd** 1:13

**3**

**3** 3:5 4:9 20:16,17
48:23 49:1 57:22
78:15 131:21
142:11,11,17
146:13 160:21
165:3 276:2 316:20
316:22 318:5
355:18 412:14
427:22
**3.0** 243:12
**3.0.** 243:13
**30** 184:9 245:12,16
278:5 279:13,17
280:15 281:7,15
282:5 286:14
307:12 310:5

341:17 365:4
373:18
**300** 185:9
**30th** 274:19 304:11
306:22 309:9
**315** 6:8
**32** 4:13
**3227636** 1:23
**325** 6:12
**338** 6:15
**341** 6:19
**35401** 2:4
**35487** 2:9
**38,000** 180:20
**382** 6:23
**386** 7:2
**3:00** 383:23
**3:30** 339:7
**3:36** 352:9
**3:43** 352:13
**3rd** 223:7

**4**

**4** 3:6 4:12 31:21
32:1 35:20 133:11
133:13 165:3 280:6
371:9
**4.0** 243:13
**4.0.** 243:15
**4/26/2017** 370:18
373:9
**40,000** 214:2
**406** 7:5
**408** 7:10
**414** 7:14
**427** 3:12
**476** 1:21 427:21
**4:30** 147:16,17
**4:34** 142:20
**4:40** 426:11,13
**4:45** 406:20

**5**

**5** 2:4 4:14 120:12
120:15 133:13
318:5,20 352:12
**5/26** 268:18 273:23
275:17 276:5
**50** 245:11,11
307:15
**56** 15:11
**58** 34:16,18
**5:44** 352:19
**5th** 427:17

**6**

**6** 4:18 133:9,9
160:23 161:3
**6/1** 326:10
**6/26/2017** 383:22
383:23
**6/29** 274:5
**6/30** 272:11,15
274:12
**6/30/2017** 272:21
**6:26** 370:15

**7**

**7** 4:22 172:15,18
202:19
**77** 35:14
**78** 36:11
**7:18** 1:5
**7th** 315:16 316:5

**8**

**8** 3:7 5:2 21:14,19
28:19 35:20 131:21
132:2 206:8,9
276:3
**870106** 2:9

**9**

**9** 5:5 23:20 48:23
131:21 222:23

223:1
**9:08** 1:15 9:2

**a**

**a&s** 176:12
**a.m.** 1:15 9:2
280:16 421:4
**ab** 406:3
**ability** 427:9
**able** 202:2 287:18
298:14 306:6 319:7
333:20
**absence** 218:17
**absent** 399:3
**absolutely** 238:13
385:9
**academic** 26:5,8
33:22 35:1 50:4
55:1,2 75:2 94:9,10
98:13 101:22
102:16 133:7 140:1
171:22 172:4
176:15 179:2
225:14 239:5 249:7
374:15 375:2,7,15
376:14,16 377:22
377:23 390:22
396:21 397:1,22
398:4,18,22 419:19
420:19
**accept** 30:8 39:2
52:22 164:13
321:20 348:13
375:18 380:2
**acceptable** 169:5
218:6 250:8
**accepting** 37:18
216:12 219:21
252:14
**access** 159:21
203:12 204:5,8,17
205:8,22 206:3,4

224:14 230:3,5
242:20 246:19
249:3 250:1,6
278:20 284:11
308:20 334:11
381:15
**account** 245:18
308:17
**accr** 1:21 427:21
**accurate** 422:2
**accurately** 52:7
**accusation** 101:23
102:17 104:6
105:14 371:23
**accusations** 103:7
176:18 177:11
181:11 330:10
**accuse** 83:4 84:2
**accused** 59:1,17
60:4 61:12 82:6
162:8 326:23
**achieved** 202:2
**act** 47:18 96:2
97:20 166:8,16
222:5 371:8
**acted** 47:17,21
48:13 136:1 166:17
218:22 247:18
248:4 284:13 289:4
**acting** 41:3 52:8
53:17 156:13
165:20 205:13,14
270:20 284:13
**action** 24:8 80:4
85:21 94:3 96:3,9
171:11 173:17
179:23 181:6 188:7
205:14 237:4
279:21 294:12
302:11 306:8
308:14 309:3

333:11 334:11
335:6 336:14
353:14 355:3
357:22 358:16
372:6 379:13 389:3
395:2,8,13,14,17
401:14 402:19
405:1 424:4
**actions** 13:14 80:2
99:21 357:6,20
**active** 167:10
**acts** 14:7
**ad** 219:20
**add** 74:17 245:17
**addition** 116:5
148:16 205:12
210:23 211:17
215:14 218:9
352:23
**additional** 15:18
16:6 162:1,4
374:22
**address** 81:17
129:4 183:4 334:17
**addressed** 97:22
377:15,18
**adequate** 17:5
179:8 293:21
**adjudicate** 156:19
181:1 294:4
**adjudicating** 337:4
**adjustments** 124:4
**administration** 2:8
**admissible** 197:21
198:6 219:20
238:17,20 239:9
**admission** 14:12
18:11,22 423:14
**admissions** 223:8
223:11 224:3,19

**admit** 423:13
**admitted** 17:21
18:12,14 228:4
424:21 425:7 426:4
**adopt** 28:12 69:19
71:16
**adopted** 29:2
**adopting** 26:23
65:19 66:4
**adult** 180:4
**advantage** 225:19
**advice** 265:19
266:3 267:11
320:18
**advise** 194:1,6
374:21
**advised** 177:10
327:16
**advising** 26:6 49:4
49:6,19,22 50:8
52:12 53:4 56:20
132:5,22 141:21
142:21 144:8
419:16 420:15,15
**advisor** 55:22 56:1
57:14,17 109:1
110:20,20 111:2
120:22 121:4 122:5
122:6,8,10,13,18
122:20 123:7,13,21
124:3,13 250:12
317:7,10,21 319:13
320:9,11,13,15
321:3 419:17
421:19 423:6
424:12
**advisor's** 122:9,22
**advisors** 26:4 54:23
55:12,16 56:6
121:15,21 157:12
195:18 196:11

207:16 210:14
213:18 320:23
**advisory** 268:19
354:15
**af** 175:14
**affairs** 98:13
370:22
**affect** 11:23,23
243:4,6,7,8 244:20
244:22 245:2,3,7
246:5,6 327:20
328:5 329:1
**affirm** 10:7
**affirmatively** 20:8
47:4 85:22 111:5
173:4 235:20
250:10 261:14
272:7 279:2 280:17
286:18 308:9 315:6
316:1 353:22 354:3
356:3 384:4 418:18
**afraid** 416:23
**afri** 175:18
**african** 175:15,18
**aft** 278:4
**afternoon** 147:15
277:19 278:5 282:5
**ago** 17:17 235:14
236:1
**agree** 29:9,10 57:8
57:10 117:11,23
153:18 154:4 157:8
287:13,18 293:5
321:2,12,13 363:17
**agreed** 8:3 135:12
135:14 151:4
**agreeing** 118:4
**agreement** 55:19
56:4 320:8
**agrees** 55:12

ah 121:13 313:1
341:15 382:8
ahead 25:7 51:11
71:22 72:11 84:8
84:12 97:8,9 158:9
194:18 207:10
276:20 366:23
409:7
aided 427:8
aimed 391:10
393:15
al 5:8 6:7 7:9
alabama 1:1,7,14
2:4,8,9 4:17 9:7,10
11:10,17 76:18
77:1,3 139:9
193:23 239:1,4,12
260:19 276:8
288:19 395:1,5
401:15 402:18
407:19 410:14
427:2,5,12,22
alarmed 329:11
alcohol 11:22
ali 1:3 2:3 4:7,20
6:6 9:5,21 25:23
45:19 207:18 215:2
268:16 272:17
273:21 280:22
298:9 300:22
307:21 313:3
326:10 339:8
351:10 354:11
383:2,20
ali's 208:2
aligned 90:17
132:15
alignment 159:19
allegation 82:21
97:20 104:9 163:10
164:3 170:12 171:3

196:10
allegations 81:22
161:14,17 196:18
allow 185:17
342:21
allowed 163:13
304:16
ama 312:14,17
313:2,5,22 341:19
341:23 342:2,7
344:20 352:21
371:2 374:18
378:10 381:9
ama's 371:6 374:11
ambiguity 282:16
284:4 298:21
ambiguous 85:6,8
144:2,3 285:21
298:23 299:1,8,10
300:12
ambiguously
300:14,16
american 175:15
175:18,18
amir 45:17
amiri 1:3 2:3 3:10
4:7,20 6:7 9:6,21
9:22 10:19 11:2
12:5,9,16 13:5
14:15 20:15 21:3,7
21:11,21 22:11
25:10 26:1 29:14
30:3 32:8,11,16,19
32:23 33:2,6,8 34:9
34:11,16,20 35:3
35:12 36:5 37:2,4,9
37:11,16 38:10
39:6,10,14,18,22
40:1 41:20,22 52:2
54:5,14 56:22
58:17 59:10 60:1

63:9,12,19 64:4,5
64:11 65:6 66:6,21
67:3 72:10 76:5,8
76:11 78:1,9 81:6
81:10,14 82:3,9,12
82:20 83:1,5,9,11
83:14,17 84:5,9,13
84:15,20 87:1
89:22 91:3,6 95:2
97:4,6 105:1
106:23 107:4,8,12
109:13 120:8,14
121:1 123:18
125:20,23 126:14
126:15 128:13
129:2,11,14,23
130:3,6 131:8,11
132:1 133:14
134:20 137:4,5
138:21 142:1
143:17 145:14,19
146:1 147:11 148:6
148:15 149:19
152:2,20 153:21
154:17,20,23 155:3
155:10,19 158:8,18
160:2,4,16 161:2,8
161:11 163:18
167:1,9,20 168:5,8
168:14 169:6,22
170:10,18 171:6
172:13,17 173:1
175:1,23 176:2,5,8
176:13 179:14
180:17 181:18
183:6,17 184:12,17
187:1,13,22 191:12
191:15,20 192:14
193:21 194:12,16
194:21 195:1 196:1
196:21 198:21

199:1,5,6 202:9,17
205:6 206:7,17
209:1 213:2 216:8
217:18 219:13
220:1,2,12,17,19
222:22 223:5
227:21 233:2,5
238:15 239:18
240:2,8,11,16,19
240:23 241:9,18,22
246:9,12 249:1
250:22 255:10
256:5 257:20 258:3
258:7,12 262:7
263:2,5,22 264:7
264:10,15 265:10
265:13,17,23 266:5
266:11,17 267:1
268:2,9,16 272:18
273:22 274:20
276:22 277:2
278:22 279:23
280:10,13,22 282:3
286:11 287:8,12,20
288:9,18 290:20
291:2,8,14,17
292:6 296:12
297:19 298:1 304:4
310:2 311:20 312:4
312:7 313:3,12
315:7,12 316:17
318:2 322:7,21
324:15,20 325:1,4
325:22 326:2,10
328:3,16,20 329:19
330:20 332:3,8,17
332:23 333:2,13
334:1 335:8 336:20
337:12 338:14,19
339:1,2 341:8,11
346:9 348:21 351:1

351:10 352:6,14
354:11 358:19
360:13,19 361:1,10
361:14,17 362:17
362:19 363:11,16
364:3 365:8,15,21
366:1,12,21 367:1
367:2 371:18 372:8
375:13 378:18,20
378:23 379:1 380:1
382:17,20 383:2,15
383:18,20 385:5,22
386:11,16 392:12
393:4,6 394:7,22
395:11 399:1,11,15
400:4,5,11,17
401:1,8 402:9,13
402:15 406:8,12,14
407:1,12,16,23
408:11,19,21 409:8
409:16,23 410:1,11
410:21 411:6,16,19
411:20 414:10,15
414:21 415:9,16,20
416:1,3,7,15,23
417:9,10 419:9
425:22 426:1,5
**amiri's** 45:18,19
192:21 193:6 298:9
300:22 307:21
339:8
**amount** 293:13
368:13
**analysis** 166:5
**analyst** 396:17
**ano** 322:13
**answer** 14:5,6 22:8
25:6,7 33:10 35:4
36:12 37:3 54:11
56:18 76:19 83:21
97:5 101:4,5

102:11 111:15
125:4,8 126:13,21
126:23 129:12
131:9 138:9,12
140:7,8 142:9
153:12,13,14
155:13 158:12,16
159:11 168:12,13
172:7,11 181:13,22
192:4 194:13,19,23
195:2 197:20 200:5
227:16 233:14
240:3 241:14 242:3
246:4 253:10 258:4
259:10,19,21,22
262:14,16 264:12
288:21 311:16
312:2,5 323:10
326:19 329:6 335:3
337:20 343:17
345:20,21 347:12
353:16 364:17
366:13 373:15
377:16 382:4 399:5
407:21 408:2 416:9
416:17,21 427:11
**answered** 36:2
45:13 172:11
191:17 261:3
262:11,12 264:8,18
264:22 311:12,21
311:23 312:2 346:6
355:12
**answering** 33:14
91:1 136:15 209:4
262:13 264:17
344:2 381:12
**answers** 8:15 12:4
37:8 187:4 361:22
**anybody** 193:14,17
193:22 195:12,18

316:10 395:18
**anymore** 194:2
195:16,19 250:21
**anytime** 415:11
**anyway** 16:23
228:22
**apart** 221:23
**apartment** 2:4
278:9 285:13
286:21 315:5
333:22 334:6
346:19 347:14
348:18,19 382:1
**apologize** 364:18
365:13,21 366:6
**apologizing** 365:10
**apparent** 301:6
**appealed** 78:23
79:5 94:3 104:14
218:9
**appear** 424:3
**appearances** 3:4
**appears** 424:3
**applicable** 129:19
**applicant** 174:22
175:4,22,23 176:1
176:2 180:4
**applicants** 224:4
**application** 214:13
214:13 224:6 225:7
**applications**
226:21
**applied** 224:7
226:13,17
**applies** 76:13
224:20,21
**apply** 76:16 224:3
224:4 225:16 226:1
226:11 227:6,7
229:15,20 230:7,13
234:20

**applying** 124:17
176:4 226:20
**appointment** 6:21
350:15
**approach** 319:11
**approaching**
207:14
**appropriate** 53:23
92:1,3 169:17
170:2,23 176:15
179:2,13,17,20
188:11 362:23
374:21 401:16
**appropriately**
270:20
**approve** 119:8
120:6 121:12,17,22
121:23
**approved** 121:7,11
**approves** 119:6
**approximately**
1:15
**april** 28:2 142:20
146:7,9 147:16
152:5 161:13
162:17,20,21
268:20 276:3
315:16 316:5
408:17 409:4,5
**araujo** 7:8
**area** 56:15 60:14
61:10 62:20 63:4
74:22 81:1 134:14
237:3,9,10 246:1
254:18 256:11
304:6 334:20 335:5
401:12
**areas** 125:18
**argued** 236:3
**arguing** 232:23
324:13

**argument** 363:4
378:19
**armed** 277:23
278:6
**aroused** 58:22
**arranged** 147:14
**arrive** 72:1
**arrived** 56:21
**art** 79:1 92:10 94:4
96:18 151:11 178:7
179:7 186:10 404:1
**article** 7:3 407:8
**artist** 92:15 388:23
**arts** 178:9
**artwork** 92:13 93:4
354:21 379:9
388:21
**artworks** 92:11,15
93:1,3,11,13
388:22
**arun** 161:19 162:8
204:23
**arunava** 70:7 206:2
**ascertain** 197:14
**asked** 40:20 41:6,8
45:15,16 46:13
47:1 61:7 71:23
72:4 91:4 106:6
129:15 160:14
163:16 170:12
191:16,21 195:8,22
196:3 197:3,11,13
199:3 209:7 211:21
211:22 216:20
253:14,18 256:17
257:4,23 258:23
259:2,6,12,17
295:5 303:15,16
319:16 321:8
336:19 338:3
344:14 355:10

362:4,7 376:1,2
392:16 395:19
409:1 411:3,10
418:5
**asking** 32:17 102:9
113:4 125:13,19
126:10,16,17,21
130:4 136:21
137:13 141:8,10
142:8 143:15 150:6
154:13,23 155:6,12
155:14 156:2 162:9
164:22 165:14,15
166:4 167:4 194:7
194:9 196:2 197:4
204:5 209:18 217:9
217:10 219:1 233:2
235:22,23 237:1
241:12 247:11
249:8 259:9 260:21
265:19 272:1 275:5
284:10 292:3,16
297:6 301:13 303:4
313:19,21 314:2
323:23 327:23
332:15,20 335:12
361:4 364:3 379:22
395:9 397:19
398:10 399:4,9
410:15
**asks** 72:19 129:6
**aspect** 162:12,12
**assaultive** 371:7
**assess** 50:3 74:3
86:13 90:4 142:5
164:23 177:10
284:19 335:12,15
**assessed** 77:15
138:18 209:19
212:20

**assesses** 86:2
**assessing** 173:15
334:10
**assessment** 123:23
162:5 173:8 207:13
209:13 214:19
298:7 338:12 339:6
340:10 370:19
371:4 373:9
**assign** 195:10
**assignment** 242:11
**associate** 11:11
176:22 208:8 211:3
215:17 233:19
253:19 404:3,9,13
404:16
**assume** 72:6 91:17
138:14 144:6,12
145:1,9 165:21
166:2,17 167:13
168:15,16,23
245:10 259:22
264:21 273:7 282:8
284:22 289:3
322:15,17,19 396:3
411:23 412:4
**assumed** 229:11
284:7,12 303:5
**assuming** 261:9
262:12 408:4
**assumption** 154:5
227:5,10 303:8
**astronomer** 71:2
**astronomers** 56:11
69:11 136:10
**astronomy** 4:16
26:13 70:21 141:14
374:17 381:8
**attach** 353:6
**attached** 92:9
186:15 260:22

268:20 281:1 298:6
313:13 316:4
326:10 353:5
354:10 388:18
**attachment** 48:12
61:18 222:20
**attachments**
293:18 368:7,9,23
369:6
**attack** 279:16
332:6 382:1
**attacked** 278:7
346:19
**attacking** 83:11
**attained** 169:4
**attempt** 73:10 74:2
**attend** 347:22
349:3
**attended** 211:6
**attendees** 384:2
**attending** 229:23
339:5
**attention** 85:9
187:8,8 219:22
349:23
**attorney** 37:19
265:14,16 266:9
410:18,19
**attorneys** 8:5 10:14
**audio** 404:7
**audiotape** 295:15
296:13,21 297:3
315:16 316:4,6,10
317:8 323:17,18
403:23
**audiotapes** 191:14
369:19
**august** 261:15
272:6,10 306:8,15
307:8,11,15 308:2
308:3 309:2,7,9,11

309:15 310:15,22
**auth** 287:17
**author** 98:4 231:20
231:22
**authorities** 94:21
297:1 360:7,8,10
389:23
**authority** 96:13,16
178:20 290:4
**authorized** 53:2
**automatically**
228:5
**available** 132:12
371:5
**avenue** 221:2
**avenues** 289:10
**average** 243:17
245:9
**award** 236:21
**aware** 60:9 90:20
229:8 284:3,4,23
345:7 350:3
**awareness** 342:9
344:19 346:16

**b**

**b** 4:1
**bachelor** 50:13
**back** 78:7 81:7 84:4
96:10 160:21 170:2
202:15 203:18
213:17 221:5,18
231:15 252:2 253:3
253:7 259:23
273:18 280:6 303:5
344:11 352:12
373:22 374:1
383:12 404:22
408:4 414:22
417:21 423:3
**background** 11:4
138:8 145:2 146:23

148:23 230:23
371:1
**bad** 85:2 285:22
345:19 346:12,17
346:20,21
**balance** 13:12
**base** 155:14 159:4
**based** 24:22 26:1
29:3 31:11 33:12
38:13,15,16 54:1
59:18 64:22 68:16
73:9,16,23 75:6
85:21 88:20 89:1
116:21 118:9 131:2
131:3 151:8 157:1
164:17 169:20
171:10,22 205:14
214:3 234:12 236:2
238:9,20 251:16
262:17 263:22
285:3 304:14
306:15 309:6
313:15 318:10
319:21 322:4 332:4
340:19 342:5 343:9
356:12 365:18
370:2,23 374:9
398:5,22
**basic** 159:8
**basically** 53:15
54:2 68:14 141:19
159:12 356:10
375:1
**basis** 152:10
165:23 183:23
286:10 406:13
**becoming** 291:9,19
**beginning** 1:15 4:6
4:19 5:6,11,15,19
6:3,10,17,21 7:1,7
7:12 58:9 177:20

295:6
**begins** 78:6 160:20
280:5 352:11
**behavior** 339:14
**behavioral** 339:5
340:9 371:3 374:11
**believe** 20:3 46:20
90:10 131:21
173:21 197:10,11
258:18,20 260:11
315:19 367:17
373:21 387:20
405:1 424:4
**bell** 253:14,18
303:17
**belong** 206:1,2
**bending** 210:12
319:8,9
**best** 125:8 264:19
264:20 298:13
301:8 326:21 339:7
342:21 427:9
**beth** 5:20 234:1
268:16 273:21
**better** 47:9 72:18
79:10 82:1 139:22
140:1 212:5 269:14
302:23 330:1
345:23 378:3
**beyond** 98:12
238:7
**big** 226:23 227:2
388:10,12 389:4
**bigger** 88:11 227:3
227:4 335:6
**bit** 182:17 254:23
286:21 287:1
319:21 339:6
**bits** 32:6,8
**black** 263:7,7

**board** 1:6 9:6 389:7
**bottom** 99:8 105:8
105:9 189:22 272:5
352:17 354:8 367:4
367:14
**boulevard** 1:13
**bounds** 136:2
**box** 2:9
**brackets** 30:23
**brandon** 2:12 9:11
**brave** 248:10,14
**break** 78:2,5 81:4
82:15 84:17 158:13
160:1,15,19 202:10
202:14 276:18
280:1,4 352:5,7,10
**brevity** 246:23
247:2 248:9,12
**brief** 143:2 144:21
146:4 248:11,11,12
**briefed** 147:17
148:20,21 342:6
344:17
**briefly** 246:17
**briefs** 37:13
**bring** 103:10,15
169:2,18 170:8
182:13 221:20
**brings** 73:5
**broad** 242:3
**broader** 377:16
399:3
**broke** 285:12 315:5
**broken** 192:13
**brought** 46:10
151:6 157:2,3
214:9 271:7 319:5
**brown** 2:12 9:11
**bryan** 259:12
**building** 1:12 2:8
251:14 279:1

347:19 348:2
349:16,17,19
**buildings** 348:9
**bullet** 133:18
381:13,13,15
**bulletin** 386:19,19
386:19,21,23 389:6
391:3 393:8,13
398:11
**bureaucracy**
308:16
**bureaucratic** 19:16
144:15
**busted** 347:15
**buy** 217:12,13

**c**

**c** 2:1
**cal** 243:10
**calculate** 246:3
**calculated** 238:16
239:8 243:9,11,16
**calculations** 245:23
**calendar** 385:1
**call** 6:21 240:15
241:7,8 267:14
314:6 350:19 351:5
351:22 383:1,19,21
385:10 417:21
**called** 88:4 267:18
350:15 351:2,4,9
351:11,19 390:2
**calling** 168:20
**calls** 44:15 327:2
**campus** 86:2
334:16 347:19
373:17
**candidate** 259:14
**capstone** 269:7
271:4,20
**car** 145:20

**card** 205:17
**cards** 205:15
**care** 63:1 394:17
**career** 14:14 72:21
317:1,13
**careful** 60:18 286:3
**carefully** 84:19
85:9 161:15 255:2
**carl** 4:20 59:17
62:4 163:4 171:4
253:15 257:14
303:18 325:7
326:14,22 327:5,15
328:23 329:13
**carries** 88:9
**carry** 368:1
**carrying** 88:3
**carvalho** 1:11 3:9
4:7,23 5:3,7,12,16
5:21,23 6:12,14,18
6:23 7:14 9:5 10:3
10:21 11:7 124:14
145:21 256:6
312:12 366:9,18
367:5 370:14 384:2
397:19 405:10
410:2
**case** 1:5 9:7 25:23
44:21,23 54:16
59:9 77:8 101:11
106:12 124:15,16
126:17,22 129:20
142:2 154:12
155:20,21 159:13
171:17 175:11
208:2 220:6,7,10
234:5,8 238:8,14
242:15 244:9
320:12 323:2 324:3
324:4 326:13
360:23 369:7,8

392:9,9 421:7
**cases** 16:9 124:17
130:14 141:7
402:20 405:2
**catalog** 53:22
104:13 118:10
119:20 190:16
**cathy** 7:13 176:22
339:4,4,11 417:15
**caught** 85:9
**cause** 425:16
**caused** 289:11
**cc** 339:4
**cell** 338:23
**center** 70:7 151:17
152:8 199:23 200:2
253:16 254:21
256:23 257:4
303:22 315:22
355:7 386:20 389:7
393:13
**central** 18:7 197:17
197:19 224:1
**centralized** 13:13
177:21
**certain** 22:18 72:20
124:4
**certainly** 174:6
256:10 322:3
**certificate** 3:12
427:1
**certified** 1:22 8:8
427:4,20
**certify** 427:5,10,13
**cetera** 207:17
339:15
**chain** 61:18,21,22
67:11,14,20 68:1
99:2 149:9 271:1
293:17 296:21
347:20 353:15

369:5
**chair** 20:13 24:12
30:15 52:19 53:6
62:5 70:8 93:23
100:14,15 101:9,10
104:17 105:15
110:21 117:15,18
119:5,7 148:9
151:16 152:9 169:9
281:5 366:16 403:3
403:4 417:21
**chair's** 298:8
300:21 301:22
**chairperson** 110:23
111:2
**chairs** 153:17
**chance** 185:13
231:11 324:2,4
**change** 24:17 61:18
183:1,4 230:7
245:19 269:20
270:17 287:14
291:15 293:17
323:18 374:11
425:15,17
**changed** 65:12,15
70:14
**changes** 124:9
287:5 316:8
**changing** 73:7,15
90:23 269:11 271:4
**channel** 179:13,18
179:21
**channels** 176:16
179:3
**char** 342:4
**charge** 165:9,12
166:15 223:12
**charged** 165:13
**charges** 165:5

[charles - committee]                                          Page 436

charles 4:23 6:18
173:3,6 203:6
312:10 313:4,20
314:15 334:4,22
335:10 337:14
341:13 342:1 343:6
344:1 345:6 346:5
346:8,13,14 348:6
352:18,21 354:9
367:5 368:4,12
370:12 371:19
charlie 86:7 89:17
89:19,19 173:14
374:23 380:9,11
387:17
charter 5:23 6:4
234:2 235:15
271:19 272:6,15
274:11,12,19
276:11 280:15,20
281:12 282:11
283:23 298:21
304:10,19 308:8
309:7,9,18 342:4,6
342:18 343:3
344:16 345:2 350:5
351:6
charter's 281:22
344:7
check 53:12
checked 90:11
checking 53:12
chips 71:6
choice 294:15
choices 31:10 222:7
222:15
choose 14:9 29:19
29:20,22 312:19,23
380:23
chooses 31:10

chose 289:8,9 290:5
293:7 294:23
chronology 166:3
chumney 11:7
circumstances
112:21 183:3
claim 59:5 162:3
327:1 385:6
claiming 285:7
claims 59:7 161:22
238:14
clair 197:13
clarification 95:15
96:4 313:19 314:3
clarify 283:16
284:18 285:1
353:15 355:10
clarity 96:1
clash 402:20
class 419:22 420:21
classes 270:5
clause 26:9 30:17
55:2
clauses 31:2,8
clean 197:9
clear 54:17 69:4
93:16,19,21 110:14
121:19 132:14,19
283:4 286:16
289:13 298:14,19
298:20 299:4,6,16
299:18,19,20
300:11,13,17,18,19
302:1,8 313:14,18
313:18 328:14,18
347:1 349:9 351:13
351:17 359:4,5
381:19
cleared 420:16
clearer 22:15,20

clearly 62:2 71:9
71:18 286:14
client 265:14,16,21
266:9
clock 231:10
389:10 390:1
398:14
closed 166:7,18,19
167:7
closely 106:11
closer 181:6
closest 294:12
cloud 109:9
coach 82:12,16
coached 81:17
coaching 82:7
code 205:21
codified 90:9
collaborated 64:14
collaborating
64:19
collaboration
212:7
colleagues 26:4
54:23
college 96:19 98:12
105:16 176:12
178:7,9 179:7,16
186:10,10 401:21
403:5,6,9,13
collo 362:1
combination
318:22
combine 319:13
come 64:8 81:7
99:1 137:11,15
152:13 156:4
199:23 201:10
204:1 213:17
216:21 221:21
253:2 255:4 260:23

275:6 278:1 286:12
288:23 296:8,10
297:8,9,10 314:23
321:16 322:13
330:11,22 333:22
334:16,18 337:23
351:8,10 364:14,16
378:1 414:22
comes 30:22 281:17
comfort 289:7
comfortable 85:16
comfortably 74:23
coming 199:11
202:4 225:8 260:8
282:20 334:5
358:17 364:8,11
comment 201:13
comments 374:23
commission 427:22
committee 20:12
23:12,16 25:19
26:7 40:17,22 44:6
48:5 49:4,6,22 50:8
50:17,19,22,23,23
52:12 53:4 55:9
56:14,20 68:3,5,12
69:16,17 70:1
71:11,23 72:7,19
72:22 73:2 74:16
75:1,13 77:12
90:16 110:22
111:12 114:3,19,22
114:22,23 115:1,19
117:18 119:5,13
120:6 124:20
130:10 131:14,23
132:5,15,22 134:13
137:7,10 139:1,3
139:20 140:12,15
141:21 142:22
144:8 149:7 151:4

157:15,17 158:16
158:22 159:1,3
163:16 165:6,8,12
166:12,13 168:23
169:2,12,18 170:8
170:12,17,23 171:2
188:7,18 197:2,14
203:10 207:16
213:21 218:21
220:22 222:2,17
234:12,14 236:7
247:17,21 276:3
293:1 353:4,5
354:16 356:7
376:20
**committee's** 23:15
29:12 73:14 132:16
232:6,10 268:20
298:7
**committees** 49:19
72:3,8
**committing** 371:7
**common** 153:15
154:7
**commonplace**
395:5,10
**communicate**
22:19 44:3 93:18
95:6 226:14 228:5
298:14 312:20
398:12
**communicated**
272:23
**communicates**
23:11
**communicating**
93:20 281:13
282:11
**communication**
23:14 48:1 57:15
179:19 218:5

256:22 260:14
261:2,12 273:3
281:4,23 353:16
398:13 412:19
**communications**
44:1 185:3 186:16
208:12 214:4
215:18 218:13
278:3
**community** 26:5
55:1
**company** 1:22
**compared** 212:1
**compelling** 327:9
**complete** 32:5 34:6
35:11 36:6 67:20
138:11 318:13
**completed** 133:21
**completely** 27:12
219:19 230:21
414:17
**completing** 133:19
134:1,8 136:18
**complex** 102:3
**complexed** 358:8
**compliance** 161:13
370:21
**complicate** 197:5
**complicated**
102:10 204:4
292:10
**complies** 10:5
35:16 57:23 233:17
273:20 412:6,15
419:12 420:8
**component** 133:19
134:2,9 136:18
**composite** 4:5,18
5:5,10,18 6:2,20
7:11

**computer** 70:18
71:5 383:9 384:19
384:21 385:3
423:21 427:8
**con** 229:12 379:12
**concept** 77:20
139:10
**concern** 85:3 88:16
92:19 180:8 206:5
355:6 372:13 388:8
389:2,8 413:17
**concerned** 72:5
81:1 82:4,5 85:10
88:22 172:4 173:12
176:13 178:17
226:3 279:5 281:22
387:19
**concerning** 85:5
314:10
**concerns** 171:21
182:5,22 353:12,20
**concert** 51:23
**concise** 390:20
**concluded** 426:13
**conclusion** 60:21
60:23 68:3,5 72:2
89:9 112:14 144:18
153:9 156:5,23
157:5 164:17 171:9
185:19 202:6 204:7
215:11 288:12
338:1 349:20
397:17 398:3,21
**conclusions** 88:20
98:3 124:6
**condensed** 70:2,16
71:3 115:21
**condition** 183:14
**conduct** 26:3 54:22
**conducted** 371:1

**conducting** 63:6
**conference** 1:13
**conferences** 211:6
230:1
**confirm** 53:8 259:1
259:3,13 282:4
424:8,11
**confirming** 178:22
280:22
**confirms** 178:6
**conflating** 347:5
**conflict** 59:20 90:1
336:4
**confront** 287:1
**confrontation**
402:22 403:1
404:21 405:12
**confronting** 285:23
**confused** 247:23
312:13 313:7,21
**conjecturing**
230:18
**conjunction** 48:3
**connect** 292:20
386:9
**connected** 278:13
**connection** 292:18
**conor** 7:8 354:18
379:6
**consequence** 85:20
236:5 340:3 379:12
**consequences** 80:3
271:7 336:13
340:18 345:8,17
353:14 354:2 355:2
355:15 357:8,22
358:15,16
**consider** 30:22
149:13 203:1 215:2
287:4 293:12
339:12 345:20

358:21
considerable 210:2
210:2
considered 24:17
77:13 86:10 175:6
254:22 317:5,6,16
355:23 372:4
considering 30:19
considers 26:7
consistent 29:18
consonant 77:17
constitute 199:16
200:11 201:2
constructed 181:4
consult 14:8 16:10
91:23 173:14 177:1
249:6 298:12
consulted 86:1
consulting 270:22
contact 13:20,22,23
46:21 177:13
256:14 314:12
contacted 47:10
174:1 175:6,8
189:3,22 345:6
contacting 297:2
contain 427:6
contained 20:12
27:13 353:7
containing 249:2
contains 242:5
368:13
content 68:22
74:10 94:8,12
258:17 264:1
354:19 356:18
379:7 387:12
contents 3:1,5
context 60:17
164:19 166:21
339:10 391:4,6

393:17 399:3
contingent 4:11
21:8 93:22 147:19
162:19
continuation 13:9
continue 23:5
33:15 34:13 58:13
78:10 83:2 84:10
106:7 107:10 139:5
142:10 198:21
202:18 225:18
229:10,11,13
241:20 287:23
290:1 304:16
305:11,18 360:18
366:22 374:6,7
382:7 411:17
continued 200:15
201:19 238:23
243:18 366:13
378:15
continuing 166:22
373:17
continuous 152:10
200:9
continuously
151:18
contradict 30:7
contrary 16:7
17:23 52:21
contrast 27:3
contributed 182:12
250:13
control 50:1 205:11
256:2
conversation 42:21
45:4 46:11 47:19
107:14 147:10
156:18,20 186:18
255:23 339:11
342:14,18 343:3

conversations
60:10 166:3 174:7
174:10,11 177:18
177:22 178:3
198:16 271:8,10,15
271:16,17,18,19,21
272:17 334:4
convey 246:22
conveying 300:17
convince 321:17
333:20 335:9,11,17
379:19 380:3,7
381:21
convinced 332:5
334:15
cooking 230:22
coordination
278:13
coordinator 370:22
copied 79:2,4
189:15 383:10
409:5
copy 32:5 120:10
297:17 410:18
415:4
copying 190:1
correct 15:2,8
16:16 21:15,18
22:3,6 23:6,7 25:13
27:6 29:23 33:13
35:2,23 36:1 39:10
39:15 47:8 53:9,16
55:22 59:21 61:20
77:21,23 90:5
100:3 105:2 109:21
110:2,4 131:3
132:6,23 136:20
138:6 151:22
152:15 153:6,8,9
155:22,23 156:4
159:15 163:4

165:17 203:21
207:2 236:4 250:11
252:5 263:4,10
264:2 268:1 276:12
276:13 281:17
285:6 288:4 306:16
309:8,16 322:9,11
322:16,23 335:20
365:12 366:14
369:14 370:9 372:1
372:5 373:13
376:12 380:3 392:6
394:4 395:13 405:2
410:7 411:22 413:2
413:13 414:16
424:9 427:6
corrected 418:5
correcting 324:16
325:2
correctly 43:3
135:22 415:18,22
correlated 318:7
corresponded
224:7
correspondence
261:7
counsel 9:15 37:19
38:17 39:3 83:17
84:5,9 129:11
238:15 239:18
240:11 246:23
249:6 262:21 264:4
265:19 267:4,6,11
297:17 332:23
361:10 362:20
383:5 384:6 385:7
385:22 410:11,17
414:15 418:7
427:14
count 245:15

counted 189:20
   244:18,22
counting 205:22
country 230:10
county 427:3
couple 92:12 257:2
   307:3 338:21
course 242:1,2,4,6
   242:7,8,9,12,20
   243:4,18 244:4,14
   364:18
courses 115:12,14
   116:3 244:18,19,20
   244:21 245:3,11
coursework 115:15
   116:5 127:11 306:6
court 1:1,22 8:9
   9:13 10:2,6,13,18
   10:20 12:10,11
   37:14 81:16 83:12
   83:16 238:9 263:2
   263:23 266:5,7,11
   266:20 278:9
   285:14 360:3 427:4
   427:20
court's 238:21
   241:19 262:18
   263:16 266:8
courtesy 128:2
courthouse 1:12
create 88:15 91:18
   91:19 92:18 180:8
   235:2 409:9
created 24:7 58:21
   88:7,16 89:11
   91:10,11,17,20,22
   92:5 93:22 94:1
   146:9 147:19 148:8
   149:8 162:20,23
   164:14 235:5

creates 319:9
creating 79:14
creation 260:19
credible 86:21
   167:15
credit 116:4,7
   118:16 127:11
   242:2 244:5 245:12
   245:12,14,17
criminals 232:12
criteria 31:11 52:6
   52:7 90:17,20
   132:9,13,18 159:17
   159:19 160:5,7
   218:23 242:16
critical 31:16,17
   229:9
criticism 331:8
criticisms 327:6
crux 121:13 321:1
curious 229:3
current 329:16
   342:7 343:8 344:17
   374:16 376:17
   377:1 378:8 381:7
   418:6
custody 286:2
   287:3 348:8 349:22
cut 313:11 362:20
   363:7,10,12,18
   365:14 366:6,10
cutting 333:5
   364:10 365:11
cv 1:5 9:8
cwid 371:2

   d

da 314:7
danger 87:2 291:8
   291:19 337:7 339:9
   339:13

dangerous 345:18
data 121:18 124:6
   318:12,14,23 319:2
   321:10
date 33:13 36:1,3
   42:21 162:13 207:6
   207:10 273:16
   274:3,9,23 275:8,9
   275:11 303:2
   306:14 308:1
   309:16 310:4,21
   311:1,2,3,4,23
   314:9 322:13
   374:10 420:3
dated 4:8,21 5:8,13
   5:17,21 6:5,12,19
   6:23 7:10,14 207:9
   370:12 372:3
dates 274:22
   275:22 277:3
   309:14,14 373:8,22
davi 314:14
davis 314:8,13,17
   314:21 355:6
day 34:23 35:5
   147:19 163:8 164:1
   177:20 248:3
   255:23 271:12,15
   307:1 326:20
   364:18 413:5
   427:17
days 42:20,20
   92:12 163:1 171:2
   253:13 257:2
   270:13 281:10
   307:3,15
de 137:11
dead 316:23 317:11
   317:15,18 320:16
dealing 175:12
   184:21

dean 11:11 36:18
   38:20 40:3 79:1
   94:4 96:18 150:2
   159:14 176:22
   177:3,4,7 197:6
   216:7 233:19 254:5
   354:17 379:5
   401:20 403:5,6,9
   403:13 404:3,9,12
   404:14,16,16
dear 161:11 248:23
decent 68:18 71:15
   356:13 389:21
decentralized
   13:13 18:8 49:15
   50:1 177:22 178:1
   224:2,15 227:19
decide 52:12
decided 41:4
   135:21
deciding 166:8
   337:5
decision 13:23 19:4
   22:19 23:11 28:12
   44:6 54:13 59:21
   72:13 73:7,13 74:2
   74:8 75:13 112:22
   136:17 139:4 140:4
   141:22 148:14
   149:21 150:8
   163:12 167:15
   168:17 169:3,20
   195:6 203:9,20
   224:16 226:23
   227:2,3,4,20
   228:15,18,21
   230:15,17 234:12
   244:1 269:20
   270:17 274:23
   293:1 294:16,17
   298:15,19 299:16

300:11,14,17,18
301:2,5 313:14,17
327:8 370:9 377:3
389:2 392:15
**decisionmaker**
167:13,14 168:17
168:22
**decisions** 50:2 73:1
73:12 77:17 140:16
150:4 228:10 229:8
238:12 284:1
304:18 310:15
350:17,18 374:15
389:4 394:21
**decrease** 245:16
**deem** 119:13
**deemed** 242:8
337:22 374:21
**deems** 118:6
119:16
**deeply** 186:2
**defend** 113:20
116:22 127:9,14,16
128:6 134:10
**defendant** 1:8 2:6
7:16
**defens** 114:8
**defense** 114:2
116:8,10,12 117:2
117:3,5,7,12 118:2
118:18,20 119:2,6
119:9,10,15,18
123:15,15 124:1,3
124:12 127:22
140:17
**defenses** 120:6
**defensible** 114:4
118:7 119:15 123:9
213:10
**deficient** 116:17

**defined** 96:17
171:23 172:5
**definitely** 59:6
89:13 145:9 171:16
279:14 418:1
**degree** 50:14,14
134:9 169:3 232:8
292:15 376:22
**degrees** 133:20
134:2
**delay** 83:19 165:23
166:1
**deliberating** 255:6
**demanding** 331:22
**demonstrated** 26:2
54:20 136:7
**denial** 249:3
284:10 352:23
**denied** 278:20
312:15 313:23
**deny** 116:8 119:17
**dep** 399:19
**department** 4:15
13:14,19 14:7,18
14:20 15:4 18:13
18:15,20 19:2,3,6
19:20 20:2 23:3
24:12,13,16 25:1
26:6,13 28:8 38:7
38:22 40:4 41:4
43:12 44:2,12,16
45:5,8 46:17,22
47:8,10 50:5,19
51:12,15 52:19
53:6,13,19 61:17
62:6 67:13 70:9
72:16 76:14 77:14
86:20 90:19 94:1
100:7,11,12 101:7
104:7,17,18 116:9
117:16 120:1

124:21 127:15
130:15 132:10,11
139:8,12 140:11,14
141:12 142:3 148:9
150:4,16 151:16
152:9 159:20
162:21 169:9
177:19,23 178:4
185:3,12 197:3
199:23 203:19
207:23 214:19,23
224:21 228:7,16,18
228:20 229:1
233:22 256:15,22
259:15 268:19
270:20 278:14
281:5 282:16,18
285:19 288:16
291:3,7 293:1
298:22 312:21
313:1 314:12 346:3
374:16,19 375:14
376:5,8,18,19
377:13,21 378:9
379:21 381:5,7
403:3,4 404:1
417:20
**department's**
14:11 15:21 203:20
**departmental** 26:9
55:3
**departments**
138:19 140:2,10
223:20 224:13,15
227:18,19
**depend** 226:17
**depends** 401:19
**depose** 145:17
**deposed** 362:3
**deposi** 361:20

**deposition** 1:10
4:12 8:6,17 9:4,9
21:5 31:22 32:6
33:1 39:22,23
83:19 84:10 220:9
240:13 322:14
360:22 361:1,9,23
399:20 409:11
426:13
**derive** 397:16
**describe** 129:18
317:19 338:8
**described** 166:11
270:22
**describes** 368:7
**describing** 315:15
**designed** 97:12
185:6,17 189:13
192:9 290:9 294:8
318:14
**desk** 391:8
**detail** 137:19
**details** 50:7 61:12
182:23 247:15
325:12,13 328:11
**determinant**
148:13
**determination**
55:11 56:21 132:17
132:23 136:2 137:8
137:12,16 139:19
139:22,23 148:5
159:5 163:17
166:13,14 188:19
236:6 322:4
**determinations**
222:4
**determinative**
31:18 133:17
**determine** 111:10
376:20 415:6

| | | | |
|---|---|---|---|
| **determined** 132:16 | 403:17 422:12 | **disciplines** 50:13 | 307:23 308:19 |
| 136:3 161:21 | **directed** 152:19 | **discontinue** 227:9 | 309:4,13,20 310:20 |
| 190:18 | 153:3 174:13 189:2 | **discovered** 151:10 | 311:2,4 343:11,13 |
| **determines** 130:15 | 203:17 394:1,10 | **discoveries** 317:14 | 353:2,9 354:12 |
| **determining** | **directing** 192:21 | **discovery** 238:17 | 370:2 405:9 407:10 |
| 239:11 | 193:5 195:14 | 239:8 260:19 318:6 | 407:11 413:1,7,12 |
| **device** 151:11 | **direction** 65:12 | **discuss** 24:10 | 424:18 |
| **di** 227:14 337:2 | 111:10 153:19 | 142:23 144:9 | **dismissed** 14:16 |
| 350:2 | 156:17 317:21 | 152:14 157:20 | 15:2,6 16:21 19:18 |
| **dictate** 374:17 | **directly** 176:17 | 207:18 305:6 339:7 | 19:19 20:4,7,10 |
| 376:18 378:9 381:8 | 180:6,6 181:9,23 | 342:4 374:20 383:2 | 22:3 26:14 27:4 |
| **difference** 186:21 | 182:15 183:8 | 388:6 | 28:10,13 29:2 |
| 187:18 188:1 247:9 | 255:11 261:4 265:4 | **discussed** 267:10 | 33:21 34:4 35:1,8 |
| 320:8 418:8 | 297:2 357:9 366:17 | 387:12,21 | 35:23 36:3,8,16,19 |
| **differences** 320:22 | **director** 70:4,7,13 | **discussing** 340:17 | 37:18 38:21 39:1,3 |
| **different** 24:14 | 72:17,20 110:15,17 | **discussion** 45:14 | 40:4,6,7 42:10,12 |
| 27:2 49:16,17 50:5 | 117:10,11,15 118:6 | 147:2 149:2 316:7 | 43:13 44:17 47:12 |
| 51:3,7 73:8,9 99:20 | 151:17 152:8 173:7 | 388:3 | 65:9 96:7 114:15 |
| 113:23 156:17 | 195:10 196:5 200:1 | **discussions** 45:1,7 | 164:9 225:4 228:13 |
| 210:3 219:2 223:12 | 248:21,23 249:2 | 207:15 | 228:19 239:12 |
| 223:19 226:1 | 250:7 252:15 | **disentangle** 101:21 | 251:8 268:17 270:6 |
| 230:23 242:7 | 271:17 315:22 | 102:1 | 272:18 273:13,22 |
| 244:18 290:11 | 342:3 | **dismal** 281:1 | 275:14 276:8,11 |
| 294:17 319:10,11 | **directors** 110:9 | **dismi** 251:8 | 282:20 283:7,21 |
| 345:22 368:8 | 111:9 153:17 | **dismiss** 22:10,14,16 | 285:10 293:3 300:3 |
| 396:11 424:22 | 156:10,15 210:6 | 22:21 24:18 28:17 | 304:15,20 305:8 |
| **differently** 50:20 | 213:5 | 64:13 130:17 163:1 | 308:11 312:14 |
| 139:13,17 182:7 | **directs** 181:2 | 251:6 286:15 | 313:22 345:10 |
| 242:18 244:22 | **disagree** 134:23 | 299:12 319:2 375:9 | 346:22 352:22 |
| 340:7 390:9 391:11 | 135:5,6 154:1 | **dismissal** 12:19 | 355:11 376:23 |
| **difficult** 101:20 | 287:19 323:4,6 | 15:19 16:6 18:23 | 421:22,23 |
| **difficulties** 182:10 | **disagreed** 135:2 | 19:1,10,16 22:1,13 | **dismisses** 13:15 |
| 396:12 | **disagreement** | 30:11,14 103:13 | 17:19 283:1 |
| **difficulty** 396:12 | 122:4 134:18 | 106:15 128:15,21 | **dismissing** 16:19 |
| **diligently** 254:23 | 153:20,23 154:8 | 131:1 149:22 | 296:22 |
| **dir** 117:17 | **disappointing** | 158:20 225:16 | **dismission** 308:6 |
| **direct** 176:14 | 301:10 | 233:23 236:15 | **dispute** 46:3 247:8 |
| 180:19 185:10 | **discern** 203:16 | 239:3,5,13 272:22 | **disputes** 46:9 |
| 192:22 193:7,9,12 | **disciplinary** 239:6 | 275:1,9 292:13 | **disrespectful** 26:3 |
| 195:5,15,19 196:5 | **discipline** 230:7 | 299:13 304:22 | 54:22 |
| 261:3 314:11 | | 305:9 306:4,13,14 | |

**dissertation** 50:16
50:18,23 56:13
57:14,17 65:13
68:11 69:15,17,23
71:11 74:10 110:18
110:19 111:11
113:21 114:2,4,23
115:16,19 116:2,4
116:8,20,23 117:1
117:7,18 118:1,17
119:5,6,14 121:7
121:11,22 122:2,12
123:22 124:10
127:10,12,22 128:6
133:21 134:13
137:7 139:3,20
140:15,17 151:4,9
153:18 195:5 196:6
207:16 213:10,20
242:15 244:4
245:13,15 356:7
367:16 396:4,7
**dissertations**
152:18 153:3 157:2
157:3 242:17
**distance** 73:11
**distant** 139:2
**distracting** 107:8
240:16
**distraction** 241:1
**district** 1:1,1
**ditto** 155:17
**division** 1:2
**doc** 164:10 208:18
**doctoral** 121:16
192:21 193:6 203:2
223:18 225:5
242:17 259:14
268:17 273:23
**docu** 276:16

**document** 12:17
13:3,4,17 20:16,22
21:1,4 24:7 48:4
56:6,7,16 58:6,11
58:20 63:17,20
68:10,21 70:23
71:10 77:10 79:16
79:18,23 85:20
86:19 87:4 120:21
121:20 132:4
133:10 142:12
146:14,14,18,19
148:1,8,13,20
149:8,8 150:15,17
150:18 157:23
161:5,7 162:19
163:1,15 164:11,14
164:15 167:5
172:21,23 176:10
206:14,16 208:18
213:21 216:1 223:3
223:4 231:19
232:13,13,14
246:11 249:19
258:11 268:7,8
276:17,20 280:12
297:23 315:9
316:15,16 326:1
338:18 341:10
353:7 355:20 356:6
356:16 357:4,10,18
359:2 360:6 367:8
371:16,17 382:6,9
382:19 383:16
386:15 393:2,3
407:5,6 408:14,15
410:10,12,22 411:7
414:13,14,16,19,20
414:23 415:23
416:8,13,14,20
417:4 422:4 425:1

425:2
**documentation**
97:15 162:2,10
209:3 214:5
**documentations**
214:6
**documented** 371:6
**documenting** 16:14
**documents** 4:9
12:20 36:22 40:15
44:8 47:1 49:1
60:17,19 79:14
81:20,22 131:17
162:16 163:2 164:2
216:2,2 219:18,23
222:21 276:1 299:5
299:9 333:18
340:20 406:15
**doing** 50:6 52:17
64:3 75:6 83:22
257:15 286:9 288:1
288:3 303:10
325:14 333:12
**dollar** 151:7
**dollars** 182:14
**domain** 122:9,22
172:3
**domestic** 227:1
**don** 69:22 261:19
**door** 205:14 257:12
278:1 315:1
**dorr** 100:2 105:18
105:21
**dors** 173:6
**dorsey** 4:23 6:19
86:7 89:17,20
173:3,6,14 193:4
203:7 248:21,23
252:16 271:17
312:10 313:4,20
314:15,15 334:5,22

335:10 337:14
341:13 342:1 343:6
345:6 346:7,8,13
346:14 352:18
354:9 367:6 368:5
368:12 370:12
371:20 374:23
380:9 387:17
**dorsey's** 89:19
**doubt** 207:21
**downloaded** 383:8
**dozen** 160:14
191:17,18
**dr** 10:3 21:5 24:20
27:17,22 28:1,19
29:7 31:22 33:11
34:2 35:7 36:12
37:7,17 38:3 40:20
42:1 44:7 45:2,17
46:18,19 53:16,17
54:2,7,8 58:11 59:1
59:5,18,19 62:3
63:7,23 64:1,6,8,12
64:15,19,22 65:20
66:5,7,13 67:22
68:11 70:6,7,8,12
78:21 79:2,3,3,5,9
96:12 99:9 104:18
104:19 106:4,5,5,6
106:7,11,13,14,17
107:16 108:2,11,21
110:17 111:23
112:1 117:19
124:14 130:9
142:19 145:17,20
146:3 147:17 149:6
149:14 158:4
161:19,19 162:7,8
162:8 163:6,9
167:11 168:16
169:8 170:11

**[dr - dykes]**

| | | | |
|---|---|---|---|
| 187:15 197:11,13 | **due** 58:21 | 163:14 166:23 | 313:9 315:9 316:12 |
| 204:23,23 205:1 | **duly** 10:22 | 167:8,16 168:6,10 | 316:16 317:17 |
| 206:1,2,18 208:16 | **duty** 49:10 | 168:19 169:16 | 321:23 322:18 |
| 208:16 212:13 | **dykes** 2:7 9:17,18 | 170:9,14 171:5 | 324:12 326:1 |
| 217:13 236:23 | 10:17 12:21 13:2 | 172:9,19,22 174:15 | 327:22 328:15,18 |
| 237:14,18,21 238:6 | 14:2,4 20:19,23 | 174:18,20 175:19 | 329:3 330:13 332:1 |
| 238:9 239:7,15 | 21:6,19 22:5,7 25:5 | 175:21 179:10 | 332:7,11,14,19 |
| 241:6 246:14 | 29:5,21 32:3,10,13 | 180:14 181:12,15 | 333:1,23 334:19 |
| 251:21 252:15,20 | 32:17,20 33:1,5 | 182:20 183:16 | 336:8,10 337:11 |
| 254:13 256:6 276:4 | 34:5,15,18 35:10 | 184:10,16 186:23 | 338:18 341:10 |
| 282:23 295:15 | 36:4,12 37:6,10,15 | 187:12,21 191:9,15 | 346:6 348:15 |
| 297:4 299:11 | 37:23 38:16,18 | 191:22 193:18,20 | 350:11 352:3 358:5 |
| 312:12 316:22 | 39:5,8,12,16,20 | 194:4,15,19,22 | 360:11,15,21 361:3 |
| 318:20,23 319:12 | 41:18 45:12 51:18 | 195:21 196:16 | 361:12,16,18 |
| 319:21 321:7,8,12 | 54:3,10 56:17 | 198:20,22 199:3 | 362:14,18 363:8,15 |
| 321:14,16,18,20 | 58:15,19 59:22 | 202:11 205:5 | 363:17 364:16 |
| 322:2,6 325:7,16 | 63:8,11,15,22 | 206:11,15 208:20 | 365:13,20,23 366:3 |
| 327:15 329:21 | 64:10 65:3,22 66:1 | 212:17 216:4 | 366:15,23 371:13 |
| 338:22 343:10 | 66:14,23 71:21 | 217:16 219:12 | 371:17 372:7 |
| 353:1,10,11,19,19 | 76:1,7,10 81:5,8,11 | 220:1,4,16,18 | 375:12 378:16,19 |
| 354:13,17,18 355:4 | 81:15 82:5,11,13 | 223:3 227:15 | 378:21 379:23 |
| 356:6 366:9,18 | 82:23 83:3,7,10,20 | 232:21,23 238:3,19 | 382:19 383:7,17 |
| 367:5 370:22 379:6 | 84:6,11 86:23 | 239:20 240:5,9,14 | 384:9,12,15 385:14 |
| 384:3 386:22 388:4 | 89:16 90:6 91:1 | 240:18,21 241:2,13 | 385:20,23 386:4,8 |
| 388:4 395:19 | 94:23 97:2,5 | 241:21 246:11 | 386:15 387:15 |
| 397:19 405:10 | 104:23 106:19,21 | 250:19 255:3,17,19 | 392:7,22 393:3 |
| 408:5 410:2 417:21 | 107:2,5 109:6 | 257:17 258:1,6,11 | 394:5,19 395:7 |
| **draw** 60:20,23 | 120:2,18 123:16 | 261:23 262:19 | 398:19 399:8,14,17 |
| 88:19 89:8 98:3 | 125:12,17,22 126:2 | 263:4,11 264:3 | 400:10,16,23 401:6 |
| 144:17 156:22,23 | 126:4,7 128:8,22 | 265:1,12,15,18 | 402:2,4,7,11 |
| 157:5 164:16 171:9 | 129:3,13,21 130:2 | 266:2,7,16,22 | 405:23 406:3,9,13 |
| 288:11 398:3,20 | 131:5,20 133:11 | 267:2,20 268:1,8 | 406:16,21 407:3,6 |
| **drawing** 88:23 | 134:16 137:2 138:7 | 274:16 276:15 | 407:15,20 408:3,15 |
| 392:10 | 141:23 143:13 | 277:1 278:19 | 408:23 409:15,17 |
| **drew** 388:15 | 145:13,16,22 147:7 | 279:19 280:12 | 410:10,13,23 |
| **drive** 2:4 | 148:3,11 149:18 | 281:18 286:5 287:6 | 411:10,18 414:14 |
| **drop** 146:22 148:22 | 151:23 152:16 | 287:10,16 288:5,15 | 414:18 415:2,19,21 |
| 148:22 | 153:11 154:13,19 | 290:18 291:5,10,23 | 416:2,5,11,18 |
| **drops** 243:17 | 155:17 158:7,10 | 294:1 296:6 297:23 | 417:3 419:1,4,7 |
| **drug** 11:22 | 159:16,23 160:8,10 | 304:1 309:17 | 425:20 426:9 |
| | 160:13 161:4 | 311:10,12,16,22 | |

**e**

**e** 2:1,1 4:1 34:14
**earlier** 61:15
  106:20 115:3
  269:14 373:5 408:6
  424:3
**easily** 230:17
**echo** 52:6 422:12
**editing** 96:1
**education** 23:5
  138:20 230:19
**ef** 302:16,17
**effect** 210:10,11
  228:15 243:20
  302:5,9,11 306:5
  306:13,15 307:23
  308:5,7 309:6,13
  310:21 319:8,9
  325:16
**effective** 79:20
  302:15 308:19
**effectively** 298:8
  300:21 301:1,17,20
  301:22 302:10,21
  303:14 307:20
  308:11,13
**effectuating** 239:13
**either** 46:18 61:3
  65:16 67:2 222:9
  227:6 242:6 306:4
  306:12 310:23
  390:19
**electron** 318:7
**elizabeth** 11:6
**email** 4:22 5:2,6,11
  5:14,15,19,22 6:3,6
  6:9,10,13,16,17 7:6
  7:7,12 15:12 17:4
  17:12 18:4 20:5,7,9
  20:11,13 21:2,12
  21:22 22:1 27:11

27:12,14,15,22
28:19 30:8 31:19
33:12 34:3,22
35:20 38:23,23
40:18,23 41:5,9,11
41:15,16,23 43:16
43:19 44:7 47:5
48:1 58:2,16 59:11
59:14 60:3 61:17
61:21,22,23 62:2
67:5,11,14,20 68:1
78:14,17,21 79:2
80:10 81:13 82:18
89:23 92:10 95:9
95:16 96:1 97:18
98:4,7,19 130:8
132:8 142:18,19
143:5,10,21,23
145:18,20 149:9
163:20,22 165:4
166:11 173:2
206:18 216:11
218:4,6,12 219:9
219:21 221:9 223:6
225:2,11 228:2
233:18 246:13,16
247:20 248:18
252:19,23 258:19
259:4,19 260:3,8
260:13 261:17
262:11 263:14,20
263:21,23 264:6,10
265:11 267:9,22
268:12,15,18 272:5
272:9,14,20 273:9
273:10,12 275:16
276:4 280:14 281:2
282:17,23 284:4
285:8,18 293:16,17
298:3,4,5,8,12,22
299:12 300:21

304:8,9 307:7,18
307:19 312:9,11,13
313:4,10,15 314:16
315:14,17,20
323:15 326:5,6,8
326:10,14 327:13
327:17,20 328:23
330:16 334:8 336:1
336:9,12,14 338:4
338:7,20 339:3
340:4,17 341:18
342:11 343:16,18
343:18,22 344:12
345:8,16 347:20
348:11 350:19
351:6 352:17,20
353:2,6,13,21
354:8,10,14,20
355:5,14,16,21,22
355:23 356:2 357:2
358:20,21,23 367:3
367:4,7 368:3,6,11
368:12 369:5,11,12
370:12 372:5,12
373:1,20 374:8
379:4,8,17 380:18
380:19,20,21 385:1
387:3,5,8,9,16,18
389:20 390:4 412:1
412:18 414:1
417:14,17,22
418:11 421:8
**emailed** 272:11
  274:11,19 351:3,3
**emails** 21:10 41:19
  41:21 44:4 59:13
  177:9 180:2 186:13
  207:9,20 208:7,10
  208:11,16 209:18
  209:22 210:1,14
  211:1,4 212:7,12

212:13 219:14
222:11,20 262:20
263:13 264:12
265:21 266:23
267:4,12,14,20
271:1 277:18,19
285:4 294:6 310:6
326:3 336:3,6,22
337:14,15 339:12
339:22 351:4
367:23 369:13
372:2,20 373:18
383:8 384:18
403:17 408:17
409:3,4 411:1
**emphasis** 370:3
**employ** 427:14
**empower** 7:4
**empowered** 139:21
  166:12
**ended** 383:13
  384:14,17
**endorsed** 270:21
**endorsing** 178:21
  179:6
**ends** 225:23
**energy** 56:10
**engineer** 211:14
**english** 302:17
**enroll** 306:6
**enrolled** 174:23
  203:2,13 243:1
  259:8,9,17 260:1
**enrollment** 238:23
**ensure** 51:19 290:9
  314:8 342:8 344:18
  346:15
**ensured** 159:17
**ent** 297:20
**entanglement**
  169:20

**enter** 12:18 205:21
222:22 251:13
279:1 297:20
347:19 348:2
349:15,17,19
402:21
**entered** 12:10
266:20 278:8 348:9
**entering** 286:20
**enti** 410:16
**entire** 263:20
**entitled** 125:20
126:1 202:7 238:16
262:23 265:21
266:4 267:13
**environment**
396:21,22 397:2,21
397:22 398:5,16,17
398:18,22 400:6,14
**equally** 182:22
**equitable** 97:18
**erase** 94:13,15
**erased** 92:11 93:2
**erred** 267:7
**esq** 2:7,7
**established** 218:23
229:22
**estimated** 183:19
**et** 5:8 6:7 7:9
207:17 339:14
**ethical** 84:1,1
**ethics** 370:21
**evaluate** 54:9 150:9
150:12,15 159:18
197:3 218:21
221:23
**evaluating** 150:11
218:19
**evaluation** 174:14
198:11,13 215:11
232:7

**evaluative** 121:16
124:12 150:3
**evenhanded** 74:3
294:11
**evening** 286:13
**evenly** 139:7
**evenness** 73:6
**everybody** 30:9
79:4 211:16
**everybody's** 285:16
**evidence** 8:18 72:1
139:11,16 140:19
140:20,22 157:10
159:4 199:16
200:11 201:2
216:14 219:10,14
238:18,20 252:13
252:22 253:1 341:2
397:10 414:6
**evidences** 294:21
**evident** 204:3
**exact** 190:21
217:12 272:13
357:14 417:16
**exactly** 110:14
116:13 211:15
301:13 317:9
340:11 376:6
**exaggerated** 370:2
**examination** 3:9
11:1 214:21,23
371:2
**examined** 10:23
**example** 143:22
182:18 212:3
230:18 285:23
337:3 339:15,20
340:14,21
**excellent** 210:3,16
211:17 213:6,6,7
382:14

**excerpts** 4:13
**exercise** 396:10
**exhibit** 4:4,5,5,9,12
4:14,18,18,22 5:2,5
5:5,10,10,14,18,18
5:22 6:2,2,6,9,13
6:16,20,20 7:1,3,6
7:11,11 12:6,7,14
12:18 20:16,17
31:21 32:1 35:19
43:8 48:23 57:22
78:15 120:12,15
131:21 132:3
142:11,17 160:23
161:3 165:3 172:15
172:18 202:19
206:8,9 222:23
223:1 246:7,10
258:8,9,13,17
268:3,4,10 274:7
276:2 277:7 280:8
280:11 297:20,21
313:16 315:8,10
325:20,23 338:15
338:16 341:6,9
352:15 355:18
382:15,17,21
386:12,13,17
406:22 407:2 408:9
408:12,21 409:18
409:20,20 410:16
414:8,10
**exhibits** 3:6 410:18
**existence** 199:8
**expect** 57:10,13
83:7 230:6 310:18
330:21 331:1,4,5
**expectation** 184:14
201:22 202:3
**expectations**
242:13

**experience** 18:1
72:19 74:19 123:21
286:23 289:11
301:11
**experiment** 214:11
318:15
**experiments**
201:12 211:23
318:12
**expertise** 138:15
173:15 246:1
334:21
**expires** 427:21,22
**explain** 12:12 13:6
18:3 27:10 37:21
38:2,13 44:13
45:17,18 49:9 58:1
72:11 76:12 87:12
92:23 95:18,19
97:13 110:13
121:14 125:14
126:11 129:12
130:22 144:5 173:5
203:4 223:9 249:14
282:22 301:21
322:2 338:5 339:17
342:10 345:3 389:5
397:10
**explained** 16:11
71:9 94:5 137:18
139:1 177:19 384:9
384:11
**explaining** 18:10
63:12 136:22
208:13 251:19
360:12 361:7
371:20 372:19
**explanation** 46:13
137:3 313:8 360:17
362:8,11 388:17

**explore** 305:15
**explored** 60:12
**express** 185:13
**expressed** 353:11
**expressing** 353:20
**extra** 182:23 183:1

**f**

**f** 1:23 243:10 244:2
  244:6 245:1 246:6
  305:13 306:1 342:5
  357:3
**fabrication** 59:2
  60:5 70:5 161:18
  161:23
**fabrications** 161:18
**face** 207:15,15
  214:4,4 215:22,22
  215:23,23 227:4
**faced** 366:16
**faces** 227:2
**facilities** 242:22
**facility** 70:5
**facing** 226:23
  227:2 366:17
**fact** 53:12 77:22
  96:10 151:6 203:7
  211:18 259:14
  302:19,20,22 303:3
  409:1
**facts** 109:22 269:16
  269:22,23 270:2
  290:2 323:13 345:4
**faculty** 26:4 54:4
  54:22 55:10 132:5
  134:19 142:5,6
  173:20,22 188:7
  192:20 193:4,8,10
  193:15,23 194:5
  195:4 201:5 212:19
  212:23 242:22
  353:8 354:15,17

355:5 375:18,20
  379:5 402:3
**fail** 119:9 242:1,6,8
  242:23 243:3,15,17
  244:19,21 245:2
  306:5
**failed** 64:16 196:18
  244:4
**failing** 290:23
**fails** 243:7 245:14
  290:16
**failure** 121:6 196:8
  203:10 246:20
  247:6,7 292:14
**fair** 75:14 97:17
  183:1 185:1,6,11
  189:14 192:10
  287:4 290:15
  291:18 294:10
**fairly** 77:13 104:1
  183:5 290:10
**faith** 188:22 218:1
  289:11
**fake** 232:14
**fall** 92:14 93:8
  268:22 270:5
  280:23 304:17
  306:3,7 312:15
  313:23 424:20
**false** 58:11 68:10
  79:14 219:21 356:6
**familiar** 50:6 99:3
  99:5 423:22 424:14
**far** 73:17 147:9
**fashion** 41:3
  239:16 241:16
**fast** 282:7
**faster** 316:20
**father** 88:10
  389:17

**faulty** 58:7,23
  327:3
**february** 1:14 9:3
  12:11 251:9 262:18
  263:3 266:13
  417:15,16 418:19
  421:11
**federal** 1:12
**feel** 185:13 191:11
  192:7 232:17,18
  234:13 275:5
  291:11 335:5 339:9
**fees** 23:6
**felt** 198:15 234:14
  322:2 328:1 354:19
  372:12,14 373:2
  379:7
**fi** 422:17
**field** 75:3 204:1
  230:11,20 231:6
**fifth** 70:12
**fight** 79:21
**figure** 204:13 301:8
**figured** 270:7
**file** 15:21 37:12
  81:16 105:13
  331:21 418:16
  419:3
**filed** 105:22 231:19
  251:5 266:19
  421:23
**final** 16:15 111:21
  274:22 414:23
  427:15
**finally** 15:5 92:9
  333:20
**financial** 26:12
  28:7,15 33:18,23
  282:19 286:16
  300:2

**find** 91:22 97:17
  131:17 133:9 169:5
  207:20 234:4 235:3
  237:23 251:4
  340:14,20 341:1
  401:3,9
**fine** 10:17 76:10
  107:15 129:13,22
  204:8 220:7 222:9
  241:21 246:23
  247:3 288:13 386:4
**finish** 73:17 74:14
  74:16 75:5 97:3,9
  134:6 231:18 233:6
  332:18,21 333:3
  362:22,23 364:7,12
  364:13
**finished** 116:6,7
  226:1 243:19
  281:16 362:17
**fir** 32:21 45:6 207:5
**fired** 66:18
**firm** 9:11,14
**first** 10:22 13:7,22
  14:19 15:12 18:16
  25:18 28:6,13 30:2
  32:21 33:9 42:23
  43:9 46:2,15 58:17
  62:12,17 79:6
  80:15 100:2,6
  105:11 146:20
  161:9 165:3 167:4
  176:10 186:9
  189:23 200:5
  206:20 207:6 210:8
  266:15,19 268:11
  273:11 280:18
  298:2 313:15 316:2
  327:2 336:10
  341:13 352:16,20
  369:3 370:17

| | | | |
|---|---|---|---|
| 382:23 387:2 410:3 | **following** 25:2,12 | 239:16 241:15 | **found** 236:9 318:9 |
| 417:12 421:6,9 | 33:19 40:16,21 | 250:19 255:3,20 | **foundation** 151:8 |
| 424:21 | 51:16 52:23 104:12 | 278:19 279:19 | 182:13 214:8,10,16 |
| **fits** 77:10 | 104:13 190:13,14 | 281:18 286:5 | 236:21 400:20 |
| **five** 68:9 70:2,15 | 190:16,17,20 | 287:16 288:5,15 | **four** 33:2 42:20 |
| 76:6 92:13 93:5 | 245:20 268:19 | 290:18 291:23 | 68:12 70:13 149:12 |
| 94:14 115:21 | 291:20 292:2 | 294:1 296:6 304:1 | 163:1 195:14 198:1 |
| 157:22 160:2,3 | 306:10 | 309:17 313:9 | 199:8 200:3,16 |
| 199:1,4 210:3 | **follows** 10:23 14:10 | 317:17 321:23 | 201:5,21 205:2 |
| 276:22 318:9 356:5 | **foregoing** 427:5 | 327:22 329:4 | 211:18 309:14 |
| 362:19 367:15 | **forgot** 268:6 | 330:13 332:2 | 311:13 312:1,3 |
| 368:7 387:23 389:7 | **form** 8:14 14:4 | 333:23 334:19 | 315:20 356:8 376:2 |
| **fixes** 122:2 | 22:7 25:5 29:5,21 | 336:8 337:11 | 381:12,13,15 |
| **floor** 1:13 | 37:23 43:14 51:18 | 348:15 350:11 | 406:19 |
| **focus** 240:17 | 54:3,10 56:17 | 364:20 372:7 | **fourth** 157:21 |
| **folks** 228:17 | 59:22 63:8,10 | 375:12 379:23 | 309:16 |
| **follow** 18:17 20:14 | 64:10 65:3,17 66:2 | 392:7 394:5,19 | **frame** 73:18 75:5 |
| 23:12 24:21 29:12 | 71:21 82:22 86:23 | 395:7 398:19 | **freedom** 1:22 9:11 |
| 30:16 31:14 42:13 | 89:16 90:6 94:23 | 400:10,16,23 401:7 | 9:14 |
| 97:23 98:4,19 | 104:23 109:6 120:2 | 425:21 427:8 | **friday** 370:13 |
| 99:14 104:2 109:11 | 123:16 128:8 | **formality** 8:11 | **frightening** 357:13 |
| 125:13 128:7 | 134:16 141:23 | **forth** 8:8 | **front** 30:9 74:1 |
| 184:23 190:7,14 | 143:14 147:7 148:3 | **forward** 44:5 47:2 | 146:15 222:8 |
| 219:7 241:10 283:3 | 148:11 149:18 | 67:19 75:7 104:6 | 259:22 263:14 |
| 289:2,9,22 290:6 | 151:23 152:16 | 122:3,12 177:11 | 269:8,17 275:22 |
| 290:17,23 295:1,6 | 153:13 158:7 | 204:10,11 208:15 | 422:5 |
| 295:8 296:7 299:14 | 159:16 163:14 | 320:21 326:14 | **fruition** 157:2,4 |
| 299:21 300:5,9 | 166:23 167:16 | 327:15 336:5,7 | **fs** 245:4 |
| 305:5 320:10 | 168:19 169:16 | 339:11 350:22 | **full** 11:5 33:7 207:5 |
| 331:22 342:9 353:3 | 170:9,14 171:5 | 369:4 417:8 | 316:6,7 317:8 |
| 377:8 | 174:15 179:10 | **forwarded** 45:22 | 323:18 354:4 |
| **followed** 51:20 | 180:14 181:12 | 78:23 145:20 | 355:16 380:21 |
| 90:8,12 97:1 104:4 | 182:20 183:16 | 206:19 207:1 | **fully** 120:22 121:4 |
| 108:22 109:4,20 | 184:10,16 186:23 | 211:11 252:19 | 283:19 284:23 |
| 110:2,3 111:15 | 187:12,21 191:9 | 259:16 261:17 | **functional** 217:3 |
| 113:12,14,16 | 193:20 194:4 | 336:15,21 351:5 | 296:15 |
| 130:12 135:21 | 195:21 196:16 | 367:23 383:9 | **functioning** 190:6 |
| 159:14 186:7,8 | 202:11 205:5 | 384:19,21 385:3 | 190:7 191:7,11 |
| 187:3 239:10 289:6 | 208:20 212:17 | 387:3,16 | 192:5,8 |
| 290:14 302:1 377:2 | 216:4 217:16 | **forwarding** 208:18 | **fund** 250:12,13,14 |
| | 219:12 227:15 | 252:15 335:23 | 250:15 |

**fundamental**
255:21,22
**funded** 172:2
**funding** 171:12,19
171:21 312:15
313:23 352:23
355:11
**funds** 249:23 250:5
250:18
**further** 12:13
162:10 167:5
222:17 249:1
272:17 353:17
374:20 391:4
427:10,13
**future** 195:7
374:18 415:11
424:20
**fyi** 280:20

**g**

**gary** 70:12 91:14
386:22 388:14
397:12
**gather** 72:1
**general** 59:8 68:16
76:13,15,21,22
77:4,6,19 124:17
124:22 125:3
126:20 129:17
137:20 139:10
152:17 153:12
154:12,14 183:13
194:7,10,17 263:13
326:12 327:3,5
330:4,22 356:12
391:15 395:23
**generally** 14:7
18:15 46:8 49:18
72:3,9 77:18
112:22 128:10
182:8 226:18

259:20
**generated** 423:21
**generous** 310:17
**genre** 93:3
**getting** 231:17,18
237:12 248:2 253:7
347:5
**give** 10:8 76:5,5
80:1 97:12 110:12
112:5,11,13 120:10
121:23 138:8,11
146:23 148:23
173:9 183:18 185:6
186:11 189:14
192:9 194:14
213:14 227:12
240:4 243:23 244:1
248:10 276:22
303:4 307:10
309:10 310:14
335:3 345:19 357:5
357:19 362:5,8
377:16 404:17
415:4
**given** 177:11
240:22 295:2
301:14 362:7 398:6
414:20
**gives** 185:11,12
255:12
**giving** 156:1
229:19 249:4
256:16 350:13
411:9
**glad** 86:11 353:16
**gladly** 261:21
**glanced** 410:23
**go** 25:6 32:11 34:9
35:13 36:10 50:20
51:11 71:22 72:11
76:3 81:4 84:7,12

96:10 97:8,8
105:12 158:9
194:18 204:9,11
207:10 222:16
230:19 231:6
233:16 248:15
255:23 256:7
273:18 276:20
279:23 297:12
307:23 312:8
316:18 335:1,13
344:7 348:3,5
350:14,20 351:22
360:3 361:23 365:3
366:23 373:22
375:21 382:5,11
409:6 415:14 418:3
418:15 419:10
421:7 426:7
**god** 10:11
**goes** 96:19 122:2
153:11 254:12
306:5,13,14 308:6
309:6,13 310:21
408:3
**goin** 129:7
**going** 9:1 12:17
24:10 27:4 29:7
32:4 33:18,23 34:5
64:20 74:16 76:2
78:3 81:8 82:6
112:20 116:22
129:7,18 143:13
148:7 156:16
158:11 160:10,15
160:17 165:1 168:6
171:11 172:9
193:11 201:20
202:12 212:20
220:21 221:1,23
230:21 233:12

238:4 240:5,6
247:10,12 257:17
267:6 276:17
277:17 279:12
280:2 283:11
297:19 300:8 318:1
332:1 339:22
345:10 346:12
347:22 348:5,8
349:20 352:3,8
359:8,18 363:9,18
365:7 398:8 399:21
400:2 405:23
407:21 408:7 415:3
415:8 416:11,13,18
418:16 419:2 421:7
426:10
**good** 11:19 17:11
19:23 26:8 33:22
35:1 55:1,18 58:9
75:8,10 103:21
127:6,7 128:2
130:2 133:7 135:18
137:19 151:5,20
152:11 169:7
171:22 172:4
181:22 201:7
213:16,16 215:2
231:13 318:12
371:12 374:2 390:5
409:2 419:20
420:19 423:17
**goodness** 192:16
**government** 258:22
**governor** 258:20
258:21 260:4,14
261:11
**governor's** 260:18
261:4,7
**gpa** 243:4,6,7
244:18,19,20,23

| | | | |
|---|---|---|---|
| 245:1,2,3,11,16,17 | 284:17 308:18 | 222:6,10,18 253:2 | **guidelines** 53:21 |
| **grad** 17:17,20,22 | 419:23 420:22 | 255:5,7,8,14 256:2 | **gupta** 59:5 70:8 |
| 298:7 | 424:22 | 256:7 289:1,2,6,12 | 161:19 162:8 |
| **grade** 243:6,17,21 | **graduated** 115:18 | 289:14,22 290:1,6 | 204:23 206:2 |
| 244:6,11,16 245:7 | **graduation** 101:23 | 290:8,17 291:1,21 | 316:22 318:20,23 |
| **graded** 242:6 | **grand** 1:13 | 292:2,12 293:6,7 | 319:12,21 321:8,12 |
| **grading** 242:12 | **grant** 237:7,8,13 | 294:3,5,8 295:7,8 | 321:18,20 322:2 |
| **graduate** 4:14 | **great** 79:11 156:14 | 296:8,9,10,14,22 | **gupta's** 322:6 |
| 11:12 13:8,10,12 | 210:16 318:6 | 296:23 319:6 324:1 | |
| 13:16,16,20 14:9 | **greer** 6:4,11 15:13 | 324:2,6,8,22 | **h** |
| 14:10,18,20,23 | 17:13 45:3 46:6 | 369:15,23 370:3,5 | **h** 4:1 |
| 15:7 17:19 18:11 | 298:4 333:14 | 375:3,4,6,10,23 | **ha** 216:16 252:9 |
| 18:16,21 19:7,9,11 | **grew** 358:11 | 377:4,9,12 397:8 | **half** 11:15,18 29:9 |
| 19:21 21:23 22:22 | **griev** 191:3 | 405:7,8,11,18 | 29:10 151:6 174:5 |
| 23:2 24:17,23 25:3 | **grievance** 94:19 | **grievances** 327:7 | 182:14 191:17,18 |
| 25:23 26:6,10,15 | 96:11,14,17,20 | **grieving** 99:19 | 323:1 409:2 |
| 27:8 28:11,21,23 | 97:11,23 98:5,10 | **grim** 88:4 94:10 | **hall** 391:12 |
| 30:12,13 35:21 | 98:15,15,19,22 | 387:22 388:13 | **hallway** 96:18 |
| 36:21 38:8 40:8,12 | 99:1,4,7 100:21 | 389:6 390:1 398:9 | **han** 5:3,12 6:14,22 |
| 43:9,11 44:11 46:9 | 101:19,22 102:12 | 398:15 414:4 | 45:2 46:6,18 79:3 |
| 47:6,9 48:2 49:4,6 | 102:14,17,21 103:4 | **grounds** 54:12,13 | 106:4,5,6,11,13,14 |
| 49:15,19,21 50:7 | 103:9,12,14,17 | 54:16,17,19,20 | 106:17 107:16 |
| 52:12 53:4,18,21 | 104:4,15,20 105:3 | 246:18 247:16 | 108:2,11,21 111:23 |
| 55:3 56:20 67:16 | 105:6,13,15,22 | **group** 69:19 72:15 | 149:14 165:5 177:6 |
| 70:13 78:22 90:2 | 106:7 107:22 108:7 | 79:12 90:3 93:21 | 187:15 206:18 |
| 99:23 101:12,16,17 | 108:9,22 111:16,22 | 145:6 198:1 199:8 | 208:16 212:13 |
| 101:18 104:8,11,12 | 112:14 113:5,17 | 257:11 316:5 336:3 | 217:13 246:14 |
| 104:13,20,22 | 127:20 128:1,5 | 336:5 402:23 | 254:13 295:12,15 |
| 105:12 108:23 | 149:16 176:15 | 405:12,22,22 | 297:4 338:22 384:3 |
| 109:2 110:5,10 | 179:2,13,18,20 | **groups** 403:2 | 388:4 404:3 |
| 113:13,15,17,18 | 180:20 181:3,4 | 405:17 | **hand** 10:4 132:20 |
| 116:1,1,21 118:10 | 185:5,17 186:4,7 | **guarantees** 139:6 | 219:10 281:10 |
| 118:10 119:20,21 | 186:17,19 187:3,5 | **guess** 114:9 122:20 | 327:14 366:4,8 |
| 119:23 120:9 132:5 | 188:6,12,20,22,23 | 140:18 150:3 184:1 | 388:21 389:11,14 |
| 132:10,12,21,22 | 189:4,7,18,21 | 210:13 220:21 | 390:2,3 398:15 |
| 133:4 138:16 | 190:4,5,12,18 | 226:16 264:19,22 | **handbook** 4:15 |
| 141:20 142:21 | 191:6 192:1,4,7,8 | 275:4 314:7 | 26:10 51:21,22 |
| 144:8 150:19,22 | 192:12 216:19 | **guessing** 123:2,5 | 52:3,5,16 53:18,19 |
| 159:15 190:15,16 | 217:1,3,8,21 218:2 | 232:6 | 55:3 90:18,19 |
| 197:6 224:4,22 | 220:23 221:4,6,10 | **guidance** 122:1 | 104:12 116:21 |
| 225:7 280:22 | 221:15,17,22 222:1 | 320:10 | 118:11 119:21,23 |
| | | | 120:10,19 123:20 |

| | | | |
|---|---|---|---|
| 132:10,12,21 133:4 | **health** 398:4 | **hierarchy** 105:7,8 | **hourglass** 88:9 |
| 135:20 150:19,22 | **healthy** 396:21 | 105:10 189:18 | **hours** 118:16 |
| 159:20 171:23 | 397:1,22 398:22 | 190:3,12 | 133:21 147:15 |
| 172:5 190:15 | **hear** 46:8 63:3 | **high** 56:9 70:23 | 244:5 |
| 270:23 377:1,8,14 | 86:11,12 129:23 | 115:22 123:14 | **house** 278:8 |
| **handle** 59:8 96:23 | 155:9 156:18 157:8 | 200:14 201:5,8,23 | **huey** 370:23 |
| 326:12 403:7,10,12 | 184:3 186:18 190:9 | 202:1 211:12 230:1 | **huge** 368:13 |
| 405:15,16 | 192:10 283:5 | 230:3 394:23 | **hum** 23:21 71:7 |
| **handled** 100:20 | 397:16 | 402:17 | 77:11 85:19 111:17 |
| 103:8,11,14 256:8 | **heard** 43:1 46:16 | **higher** 94:21 297:1 | 117:14 147:22 |
| 340:7 379:20 | 68:18 183:5 277:19 | 360:7,8,10 389:22 | 205:16 211:8 |
| 405:19 | 322:1 324:3 356:14 | **highest** 96:13,15 | 214:15 229:2 |
| **handles** 16:8 | 369:3,16 397:14 | 100:10 101:7 | 246:15 254:8 274:1 |
| 176:23 403:3,5 | **hearing** 62:18 | 104:16 105:6 186:9 | 275:17 277:21 |
| **handling** 102:20,22 | 185:1,7,12 189:14 | **history** 75:6 149:15 | 284:9 307:13 326:4 |
| **happen** 44:18 | 192:10 322:5 | **hmm** 62:1 65:14 | 347:13 379:14 |
| 65:21 82:2 127:15 | **hears** 41:1 | 140:13 255:1 | 382:18 421:10,12 |
| 127:17 186:3 244:7 | **held** 9:9 49:20 | 348:10 350:1 | 425:3 |
| 279:12,21 | 79:23 354:23 357:4 | **hol** 422:19 423:23 | **hurt** 222:14 |
| **happened** 44:20,23 | 357:18 359:2,9,17 | **hold** 15:19 16:2,12 | **hypothetical** 168:1 |
| 45:17 105:23 138:5 | 360:6 379:11 | 16:14 19:8,12,14 | **i** |
| 217:1 244:8 257:8 | 389:22 | 42:14 130:19 | |
| 257:9,10 267:18 | **help** 10:11 157:6 | 233:20 234:2 | **idea** 138:3 330:6,8 |
| 283:12 392:18 | 222:12,14 320:18 | 268:21 269:2 270:7 | 338:2 391:17 |
| **happening** 45:19 | 350:21,22 | 280:23 302:2 | **identify** 9:15 |
| 181:7 229:4 333:11 | **helpful** 207:22 | 308:17 359:8,19 | 190:10 |
| **happens** 14:12 | 284:21 | 422:17,19,21 | **illegal** 24:5 |
| 119:19 193:13 | **helping** 294:20 | **holds** 419:18 | **image** 88:13,14,15 |
| 253:22 285:22 | **helps** 353:15 | 420:17 421:20 | 88:16,20 89:1,2,4,6 |
| 321:3 340:12 | **hen** 379:6 | 422:11 423:8,9,10 | 89:9,12 91:10,12 |
| **happy** 267:16 | **henderson** 7:9 79:3 | 424:8 425:13 | 91:18,19,19,20,22 |
| 338:13 374:19 | 353:10,19 354:18 | **home** 297:12 | 92:7 94:6,15 |
| **hard** 182:23 306:17 | 379:6 | **hope** 282:17 305:20 | 391:14 412:17 |
| 396:4 | **hereinbefore** 8:7 | 353:15 | 414:4 |
| **harm** 337:18 | **hereto** 8:4 | **hoped** 305:6 | **images** 7:1 94:7 |
| **head** 24:12,15 | **heretofore** 427:7 | **hour** 76:3 116:4,7 | 211:13 |
| 38:22 53:12 104:7 | **hi** 225:3 246:17 | 127:11 148:9 | **imagine** 243:11 |
| 199:22 295:19,21 | 268:16 272:15 | 158:11 202:5,5 | **immediately** 256:9 |
| **heading** 27:10 | 273:21 280:20 | 245:12,12 276:18 | 304:15,20 |
| **heads** 329:15 | 298:6 326:9 339:4 | 347:23 352:4 409:3 | **impact** 228:20 |
| | 352:21 383:1 | | 271:3 |

| | | | |
|---|---|---|---|
| **impacted** 63:3 | **indicate** 339:13 | 329:8 335:20,21,22 | 109:8 |
| 325:14 | **indicating** 13:1 | 350:8,12,17 356:9 | **intelpro** 104:9 |
| **implicit** 353:12,21 | 21:16 341:22 | 356:12,17 368:13 | **intend** 93:17 |
| 355:13 | 385:15 417:18 | 371:6 373:4 374:10 | **intended** 227:11 |
| **implying** 93:7 | 419:15 | 391:17 397:4 | 391:14,18 |
| **important** 73:15 | **indiscernible** 33:17 | 399:16 401:3,10 | **intentionally** 80:17 |
| 350:16 398:21 | 81:7 322:22 | 402:19 405:6 | 237:7 |
| **impression** 143:8 | **individually** 143:3 | 418:16,23 | **inter** 229:23 416:19 |
| **improper** 94:7,12 | 144:23 146:5 | **informed** 121:4 | **interacting** 411:8 |
| 144:1,18 317:10,11 | 148:20 163:19 | 149:21 234:6,16 | **interest** 59:20 |
| **improved** 319:20 | **influence** 229:4,6 | 281:8 305:7 342:20 | 238:23 329:21 |
| **inappropriate** | 329:9 | 345:5 348:4,12 | 427:15 |
| 317:19 | **inform** 176:20 | 349:16 | **interested** 167:5 |
| **incarcerate** 290:16 | 269:14 | **informing** 234:2 | **interesting** 17:16 |
| 349:21 | **information** 11:4 | 269:1 372:11 | 396:19 |
| **incarcerated** | 42:18 43:5 45:16 | 403:18 | **interfere** 61:9 |
| 251:15 290:19 | 68:13,17,22 69:13 | **infrequent** 16:10 | **interfering** 185:22 |
| 291:4,9,20 | 71:1 73:20 106:1 | **initiate** 377:9 | **intermediaries** |
| **incarcerating** | 108:12,18 111:6 | 405:18 | 224:19 |
| 291:12 | 113:3 114:9,18 | **initiated** 174:9,10 | **internal** 205:13 |
| **incarceration** | 123:17 131:3,4 | **input** 72:16 | 326:16 |
| 292:9 | 141:20 142:9 147:1 | **inquiry** 325:11 | **international** 211:5 |
| **incident** 253:16 | 149:1 150:7,10 | 370:23 389:1 | 225:6,13,22 226:15 |
| 254:15,21 256:6,8 | 153:7,7 155:21 | **insecurity** 58:21 | 227:3 228:6 229:23 |
| 256:13 257:3 277:4 | 156:2,3 157:11 | **insert** 177:17 178:2 | 269:7 271:5,20 |
| 285:22 303:20 | 159:13 161:12,16 | **insinuated** 83:22 | 304:11 342:3 |
| 348:12 | 161:21 162:4 | **insinuates** 82:15 | **interpret** 60:18 |
| **incidents** 277:17 | 171:18,20 172:1 | **insinuating** 81:12 | 62:20 390:8 |
| 286:4 287:5 | 173:10 176:21 | **insinuation** 96:6 | **interpretation** |
| **include** 34:7 37:2,7 | 177:14 179:8 183:1 | **insist** 221:8 | 63:16 396:6 422:9 |
| **included** 37:6 | 194:17 196:4 | **insisting** 372:3,18 | **interrelated** 225:14 |
| 267:4 | 215:20 220:14,15 | 373:3 | **interrupt** 276:21 |
| **including** 59:7 | 228:13 234:18 | **inspector** 59:8 | 361:15 364:22 |
| 208:7 239:4 315:21 | 235:11 237:16 | 326:12 327:3 330:4 | 365:1,5 416:19 |
| 316:6 338:21 | 250:11 256:16 | 330:22 | **interrupted** 364:23 |
| 388:16 404:2 427:5 | 269:8 272:22 | **instructed** 126:9 | **intro** 362:6 |
| **incomplete** 243:22 | 274:14 275:7 | **instruction** 128:23 | **introduce** 12:5 |
| 243:23 244:2,12,16 | 282:12 288:8 | **intellectual** 100:1 | 20:15 31:20 161:2 |
| **incorrect** 333:7 | 293:14 301:10 | 100:16,19 101:13 | 172:8 258:7 386:11 |
| **independent** 13:21 | 305:2 314:10 322:9 | 101:14 102:19 | 414:10 |
| 213:14 | 322:15,20 325:6,10 | 103:7,16 104:10 | |

**introducing** 172:17
206:7 246:9 280:11
315:7 325:22
338:14 341:8 407:1
408:11
**invalidate** 188:23
**investigate** 92:2,3,4
180:3 221:2 222:17
253:15 257:6
303:19 330:23
**investigated** 60:12
103:17
**investigating** 64:1
64:7
**investigation** 55:4
61:13 62:4,15,19
63:6 64:16,20 65:1
65:4 80:20 89:11
89:20 91:21 97:15
102:23 162:11
164:15 165:14
167:11 170:5
180:12,15 238:10
257:15 294:10
325:9,18 326:16
327:21 328:9,12
329:1,8,17
**investigator** 70:11
236:20 314:7,8,13
314:14,17,20
**invited** 321:15
**involve** 46:9
**involved** 61:14
62:23 79:4 80:18
107:22 128:12
159:2 168:23 174:7
174:11 262:20,21
264:3 265:5,8
269:6 271:5 294:18
329:12,14,18 330:2
330:4,11 334:2

348:16 370:20
374:14 383:12
384:16 387:14
388:15 403:4,7,10
403:14 404:13
**involvement**
326:17
**involves** 98:16
102:16 103:5 266:3
**involving** 173:12
174:17 175:4 177:2
**irrelevant** 222:15
337:17
**issue** 63:1 103:11
109:9 125:5 144:7
154:8 177:1 188:8
188:9,11,15 192:11
292:10 294:4
302:19 321:1
334:18 397:7
**issued** 43:4,5
130:13
**issues** 28:19 124:19
124:22 125:3 177:1
234:5,8,9 267:7
388:20
**item** 249:1
**iterative** 124:10
**ivey** 260:5
**ivey's** 260:15

**j**

**j** 2:7
**january** 266:13
407:8 427:22
**jared** 2:7 9:19
383:6 384:6,12,16
384:17 385:12,14
385:19 386:1,7
**jared's** 383:8
**jennifer** 6:4,11
15:13 17:13 45:3

46:6,19 298:4,6
301:11 326:9
329:23 333:14
**jo** 376:7
**job** 52:10 61:10
86:12,13,13 89:14
89:15,18,19,21
90:3,9 91:23
130:19 132:17
247:17 260:18
376:3,9
**jobs** 254:3
**ju** 307:9 402:2
**judge** 166:1 196:17
213:1 240:15 241:7
267:15 322:1 323:7
360:4 397:1 398:7
**judged** 116:17
**judging** 369:7
392:8
**judgment** 75:19,21
155:7 164:23 166:6
202:8 213:14 248:7
286:8 294:7,9,20
294:21 323:1
392:10
**judgments** 165:16
**july** 65:18 108:3,7
223:7 260:2 261:13
272:19 273:13
275:2 276:12
307:14
**jump** 363:1
**june** 15:13 17:3
36:18 38:20 43:10
108:3 173:3 205:3
207:7 236:9,17
246:14 248:19
251:2 253:13
268:14 269:19
272:20 273:14,15

273:17 274:11,17
274:18,19 275:2,10
276:9,14 277:6,10
277:14,15,18,22
278:5,5,16,17
279:8,17 280:15
281:7 282:5 286:14
298:3 304:11
306:19,22 307:12
309:23 310:1,5
314:11 323:14
326:6 338:22
341:17 346:18
347:14 352:18
354:11 355:21
373:15,18,19,20
379:3,15,17,18
381:6 400:9 402:16
422:13 423:5 426:3
**jury** 360:3
**justification** 246:22

**k**

**kay** 260:4,14
**keep** 120:22 121:3
253:7 371:9
**keeping** 243:1
392:4
**kept** 350:15
**key** 205:20 278:2
323:16 422:9
423:12
**keys** 205:3,7,10
257:12 278:20
284:7 292:11 303:5
303:6,16,16
**kind** 45:7 57:15
60:22 65:11 71:8
79:14,19 94:7,12
96:5 144:4 178:21
181:10 222:10
325:9 331:23 340:5

356:1 395:4 396:17
398:16 412:9
**kinds** 182:10
**knew** 68:2 99:12
128:18 165:22
208:10 226:22
228:18 251:15
270:9 271:2 278:16
278:18,21 279:3,4
283:21 284:6
293:10 301:9
302:13 306:18,23
309:20 325:11
345:9 358:10 386:6
391:9 396:6
**know** 11:20 15:23
16:13 19:23 33:14
41:7 42:22,23
49:18 58:3 59:23
61:3 63:2 68:14,15
69:8,21 71:2,12,12
71:16 73:3,22
74:21 77:10 79:9
85:10 87:16,17
88:7,12,13 89:18
91:11,20 92:20,22
93:2,5,6,9,11,15
96:22 97:22 99:6
99:10 101:4,5
102:10,13 103:4
105:4,7 106:8,11
108:17 110:16
111:12 112:20,23
115:10 122:7
124:19 125:4,6,7
125:14 126:22
127:1,2,18 128:9
128:11,12,19 135:9
137:10 138:3,4
140:6,7 141:8,13
141:15 147:8,8

152:1,5 156:13
157:18,18 166:20
170:15 172:12
173:23,23 177:5
180:5 181:17,20,21
183:12 185:15
188:15 198:10,12
200:20,20 203:15
203:18,21 204:16
208:21 218:8,15
224:16,17 225:9
226:2,7,10,16,18
226:21 227:1
228:10 229:14,16
230:1,11,22 236:19
237:6,18,22 240:3
244:8 247:5,6,16
249:5 250:2 253:12
253:21 254:10,11
257:7,9 260:16
261:1 264:23
267:19 268:23
271:6 273:7 274:22
275:4 279:15 283:9
283:19,22,22
284:12 285:2,4,9
292:12,16,17,19,22
292:23 293:9,11,12
296:3 297:5 298:13
301:15 302:8 303:1
303:9 304:2 305:12
305:13 307:4
314:19,20 321:11
323:11,11 325:13
328:12,19 329:7,9
329:14 330:12,14
330:16,17 331:3,6
332:19 336:19
340:6,11,13,22
343:7 345:12
346:13 351:2

356:10,11 358:11
358:17,22 364:20
365:19 369:20
372:17 385:12
388:14,23 391:8,20
393:19,21 394:9,15
395:10,18,21
396:10 400:6,14
410:4 412:10 415:7
418:8,21 421:23
422:22 423:15,18
425:11,12,14,18
**knowing** 226:13
227:5
**knowledge** 17:5
72:6 138:9 145:2
188:4 279:20
281:20 293:13,22
293:22 304:6
334:23
**known** 69:18 236:7
303:11
**knows** 57:17 79:10
123:8 169:10
185:16 310:6
346:14

**l**

**l** 2:7
**lab** 203:3,9,12
204:2,4,8,12,15
205:2 246:19
247:23 249:2,3,9
250:6,7 254:15
278:21 279:6
283:11 284:5,11,12
292:11 303:2,10
334:12
**labs** 204:16,22,23
205:1,8,9,13,21,23
206:3,5 230:4,5
250:2,3 381:16

**lack** 26:2 54:21
55:7,16 57:15
136:7
**laid** 90:18
**language** 85:3,17
144:1,2,3,4
**large** 74:17 77:13
427:22
**laughter** 385:17
**law** 232:11 331:22
**lawsuit** 251:5
265:11 266:17
331:9,9,11,12,18
331:21 333:16
351:14 418:17
419:6 422:1
**lawsuits** 327:7
**lawyer** 82:15 265:5
**lawyers** 265:8
**lay** 31:12
**le** 112:11
**lead** 238:17 239:8
304:22 305:9
**leadership** 79:11
**leading** 213:10
360:17 365:6
**learn** 33:10
**learned** 42:10,11
45:14 46:1 47:11
237:8 270:1 280:21
281:8 294:2 372:11
**learning** 269:22,23
270:12
**leave** 276:6 418:4
**leaves** 205:9
**leaving** 230:20
**leclair** 24:20 27:17
28:1,19 29:7 31:22
33:11 34:2 35:7
37:17 38:3 40:20
45:22 53:16,17

| | | | |
|---|---|---|---|
| 54:2,7,8 58:11 59:1 | 67:15 68:8 112:12 | **level** 73:6 97:16 | **literature** 50:11 |
| 59:18,19 62:3 63:7 | 112:13 113:9 | 98:12,14,18 100:7 | **litigation** 189:9 |
| 64:1,8,12,15,19,22 | 114:15,16 128:14 | 105:16 158:17 | 418:3,15 421:8 |
| 65:20 66:7,8 67:22 | 128:20 130:5,13,20 | 159:3,7 181:7 | 425:19 |
| 70:8 78:21 79:2,9 | 130:23 131:2,13,19 | 185:7 221:1,1 | **little** 74:22 110:13 |
| 104:18,19 106:7 | 141:2 149:22,22 | 294:14 337:21 | 182:17 254:23 |
| 110:17 112:1 | 158:20,22,23 159:1 | 339:14 371:8,23 | 286:21,23 287:1 |
| 117:19 130:9 | 159:3 162:6 163:7 | 372:23 373:13 | 304:18 316:19 |
| 142:19 145:17 | 163:8 165:22 167:3 | 374:12 | 319:21 |
| 146:3 147:17 149:6 | 167:3 186:11 | **levels** 97:14 98:17 | **location** 383:20,20 |
| 161:20 162:9 163:6 | 189:17 225:15 | 221:12 256:1 | **logical** 202:6 |
| 163:9 165:4 167:12 | 229:18 230:7 234:1 | 294:13 | **logically** 391:23 |
| 168:16 169:8 | 235:6,19 249:1,17 | **liaison** 258:22 | **long** 25:21 42:7 |
| 170:11 197:11,21 | 254:22 261:9,10 | **libby** 5:7 | 151:22 167:3 271:9 |
| 205:1 206:1 208:16 | 269:1,10,13,21 | **library** 242:21 | 304:8 311:8 373:10 |
| 275:15 299:11 | 270:1,9 271:2,2,11 | **life** 73:7,15 269:10 | 423:5 |
| 321:7 343:10 353:1 | 272:2 273:17 274:2 | 271:3 358:14 | **longer** 103:11 |
| 354:13 355:4 388:4 | 274:4,18 277:5,13 | **limit** 134:4 | 118:22 192:22 |
| 388:8 417:21 | 278:12 279:9 | **line** 27:11,13,21 | 193:7 195:5 196:5 |
| **leclair's** 21:5 27:22 | 280:21 281:9,16 | 31:18 33:11 34:12 | 203:8 236:11 260:1 |
| 37:7 44:7 276:4 | 282:6,9,10 283:15 | 35:17,18 36:12 | **look** 15:10 35:19 |
| 282:23 321:14 | 284:17 285:20 | 146:21 192:17 | 42:21 57:20 73:19 |
| **lee** 1:21 8:8 9:13 | 300:12,15,17 301:3 | 202:23 218:22 | 73:20 120:20 133:4 |
| 427:4 | 302:4 303:13 | 240:7 259:5,11 | 135:20 136:8 |
| **leeway** 241:3 362:8 | 306:16,19,21 309:1 | 281:6 349:11 | 142:11 146:13 |
| **left** 66:17 74:15 | 309:21 310:1,1,7,8 | 367:18,22 368:1 | 215:20 221:21 |
| 78:11 81:20 114:2 | 310:10,19,20 311:5 | 389:1 | 222:2 261:21 |
| 119:4 202:19 | 341:12 345:13,14 | **lines** 248:19 304:12 | 274:21 275:21 |
| **legal** 73:18 246:23 | 357:15,16 370:2 | 343:19 | 277:7 304:7 327:4 |
| 249:6 266:3 267:10 | 371:19 418:5 421:6 | **linguistically** 31:1 | 331:4 355:17 |
| 267:11 418:7 | 422:12,15,18 | **link** 325:8 | 366:19 367:21 |
| **length** 316:7 | 424:18 426:2 | **lis** 297:7 | 368:8,9 373:6,8 |
| **lenient** 267:3 | **letters** 15:1 19:20 | **lisa** 100:2,8 105:18 | 392:20 410:19 |
| **letter** 4:6,19 12:19 | 44:4 54:9 64:23 | 105:21 | 411:4 412:5,14 |
| 13:7 14:17 15:7,19 | 309:15 | **listen** 191:13,23 | 415:8,22 416:5,8 |
| 15:21 16:6,14,16 | **letting** 99:22 | 295:23 297:6,11,13 | 416:10,12,13,22,22 |
| 16:21 17:1 18:18 | 101:11,16,18 104:8 | 323:20 358:9 | 417:11 418:20 |
| 20:1 22:12 27:16 | 104:11,19,21 109:1 | 368:22 369:2,18 | 419:11 420:6 |
| 28:1 36:14,18 | 127:21 296:23 | **listened** 192:6 | **looked** 132:11 |
| 38:19 42:6,13,19 | 332:18 408:1 | 295:14,18 369:22 | 133:2,3,6 341:15 |
| 43:4,6,7,10,15 44:9 | | | 372:15 410:22 |

[looked - media]                                                                 Page 455

| | | | |
|---|---|---|---|
| 416:3 | **major** 50:10 | 297:22 315:11 | 202:7 208:9 209:3 |
| **looking** 123:19 | **maker** 28:12 | 325:21 338:17 | 210:6,13 211:15 |
| 411:7 416:20 417:2 | **making** 52:18 53:1 | 341:7 382:16 | 215:13 216:9 |
| 417:4 | 94:6 136:17 137:8 | 386:14 406:23 | 217:14 228:4 |
| **looks** 72:23 | 137:16 151:5 154:6 | 408:10 414:9 | 244:15 248:9 |
| **loop** 255:13 | 157:9 175:5 176:6 | **mask** 300:7 412:8,9 | 249:10,11 266:22 |
| **lose** 225:20 289:11 | 177:12 184:1 | 413:15,22 | 269:13,18 270:15 |
| **lost** 66:16 188:22 | 196:14 201:7 215:2 | **master** 50:14 | 285:15 291:14 |
| 218:1 286:16 | 228:10,17 229:9 | **master's** 223:17 | 302:18 308:21 |
| **lot** 79:18 113:3 | 248:3 281:23 294:7 | **material** 70:18 71:3 | 310:19 322:12 |
| 180:1 193:13 | 294:19 298:13 | 71:4 | 328:22 334:17 |
| 197:17 208:6,11 | 328:1 332:9,22 | **matter** 9:5 10:9 | 339:18,21 343:17 |
| 209:22 214:11 | 337:18 360:19 | 43:1 70:3,16 71:3 | 345:2 349:8 358:1 |
| 222:20 230:1,2 | 361:3,6 362:10 | 101:19 115:21 | 358:14,16 359:7,10 |
| 236:3 241:2 248:2 | 363:5,13 373:3,6 | 143:1 145:12 146:2 | 359:18,19 360:2 |
| 270:12 288:8 | 376:21 389:2 | 146:3,10,11 148:17 | 368:2 390:8 392:1 |
| 292:19,22 293:13 | 392:15 399:9,12,22 | 148:17 151:6 | 392:5 404:2,13 |
| 293:22 301:11 | 409:13 | 157:20 162:2,22 | **meaning** 18:3 |
| 339:21 396:16 | **malconduct** 331:2 | 163:21 164:6,7 | 300:23 301:16 |
| **loud** 15:17 | **man** 88:2 286:22 | 166:7,18 167:7 | **meaningful** 94:16 |
| **low** 86:10 87:2 | **manage** 19:13 | 187:9 220:20 | **means** 23:3 29:1 |
| 337:22 338:12 | **manages** 13:9 | 221:19 293:23 | 53:11 92:21,23 |
| 371:8,23 373:1,13 | **mankey** 70:12 | 314:10 330:5 | 93:2,15 117:15 |
| **lunch** 202:14 | 91:14 386:22 | 370:20 374:20 | 134:5 190:5 191:1 |
| **lunchtime** 142:23 | 388:15 395:19 | 379:20 387:14 | 191:10 201:6,21 |
| **luoheng** 5:3,12 | 397:12 | 427:11,14 | 247:2,4 248:12 |
| 6:14,22 46:6 165:5 | **manus** 118:8 | **matters** 319:5 | 263:9 270:19 301:2 |
| 177:6 206:22 207:1 | **manuscript** 116:17 | **mature** 286:22 | 301:20,21 302:10 |
| 207:11 209:7 | 116:19 117:1,1,6 | **mean** 24:6,23 27:1 | 302:19,21 306:7 |
| 246:17 271:18 | 118:6,9,18 120:7 | 30:5 38:16 39:10 | 331:21 360:8 |
| 295:12 339:4 | 123:8 124:5 | 39:19 40:8 44:3 | 377:14,23 393:23 |
| 340:22 383:1 | **march** 215:1 | 46:2 50:12 60:5 | 395:19 423:16,18 |
| 385:10,11 387:18 | 216:17 266:18 | 62:17 67:6 75:23 | **meant** 38:4,4 85:11 |
| 388:8 | 420:10 421:4,14 | 76:21 80:14 83:19 | 85:12 203:5 284:7 |
| **m** | 425:4,16 427:17 | 85:14,15,17 86:4 | 308:14 358:18 |
| **mail** 281:2 282:7 | **marcy** 370:22 | 95:8 99:13 110:15 | **mechanical** 211:14 |
| **main** 207:23 | **marked** 12:8,15 | 113:14,20 117:17 | **mechanism** 242:23 |
| **maintain** 242:20 | 20:18 32:2 120:13 | 143:20 168:7 171:7 | **media** 9:3 78:7 |
| 342:21 | 161:1 172:16 | 180:3 191:6,10,18 | 160:21 280:6 |
| **maintained** 138:18 | 206:10 223:2 246:8 | 192:1,12 198:22 | 352:12 |
| | 258:10 268:5 280:9 | 199:11 200:12 | |

**medical** 11:21
**meet** 142:22 144:9
  374:20 376:20
**meeting** 17:15
  106:13 146:23
  147:14,14 148:23
  151:14,19 157:19
  162:23 199:8
  200:13 201:4,20
  213:19 215:5 316:5
  317:8 321:15,17
  339:6 341:19,23
  342:2 345:1,2
  346:4 347:21,22,23
  348:3,4,5 349:4,12
  351:8,11,23 383:5
  383:23 384:1,5,16
  385:11 404:17
  412:20,21,22 413:7
  413:9
**meetings** 121:9
  151:18,21 152:3,4
  198:2 199:12
  200:10 201:1,18
  211:18 278:3
  298:11 340:11
  385:7
**meets** 224:12
**member** 173:20,22
  193:8,10,15,23
  194:5 195:4 315:23
  375:21
**members** 26:5
  46:18 54:23 134:13
  134:19 137:6
  192:20 193:5 201:5
  207:17 212:19,23
  213:20 232:10
  353:8 354:15,17
  355:6 375:18 379:5
  402:6

**memory** 151:10
**mentioned** 21:13
  133:20 217:2 250:1
  314:18 345:3 388:2
**mentioning** 217:5
  308:1 309:20
**mentions** 308:3
  326:11
**mere** 199:7
**merit** 331:5
**message** 27:12
  143:5 298:23
**messages** 176:14
  185:9
**met** 106:14 108:2
  157:19 163:19
  207:17 242:13,14
**method** 210:12
**methodology**
  121:18
**metrics** 207:23
**microfa** 70:5
**middle** 14:13 326:5
  333:5 361:17 363:1
  364:9,14,17
**miller** 2:7 9:15,20
  383:6 384:6 385:12
  386:1,5
**miller's** 384:13
**million** 151:7
  182:14
**mind** 229:17
**mine** 37:7
**minimum** 117:8
  118:19 224:12
**mint** 70:7 151:17
  152:8 199:23 200:2
  203:9 249:21
  253:16 254:21,22
  256:23 257:3
  303:22 315:22

355:7 386:20 389:7
**minute** 35:6 184:8
  184:9 316:20,22
  317:2 318:5,5,20
  362:5,20 365:4
  409:10,11
**minutes** 76:6 160:3
  160:3 185:23 192:2
  199:2,4 276:23
  295:20 297:15
  352:2,4
**misconduct** 59:4
  64:7 101:1,10,14
  101:15 102:1,18,18
  161:14 162:9
  163:11 164:3
  170:13 171:3
  176:19 196:10
  320:3,6 321:21
  323:12 374:15
**mishandling** 327:1
**misinformation**
  324:17 325:3
**missing** 323:16
**mission** 374:13
**misstep** 269:10
**mistake** 269:12
**misunderstanding**
  255:22
**moment** 33:20
**monday** 142:23
  383:21,22
**monetary** 427:15
**money** 151:7
  182:14 214:9,11
**monitor** 50:3
**month** 17:17 28:20
  94:2,2 108:1
  152:12 421:5
**months** 92:14 93:5
  94:14 152:12 158:6

260:8 387:23 389:8
**morning** 115:3
  188:17 277:22
  293:10 341:20
  342:1,2
**morris** 5:23 6:5
  272:6 280:15
  304:10 308:8 309:7
  310:5 342:4,18
  347:21 348:6
**motivation** 170:4,7
**move** 122:12
  177:11 192:15
  203:18 320:19
  417:1,7
**moving** 75:7
  294:13 350:22
**multiple** 74:18,20
  111:9 145:5
**mumper** 7:3
**murky** 109:16

**n**

**n** 2:1 60:20,20
  178:16
**name** 9:10,17,19,21
  11:5,6 43:1 79:17
  89:4 91:13,16
  110:12 131:23
  190:19 223:14
  312:19,23 313:2
  344:20 383:11
  384:15,22,23
  386:20,22 391:9
**names** 174:20
  353:7
**narrower** 196:23
**national** 151:7
  182:13 214:8,10,14
  236:20 400:19
**naturally** 80:2
  357:7,21 358:14

**ne** 135:5

**near** 60:13

**necessarily** 33:21
181:20

**necessary** 118:9

**need** 12:12 23:5
38:2,9 44:3 56:19
63:2 76:3 110:10
111:7 114:9 116:3
118:13,15,15
120:17 121:23
122:6 123:17
134:15 135:7
138:11 142:9 145:2
155:8 158:12
198:14 205:19,21
214:5 224:8,9,10
228:6 235:3 241:7
245:16 247:4,5
248:9 249:17
254:22 256:8
282:12 285:1 288:8
323:2 329:15 335:4
349:15 358:22
376:15 382:7
396:23 405:17
415:2,5,7,12
416:12,21 421:17
421:17 423:6,11,13
425:6

**needed** 30:2 61:3
96:4 189:1 203:17
247:15 270:19
284:2 329:14
339:23 405:9,14,16
426:3

**needs** 116:23
142:22 144:8
173:17 320:10
339:15,19

**nefarious** 391:5,7

**negative** 60:22

**negatively** 295:19
295:21

**never** 56:4 59:3
61:7 95:21,22
129:14 184:3
185:16 229:16
261:2,3 295:18
296:4,17 297:8
338:2,7 340:10
412:10

**new** 151:10 188:8
188:15 195:10
233:10,13 275:6
343:15 344:8 418:2

**news** 283:5 343:15
344:6,8 345:15,19
346:12,17,20,21
407:7

**nobel** 221:20

**nods** 20:8 47:4
85:22 111:5 173:4
235:19 250:10
261:14 272:7 279:2
280:17 286:18
308:9 315:6 316:1
353:22 354:3 356:3
384:4 418:18

**nonrelevant** 28:14

**norm** 19:22

**norma** 16:1 17:15
298:10

**normally** 267:9

**northern** 1:1

**northwestern**
212:4

**notary** 1:22 8:9
427:4,22

**note** 372:19

**noted** 305:6

**notice** 157:22
411:12

**noticed** 362:3

**notification** 43:12
43:14 44:12,14
47:7,15,18,22,23
48:11,15,18,20
61:16 67:13 235:14
236:1,2 347:17
354:12

**notifications**
308:15

**notified** 15:3,23
17:18 42:9,11
43:17,19 45:11
157:21 233:23
234:23 308:18
342:7 344:18 346:5
346:8,15 348:1
418:9

**notifies** 18:11,13
19:2,6,9 285:18

**notify** 13:15 17:20
18:16,20 45:6
224:18 226:12
233:22 344:23
346:3,7

**notifying** 130:20
298:16

**november** 419:14
420:4 421:21 423:4
425:16

**nsf** 59:7 70:11
237:7,8,13 326:11
326:17 327:3
329:12,17 330:3,22

**number** 9:7 12:6
12:18 20:16 21:14
31:21 35:20 48:23
57:21,22 78:15
120:15 142:11
160:21 161:3
172:18 183:19
202:19 206:8 208:1
222:23 246:10
249:20,22 258:8
268:3,10 274:7
277:8 280:6,11
297:20 315:8
325:23 338:15
341:9 352:12,16
355:18 382:17,21
386:12,17 407:2
408:12 409:2
414:11

**O**

**oaa** 98:13

**oakland** 212:8

**oath** 34:3 39:2
427:11

**ob** 107:1

**object** 14:2 22:5
25:5 29:5,21 32:4
34:6 37:23 39:5,8
39:13 51:18 54:3
54:10 56:17 59:22
63:8 64:10 65:3,22
66:1 68:4 71:21
81:9 86:23 89:16
90:6 94:23 104:23
109:6 120:2 123:16
126:1 128:8 134:16
137:2 141:23
143:13 147:7 148:3
148:11 149:18
151:23 152:16
153:12 158:7
159:16 163:14
166:23 167:8,16
168:6,11,19 169:13
170:9,14 171:5

172:10 174:15
179:10 180:14
181:12 182:20
183:16 184:10,16
186:23 187:12,21
191:9 193:18 194:4
195:21 196:16
202:11 205:5
208:20 212:17
216:4 217:16
219:12 227:15
238:4 250:19 255:3
255:19 257:18
258:1 278:19
279:19 281:18
286:5 287:11,16
288:5,15 290:18
291:23 294:1 296:6
304:1 309:17 313:9
317:17 321:23
327:22 329:3
330:13 332:1
333:23 334:19
336:8 337:11
348:15 350:11
365:7 372:7 375:12
379:23 392:7 394:5
394:19 395:7
398:19 399:22
400:10,16,23 401:6
406:1 408:23
409:19 415:11,12
415:13 419:1
425:20,21
**objected** 67:16,17
364:20 409:20
**objecting** 63:15
68:2 69:6 94:19
**objection** 32:18
35:10 36:4 39:17
57:4 63:17 64:2

67:14 107:4,10
149:11,13 189:16
365:2 399:23 400:2
408:22 409:13
415:7
**objections** 8:13
24:2 240:12 409:10
**objective** 73:11
75:16 169:1
**objectivity** 73:6
74:18 169:4
**obligations** 84:1
**obliged** 30:16
31:14 283:2
**observation** 93:7
**obvious** 147:3,6
149:3,5
**obviously** 59:2
**occasion** 174:2
363:5
**occasions** 364:8
**october** 260:13
261:16
**offered** 409:15,18
413:1
**office** 44:16 60:10
62:22 63:5 98:13
100:21 102:22
161:12 163:3 173:8
174:9 176:23
207:19 211:3
219:15 223:21
224:5 226:15 228:6
241:8 258:19,21
260:4,15,18 261:4
261:8 265:22
267:15 268:13
293:19,20 298:17
304:11 326:22
344:7 370:18

**officer** 173:19
333:21 344:22
355:6
**officers** 205:3
257:12 278:1 286:1
287:2 288:2 315:4
332:6 334:15
346:18 376:10
380:4,8 381:22
**official** 13:17 18:17
112:3 258:22
369:11 394:23
402:17
**officially** 163:10
312:14 313:22
**officials** 186:17
208:7
**oh** 49:1 137:18
175:14 192:16
302:21 371:12
382:14 385:16
402:1,9
**okada** 68:11 356:6
**okay** 10:2,18 13:3
21:6 31:15,20
34:19 37:15 53:1
57:20 58:19 59:15
61:6,15 64:4 66:23
67:4 76:7 78:1
83:16 98:9 111:3
118:23 125:10
129:21 130:2,3
136:5,9 137:4
142:10 145:22,23
146:6,12 154:19
159:23 160:16
165:19 166:20
172:6,9,13,16
181:8 183:7 184:2
189:15 191:15
192:15 193:11

202:9 207:3 209:2
215:21 232:21
233:14 240:14,18
241:21 246:2
248:13 249:19
251:11,23 252:6,8
253:3 257:16,22
275:23 277:1
279:23 284:3
287:10 288:10
291:5,10,13 297:19
300:20 304:5 305:1
305:20 306:2,20
310:12 314:4 321:6
323:7 332:7 340:8
342:10 344:9,20
346:10 347:11
349:7 352:1,6
356:22 361:6
365:15,20 366:21
371:11 374:4 378:6
378:14,23 382:4,12
386:5 391:2,6
392:20 395:6,12
396:18 399:6,8,14
402:17 405:23
406:2,8,16,21
407:7,15,20 409:23
411:16 415:16
417:9 419:16
424:15 425:22
426:9
**olin** 78:19,23 79:5
96:12 99:9,9 177:3
177:4,7
**once** 13:23 103:10
103:18 207:18
236:10 269:16
**ones** 50:3
**online** 132:13
133:3

**op** 31:5 50:21
**open** 231:2
**opened** 368:18
**operate** 49:16,16
  49:23 53:7,19 72:3
  72:9 129:5 138:19
  140:2 178:1 242:18
  330:15
**operated** 50:19,21
**operates** 51:12
  72:7 139:12
**operating** 51:2,23
  139:17 141:4,6,16
  205:10
**operation** 65:8
  277:23 278:6,17
**operations** 65:1
  279:10 281:15,21
  285:5,12 286:20
**opinion** 156:23
  213:22 220:22
  241:19 247:9 288:6
  288:12 320:23
**opinions** 220:7
  290:11
**opportunity** 97:13
  145:17
**opposite** 221:17
**opted** 307:7 310:14
**option** 225:20
  229:19 231:2
  302:18
**options** 23:17 31:6
  31:7,8 204:13
  222:8 249:7 305:16
  306:9 342:5,15
  351:15
**order** 4:4 12:10,12
  238:21 245:15,18
  255:12 262:18
  263:2,17,23 266:6

266:8,11,20 278:10
  285:14
**ordered** 266:8
  303:17
**organized** 209:23
**organizer** 384:1,1
**ota** 370:19,23
  374:10,13,19
**outcome** 111:20
  427:15
**outlined** 53:21
  132:14
**outside** 81:21
  266:20 294:5
  296:10 324:1
**ownership** 231:18

**p**

**p** 2:1,1 243:5,10,12
  243:12,12,12,12,14
  243:14,14,14,14
  245:1
**p.m.** 17:4 142:20
  147:17 326:7,20
  352:19 370:15
  383:22,23 420:5
  426:13
**pa** 23:19 361:19
**pagani** 7:13 176:22
  339:5
**page** 3:2,3,4,6,7,12
  4:2 13:7 15:10
  17:12 21:13 23:20
  23:20 24:19 28:19
  33:9 34:13,13,15
  34:16 35:13,14,20
  36:10,11 43:9
  48:23 57:21,21
  78:15 87:21 120:23
  132:2 133:9,11
  142:11,13,15
  146:13 165:3

233:16 246:13
248:16 249:18
258:13 268:11
272:4 273:19 276:3
298:2 304:8 312:8
341:13 352:17
354:8 355:18,19
367:4 370:11 382:5
382:13,23 387:2
392:21 410:3 412:5
412:14 417:12
418:22 419:11
420:7 421:7,9,16
427:6
**pages** 21:7 33:2,4
  133:13 268:11
  382:22 386:17
  427:5
**pain** 393:9 394:14
  396:11,12,13 398:9
  398:13
**paper** 318:21
  319:20
**papers** 109:2 211:9
  319:1,3,6,7,17
  320:2 321:19
**par** 281:6
**paradigm** 77:10
**paragraph** 23:9,10
  25:19,22 58:18
  60:21,23 62:12
  68:8 69:5 79:7,8
  80:11,16,22,23
  84:16,18,21 85:2,5
  86:3 88:22 92:8,21
  149:12,12 161:10
  167:4 206:20 207:6
  280:19 282:14
  283:15 284:16
  305:2,4,19,21
  306:18 316:19

318:4 334:8 337:6
337:19 340:16
352:20 356:4,20,21
370:17 374:8
380:14,22 381:14
387:20 390:14
**paralegal** 384:20
**parallel** 18:6 41:3
**parsing** 396:15
**part** 8:17 15:14
  19:16 26:19 28:12
  28:13 32:22 35:7
  49:14 67:21,23
  73:21 79:15 92:22
  93:15 98:9,14,22
  114:1 133:16 147:1
  149:1 176:10 177:5
  177:23 200:5,6
  202:22 207:4 208:3
  273:11 279:6
  292:21 303:9
  337:10 340:9
  341:15 357:17
  361:5 362:11
  368:23 381:3
  383:14 388:10,12
  389:4 392:14 393:9
  397:9 419:15
**particle** 56:10
  136:11
**particular** 33:13,20
**parties** 8:4
**parts** 29:17 30:18
  263:7 317:9
**party** 427:14
**pass** 118:16 242:1,6
  242:8,23 243:3
  244:19,21 245:2
**passed** 115:12,14
  116:2 127:10,11

| | | | |
|---|---|---|---|
| **passes** 243:5 | 356:13,13,18 357:3 | **ph.d.** 1:11 3:9 | 234:10 251:16 |
| **patents** 231:19,20 | 357:9,17 359:1 | 10:21 50:11,12,14 | 259:15 268:17 |
| **patrick** 31:22 | 360:2,5,14 373:2 | 65:9 66:16 120:5 | 270:23 272:18 |
| 36:14 45:22 60:16 | 387:13 389:21,21 | 180:4 181:9 182:2 | 273:12,22 275:15 |
| 63:7 79:11 117:19 | 390:5,5 398:12 | 182:8,8,12 183:8 | 285:19 288:16 |
| 161:19 162:8 163:9 | 400:15 401:16 | 200:2,14,23 201:4 | 291:3,7 305:8 |
| 165:4 167:11 | 402:7 403:23 | 229:21 230:4 232:1 | 374:17 381:8 |
| 197:20 205:1 | 413:11 | 237:12 291:18 | **picking** 32:21 |
| 206:21 209:4 | **perceives** 184:22 | 304:22 305:10 | **picture** 87:10,11,13 |
| 275:15 385:12 | **percent** 120:5 | 396:5 | 87:18,20 88:1 |
| 387:18 388:8 | **perfectly** 405:21 | **phone** 234:3 | 91:15 92:10 96:18 |
| **paulo** 7:8 | **period** 93:9 266:12 | 338:23 350:16 | 109:11,14,15,17 |
| **pay** 23:5 25:1 187:7 | 266:19 303:13 | 383:19 385:9 | 365:17 387:5,13,19 |
| 187:8 349:23 | **permission** 310:8 | **photograph** 354:14 | 387:21,22 388:5,6 |
| **paying** 219:22 | 421:18 | **phrase** 31:17 283:1 | 388:10 390:21 |
| **pdf** 208:13 383:10 | **permits** 419:20,22 | 283:2 299:15 | 391:3,16,21 392:2 |
| 384:20 385:4 | 420:20,21 | **physicists** 56:10,10 | 392:4 393:20,22 |
| **peo** 136:16 | **permitted** 424:19 | 136:11 | 394:3 398:5 410:3 |
| **people** 24:6 56:7,12 | **person** 19:17 24:16 | **physics** 4:16 13:20 | 410:6,8 411:2,3,4 |
| 66:18 68:9,12,17 | 26:23 46:2 53:1 | 14:17,19 18:20 | 411:11,12,15,21,22 |
| 68:18,23 69:7,16 | 70:23 73:22 86:1,5 | 19:20 20:1 23:2 | 412:1,2,2,7,16 |
| 69:20 70:15,22 | 86:6,21 89:11 | 26:6,13,14 28:8,10 | 413:14 |
| 71:10,15 74:19 | 98:18 104:16 | 36:19 38:21 40:3,4 | **pictures** 93:12 |
| 79:12,16,18,22 | 105:11,17 117:23 | 40:11 43:13 44:2 | 386:18 398:23 |
| 83:13 86:18 87:3 | 118:3 129:18 | 44:12,15 45:5,8,9 | **piece** 92:10 103:10 |
| 92:1 100:7 110:13 | 148:21 158:19 | 46:17,22 47:8,10 | 275:6 301:4 323:16 |
| 112:1,2,2 115:21 | 180:4 185:15 186:9 | 49:21 50:8 51:4,8 | **pieces** 32:7 248:1,2 |
| 115:22 117:6 | 186:9 187:5 190:10 | 51:15 52:14 61:17 | 270:10 271:22 |
| 136:16 137:15 | 203:14 218:8 | 62:5 67:13 70:3,9 | 302:6 |
| 146:4 147:18 | 242:11 259:13 | 70:16 76:13 93:23 | **pile** 405:6 |
| 148:19 159:2 | 314:23 334:23 | 101:8 104:7,16,17 | **pinkert** 4:20 59:17 |
| 165:17 186:19 | 342:17 345:18 | 116:9 117:16 120:1 | 62:5 63:23 64:15 |
| 187:7,7,9,11 | 360:4 364:6 366:19 | 127:15 132:10,11 | 64:20 65:1,4 162:7 |
| 189:17 190:3,11 | 373:16 391:14,19 | 139:9,12 140:11 | 163:4 171:4 237:14 |
| 202:4 213:15 217:8 | 394:2 407:13,17 | 141:12 142:3 148:9 | 237:18,21 238:6,9 |
| 218:7 223:10 224:5 | 410:6,9 412:3 | 150:16,19,22 | 239:7,15 253:15 |
| 224:17 230:9,13 | **personal** 71:14 | 151:16 152:9 | 257:14 303:19 |
| 231:3,4 233:11 | **personality** 79:15 | 162:21 169:9 | 325:7,16 326:15 |
| 315:4,21 317:22 | **perspective** 73:14 | 171:23 199:22 | 327:16,20 328:5,23 |
| 331:10,12 336:4 | 97:13 157:7 324:19 | 203:19,20 225:5 | 328:23 329:21 |
| 338:21 356:1,5,8 | 371:4 | 227:7 228:14,19 | 408:5 |

pinkert's 239:22
241:6 329:13
place 8:7 15:19
268:21 294:11
363:19 398:11
427:7
placed 39:12 371:8
427:10
places 19:7
plagiarism 59:1,7
59:18 60:5 161:17
161:22
plagiarized 64:9,14
plaintiff 1:4 2:2
9:22 266:14
plaintiff's 4:3 12:7
12:14 20:17 32:1
120:12 160:23
172:15 206:9 223:1
239:3 246:7 258:9
268:4 280:8 297:21
315:10 325:20
338:16 341:6
382:15 386:13
406:22 408:9 414:8
plan 349:21
plausible 169:11
pleading 369:7
please 10:1 11:5,8
13:6 15:12 17:11
25:20 45:17,18
49:3 57:20 58:1,5,8
58:13 68:7 72:12
79:8 83:2 84:10
92:6 97:2,7 106:23
107:9 110:12
120:15 125:2
126:21,23 127:1
128:5 131:8 135:13
137:22 138:1
142:11,13,18

146:18,20 154:9
161:9 162:13 173:5
175:2 176:9 192:18
194:13 199:2
202:21 203:4
206:19 207:10
225:1,8,10 233:18
234:7 240:19
241:23 246:16
247:1 248:20
249:14 258:16
259:4,18 268:15
272:8 277:7 280:18
282:13 284:15
285:2 297:12 298:5
304:13 305:3,11,17
312:10 315:13
316:2,21 318:3,18
321:9 326:7,18
339:3,17 341:18
342:10 347:2
352:19 355:17
363:6,12,13 364:4
364:13 366:22,23
367:19 370:16
373:8 374:6,21
382:22 392:20
393:7 411:19 416:8
417:11,17,22
418:20 420:2,6,11
point 16:11 35:22
44:5 55:18,20 64:8
72:21 98:23 103:9
113:1 122:3 127:13
134:17 180:11
195:7 200:21
204:14 221:5,18
229:9 231:13,15
239:19 243:17
245:7 249:7 253:4
253:8 269:18

275:10 286:13,19
289:15,16,19,21
294:19 324:10,13
349:5,8 366:5
374:6 397:15
404:22 423:12
424:5
pointed 354:22
379:10 385:23
pointing 365:9
366:9
points 381:13,13,15
pol 376:17
police 64:23 65:8
86:20 173:19 205:2
256:15,21 257:11
277:23 278:1,6,14
278:17 279:10,20
281:14,21 285:5,11
286:1,9,20 287:2
288:2,17 312:20
313:1 314:12 332:5
333:9,11,21 334:5
334:11,14 344:22
346:3,18 347:18
375:14 376:10
377:20,23 379:20
380:4,8 381:5,21
policies 374:16
376:17,19 377:2,2
377:13 378:8 381:7
policy 137:21
portion 250:14
position 11:9,14
16:15 36:15 37:20
40:2,6 64:17 70:14
121:16 148:4
150:11 196:15
203:8 251:3,10
285:10,16

positive 60:22
68:19 227:12
356:14
possibility 86:22
possible 156:5
193:10 244:3
269:19 270:16,18
278:12 285:21
363:6
possibly 88:6 164:7
204:14 345:9
poster 389:5 395:2
posters 211:6 395:4
postpone 83:18
potentially 119:14
power 53:5 427:12
powerpoints
211:19
pr 367:19
practice 137:21
141:17 152:18
pre 27:20 183:9
preaching 220:5
preempt 266:9
prefer 10:14
preliminary 214:20
present 2:11 87:8
397:8,9
presented 4:10
92:16 93:13 211:7
211:20
presenting 31:9
220:14 392:9
presents 102:2
124:12
president 6:7 59:17
60:6,15 62:4 63:5
64:6 163:3,3 171:4
176:17 179:12,19
179:22 180:2,7,8
180:23 181:10

182:1,16 183:9,14
184:6,7 185:4,8,21
186:15 187:17
189:3 190:4,22
191:13 192:5 217:7
218:10 253:13,15
253:18 255:11
256:2 257:4,4,5,13
303:17,18 315:21
327:15 404:18
**president's**  58:7,22
181:7
**prevent**  419:19
420:18 421:20
422:11 424:9
**previous**  16:7
24:19 99:18 115:20
273:18 305:18
309:15 372:2
**previously**  80:13
186:6 368:14 414:5
**primary**  196:13
418:10
**principal**  70:10
236:20
**prior**  117:2 140:5
419:17 420:16
421:15,19 424:12
**prioritize**  230:10
**priority**  230:12
**privilege**  262:4
265:17,18,20
266:10
**privileged**  262:2,5
262:20,23 263:8,19
263:20 264:6 265:2
265:9 266:23
267:12,23
**prize**  221:20
**pro**  2:3 57:8 108:11
108:19 208:9

**probably**  32:21
43:21 46:21 79:9
180:10 184:7 231:6
256:12 264:18
297:10 330:18
392:2,19 394:1
401:20
**problem**  39:18 46:4
56:5 71:14 87:4
108:19 128:22
160:16 165:19
233:15 253:9 312:6
375:7 376:14,16
393:14,18 396:18
398:8 423:6,7
**problems**  375:15
376:11 377:22
**procedure**  51:16
94:20 98:10,22
99:4,7 101:19
102:6,13,14 104:3
104:5,15,21 105:3
105:6,13,22 106:8
108:10,22 109:5,12
109:21 110:2,4
111:16,22 112:14
112:19,21 113:5,17
127:20 128:2,5
135:21 141:4,6,11
141:17 149:16
159:14 186:7,20
187:3,5 189:18,21
190:4,5,12,18
191:6 194:8,10
235:18,21,23
237:22 238:2,5
241:5 255:15 256:7
289:14 290:17
291:21 292:2
296:17,22 319:6
338:5 370:4,5

371:21 375:3,4,6
375:11,20 376:11
376:15 407:12,17
408:8
**procedures**  24:9
129:16,19 180:6
186:17 190:13,17
239:10,14,21
287:14 288:2
407:10
**proceed**  16:2
103:18 118:2 124:1
124:1,4 249:5
317:22
**proceeding**  317:20
**proceedings**  241:11
427:15
**process**  17:6 19:14
43:2 51:20 52:1,8
53:23 90:8,12,14
90:15 96:11,17,20
97:11,17,19 98:1,5
98:15,16,20 100:9
100:21 102:21
103:4,9,12,14,18
112:18 113:6 119:4
124:10 128:10
130:12 144:15
169:3 180:20 181:3
181:4 183:1 184:21
185:1,5,11,17
186:4 188:12,20,22
189:1,4,9 192:5,7,9
192:13 216:19
217:1,3,8,21 218:2
219:6 221:1,4,6,16
221:17,22 222:1,6
222:10,18 224:20
238:11 241:5 253:2
255:5,7,8 256:3,3
289:1,2,7,12,23

290:1,6,8 291:1
292:13 293:6,7
294:3,5,8,23 295:2
295:7,8 296:8,9,11
296:15,15 301:4
302:6 324:1,2,7,9
324:23 330:18
331:4 369:15,23
375:23 377:4 397:9
405:8
**processes**  16:9 18:7
189:11,13 224:2
301:23 401:17
**processors**  403:2
**proctor's**  241:7
267:15
**produce**  201:16
263:6,21,23 264:5
265:9 383:11 418:4
**produced**  12:20
21:13 24:5 59:13
214:12 262:15,17
262:22 263:17
265:3,5 267:2
340:20 385:4
**producing**  263:9
267:8 268:2
**production**  7:2
15:11 266:15
383:14 387:4
**productions**  41:17
**productive**  198:16
198:17
**prof**  186:14
**professional**
230:11
**professionally**
175:12
**professor**  90:2,5
91:9 164:14 169:10
195:13 200:14

| | | | |
|---|---|---|---|
| 217:10 218:18 | **programs** 13:11,12 | **progressing** 197:1 | 208:8,15 211:2,3 |
| 236:17 243:22,23 | 49:15,16 138:17 | 198:17,18 | 211:12,14 215:17 |
| 375:5,8,9 386:21 | 175:4 223:12,15,16 | **project** 70:11 111:9 | 217:7 218:10 |
| 392:1 394:13 | 223:17,18 242:18 | 192:23 193:7 | 253:14,19,20,22 |
| 397:12 398:9 | **progress** 26:2 50:4 | 400:20 | 254:12 257:5 273:1 |
| 400:18 | 54:21 55:7,17,17 | **prompted** 273:8,10 | 273:5 295:16 |
| **professors** 65:8,16 | 56:1,2 57:9,16,18 | **proof** 296:20 297:3 | 296:14 297:2 |
| 69:18 90:3,8 93:21 | 57:18 72:14,22,23 | **proper** 322:14 | 303:18 315:21 |
| 99:22 151:14,15,20 | 73:16 74:11,12,12 | **property** 100:1,16 | 403:10,12,17 |
| 152:13 153:22 | 75:3,4 77:16 121:5 | 100:20 101:13,15 | 404:18 405:1 |
| 155:5 186:14 198:4 | 123:12 130:15,16 | 102:19 103:7 | **provost's** 219:15 |
| 198:11 199:9 | 133:18 134:1,5,8 | 104:10 109:9 | 293:19 |
| 201:10,23 202:1 | 136:3,7,8,18 137:9 | 238:22 | **ps** 245:6 |
| 204:20,22 205:11 | 137:17 138:16,17 | **proposal** 242:5 | **public** 1:22 8:9 |
| 213:8 219:17 230:2 | 140:17 142:7 150:5 | **proposed** 242:4 | 427:4,22 |
| 257:11,15 321:17 | 150:9,12,13,14 | **prosecuted** 232:10 | **publication** 317:2 |
| 372:4,12 377:7,7 | 151:3,5,21 152:6 | **protect** 329:21 | 317:13 319:15 |
| 385:8 398:7 400:7 | 152:12,14 153:16 | **protected** 238:22 | **publications** 208:1 |
| 402:21,23 405:13 | 154:6 156:9,15 | **prove** 59:6 190:20 | **publish** 109:1 |
| 405:17 | 157:9,13,16 159:5 | 296:14 318:15 | 320:2 321:19 |
| **profile** 411:21 | 169:21 170:21 | 341:2 406:12 | **publishable** 321:10 |
| 412:2,7,16 413:14 | 171:13 195:23 | **proved** 232:19 | **pulled** 355:12 |
| **program** 15:6 | 196:8,14,18 197:8 | **proven** 233:8 | **punishment** 29:3 |
| 17:18,21 19:10 | 197:8 198:11,13 | **proves** 164:2 | **pure** 406:10 |
| 26:15 28:11 36:20 | 199:17,19 200:4,7 | **provide** 108:12,18 | **purely** 103:4 385:2 |
| 38:21 52:13 66:17 | 200:9,11,12,17,19 | 111:7 117:5 162:5 | **purpose** 190:8 |
| 96:7 103:13 128:17 | 200:21 201:2,8,11 | 194:13 297:17 | 225:11 228:2 |
| 139:5,13 225:5,8 | 201:12 203:11 | 337:9 | 242:19 |
| 225:17,23 226:2,17 | 209:16,17,21 210:3 | **provided** 161:16,21 | **purposes** 419:23 |
| 227:7,8 229:13,20 | 210:15 211:5 | 171:3 217:23 218:3 | 420:22 |
| 230:8,13 233:10,13 | 212:20,21 213:1,16 | 218:6,8 296:5 | **pursuant** 8:10 |
| 233:13 234:11,19 | 213:17 214:20 | 374:9 | 263:16 |
| 236:11 268:18 | 215:3 216:20,21 | **provides** 410:17 | **pursuing** 284:14 |
| 273:23 275:15 | 218:13,22 219:16 | **providing** 228:12 | **purview** 222:3 |
| 282:21 283:8 | 226:5 232:1,7 | 328:22 335:19 | **pushing** 292:4 |
| 292:14 293:4 | 237:12 246:21 | 336:2 337:13 | 334:13 |
| 304:17,23 305:8,10 | 247:7 292:15 | **proving** 187:2 | **put** 15:20 16:12 |
| 305:15 343:11 | 376:21 | **provost** 11:11 | 19:14 39:16 104:6 |
| 353:2 376:23 | **progressed** 215:3 | 176:17 179:23 | 104:8 130:19 |
| 424:23 | 216:17 | 180:2 183:10,11 | 150:10 183:3 184:7 |
| | | 185:8 186:14 208:7 | 214:12 291:18 |

302:2 365:1 383:10
384:19,21 385:4
391:8,8
**puts** 271:21
**putting** 32:18
63:17 64:2 270:6
422:17,19

**q**

**qualification** 56:8
**qualifications**
69:20
**qualify** 71:18
**quality** 118:2 122:8
122:11,14,18,21
123:6,11,14,23
211:13
**que** 25:6 196:20
335:2
**quest** 377:20
**question** 38:12
45:10 63:10,14
66:20 67:7 73:16
73:23 74:11 83:21
86:16 91:2 97:10
98:21 101:3,6,20
103:2,15 107:11
111:14 114:10
125:13,19 126:16
126:21 129:6
135:18,19 136:21
136:23 137:13
138:9 139:18 142:8
143:14 153:14,14
155:12 160:13
163:16 169:8
172:12 188:16
191:2,16,21 192:17
193:8 194:20 195:2
195:8,12,22 196:20
197:2,5,7,9,10,13
197:16,18 198:19

199:7 203:6,11,14
208:22 209:2,4,7
212:16 215:16
217:5,9 229:12,16
233:7 238:16
241:14 245:22
247:22 248:8 250:2
256:11 257:19
261:15 270:3,14
287:6 291:12,15,16
300:10 309:12
311:13,23 325:5
328:4,14,15 332:15
332:16,20,21,21
333:4 334:22 335:2
337:17 344:15
345:21 346:1,2
347:3,10 355:10,13
360:18 361:5 362:6
362:7,9,13,15,16
363:3,8,9,10 364:2
365:1,6 370:6
372:22 375:16,17
377:16,19 378:22
378:22 381:17,18
390:6 392:16
397:20 399:4,10
400:1 409:8,12,21
411:11 413:6
414:22 416:9,9,16
416:21 417:6,7
419:8 423:1 425:8
**questioning** 240:7
260:22
**questions** 8:14
11:20 67:9 75:1
98:2 107:6 114:13
125:21 126:11,20
154:14 155:4
158:16,21 159:10
159:11 197:4 204:2

211:21 220:5,11
233:1,1 237:1
240:20 241:3,20
256:17 276:19
324:14 353:17
358:8 361:21,22
362:4 363:21,23
374:12,22 376:1,2
387:1 399:20
407:21 408:7 409:2
409:7,22 415:15
416:4 427:11
**quickly** 147:3,5
149:3,4
**quietly** 364:21
**quite** 42:8 50:20
102:9 147:9 292:19
292:22 293:13,22
359:14 396:16
**quotations** 332:4
**quote** 326:11,13
353:13 354:23
355:1
**quoted** 136:6
357:15 380:15
**quoting** 354:5

**r**

**r** 2:1
**r.b.** 5:16 258:23
259:2,6,12,16,21
262:16
**ra** 366:4
**raise** 10:3 372:22
**raised** 188:10,17
366:4
**raising** 188:16
**range** 406:6,7,9
**rank** 101:7 104:16
105:6 115:22
200:14 201:5,8,23
202:1 230:1,3

394:23 402:17
**rare** 57:7
**rational** 349:19
**rationale** 208:9
249:2,15,15,20
250:8 252:4 322:6
**rdp** 1:5 9:8
**reach** 13:23 64:20
182:1,19 185:19
281:10 296:18
297:1 325:8 333:19
374:5
**reached** 68:4 113:8
177:3,4 183:8,9,13
258:21
**reaches** 68:5
**reaching** 176:16
180:7 181:9 182:16
184:6 339:13
**read** 15:12,14
17:12 24:20 25:20
27:16 33:10 34:12
35:18 36:11 51:22
55:4 58:3,8,16
60:16,19 61:22
62:13 67:4,21,22
68:7 79:6,6,8 80:5
84:18,22 85:7,8
86:3 92:8 132:8
142:18 143:20,23
146:16,20 149:11
157:20 161:9
163:20 176:9
178:13 192:18,23
196:9 202:21,22
206:19 207:3 225:1
233:18 246:16
248:20 259:4
260:17 268:15
272:8 280:18 281:6
282:13 284:15

[read - referencing]                                                    Page 465

293:16,18 298:5
299:5,9 300:20
304:13 305:3,18
308:21 312:11
313:16 314:4 316:2
318:3,18 326:8,19
339:3 341:18
343:20 349:12
352:19 357:14
358:12 359:21
367:9,11,12 368:17
369:12 370:16
372:2 373:23 374:7
380:10,13 383:16
391:11 393:7
417:17 419:14
420:2,11 421:9
**reading** 8:11 16:3
18:2 85:20 312:12
327:11 358:20
369:8 371:10
**readmission**
420:16 421:15,17
422:22
**reads** 123:22
266:12 273:21
356:5
**ready** 7:4 101:16
108:23 116:1
134:10
**realize** 233:11
343:14 411:1
**realized** 299:3
345:13
**really** 31:16 264:22
281:20 288:7 303:9
304:2 329:16 343:1
**reaper** 88:5 94:10
387:23 388:13
389:6 390:1 398:10
398:15 414:4

**reason** 54:7 73:1
103:22 122:17
134:2 165:21
170:11 177:16
181:3 196:7,14
204:19 269:4
271:23 295:22
299:7 327:9,23
342:19 353:10
374:11 375:19
384:22 394:10
409:16
**reasonably** 239:7
**reasons** 80:1 147:2
147:5 149:2,4
239:2,6 242:7
357:6,20
**rec** 219:5
**receipt** 47:17,21
**receive** 14:17 19:19
20:6 26:12 28:7
33:18,23 41:16
89:23 185:9 243:21
260:7 282:10 300:2
306:20 307:1 325:6
330:15 350:18
**received** 20:1 43:12
44:8,11 47:7,15
48:7 51:20 58:10
59:11,14 60:2
61:11,16 67:12,18
78:21 114:16 130:8
132:8 196:3 219:9
260:4 261:17
263:16 273:3 281:3
281:4 282:6,9
283:17 284:19
285:8,19 312:5
316:9 345:13
354:10 369:10
417:15

**receiving** 216:11
336:3
**recognize** 88:14
**recognized** 398:17
**recognizing** 165:1
**recollection** 44:19
44:22 244:12
**recom** 146:8
**recommend** 26:11
30:21 300:1
**recommendation**
4:11 14:11 20:12
20:14 21:9 23:13
23:15,22 24:3,11
24:13,21 25:2,12
25:16,17 26:21
27:1,2 28:4,5 29:4
29:8,13 30:16,18
30:23 31:1,3,5,11
31:13,14 40:17,21
48:22 52:18,21
53:2,3,5 61:19
65:20 66:4 67:15
67:18 69:19 71:17
71:19 77:16 90:16
93:23 94:1 130:10
146:8 147:13,20
164:11 166:9,10
167:22 169:13
189:16 227:12,17
283:3 293:2 299:14
299:21,22,23 300:3
300:6,9 353:4,5,9
354:16 413:12
**recommendations**
24:15 26:22 29:9
30:20 227:23
**recommended**
23:16
**record** 8:6 9:2
16:12 63:18 64:2

66:22 78:4,7
160:18,22 202:13
202:16 214:1 217:7
238:4 270:7 280:3
280:7 306:1 325:3
352:9,13 365:2
366:3 394:3 399:7
399:12,16 404:7
408:1 422:18 426:8
426:11
**recorded** 9:4
186:12 215:12,15
217:6 241:10
295:15 312:5
324:21 365:16,17
404:8,15
**recording** 112:11
187:17 190:2,9
**recordings** 368:21
368:23
**records** 15:22
219:19
**recourse** 118:5
**recuse** 170:3
**redact** 264:1
**redacted** 263:18
**reduced** 427:8
**reference** 140:16
147:21 251:20
326:17 353:3
354:21 379:9
**referenced** 18:6
51:21 132:9 225:4
267:5 299:13
355:13 380:22
**references** 23:14
30:17 48:4 357:9
**referencing** 27:19
55:1 146:9 211:1
249:16 274:1 373:5

referred  312:22
  313:5
referring  346:21
  346:22
refre  220:17
regard  180:1,12,16
  325:7 401:14
regarding  4:10
  326:9 371:2 374:12
regards  374:23
register  23:4 270:5
  420:14 424:19
registered  268:23
registrar  16:8
  245:22 268:13
  419:14 420:10
  421:13 422:4,23
  423:16 424:2
registration  13:9
  13:18 15:20 16:22
  19:8,12,13,15
  42:14 130:19
  268:21 280:23
  302:3 419:18,19,21
  419:22,23 420:12
  420:13,17,18,20,21
  420:22 421:16,19
  421:21 422:11
  424:9,12
regular  281:2
  298:11
regularly  121:4
regulatory  370:22
reinstate  273:1,6
reiterate  343:11
  353:1
reject  24:14 252:12
rejected  214:16
  318:21 319:4,15,23
  321:14

rejecting  252:7
relate  174:12 237:2
  238:21 401:11
related  133:6 162:2
  171:12 203:7
  209:12 239:23
  241:14 256:17,18
  256:20 258:18
  260:9,18 263:15
  267:7 279:10 311:5
  334:11 348:17
  368:19 388:17
  392:3 393:16 414:3
  427:14
relates  138:10
  144:13,15 232:1
  240:10 355:7
  397:11
relation  354:11
  398:6
relationship  38:6
relevance  93:17
relevant  196:19
  207:20 234:21
  239:16 241:16
  368:20
reliable  148:10
relied  218:17
relieved  86:11
rely  148:10 213:8
remember  18:19
  41:7,8,14 42:3
  43:18 45:2 46:5
  80:11,15,16,21,22
  84:16,17 99:11,12
  109:3 133:8 143:7
  149:17 174:8,16
  175:3,7 177:2,5,7
  223:22 247:19
  254:16,17,19
  260:16,20,23 261:8

262:10,13 264:12
  264:17 272:12
  273:8,10 279:4
  307:6 332:10
  333:10 340:15,16
  343:12 351:18
  368:10,17,18 369:6
  388:7
remembering
  261:20,22
reminds  318:20
remove  28:15
  52:13
removed  73:12
  74:9 139:6 147:9
  169:19
removing  25:3
repeat  137:19
  175:2 299:11
  345:23
repeated  176:18
repeating  115:6,8
  232:3 324:10
repeats  317:3
replaced  408:5
replacement
  237:23 238:6,11
  239:6,15,22
replied  95:19
reply  78:20 95:16
report  48:5 58:7,23
  58:23 59:3,3,19
  60:8 61:3,4,8,8
  114:19 211:11
  215:8,13,15 223:13
  247:20 254:20
  256:15 276:4 317:4
  327:2
reported  1:20
  106:3 254:4,9,14
  257:3 355:5 404:17

reporter  1:22 8:9
  9:13 10:1,2,6,13,18
  10:20 83:12,16
  426:6 427:4,20
reporting  1:22 9:12
  9:14 86:17 193:3
  256:21
reports  211:10,11
  211:12 213:23
  214:7,7
represent  9:16
  336:16
representation
  323:5
representative
  77:15
represented  334:7
  390:17
representing  337:6
  410:14
request  242:5
  266:15 370:20
requested  127:9
  166:10 266:14
requesting  128:5
require  121:21
  129:7 420:16
  421:15
required  22:17,18
  384:2
requirement
  133:23,23 420:15
requirements
  224:13
requires  138:8
res  193:6
research  7:4 26:3
  52:11 54:21 55:8
  56:9,12 59:4 60:11
  62:23 64:7 68:14
  69:14,22 100:22

102:18,23 109:8
115:16 120:4 121:5
127:12 133:19,22
134:1,9 136:19
161:13 192:22
193:6 204:11
207:15,19 209:14
209:17,19 211:13
214:19 242:16
244:4 245:13,15
246:21 249:10,23
250:5 284:14
317:20,23 318:9,13
355:8 356:9 368:19
393:13
**reserved** 8:16
**residence** 278:7
279:17 332:6
**resident** 279:16
**resolution** 113:8
**resolved** 103:19
181:6
**respect** 202:8
**respective** 8:5
**respond** 83:10 98:1
184:8 263:10
**responded** 176:14
178:18 265:2,4,7
**responding** 344:4
**response** 48:16
61:14 175:16 222:5
265:7 363:3
**responsibilities**
248:5
**responsibility**
49:11 63:4 81:1
236:10 237:3,10,11
335:6 374:14
401:12
**responsible** 79:23
354:23 357:5,19

359:2,8,9,17,19
360:6 379:11
389:22
**responsiveness**
8:15
**rest** 68:23 76:3
192:23 337:16
356:18 374:7
425:13
**result** 36:20 64:21
65:7 66:15 121:6
125:18 201:15
211:13 226:12
230:6 235:17
236:12 355:4 385:2
**results** 19:11
201:17 212:2,6
214:12 318:10
**retired** 158:9
**retirement** 65:17
**return** 303:15,16
**review** 133:17
134:3 162:4 261:21
268:20 371:5 385:2
414:16,22 415:1,3
415:3,5
**reviewed** 40:15
131:13 161:15
384:18 412:23
414:18,19
**reviewing** 72:14
413:9
**reviews** 13:2,4 21:1
49:1 58:6 72:15
120:21 131:16
132:4 133:10
142:12 146:19
161:5 172:23
206:16 223:3,4
246:11 249:19
258:11 268:8 276:1

280:12 297:23
315:9 316:16 326:1
338:18 341:10
355:20 367:8
371:17 382:6,19
386:15 393:3 407:6
408:15 410:10
414:14
**reward** 393:10
**right** 10:3 17:7,10
25:8 32:10 33:3
50:15 51:16 52:4
55:23 81:5 92:17
93:14 97:14,14,15
106:19 109:5,11
114:21 115:1
125:16,22 127:5,23
128:7 130:11,17
131:23 132:16
136:9 138:13
141:16 142:4
143:16 145:13
154:15 163:17
164:4,8,12 169:17
178:7,10 184:13
188:14 194:8
203:14 205:18
212:9 218:11 222:6
231:23 236:12
249:4,21 250:3,6
251:22 252:10
271:12 272:11,20
273:17 275:18
281:12 285:1
289:16 306:11,19
314:2 324:12 335:1
335:22 344:5
347:16 350:8,14
356:20 360:16
361:11,13,19,21
373:23 383:17

385:20 386:2
404:20 409:9,19
411:5 412:3 415:13
415:22 425:5
**rigor** 138:18
**rings** 338:23
**risk** 371:6 374:11
**riverside** 2:4
**road** 192:2 294:22
**robe** 88:2
**robert** 78:19,23
79:5 96:12 99:9
**role** 51:19 150:3
216:6 218:19,20
221:3 222:1 295:1
295:3
**room** 1:13 76:4
152:23
**rose** 2:8
**rotate** 366:12,16
**roughly** 242:13
**rubric** 74:5
**rude** 187:4
**rule** 52:22 232:11
331:22
**rules** 8:10 24:8
**run** 298:10

**s**

**s** 2:1 4:1 62:8 90:7
129:10 144:7
229:10 287:18
335:4 398:1 421:6
425:1
**sa** 84:7 152:21
**sample** 339:23
340:1,2
**san** 158:4
**sand** 389:10 390:1
398:14
**sanjoy** 70:10 158:4
236:23 321:16

sar 158:4
sarker 70:10 158:4
  236:23 321:16
satisfactory 56:3
  74:12
satisfied 122:10
  157:12
satisfy 196:4 202:3
saw 43:3 77:9
  81:20,21 209:18
  247:20 261:8,11
  373:7 395:15
saying 38:17,18
  62:9 63:22 66:19
  69:7,12,12 74:6,8
  84:2 96:8 102:4,8
  154:4 167:6 171:15
  188:21 227:18
  234:22 250:4,7
  262:3 264:13
  274:17 278:11
  283:9 299:13
  304:21 307:22
  343:7,13 344:5
  349:2 370:4 377:13
  379:4 389:20 408:4
says 18:14 20:13
  22:2 23:12 24:15
  25:14,21 30:15
  31:13 35:7 36:18
  38:20 53:19 56:2
  62:14 122:6 123:23
  133:18 165:8 209:5
  214:18 215:1
  216:16 222:13
  225:3,16 272:15
  283:2,7 299:21
  300:5,8 310:20
  335:13 346:15
  369:4 377:1 378:10
  393:9 425:12

schedule 116:11
  117:3 118:16
  279:16
scheduled 117:12
  119:15 127:14
  345:1,1,2 346:4
  347:21 348:6
scheduling 238:21
school 11:12 13:8
  13:16,16,20 14:9
  14:10,18,21,23
  15:7 17:17,20,21
  17:22 18:11,17,21
  19:7,9,12,21 36:21
  38:8 40:9,13 43:11
  44:11 47:6,10
  70:23 119:17
  159:15 197:6 224:4
  224:22 280:22
  284:17 308:18
  424:22
science 71:3,4 79:1
  94:4 151:8 178:7
  179:7 182:13
  186:11 214:8,10,14
  230:19 236:21
  400:20 404:1
sciences 70:18,18
  178:10
scientific 79:20
scientist 229:22
  231:13 233:9
scope 238:7 247:19
  248:5 289:4
score 224:9
screens 423:21
scrutiny 49:21
scythe 88:3
se 2:3 139:15
seal 427:16

search 285:13
  397:3
second 12:17 28:9
  28:12,16 30:1 68:7
  79:7 100:5 122:20
  123:2,3,5 150:3
  190:1 200:6 210:10
  220:21 232:6
  282:14 319:19,19
  327:1 356:4 419:11
seconds 365:4
section 115:20
  133:6
see 12:21 15:5 17:3
  19:17 20:19 30:10
  30:20 37:17 46:7
  46:15 48:8,14,21
  51:7,15 53:3 55:16
  61:1 62:7 80:3 81:3
  84:21 85:1 87:10
  87:11 91:15 103:19
  122:6,7 124:18
  132:21 139:16
  156:16 157:6 161:4
  167:2 172:19 174:1
  175:9 176:5 196:12
  201:11,20 204:9
  206:11 207:19
  208:22 218:20
  222:2,19 225:1
  226:20 228:21
  229:3 234:19
  248:13,15 249:17
  255:18 263:18
  268:18 272:4 295:3
  299:2,2,18 313:10
  316:12 333:3
  336:13 350:1 355:1
  357:7,12,21 371:13
  377:14 379:12
  388:17 390:17

  392:22 393:4 395:1
  400:4 407:3 410:12
  411:1,14 413:5
  419:17 421:18
  422:20 423:6
  424:11
seeing 38:14 67:12
  164:21 165:2
  197:12 353:13
  354:1 355:14
seeking 266:3
  267:11 273:1
seen 20:9,11 23:23
  60:8 61:8 80:8
  123:1 139:11 143:4
  157:1 164:22 177:8
  210:22 271:16
  315:17 387:4,5,9
  393:2 403:16 409:6
  412:10
sees 55:17 156:14
  326:22
seldom 55:12,19
  156:8,11
selec 239:22
selected 407:13
selecting 239:14
  241:6 407:17
selection 239:23
self 204:3
semester 15:20
  23:1,4 27:5,7 28:18
  33:19 171:11,14
  244:5 306:4,7
  312:16 314:1
  424:20
send 14:23,23 15:7
  15:18 16:5,14,16
  16:23 41:5 43:15
  43:16 128:14,20
  130:20 163:20,22

[send - situation]                                                                Page 469

| | | | |
|---|---|---|---|
| 165:21 205:2 216:1 | 302:3 304:9 312:9 | 321:9 349:12 | 216:22,22 221:2 |
| 217:6 221:9 223:7 | 315:20 317:7 | **sets** 318:23 | 252:18 267:8 |
| 229:19 248:18 | 323:14 326:6 | **setting** 94:9,11 | 322:10,11 |
| 257:11 269:1,2,5 | 338:20 340:22 | **seven** 73:18 74:14 | **sides** 185:15,16,18 |
| 269:21 270:1,8,15 | 341:13 343:16 | 134:4 | 192:10 |
| 270:18 271:1 272:1 | 355:9 367:5 368:4 | **seventh** 207:13 | **sign** 56:6,15 68:20 |
| 272:5 277:5,13 | 369:19 370:13 | **severe** 28:9,17 29:3 | 91:16 158:1,3 |
| 278:11 279:9 281:9 | 373:1 380:17,21 | **sevis** 235:16 272:23 | 213:21 356:16 |
| 294:6 319:14 | 403:17,22 404:11 | 273:4 306:1 | **signature** 79:17 |
| 327:16,17 338:4,7 | 418:6 422:13 | **shadow** 79:21 89:5 | 427:16,20 |
| 352:17 405:6 418:2 | **sentence** 23:8,9 | **shakes** 295:19,21 | **signatures** 219:17 |
| 421:6 | 25:18,22 30:21 | **shape** 111:10 | **signed** 56:7 68:10 |
| **sending** 96:17 | 82:3 95:14,17,18 | 239:16 241:15 | 70:22 71:10 79:22 |
| 131:1 149:21 | 102:2 144:21 193:1 | **share** 327:6 331:8 | 148:19 157:23 |
| 186:13 190:2,8 | 283:6 314:5 316:3 | **shared** 156:9 354:9 | 164:10 218:14 |
| 208:6,14 215:18 | 348:18 354:4 357:8 | 354:14 372:13 | 232:13 356:6 357:4 |
| 269:13 297:3 310:7 | 357:14 358:12 | **shop** 329:13 | 357:10,18 359:1 |
| 327:19 354:1 370:1 | 422:9,21 423:15 | **short** 42:8 194:13 | 360:5 |
| 379:16 | 424:2,13 425:12 | 259:9 288:21 | **significant** 271:3 |
| **sends** 13:17 | **sentences** 95:10 | **show** 15:22 120:15 | **signing** 8:12 149:7 |
| **senior** 315:23 | **separate** 15:18 | 150:23 190:11 | **similar** 74:4 |
| **sense** 169:5 243:2 | 16:5 30:19 73:2 | 212:12 358:15 | **simple** 73:13 102:5 |
| **sent** 15:13 17:17 | 237:13 292:3,8 | 381:1 414:5 | 163:16 318:11 |
| 34:2,22 35:22 | 319:16 320:1 321:9 | **showed** 61:13 | **simpler** 28:14 |
| 36:14 42:5,19 | 321:18 333:12 | 71:13,18 211:4,5 | **simply** 90:10 |
| 114:14 130:4 141:1 | 334:12 381:16 | 212:1,6 | **single** 30:18 72:15 |
| 142:19 145:18 | **september** 260:12 | **showing** 210:1 | 231:20 |
| 149:9,10 158:20 | 261:16 | 212:21 317:9 383:4 | **sir** 404:10 |
| 163:6 173:2 187:16 | **series** 222:11,19 | **shows** 52:11 59:13 | **sit** 74:23 152:13 |
| 190:21 209:22 | **serious** 81:23 143:1 | 59:19 62:2 90:1 | 200:1 201:10 |
| 214:13 219:15,23 | 144:10,14,16,19,20 | 94:12 151:1 213:22 | **sitting** 107:23 |
| 220:21 223:6 234:1 | 145:12 146:3,10 | 218:13 219:16,16 | 202:4 386:1 |
| 235:6 246:13 | 148:17 157:20 | 219:18 337:15 | **situation** 45:18,20 |
| 258:19 259:5 | 162:22 163:21 | 347:20 348:11 | 60:11 63:13 94:22 |
| 260:17 261:10 | 164:6 251:14 | 421:14,16 425:6 | 102:3,5 106:4 |
| 263:15,16 268:12 | **seriously** 81:19 | **shutting** 406:18 | 109:10 128:11 |
| 271:11 274:13,15 | 84:2 173:16 186:2 | **si** 245:14 | 138:2,4 173:12 |
| 275:16 277:14 | **seriousness** 342:16 | **sic** 348:6 408:7 | 174:16 175:3 180:3 |
| 280:14 281:1 | **services** 342:3 | 415:10 421:22 | 181:5 185:14 |
| 293:19 295:16 | **set** 8:8 103:23 | **side** 30:20 64:16 | 187:10 194:9 |
| 296:13,20 298:3,4 | 254:2 318:13 319:2 | 87:5 185:13 190:19 | 226:22 235:2,5 |

[situation - status]                                                Page 470

257:6 282:1 283:13
283:16,20 284:20
330:23 337:16
339:8 340:7 342:16
345:18 346:11
350:23 372:16
373:6 375:2 393:16
401:3 404:18
**situational** 342:8
344:19 346:16
**situations** 96:23
102:15 168:1 175:8
181:1 321:4
**six** 74:15 157:22
205:9 244:5 245:14
245:17 274:8
**sixth** 73:13 134:3
170:20 180:5
182:12 229:21
**skill** 427:9
**skills** 79:12
**skip** 98:17 256:1
**skipping** 98:17
**slowing** 240:12
**small** 81:3 87:20
410:3 411:2
**smaller** 67:8
**soft** 299:15
**softer** 283:8
**solemnly** 10:7
**soliloquy** 258:6
287:11 333:1 362:1
**solve** 323:23
375:15 376:11
378:1
**solved** 377:22
**somebody** 44:15
94:17 152:6 244:3
394:1
**someone's** 188:13

**somewhat** 139:2
312:13 313:6,7,21
**soon** 299:20 348:18
**sorry** 39:14 83:15
268:6 339:1 366:10
385:18 386:3
392:23
**sought** 8:18 61:11
**sound** 110:1 121:18
121:19 332:20
**sounded** 362:9
**sounds** 109:19
**source** 176:20
**span** 148:12
**speak** 40:8,11
49:17 128:10
129:17 135:8 138:1
152:17 185:18
290:4
**speaking** 40:12
218:18 251:21
**speaks** 39:20
**special** 12:4 92:12
93:4 134:14 388:21
**specialists** 74:7
**specialization** 73:5
**specialized** 56:14
**specialty** 70:17
**specific** 77:7,22
124:15 125:4
129:20 142:2 145:4
150:23 154:12
155:3,21 159:13
242:10,10,16
246:18 254:2
301:17 341:4
391:13,14,18
393:14,16
**specifically** 8:12
98:16 138:10
354:21 379:9

**speculate** 112:15
135:11,13 141:9
143:15
**speculated** 415:10
**speculating** 286:6
**speculation** 168:20
406:10
**speed** 127:3
**spelled** 159:20
**spend** 79:18
**spent** 197:17
**split** 29:7
**spoke** 234:3 274:11
342:5 344:16
**spoken** 274:12
**spot** 166:5
**spring** 92:14 93:8
420:4
**staff** 223:8,11
224:23
**stage** 124:2
**stance** 327:5
**standard** 10:15
121:20 141:3,5
225:15 371:1
**standing** 26:9
33:22 35:2 55:2
133:7 171:22 172:4
188:18 419:20,20
420:19,19
**start** 11:3 45:7
96:15,16 104:20
105:16 142:13
146:22 148:22
231:8,10 233:9,13
306:3 352:15 365:3
375:10 383:21
405:9 406:17
**started** 42:22 64:21
99:7 115:15 127:20
128:1,4 147:16

266:18 296:16
373:21 374:3
407:18
**starting** 105:3
294:11
**state** 9:16 151:11
214:1 427:2,5,12
427:22
**stated** 52:15 374:13
427:7
**statement** 69:2
76:22 80:6 157:15
169:10 172:10
178:5,13,22,23
179:1 279:7 282:22
287:9,13,22 327:12
333:3,6,8 336:18
347:1 354:22
360:20,23 361:4,5
361:7,11,19 362:14
362:21 363:2,2,4
363:13,18 365:9
379:10 380:2
393:12 395:20,23
399:7,9,12,21,22
400:3 413:21 419:5
425:21
**statements** 97:8
175:5 362:6 363:12
363:20 399:18
**states** 1:1
**stating** 52:17
**status** 21:23 22:23
24:18 27:9 28:22
29:1 30:12,14
35:21 45:4,15
46:10,14 48:2
67:17 78:22 163:12
225:13,15 226:4
236:4 249:11 298:9
300:22 305:14

307:21 309:22
342:7,22 343:8
344:17 374:18,18
376:18 378:10
381:9 383:23 388:9
412:23 413:10
419:16,21 420:13
420:15,21
**stay**  229:8 234:4,6
234:16 235:3
**stayed**  383:11
**staying**  230:10
235:13
**steal**  100:1,15
101:12 151:12
**stealing**  101:14
**step**  74:9 99:8,8,15
99:15 100:3,5,6,17
101:2 104:5,5,22
111:18,18,21
124:13 139:6 170:2
185:2 186:8,8
195:9 294:14
298:13 301:14
302:12
**stepped**  237:19,21
257:13
**stepping**  237:15,15
**steps**  113:12,15,16
128:7 130:22
203:17 342:20
350:21
**stick**  310:19
**stickers**  382:14
**stip**  10:15
**stipulated**  8:3
**stipulation**  3:7 8:1
**stipulations**  10:16
**stop**  154:13 215:19
320:16 363:22
402:22

**stopped**  65:2,5
112:23 296:18
**stopping**  32:15
360:20
**stops**  113:6,7 335:1
**story**  64:17 94:18
115:13 247:5
**strain**  210:10,11
318:21 319:8,9
**stranger**  69:8
**strict**  311:1
**string**  409:4
**structure**  111:12
140:1
**student**  13:15,21
14:1,16 15:6 16:20
16:20 17:1,19
18:12,13,21 19:3,7
19:9,18 24:19
25:23 26:7,11 27:4
28:6,17 29:1 44:17
46:9 50:4 52:13
55:11,15,17,21,23
57:7 64:13 73:17
74:13,16 75:2,4,9
90:2,4,19 95:6 96:6
97:12,21 105:12
113:7 116:22 117:3
119:1,8,17 120:21
121:3,17 122:1,1,5
124:9,11 130:18,20
130:21 134:19
139:4 140:5 144:13
145:4 150:4 151:2
153:16 156:10,14
169:21 174:14,23
175:10,13 176:23
177:2,18,23 178:3
181:8,23 182:12,18
182:21 183:5,8,9
183:13 184:6,22

185:4,6,10,11
192:9 193:9 194:2
194:6 195:9,14
197:1 200:3,15,15
200:23 201:4,6,9
201:15 202:2 203:2
203:13 205:17
208:1 214:3 216:1
224:18,20,21 225:3
225:6,13 226:19
227:1 230:4 233:20
243:5,7 245:11,14
249:11 250:20,23
251:16 260:2
272:18 273:2,13
276:11 285:15
290:16,21 291:2,6
291:19 298:9 300:1
300:22 305:13
307:21 309:22
320:9,9,12 331:20
346:12 375:5,8,10
375:19 388:9 397:7
397:20 407:18
412:23 418:2,8
419:21 420:1,20,23
**student's**  13:18
14:13 16:12,22
19:8 26:1 72:14
139:2 142:7 156:9
177:19 180:11
195:7 242:20
**students**  13:10 15:1
55:7 65:9 66:16
68:4,20 72:15,20
73:8 74:5,20 97:16
104:1 137:23
138:16,23 139:7
145:6,7,10 174:21
180:21 181:2,9
182:2,4,8,9 213:7

224:3 225:22 227:3
243:1 320:23 343:4
356:15 400:19
**studied**  150:21
**studies**  50:17
225:18 227:10
229:11,13 305:14
318:11
**study**  61:5 132:20
146:17,18 167:6
201:11
**stuff**  71:8 383:12
**subarea**  73:4 74:7
**subhadra**  70:6
**subject**  27:11,13,21
31:18 74:22 90:23
345:22 367:7,10,15
367:18,22 368:1
383:19
**subjective**  73:10
**submit**  116:23
118:17 162:1,10
164:1 319:17
329:20,22,23
**submits**  118:21
225:6
**submitted**  161:12
162:16 163:2
319:20,22
**succeed**  233:12
**successful**  75:9
115:17 151:10,13
231:1,7,9 234:10
234:14,15
**sue**  331:10,16
**sufficient**  74:13
118:1 123:12
130:16 196:3
403:21,22
**sufficiently**  169:1
169:19

suggest  417:2
suggestion  321:14
suggestive  411:9
  417:1,4
summation  82:22
supervision  427:9
supervisor  249:21
support  21:23
  22:23 23:2 24:18
  24:23 25:3 26:12
  27:8 28:7,16,22,23
  30:12,14 33:19
  34:1 35:21 48:2
  67:16 78:22 82:1
  161:16,22 162:3
  187:10,11 282:19
  286:17 300:2
supported  249:22
  250:5
supporting  64:22
suppose  54:7 153:5
  156:3 167:21
  216:18 322:8
supposed  25:1
suppositions
  167:18
sure  41:2 51:22
  70:20 90:7,11
  103:23 105:19,20
  130:11,23 132:13
  132:18 160:6
  209:10 216:5
  224:11 246:3
  247:17 248:4
  253:21 269:9
  270:19 274:13
  275:3 281:23
  283:21 298:13,15
  302:1,12,13 342:14
  357:12 373:4,7
  380:9 399:15

surface  285:17
surprised  344:6
  345:15
susan  1:11 3:9 4:7
  4:22 5:3,7,12,16,20
  5:22 6:11,13,18,22
  7:13 9:5 10:21 11:6
  12:21 20:19 42:1
  174:18 206:11
  339:16 367:5
  370:14 383:3,21
  384:2 410:2
suspended  36:21
  293:8
suspends  13:18
  16:21
suspension  19:11
  130:5 418:9
suzanne  1:21 8:8
  9:13 427:4
suzuki  251:21
  252:20
swear  10:1,4,7
sworn  10:22
syllabus  242:10
system  2:8
systems  318:8

**t**

t  4:1
table  3:1,5 74:19
  183:3
take  24:13 76:2
  78:1 81:3,18 83:23
  85:21 96:3 111:11
  116:4 120:20 152:7
  158:12 159:23
  160:15 188:19
  202:9 205:3 225:19
  251:14 276:18
  287:3 289:9 306:8
  309:3 318:16 348:8

349:22 351:15
352:5,6 368:8
373:8 391:20
392:20 395:2,8,12
395:14,16 401:13
402:19 405:1
418:20 419:10
420:6
taken  1:12 8:7 78:5
  96:9 160:19 171:12
  173:16,17 182:6
  202:14 237:22
  246:19 278:18
  280:4 302:11
  308:14 352:10
  424:5 427:7
talk  48:21 72:18
  81:13 82:16,17
  94:17 100:8 106:6
  106:17 124:21
  125:3 129:7,15
  153:2 154:11 200:3
  238:8 267:6,15
  317:1,23 342:23
  343:2 364:15
  396:19
talked  82:16 86:19
  106:5 108:11 115:2
  129:16 136:13
  149:14 160:12
  177:6,9 187:16
  198:3 218:7 254:13
  302:8 321:8 340:18
  345:8 387:17 402:4
  408:16
talking  27:8,23
  28:21,23 38:3
  83:13 84:7,12
  90:22 93:10 107:6
  107:7 124:15,16
  126:18,19 129:4

137:20 152:21
177:7 190:11
192:12 200:7,8
202:5 251:17
256:19 283:23
291:6 297:4 298:18
309:18 311:7,9,15
314:17 317:12
318:6 321:2 333:15
334:9 342:11,13
343:19 353:18
362:20 363:7,22
364:1,5,6,7,11
365:3 366:18,20
375:22 376:1 377:6
377:12 394:13
396:7,9 398:9
401:22 402:3,13,16
404:5 405:10,11
422:14 425:2
tapes  191:23 192:6
taylor  259:12
team  339:6 340:10
technology  71:5
tell  40:3,7 49:3,5
  54:18 72:2,8 74:21
  75:3 81:12 87:23
  90:13 94:18 95:16
  98:6 104:3 108:15
  108:21 115:13
  120:5 125:5 126:8
  126:23 128:23
  140:9 146:17
  149:15 155:14
  162:13 199:4
  208:17 213:1,13
  215:21 220:9
  221:19 225:10
  234:7 239:20
  240:10 241:23
  246:18 247:1,2

**[tell - think]**

| | | | |
|---|---|---|---|
| 254:14 258:16 | 305:23 306:12 | **testimony** 10:8 | **think** 16:1 22:12 |
| 259:18 270:14 | 351:9 | 12:1 16:7 34:7,8 | 24:7 29:6,22 36:13 |
| 276:7 292:7,21 | **ten** 21:7 183:22,22 | 35:7,11 36:7,17 | 38:1,12 42:19 |
| 295:12 301:9 304:9 | 184:7 185:23 205:7 | 38:19 364:9 365:11 | 45:12 54:17 59:12 |
| 315:13 323:3 327:4 | 205:8 206:4 352:4 | 368:14 427:6 | 76:19 79:22 81:17 |
| 342:12 347:2 350:5 | 368:6 | **tha** 73:21 172:2 | 86:15 89:8 94:16 |
| 367:6 382:22 390:9 | **tenders** 20:21 | **thank** 10:13,20 | 100:18 106:2 108:2 |
| 390:13 407:9 | 161:6 172:20 | 12:3 16:3 18:2 | 109:4 112:12 119:3 |
| **telling** 16:4 40:5 | 206:13 268:7 | 20:23 84:13 120:19 | 131:20 143:6 147:4 |
| 43:8 44:10 47:6 | 316:14 371:15 | 172:22 192:16 | 147:23 149:20 |
| 51:8 52:3,5 53:13 | 393:1 407:4 408:13 | 199:5 206:15 285:3 | 155:6,8,15 163:9 |
| 59:16 63:20 83:20 | 414:12 | 326:18 327:11 | 170:1 174:6 178:6 |
| 89:2 94:20 99:14 | **term** 38:5 132:6 | 372:19 | 178:19 179:22 |
| 99:17 102:5 109:5 | 316:23 317:3,18,23 | **thanks** 16:2 234:6 | 182:11,21 183:2,21 |
| 109:7 126:4 134:7 | **terminate** 235:12 | 339:16 383:2 | 184:13 185:14 |
| 141:11 148:21 | 236:11,16 298:9 | **theft** 100:19 103:8 | 186:20 196:13 |
| 152:22 153:5,8 | 300:22 305:23 | 103:16 253:16 | 200:19 213:7 216:6 |
| 154:22 155:7 162:7 | 307:7 | 254:4,6,15,21 | 216:10 218:4 |
| 187:6,14 188:3 | **terminated** 65:10 | 256:6,8,13 257:3 | 228:14 230:16 |
| 197:23 198:12 | 65:11,16 158:5 | 303:19 | 233:9 245:21 |
| 199:19 208:4 | 235:10 236:8 | **theoretical** 318:11 | 259:20 275:19 |
| 210:15 212:15 | 257:14 275:12 | **theory** 318:16 | 286:2 287:21 |
| 215:21 217:11 | 301:15 302:4,6,20 | **thereof** 8:17 | 288:10,13,21,22 |
| 219:4,8 220:13 | 303:14 307:21 | **thi** 261:5 275:7 | 290:15 311:20,22 |
| 231:12 241:13 | 309:23 400:7,21 | 407:7 | 312:4 317:4,15 |
| 252:5 263:12 264:7 | 401:20 402:6,8,12 | **thing** 11:22 28:15 | 320:3 321:21 |
| 273:12 277:12 | 405:22 | 59:2 86:14 115:6,9 | 326:13,21 327:19 |
| 278:10 279:8 | **terminating** 24:22 | 169:18 170:2 192:3 | 328:4,6,22 330:3 |
| 281:19 285:20 | 235:16 236:3 301:1 | 319:10 353:23 | 334:14 335:5 337:8 |
| 296:17 297:5 | 311:6 | 358:18 380:10 | 342:12 347:1 350:2 |
| 303:14 304:19 | **termination** 236:13 | 418:10 425:11 | 350:8,13 357:17,23 |
| 307:18,20 308:10 | 275:13 301:19 | **things** 68:19 79:19 | 358:1,3 359:1 |
| 310:13 322:5 | 302:14 401:23 | 85:15,16,18 86:4 | 360:5 361:7 364:19 |
| 331:20 339:19 | 402:14 | 102:16 126:11,13 | 366:7,11 370:8 |
| 360:4,9,9 371:22 | **terms** 93:16 204:4 | 129:5,8 164:21 | 377:15,18 378:2 |
| 375:1 377:21 381:6 | **test** 145:23 | 165:2 188:3 216:22 | 382:6 390:4,12,14 |
| 390:4 393:21 | **testified** 10:23 36:7 | 231:3,4 292:3,8,11 | 390:21 391:5,13,15 |
| 394:11 404:19 | 61:15 | 334:12 347:6,7 | 391:23 392:17,19 |
| 418:14 | **testifying** 34:3 | 356:15 358:2 | 393:11 394:10,12 |
| **tells** 20:7 22:23 | **testimon** 38:15 | 388:19 390:19 | 395:15 396:20 |
| 37:20 44:16 263:5 | | | 397:10,21 398:16 |

401:2,5,13,16
411:6 414:2,3,7
415:2,5 426:1,5
**thinker** 358:8
**thinking** 24:4,4
83:5,18 115:23
123:13 184:5 231:5
232:9,16 254:20
290:12 293:21
299:8 348:1 359:3
388:11,13 402:10
**thinks** 55:23
153:16 234:3
317:21
**third** 79:8 80:22
283:14
**tho** 244:10
**thorough** 188:4
294:10 371:5
**thoroughly** 186:3
188:9
**thought** 27:18
88:10 137:18
225:18 244:10
274:5 276:21
345:11 389:15
402:1
**thoughtful** 184:21
**thread** 5:14 6:9,16
7:6
**threat** 85:2,7,7
86:2,9,10 87:9
173:8,13,16 328:2
329:11 331:9,11,18
331:23 332:5,9
333:16,21 334:7,10
334:16,23 335:10
335:16,18 336:16
336:17 337:5,18,21
338:12 345:17
353:12,21 355:14

356:1 358:9,10,13
359:22 362:2
370:19 371:3,22
372:1,5,13,17,22
372:23 373:17
379:21 380:6,8
381:1,4 413:19
**threaten** 331:10,12
389:18,19 412:12
**threatened** 354:19
356:2 373:2 379:7
**threatening** 88:21
89:3,6 143:22
175:6 356:21,23
357:23 358:4 361:8
372:14 389:23
390:3,13,14,21
**threats** 176:7 327:6
331:8 339:14
**three** 42:20 65:8,15
66:16,17 131:6
163:8 164:1 171:2
181:17,21,23 183:7
184:5,20,20 185:9
230:5 231:19,20
274:9,21 297:15
309:14 318:16
343:19 349:11
354:6 357:15,15
400:7,15 402:7
**throwing** 317:14
**thunder** 41:1
**ticket** 420:14
**tied** 305:14
**till** 122:1 309:2
**time** 8:7,16 16:13
17:22 18:15 20:2
24:9 34:4 36:9 42:8
42:23 46:15 56:23
62:18 65:18 67:19
73:18 75:5 79:19

83:13 84:19 88:10
92:17 93:9,14
97:16 117:4 119:19
120:20 121:9
127:23 128:2 134:4
140:5 141:1 148:12
148:16 152:7
161:20 165:3,23
166:1,17 184:8
187:6,15 188:13
197:18 201:9
203:15,22,23 208:6
220:9,11 221:13
230:14 233:22
240:6 247:15,22
248:3 249:13 251:1
251:5 252:17
265:10,23 266:1,2
266:12,19,21
277:17 281:12
282:10 283:18
285:9,11,16 303:12
303:15 304:18
306:17,21 319:19
327:5 351:21,22
360:22 361:23
363:19,20 364:4
369:3 373:10 374:3
389:17 404:17
406:17 409:6,11
410:17 420:13,14
421:1,2 426:6,7
427:7
**timely** 133:18,23
134:5,8 136:3,8,17
137:8 151:2 154:6
157:15 159:5
170:21 200:8 232:7
376:21
**times** 131:6 160:14
191:17,18 214:17

311:13 312:1,3
315:1 318:22 324:9
362:21
**title** 3:3 21:8,22
30:11,13 48:2
**tobias** 2:7
**toby** 9:17
**today** 131:7 188:2
196:12 239:17
240:1 241:3,17
277:20 280:21
339:6 350:13
354:13 366:7,10
369:4 408:17
414:20
**toefl** 224:9
**told** 17:8 46:2,22
66:21 71:14 82:4
82:18 86:8,9,20
94:13 102:12
104:15 105:5 106:8
108:23 111:23
115:20 126:8 127:8
135:8 139:20
143:21 151:1,3
157:17 164:5
169:11 175:17
179:16 183:7 186:5
186:6 194:10
204:20 217:22
219:9 277:4 293:4
319:12,22 324:9
354:18 368:16
373:12 379:6 426:6
**tomorrow** 17:16
**ton** 362:8
**tone** 334:8 339:23
354:20 379:8
**top** 102:13 383:11
384:22 386:23

**topic** 240:17
**topics** 210:4 318:9
367:15 368:8
**totally** 65:12 69:8
319:10 381:16
**townsley** 353:11,19
354:18 379:5
**traditional** 205:8,9
205:20
**train** 276:21
**transcript** 4:13
33:3 34:20 35:14
35:15 36:11 37:12
224:8 228:22
244:13 365:18
427:6
**transcription** 427:8
**transistor** 71:6
**treated** 73:9 104:1
139:7 182:7,22
184:23 186:1,2
288:14,22 290:10
**tricky** 102:15
308:12
**tried** 151:12 335:9
364:21,23
**trigger** 89:20
**triggered** 275:13
**true** 47:14,14 59:5
88:5 115:11 139:8
156:14 216:12,15
219:10,11,21
320:20 321:5
330:11 387:6 427:6
**trust** 51:17 53:22
54:1,8 55:9 62:22
112:2 123:7 137:14
221:6,7,11 222:6
335:3,15
**trusted** 53:15
221:11 348:7

**trustees** 1:6 9:6
**trusting** 54:6
**truth** 10:9,10,10
53:13 248:10 321:7
337:9,10,15
**truthfully** 427:11
**try** 75:14,15,15
80:17 96:20 150:17
217:20 365:5
366:19 381:21
401:2 416:18
**trying** 64:12 66:15
66:20 83:18 95:5
95:11 99:23 100:15
101:12 107:2
111:14 203:16
204:12 215:19
248:6 249:12 301:8
325:8,15 335:11,17
341:1 363:21
379:19 380:3,7,9
380:11
**tuesday** 9:2 272:5
298:3
**tuitions** 23:6
**turn** 299:22 382:10
**turned** 170:16
**turning** 208:13
**turns** 170:22 171:1
**tuscaloosa** 1:12,14
2:4,9 9:10
**twenty** 409:4
**twice** 36:2,3,7
**two** 11:15,18 19:19
23:9,10 26:20,22
27:2 29:8,17 30:18
30:19 31:2,5,6,9
65:9 83:13 85:16
85:18 86:4 102:16
117:2,4,8 118:18
118:19,22 151:20

152:12 158:5
167:18 174:3
192:20 193:4 198:4
199:9 200:13 201:4
201:9,22 202:5
204:20,22,23 205:1
205:11,23 206:1
210:9 214:16
216:22 230:5
248:19 249:22
268:10 281:14
285:11 286:20
292:3,8 297:15
299:5,9 315:1
318:16,22,22 319:1
319:7,17 320:2
321:9,17,18 326:3
354:17 356:1 358:2
362:5 372:4 379:4
382:21 385:6
386:17,18 392:5
400:18 402:21,22
403:2 405:12
409:10
**typewritten** 427:8

**u**

**u.s.** 230:15 234:5
235:3,13 236:4
**ua** 7:2,5 15:11 24:9
190:13 229:14
259:14 281:1 287:4
287:14,23 312:15
313:22 315:23
330:22 387:4
**ua's** 342:2 370:21
**uapd** 314:6 342:8
344:18,23 345:4
346:3,8,15 348:3,7
348:17,19 349:16
349:18 355:7

**ultimately** 327:8
413:3,4
**um** 23:21 71:7
77:11 85:19 111:17
117:14 147:22
174:6 188:2 205:16
211:8 214:15 229:2
242:3 246:15 254:8
274:1 275:17
277:21 284:9
307:13 326:4
347:13 379:14
382:18 421:10,12
425:3
**umm** 58:14 287:15
291:13 294:15
303:21,23
**un** 45:10 62:3
286:2
**unambiguous**
283:15
**unaware** 60:14
**uncommon** 124:2,7
**unconnected**
388:20
**undergraduate**
17:23 182:18
**underlined** 176:10
192:18 202:22
207:4 208:4 304:12
**understand** 15:17
16:5 17:9 36:17
38:18 46:14 55:4
56:9,11 62:8 66:20
67:2,6 69:3,22 71:1
75:12 100:8 103:3
103:20 107:3
110:14 135:4,23
158:23 171:15
188:9,21 190:23
198:14 211:15,16

228:1 232:15,20
234:13 248:6
249:13 271:6
283:12 291:11
309:19 323:2
331:19 349:2,4
350:23 360:21
378:3 396:1
**understandable**
69:1
**understanding**
143:9,11 152:11
200:22 201:3 229:2
244:17 270:23
304:14 343:10
395:22 396:1
**understands**
282:17 284:20
298:16
**understood** 38:5,6
282:1 283:10,19
286:14 301:7 303:3
**uneffective** 301:18
**unethical** 80:3
83:23 355:2 357:22
379:13
**unfairly** 288:14,23
**unfamiliar** 330:19
**unfavorable** 68:6
**unfortunately**
207:12 208:5
289:19
**unique** 51:1
**unit** 9:4 78:7
160:21 280:6
352:12
**united** 1:1
**universities** 51:5
76:17,23 212:2
**university** 1:7,13
2:8 4:17 9:7,18,20

11:9,17 13:11
37:20 38:17 39:4
51:2 53:20 76:17
77:1,3 114:17
115:22 126:18
129:5,8,16 139:9
141:17 151:12
158:5 173:11 180:9
182:15 193:22
194:8 212:4,8
214:2 225:17 239:1
239:4,12 242:21
276:8 286:3,15
288:19 293:9
309:22 345:11
346:23 351:14
352:22 359:10,11
359:20 390:22,23
395:1,5 401:14
402:18 407:19
410:14 419:13
420:9 421:13 422:3
**university's** 36:15
224:12 289:21
**unjustly** 184:23
**unlawful** 24:8
**unproductive**
195:11
**unquote** 353:14
355:3
**unrelated** 318:23
**unsatisfactory** 57:9
**unsure** 100:18
**untouched** 92:13
93:4
**unusual** 73:2
**update** 272:16
**urgent** 143:1
144:11,14,16
145:11 146:2,10
148:17 157:19

162:22 163:21
164:6
**use** 22:9,13,17,20
82:9 131:22 132:6
148:12 164:23
166:5 174:18
185:10 189:1,4,6
222:9 234:17 250:3
293:6,7 308:12
313:2,2 317:22
324:6,8 343:12
377:4 409:11
**uses** 207:23 316:22
317:1 386:21
**usual** 10:15 14:22
**usually** 92:11 93:1
94:13 116:16
144:14,16 207:17
230:4 316:23
386:21

**v**

**v** 1:5
**vague** 95:10,14,17
95:18 359:14
388:20
**valid** 147:23
148:14 165:11,15
165:16 166:11,15
167:19 168:17
169:14 171:8 182:5
**validatable** 169:14
**validate** 150:17
**validated** 150:18
151:1
**validity** 24:3 74:9
150:15
**valu** 171:7
**valuable** 182:17
**variable** 113:10
**ver** 112:4

**verbal** 41:9 42:2,3
43:20,21 44:2,13
44:14 47:19 214:4
215:10 251:12
**verdict** 112:3,7
**verified** 40:16,18
42:18 43:2,4
**verify** 40:19 55:6
87:3 275:23
**veritext** 1:22
**version** 112:6
370:3 418:6
**versus** 9:6
**vested** 427:12
**vice** 58:6,22 59:17
60:6,15 62:4 63:5
64:6 70:6 151:17
152:7 163:3 171:4
200:1 253:14 257:5
257:13 303:18
327:15 404:2
**video** 1:10 9:4
**videographer** 2:12
9:1,12,23 78:3,6
160:17,20 202:12
202:15 280:2,5
352:8,11 406:19
426:10
**view** 69:3,4 134:11
134:12 156:9
180:11 232:11
234:11 239:19
252:19 275:10
289:15,16,20,21
323:5 324:11
**views** 362:1
**violate** 53:20
**violation** 26:8
**violent** 371:7
**visa** 225:13,21
226:4 235:9,16

236:12,13 275:12
275:14 298:17
302:4 305:14 307:8
309:3,19 311:6,7
311:11,18 342:5,21
**visible** 386:23
**vo2** 210:10
**voice** 112:10
182:16 187:17
190:2,9 217:6,7
219:18 297:5
365:16 368:21,22
369:3 404:15
**voices** 186:12
190:21 215:12,15
**volunteered** 258:4

**w**

**wait** 128:3 240:2
272:1 362:23
363:13 364:6
**waited** 127:23
165:21
**waiting** 166:7
362:22 364:12
417:20
**waived** 8:12
**walker** 5:16 258:23
259:2,21 262:16
427:3
**walking** 91:18
**wall** 391:12
**want** 15:14 41:2
58:16 73:8 79:21
81:15 82:20 126:12
129:1,9,23 131:10
146:16 156:17
172:7,11 182:1
194:22 195:3,15
207:3 212:22,23
225:23 227:22
228:1 229:4,6,7

234:4,6 241:19
267:14 270:1,4,8
275:21 276:6,19,21
281:5 283:5 284:22
286:15 298:10
305:1 310:19
325:13 327:14
331:16 346:13
399:23 405:20
409:21 410:12
415:15,17,17,20
417:5 418:1
**wanted** 132:6
169:12 226:2,7,10
226:21 228:9,9
234:16,19 269:9
271:4,5,8 282:9
283:12,22 305:15
342:13 411:4,14
**wants** 79:13 327:4
417:6
**warned** 39:9
**warning** 251:13
278:23 347:18
349:18,23
**warns** 39:4
**warrant** 278:9
285:13
**waste** 240:6
**wasting** 187:6,15
188:13
**watch** 139:16
358:17
**watching** 401:17
**way** 24:6 49:15
50:1,5 51:1,13,15
53:18 56:3 60:13
74:3 82:18 103:23
105:2 116:18
139:14 140:2 178:1
181:4 183:4 194:20

195:3 204:10 221:3
229:5,7 230:23
232:17,18 234:4
235:3 239:23
247:11 256:3,18
259:9 282:16 283:8
288:1,7 291:11
294:2 298:22 299:1
300:7 301:8,17
302:23 312:23
318:1 322:2 326:23
328:12 329:9
334:20 336:18
339:9 359:3,21
390:16,17 391:10
406:5,6 414:4
417:5
**ways** 49:17 73:9
177:20 219:1
270:21
**we've** 76:2 131:5
136:13 158:10
160:10,11 165:18
197:17 276:17
340:17 352:3
**weapon** 389:13
390:2
**week** 152:10
161:13 201:10,13
201:14,15,17,17
202:6 207:18
211:10,20,22 212:1
234:1,23 235:12,14
236:1,14 238:10
279:21 315:1
379:15
**weekly** 121:8
151:14,18 198:1
211:10
**weeks** 117:2,4,8
118:18,19,22

201:18 225:8
318:17
**weigh** 216:22
**weighty** 139:4
**welcome** 32:13
164:20
**went** 100:2 106:4
373:22
**western** 1:2
**wha** 270:11
**whitaker** 253:19,23
254:12 303:18
**whoo** 41:1
**williams** 5:8
**willing** 162:3
243:22
**wise** 173:13
**wish** 192:22 193:7
193:9 195:19
204:21
**wished** 196:5 283:6
**wishes** 194:5 195:4
**wishing** 194:1
**wit** 365:22
**withdraw** 282:19
**withheld** 262:3
**witness** 10:1,5,12
12:23 20:21 35:16
41:1 57:23 67:1
81:18 82:7,17
120:17 125:16
126:3,6,8 131:18
131:22 133:12
138:13 154:15,18
154:21 155:1,5
158:14 161:6
172:20 174:19
176:1,3,6 181:13
206:13 233:4,17
264:9,11 266:1
267:17,21 268:6

[witness - zero]

273:20 290:22
316:14 324:18,22
362:12 364:5,9,13
365:10,11 366:2,5
371:15 382:18
385:16,18 386:3,6
386:9 393:1 406:2
406:5 407:4 408:13
408:18,20 410:15
410:20 411:8 412:6
412:15 414:12
415:14 416:16
419:12 420:8
425:23 426:2 427:7
427:11,16
**wonder** 158:2,15
273:2
**word** 22:9,13,16,18
22:20,22 30:14
39:1 82:10 217:12
232:2 299:11
300:23 301:17
308:5,13 317:10,11
317:14 343:12
**words** 85:11,14
213:4 354:6 357:16
364:10 378:4
380:16,23
**work** 49:19 64:13
81:2 122:9,11,14
122:18,21 123:6,12
123:14 124:11
126:19 153:19
156:16 158:17
182:23 204:21
211:17 212:3,4
213:7 214:3 224:5
237:4
**worked** 210:9
**working** 70:2,16
106:10 320:17

400:19
**works** 49:22 50:8
79:20 128:11 221:4
224:3 256:4 336:18
**world** 239:21
336:18 417:3
**wou** 42:22 61:9
226:16
**write** 178:20 319:1
319:7 333:14 396:8
**writes** 331:7
**writing** 121:19
179:11 180:1
207:12 208:5,12
209:6,10,11 212:15
276:10 300:18
307:19 313:18
360:7 396:4
**written** 48:17,19
85:13 98:7 119:22
119:22 208:17
215:7,8 282:17
298:23 299:1 300:7
300:14,16 345:7,16
358:23 359:20
393:8,12
**wrong** 30:6 73:22
94:22 113:2 131:2
180:10 220:10
252:23 318:1
**wrongdoing** 83:4
**wrote** 17:4 38:23
44:8 67:22,23 95:9
97:21 98:19 176:11
178:6 211:2,9,20
211:21 221:12
247:19 259:23
267:21 283:18
351:6 354:16
358:23 368:11
372:10,21,23

373:19 379:3
397:13 418:12
421:9

**x**

**x** 4:1

**y**

**yarbrough** 5:20
**yeah** 13:2 21:19
22:8 33:5 38:1
39:20 58:9 62:11
67:10 75:20,22
82:23 100:6 103:20
107:13,13 108:6
115:4 120:3,18
124:18 127:6 128:9
128:16 143:4
145:22 147:9
158:14 167:17
183:11 198:22
210:17,20 214:5
216:5 219:8 220:19
228:3 233:4 252:3
253:11,21 254:10
266:16 277:7
302:23 305:11
308:12,23 310:4
311:3 317:18
363:11 373:10
386:8,10 387:7
389:12 393:2
406:16 408:18
**year** 73:13 74:14
74:15 99:18 106:20
127:19,23 128:3,4
134:3,6 170:20
174:5 180:5 181:10
181:23 182:12
184:9 203:23
207:13 213:20
229:21 282:20

301:12 407:14
**yearly** 214:7,22
**years** 11:13,16
70:13 73:19 74:14
134:4 152:4 195:14
198:1 199:9 200:3
200:16 201:6,21
210:9 211:19
289:14 290:12
343:5 392:5
**yesterday** 281:2
354:13
**yo** 82:11
**younger** 286:22
287:1

**z**

**zero** 208:2 243:16
244:6,13,15,15
281:20

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.

(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER:   THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.   PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**PLAINTIFF'S
EXHIBIT**

WD 800-631-6989

**FILED**

2019 Feb-13  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

**ALI AMIRI,**                        }
                                      }
    **Plaintiff,**          }
                                      }
**v.**                                }    **Case No.:  7:18-cv-00425-RDP**
                                      }
**THE BOARD OF TRUSTEES OF THE**      }
**UNIVERSITY OF ALABAMA,**            }
                                      }
    **Defendant.**

### ORDER

This case is before the court on pro se Plaintiff Ali Amiri's informal request to compel Defendant to produce certain documents in advance of a deposition scheduled for February 19, 2019. For the reasons explained below, Plaintiff's request is **GRANTED**. Defendant is **ORDERED** to produce "[a]ny and all emails and letters received, replied to, or sent by Dr. Susan Carvalho regarding any matter related to Mr. Ali Amiri" for the time period between January 1, 2016 and February 28, 2018, as Plaintiff requested in his fourth Request for Production. Moreover, Defendant shall produce the documents in a timely manner that will enable Plaintiff to use the documents to adequately prepare for the deposition of Dr. Carvalho on February 19, 2019.

In the Scheduling Order entered on November 14, 2018 (Doc. # 36), the court stated that initial proceedings in this action would be targeted at the questions of (1) whether Plaintiff had a protected property interest in continued enrollment at the University of Alabama; (2) the reasons for Plaintiff's dismissal from the University of Alabama, including whether his dismissal was for academic or disciplinary reasons; and (3) the procedures followed in determining that Plaintiff should be dismissed from the University of Alabama and in effectuating his dismissal.

Defendant represents that it has produced emails involving Dr. Carvalho that relate to these topics, including specifically the reasons for Plaintiffs dismissal from the University of Alabama and the procedures followed in making the dismissal determination. But Defendant has declined to produce any other emails involving Dr. Carvalho, including emails related to things such as Plaintiff's claimed ownership interest in an electronic device, and his claims of theft, plagiarism, and academic misconduct. The court concludes that these other emails, even if they do not expressly state the reasons for Plaintiff's dismissal, may be relevant as circumstantial evidence concerning the true reason for Plaintiff's dismissal from the University of Alabama, including whether it was for academic or disciplinary reasons. The court therefore orders Defendant to produce the remaining emails involving Dr. Carvalho and Plaintiff from the relevant time period identified above.

**DONE** and **ORDERED** this February 13, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

2



PLAINTIFF'S
EXHIBIT
2

THE UNIVERSITY OF

June 29, 2017

Ali Amiri

Tuscaloosa, AL   35401

Dear Mr. Amiri:

The Graduate School received notification from the Department of Physics that you have been dismissed from the Doctor of Science in Physics program. As per Scholastic Requirements of the Graduate Catalog, departmental dismissal from a degree program also results in suspension from the Graduate School.

As a result, you will not be permitted to register for the Fall 2017 or any future semester unless you have first been readmitted to the Graduate School, in a different program. The process for readmission is described in the Graduate Catalog online in https://catalog.ua.edu/graduate/about/academic-policies/scholastic-requirements/.

I wish you the best in all of your future endeavors.

Regards,

Susan Carvalho
Associate Provost and Dean of the Graduate School

cc    Chemistry

**From:**        Carvalho, Susan
**To:**          Greer, Jennifer
**Subject:**     RE: RE: Graduate support status
**Date:**        Monday, June 26, 2017 4:42:00 PM
**Attachments:** image001.jpg

As I understand it, we do not send a separate/additional letter of dismissal. We place a hold on their next-semester registration, and put the department's letter into their file. That's it.

But records here do not show that we were notified.

Let me know what you and Norma think, and whether we should proceed with the Hold—thanks!

Susan

Carvalho signature block no logo



**From:** Greer, Jennifer
**Sent:** Monday, June 26, 2017 4:22 PM
**To:** Carvalho, Susan
**Subject:** Re: Graduate support status

I'm meeting with Norma tomorrow. It's interesting that this was sent a month ago and the grad school was not notified.

After a program dismisses a student does the graduate school also notify them? In grad school, they are admitted to a program and the grad school at the same time, contrary to the undergraduate experience.

Jennifer Greer
Associate Provost
University of Alabama

On Jun 26, 2017, at 4:18 PM, Carvalho, Susan <scarvalho@ua.edu> wrote:

> Hi Jennifer – the attached Grad Committee assessment and the chair's email below
> effectively terminate Ali Amiri's student status. Do you want to run this by Norma
> during your regular meetings, do we do this by email, or shall I consult with her? Let me
> know best next step in making sure we are able to communicate this clear decision to
> him and make sure he understands it, as well as notifying the visa office.
>
> Thanks,
> Susan
>
> **From:** Han, Luoheng

UA000056

**From:**              Carvalho, Susan
**Sent:**               Monday, June 26, 2017 3:40 PM
**To:**                 Greer, Jennifer; Han, Luoheng
**Subject:**           Ali Amiri
**Attachments:**      Physics Ali Amiri 6 2017.docx

Hi Jennifer and Luoheng – thanks for the conversation today about Ali Amiri. Just FYI, attached are segments of the Physics graduate handbook, that outline the grounds for expected research progress, funding, and dismissal from the program. Just for your reference, in case we need to echo any of this language in future communications.

As we discussed:
1) Luoheng will assemble email records, including the Physics department's assessment of Amiri's research progress. Also a past letter of dismissal, so that we can compare to past student situations and use similar language where appropriate.
2) Jennifer and Susan will draft a letter of dismissal patterned after prior letters, if the documentation warrants, and then will review with Legal Counsel to make sure the academic process is not seen as interference with any ongoing grievance or investigative processes.
3) We will circle back to A&S and Physics, on next steps.

Thanks,
Susan


**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile ▉▉▉▉▉▉
scarvalho@ua.edu | http://graduate.ua.edu



**From:** Carvalho, Susan
**To:** Han, Luoheng
**Subject:** Phone call re Amiri
**Date:** Monday, June 26, 2017 2:20:59 PM

Hi Luoheng - I was talking with Jennifer Greer, who has been involved in Amiri's case before. She will join me on our phone call at 2.30, if OK with you. If Lisa Dorr is frees, should she also join, so we put a full plan together?

Susan

Susan Carvalho, Ph.D.
Associate Provost and Dean of the Graduate School
University of Alabama
102 Rose Administration Bldg.
Tuscaloosa AL 35487
205-348-5921 (office)
859-618-4399 (mobile)

UA000045

**From:**          Han, Luoheng
**Sent:**          Monday, June 26, 2017 4:00 PM
**To:**            Carvalho, Susan
**Cc:**            Greer, Jennifer
**Subject:**       Ali Amiri
**Attachments:**   1281_001.pdf

Susan and Jennifer:

I just had a meeting with Dr. Patrick LeClair. Here are the answers to your questions:

1) Dr. LeClair is advisor and Dr. Gupta is co-advisor for Mr. Amiri.
2) Neither of them have told him in writing that they would no longer serve as his advisor. In his email dated June 19, Dr. LeClair said "...given that we have long since ceased to have any sort of productive relationship, I no longer consider you to be member of the research team".
3) Mr. Amiri was funded through the end of spring 2017 semester with a NSF grant, which Drs. LeClair and Gupta are serving as co-PIs.
4) Mr. Amiri will be in his 7th year in August 2017, and he has not published an article. In addition, he has not shared his research results for the last six months.
5) The Graduate Committee of PHAY recommended Ali should <u>not receive financial support and be dismissed from the department</u> (See attached letter).

Luoheng

UA Production - 000109



PLAINTIFF'S
EXHIBIT
3

Documents Presented Regarding the

# Contingent Recommendation

## Table of Contents

Email from Patrick LeClair on 4/27/2017, 4:34 PM[1] ------------------------- page 2

Email from Patrick LeClair on 4/27/2017, 10:11 PM[2] ----------------------- page 3

Email from Patrick LeClair on 4/28/2017, 1:37 AM[3] ------------------------- page 4-5

Email from Tanta Myles on 4/28/2017, 8:50 AM[4] --------------------------- page 6

Email from Patrick LeClair on 4/28/2017, 9:12 AM[5] ------------------------- page 7

Email communication entitled **"Graduate Support Status"**

Email from Patrick LeClair on 5/26/2017-------------------------------------- page 8

Attachment of the email (*Contingent Recommendation*)[6] ----------------- page 9

Reply by Ali Amiri on 6/1/2017------------------------------------------------ page 10

---

[1] UA Production 000222, Initial Disclosures.
[2] UA Production 000214, Initial Disclosures.
[3] UA000014, UA's Response to Plaintiff's First Set of RFPs.
[4] UA000005, UA's Response to Plaintiff's First Set of RFPs.
[5] UA000008, UA's Response to Plaintiff's First Set of RFPs.
[6] Contingent Recommendation is produced on 4/28/2017 at the urgent meeting declared by Dr. Patrick LeClair (and the whole process was started and done in less than 20 hours), but it was not communicated until 5/26/2017.

**From:** Leclair, Patrick pleclair@ua.edu
**Subject:** grad advising needs to meet ASAP
**Date:** April 27, 2017 at 4:34 PM
**To:** Conor Henderson conor.henderson@ua.edu, Paulo Araujo ptaraujo@ua.edu, Preethi Nair preethi.nair@ua.edu, Nobuchika Okada okadan@ua.edu, Sanjoy Sarker ssarker@bama.ua.edu, Dean Townsley Dean.M.Townsley@ua.edu

Hi,

The graduate advising committee needs to meet before lunchtime on Monday to discuss an urgent and serious matter. I will brief as many of you as I can on it individually.

-patrick

From: Leclair, Patrick pleclair@ua edu
Subject: Re: grad advising needs to meet ASAP
Date: April 27, 2017 at 10:11 PM
   To: Conor Henderson conor henderson@ua.edu
   Cc: Dean Townsley Dean M Townsley@ua edu, Preethi Nair preethi nair@ua edu, Paulo Araujo ptaraujo@ua edu, Nobuchika Okada okadan@ua edu, Sanjoy Sarker ssarker@bama ua edu

I will drop by for the start of the meeting to give some background information, but should not be part of the discussion for reasons that will quickly become obvious.

Looks like 10am Friday does work, let's go ahead with that unless someone objects in the next hour or so ...

-patrick

> On Apr 27, 2017, at 6:53 PM, Conor Henderson <conor.henderson@ua.edu> wrote:
>
> I could meet any time tomorrow after 10am, and almost any time Monday.
>
> So far it sounds like 10am Friday works for the people who have responded already. Is there anyone for which this does not work?
>
> Conor.
>
>
> On 4/27/2017 5:37 PM, Dean Townsley wrote:
>> I am available 10-4 tomorrow, and pretty much any time on Monday morning.
>>
>> Dean
>>
>>
>> On 04/27/2017 04:38 PM, Nair, Preethi wrote:
>>> Hi Patrick, et al.
>>>
>>> I can meet between 9:00 - 11:00 a.m. tomorrow.
>>> I have office hours with AY101 students after that plus class at 2:00 p.m. followed by more help sessions.
>>>
>>> I can also meet on Monday nearly anytime.
>>>
>>> Cheers,
>>>
>>> -Preethi
>>>
>>>
>>>
>>>> On Apr 27, 2017, at 4:34 PM, Patrick LeClair <pleclair@ua.edu> wrote:
>>>>
>>>> Hi,
>>>>
>>>> The graduate advising committee needs to meet before lunchtime on Monday to discuss an urgent and serious matter. I will brief as many of you as I can on it individually.
>>>>
>>>> -patrick
>>>
>>>
>> --
>> Dr. Conor Henderson
>> Associate Professor & Graduate Director
>> Department of Physics & Astronomy
>> University of Alabama

If you received this in error, please contact the sender and delete the material from your computer.

-----Original Message-----
From: Patrick LeClair [mailto:pleclair@ua.edu]
Sent: Friday, April 28, 2017 1:37 AM
To: Luoheng Han
Cc: Carpantato Myles; Conor Henderson
Subject: Ali Amiri

Luoheng (cc Tanta, Conor),

Copying Tanta Myles as Research Compliance Officer, and Conor Henderson as our department's graduate director.

My departmental graduate advising committee will meet Friday morning 4/28 to discuss Ali Amiri's situation. They will specifically consider recent correspondence he has had with his advisors (including myself) and administrators, as well has his progress in research thus far. Their task is in short to determine if Ali is currently in good academic standing in our department, and make a recommendation regarding his financial support. I will not be a part of this review.

I will brief the committee on the basic and documented facts of the situation, but will recuse myself at that point from their discussion and decision process. I am not offering them any opinion of the situation, as chair I am only charging them with coming up with an independent recommendation of Mr. Amiri's standing in the department. I have instructed them that any recommendation they make to me should be copied to you and Tanta Myles to establish the origin of the recommendation, and that they do not communicate the recommendation further until you, Tanta, and Bob Olin have weighed in.

The committee is charged with considering three matters: (1) is Ali in good academic standing in our department right now, (2) if not, should he continue to be supported by the department financially (whether by TA or using RA using funds administered by the department), and (3) if they do not suggest supporting him financially, does the committee recommend he be removed from the program, or is he allowed to continue if he can provide his own funding.

I have given the committee a hard copy (and no electronic copy) of recent email correspondences between Ali and myself, Arun Gupta, Takao Suzuki, and later forwards to Tanta Myles and Carl Pinkert. They will also interview parties that were present at recent meetings, including grad students and faculty members in our department. I will have no part in this process either, I only informed them who was present at the most recent meetings that they might want to talk to.

Once the committee has made a recommendation, they will send it to me, and cc you and Tanta Myles. The committee has been instructed to finish this by lunch time on Monday 1 May. We will not proceed any further than that until Bob and

UA000013

Tanta have had a chance to weigh in on our committee recommendation, that's why I asked for the committee feedback by Monday when Bob returns from his travels. We will not send the committee's recommendation to Ali until that action is cleared by Bob and Tanta at least.

I should also say that I passed the email exchanges noted above along to March Huey, Compliance, Ethics, and Regulatory Affairs Coordinator, and ███████████

██████████████████████████████████

███████████████████████. I am deferring to the judgment of A&S and Research Compliance as to whether legal council should be involved, I'm clearly out of my depth.

I do want to point out some relevant text in our department's graduate handbook:

https://physics.ua.edu/wp-content/uploads/2016/05/GradHandbook-2016-06-15.pdf

5. Good Academic Standing
"Graduate students are required to maintain good academic standing within the Department.

Students who are not in good academic standing may have their financial support reduced or withdrawn, or may be dismissed from the program. The Departmental requirements for maintaining good academic standing supplement the Graduate School requirements; together, these requirements include (but are not limited to) the following:"

[cut]

"The maintenance of good academic standing with the Department also requires that graduate students conduct themselves responsibly and respectfully towards other members of our academic community. Indeed, the University has a vital interest in the character of its students, and therefore regards behavior at any location (on-campus or off-campus) as a reflection of a student's character and fitness to be a member of the student body. Accordingly, in addition to the relevant academic thresholds, a student's standing with the Department is also contingent on compliance with the Code of Student Conduct and adherence to the Capstone Creed."

The last paragraph is of particular relevance, and it is one factor the committee will consider.

Let me know if you have any questions or if you need anything from me. My cell is 857-891-4267 if you need to reach me on short notice.

Best,

-patrick

| From: | Carpantato Myles |
|---|---|
| To: | Pinkert, Carl |
| Subject: | FW: FW: Ali Amiri |
| Date: | Friday, April 28, 2017 9:02:12 AM |

**II**

**9:02 am**

CAP,

Based on Mr. Amiri's reporting of possible misconduct, unless this meeting is to discuss the status of all graduate students or was scheduled prior to our notification about the matter this could be considered retaliation based on the timing. I talked with Louheng yesterday about how Mr. Amiri's access to the labs could be continued.

Tanta

Carpantato (Tanta) Myles, MSM, CIM, CIP | Director & Research Compliance Officer

Office for Research Compliance
The University of Alabama
358 Rose Administration
Box 870127
Tuscaloosa, AL 35487
Phone 205-348-5746 | Mobile 205-310-8985 | Fax 205-348-7189
cmyles@fa.ua.edu | http://osp.ua.edu/Research_compliance.html

The information transmitted is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any review, transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from your computer.

**I**

**8:50 am**

-----Original Message-----
From: Carpantato Myles
Sent: Friday, April 28, 2017 8:50 AM
To: 'Patrick LeClair'; Luoheng Han
Cc: Conor Henderson
Subject: RE: Ali Amiri

Patrick,

Is the meeting scheduled only to discuss Mr. Amiri's status or a meeting to discuss support and standing for all students?

Thanks,

Tanta

Carpantato (Tanta) Myles, MSM, CIM, CIP | Director & Research Compliance Officer

Office for Research Compliance
The University of Alabama

| | |
|---|---|
| **From:** | Carpantato Myles |
| **To:** | Pinkert, Carl |
| **Subject:** | FW: FW: Ali Amiri |
| **Date:** | Friday, April 28, 2017 9:13:17 AM |

FYI...

Carpantato (Tanta) Myles, MSM, CIM, CIP | Director & Research Compliance Officer

Office for Research Compliance
The University of Alabama
358 Rose Administration
Box 870127
Tuscaloosa, AL 35487
Phone 205-348-5746 | Mobile 205-310-8985 | Fax 205-348-7189
cmyles@fa.ua.edu | http://osp.ua.edu/Research_compliance.html

The information transmitted is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any review, transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from your computer.

-----Original Message-----
From: Patrick LeClair [mailto:pleclair@ua.edu]
Sent: Friday, April 28, 2017 9:12 AM
To: Carpantato Myles
Cc: Luoheng Han; Conor Henderson
Subject: Re: Ali Amiri

*7:12 am*

Hi,

Conor, just as a reminder this is a normal end-of-semester meeting of the grad advising committee to discuss the support and standing of all students in their 5th or 6th year who are getting close to their PhD deadline. You should also discuss anticipated graduation dates for these students so we can predict how many grad offers we might need to make in the spring.

-patrick


> On Apr 28, 2017, at 8:49 AM, Carpantato Myles <cmyles@research.ua.edu> wrote:
>
> Patrick,
>
> Is the meeting scheduled only to discuss Mr. Amiri's status or a meeting to discuss support and standing for all students?
>
> Thanks,
>
> Tanta
>
> Carpantato (Tanta) Myles, MSM, CIM, CIP | Director & Research



Ali Amiri <aamiri1@crimson.ua.edu>

## Graduate support status

Leclair, Patrick <pleclair@ua.edu>                                    Fri, May 26, 2017 at 11:56 AM
To: Ali Amiri <aamiri1@crimson.ua.edu>
Cc: Luoheng Han <luoheng.han@ua.edu>, Robert Olin <olin@ua.edu>, Carpantato Myles <cmyles@research.ua.edu>,
Conor Henderson <conor.henderson@ua.edu>

Ali,

It is departmental policy at this point that near the end of each Spring semester, the graduate advising committee
meets to consider the continued support of students who are in or about to enter their 7th year in the graduate
program. You were included in this cohort of students based on your year of entry into the program, and thus your
case was discussed, along with several other students in the same situation. The main points of discussion are
progress toward degree, and whether the students in question are in good academic standing. The latter point
includes conduct toward colleagues in addition to grade point average and other factors listed in the department's
graduate handbook.

While as department chair I asked for this meeting to occur, I recused myself from the committee discussion and
decision process to avoid any conflict of interest. The graduate advising committee has concluded that based on your
research progress and conduct you are not in good academic standing, and should not receive financial support from
the department for the Fall 2017 semester. I attach a scan of the letter stating their recommendation. I am obliged to
follow their recommendation, and the department will not offer you financial support for the Fall 2017 semester.

Please also note that their recommendation was contingent on the investigation and findings of the Research
Compliance Office, which have now concluded.

I should also note that you have a right to appeal this decision. Claims associated with academic progress must be
handled through University Academic Grievance Procedures provided in the University of Alabama Graduate
Catalog. I will be happy to inform you of those procedures if you have any questions.

Best Regards,

-Patrick


--
Dr. Patrick R. LeClair
Professor and Chair
Department of Physics and Astronomy
Box 870324
University of Alabama
Tuscaloosa, Al 35487
USA

office:
Gallalee 206
Bevel 1047
office: 1.205.348.3040
cell :  ++1.857.891.4267

pleclair at alum.mit.edu
pleclair at mint.ua.edu


📎 **Amiri_grad_eval_S17.pdf**
   50K



THE UNIVERSITY OF **ALABAMA**®

*College of*
**Arts & Sciences**
**Physics & Astronomy**

28 April 2017

Dr. Patrick LeClair,

Chair, Department of Physics & Astronomy

Dear Dr. LeClair,

In the case of graduate student Ali Amiri, based on the student's demonstrated lack of progress in research and disrespectful conduct towards faculty advisers, colleagues and members of the academic community, the Physics Department Graduate Advising Committee considers that the student is in violation of the Good Academic Standing clause of the Departmental Graduate Handbook and therefore we recommend that the student should not receive financial support from the Department of Physics & Astronomy and should be dismissed from the Physics graduate program.

We are aware that the student has made allegations of research misconduct by faculty members. If UA's Office of Research Compliance finds there is merit to these allegations, then the Physics Department Graduate Advising Committee may review the above recommendation.

Yours sincerely,

Dr. Conor Henderson (Graduate Director)

On behalf of the Graduate Advising faculty committee of the Department of Physics & Astronomy:

Dr. Paulo Araujo

Dr. Preethi Nair

Dr. Nobu Okada

Dr. Dean Townsley



Ali Amiri <aamiri1@crimson.ua.edu>

## Graduate support status

**Ali Amiri** <aamiri1@crimson.ua.edu>                                          Thu, Jun 1, 2017 at 3:51 PM
To: Robert Olin <olin@ua.edu>
Cc: "Leclair, Patrick" <pleclair@ua.edu>, Luoheng Han <luoheng.han@ua.edu>, Conor Henderson <conor.henderson@ua.edu>

Dear all,

Recently I have received a false document from Dr. LeClair. It seems that the document is created due to the insecurity aroused from the Vice President's faulty report. In that report, Dr. LeClair is accused of plagiarism and fabrication. Obviously, such a thing never has been in my report. My report for research misconduct is only against Dr. Gupta. And it is a true claim, and I will definitely prove all of the claims including plagiarism. The NSF Inspector General will handle this case.

From these five people who have signed the false document, Dr. Okada is on my dissertation committee. But the other four people, do not have any information about my research, or basically they don't know anything about me! And I don't know them as well. But based on my general information, all of these people are decent people! And I have heard more or less positive things about them from their students. If they can sign a document without having enough information about the content, what the rest of the people can do!?

I know Dr. LeClair, probably better than all of you. And he knows me as well. Patrick has great leadership skills and can make a group of people to do something he want to be done! But creating this kind of false documents is not a part of his personality. There are other people behind this document, which their name or signature is not in the document! These people spend a lot of time for these kind of things and are less effective in scientific works. But I don't want to fight with the Shadow. And I think the people who signed this document should be held responsible and they have to give their reasons for their actions. And naturally, they will see the consequences of their unethical action.

Finally, I have attached a picture of a piece of art to this email. Usually these artworks are erased in a couple of days. But this special artwork was untouched for more than 5 months in fall 2015 and spring 2016. I have some other artworks of this artist, which will be presented later on, in the right time.

For the time being, you enjoy the artworks of your sincere faculty members.

Thanks,
Ali
[Quoted text hidden]

--
Ali Amiri
Doctoral Candidate
Center for Materials for Information Technology
Department of Physics and Astronomy
University of Alabama



**THE SHADOW.jpg**
1899K

1          A.    It's alluded to by saying that you

2     are not in good academic standing and should not

3     receive financial support.  I'm referring back to

4     Exhibit 2, the graduate handbook that would imply

5     that you would be dismissed from the program.

6          Q.    I know it means that -- in the

7     graduate handbook, it says that you can take

8     different action.  You can reduce the support,

9     you can remove the support, or you can dismiss.

10    So you can take different actions.  Here you are

11    telling me that I will not be supported for the

12    fall semester.  It means that I will enroll for

13    the fall semester, but I don't have financial

14    support, so I can pay the money myself.

15         A.    Based on this e-mail at this

16    particular date, that is correct.  You were not

17    going to receive financial support for the

18    following semester, and at that particular

19    moment, yes, you had not been dismissed

20    necessarily, but you were not in good academic

21    standing and were not going to receive financial

22    support.

23         Q.    So the e-mail that you sent me on May

Page 59

1    26th, on that day I am not dismissed?  I am not

2    in good academic standing; is this correct?

3        A.    On that day, yes.

4        Q.    Yes.  Please look at Page 10 on this

5    Exhibit Number 4.  In this e-mail, I forwarded

6    your e-mail to me to Dr. Robert Olin, the dean of

7    art and science, and I copied you and a few other

8    professors, and I objected to the whole thing,

9    the whole e-mail communication, to the document.

10   So could you please read the first sentence?

11       A.    Recently I have received a false

12   document from Dr. LeClair.

13       Q.    Yes.  So I claimed that the document

14   is false.  Could you please read the second

15   paragraph?

16       A.    From these five people who have

17   signed the false document, Dr. Okada is on my

18   dissertation committee.  But the other four

19   people do not have any information about my

20   research, or basically they don't know anything

21   about me, and I don't know them as well.  But

22   based on my general information, all of these

23   people are decent people.  And I've heard more or

1    did in 2015 has no bearing on whether or not you

2    were given due process in the -- in your

3    suspension and dismissal from the program.  I

4    mean, I understand that you feel as though there

5    were issues with your research and the impact on

6    it, but those don't bear on what the procedure

7    was and whether or not it was an academic or

8    disciplinary dismissal.

9              MR. AMIRI:  Okay.

10             MR. DYKES:  And, I mean, I

11   understand, and I let you ask questions about the

12   background of the folks on the different

13   committees and the dissertation.  I get that,

14   because I understand your argument that the

15   dissertation folks are the ones that are equipped

16   to make that decision, and so -- but --

17        Q.   (BY MR. AMIRI:)  So then let's look

18   at Exhibit Number 4, Page 8.  So this e-mail is

19   about graduate support status that is sent on the

20   26th.  And at this point, I'm not dismissed; is

21   this correct?

22        A.   On that date, correct.

23        Q.   So I just lost my graduate support,

Page 78

1    yes?  Do you know when I was dismissed?

2         A.    I would have to look at the

3    documents, but I believe it was in June sometime,

4    but I would have to check the documents.

5         Q.    Yes.  I asked you to bring the

6    documents that refresh your recollection.

7              MR. DYKES:  Right, and the documents

8    that we reviewed are the documents we produced.

9    So you have all the documents that he reviewed to

10   get ready for the deposition today.

11             MR. AMIRI: · Yes.  And I think the

12   talk is about dismissal, so you should have your

13   documents that states when I was dismissed.

14             MR. DYKES:  Well, I -- well, I think

15   that this letter that Patrick sent on May 26th

16   and the University's position is that's when you

17   were dismissed.  I understand his testimony.

18   There's the letter from the dean in June that

19   says that you were dismissed from the physics

20   program, and as a result were being suspended

21   from the graduate school, but you have all the

22   documents that we have.

23             MR. AMIRI:  But Dr. LeClair is


PLAINTIFF'S
EXHIBIT
5

# Graduate Handbook
## Department of Physics & Astronomy
## University of Alabama

*as revised 29-Apr-2016*

TABLE OF CONTENTS:

|    |    | PAGE |
|----|----|------|
| I. | INTRODUCTION | 3 |
| II. | ACADEMIC POLICIES AND REQUIREMENTS | 3 |
|    | A. Scholastic Requirements | 3 |
|    | 1. Master's vs. Ph.D. programs | 3 |
|    | 2. Academic Advising | 3 |
|    | 3. Minimum GPA | 4 |
|    | 4. Research | 4 |
|    | 5. Good Academic Standing | 4 |
|    | B. Enrollment Policies for Graduate Teaching/Research Assistants | 5 |
|    | C. Policies on Financial Support | 6 |
|    | 1. Maintaining Good Academic Standing | 6 |
|    | 2. Conditional Admissions | 6 |
|    | 3. Teaching Assistantships | 6 |
|    | 4. Research Assistantships | 6 |
|    | 5. Fellowships | 7 |
|    | 6. Summer Support | 7 |
|    | 7. Jobs Outside the Department | 7 |
|    | D. Time Limits | |
| 7 |    | |
| III. | REQUIREMENTS FOR THE DEGREE OF Ph.D. | 8 |
|    | A. Course Requirements | 8 |
|    | 1. Core courses | 8 |
|    | 2. Sub-area courses | 8 |
|    | 3. Research Techniques and Approved Electives | 10 |
|    | 4. Seminars, Research Techniques, or Approved Electives | 10 |
|    | 5. Dissertation Research | 11 |
|    | B. Qualifying and Preliminary Examinations | 11 |
|    | 1. Qualifying examination | 11 |

i

         2. Preliminary examination    11
      C. Master's Degree En route to the Ph. D.    12
      D. Research and Dissertation    12
         1. Selecting a research area and a research advisor    12
         2. The dissertation committee    13
         3. Final version of the dissertation    13
         4. Oral examination    13

IV.    M.S. DEGREE    13

      A. Qualifying Exam    13
      B. M.S. in Physics (Thesis Option – Plan I)    14
         1. Course requirements    14
             a. Core courses    14
             b. Electives    14
             c. Research Techniques    14
             d. Seminars and pass/fail electives    15
             e. Thesis Research    15
         2. Selecting a research area and a research advisor    15
         3. The thesis committee    15
         4. The final version of the thesis    15
         5. Oral examination    15
      C. M.S. in Physics (Non-Thesis Option – Plan II)    16
         1. Course requirements    16
         2. Oral examination    16
      D. M.S. in Physics with Astronomy Specialization (Thesis Option – Plan I)    16
         1. Course requirements    16
             a. Core courses    16
             b. Electives    17
             c. Research Techniques    17
             d. Seminars and pass/fail electives    17
             e. Thesis Research    17
         2. Research and thesis    17
      E. M.S. in Physics with Astronomy Specialization (Non-Thesis Option – Plan II)    18
         1. Course requirements    18
         2. Oral examination    18

V.    TRANSFER CREDIT    18

UA Production - 000002

# I.  INTRODUCTION

The Department offers both the Ph.D. degree in physics and the M.S. degree in physics.  The M.S. degree includes both a thesis option (Plan I) and a non-thesis option (Plan II).  Both the Ph.D. and the M.S. degrees in physics are offered with specialization in astronomy.  The departmental requirements for these degrees are outlined in this manual and in the Graduate Catalog.  Checklists, advising worksheets, and the various forms needed for the completion of a degree, can be found in the Academics area of the departmental web site, physics.ua.edu.  Students are advised to make personal copies of completed forms before submitting them.  Students are subject to the general rules and regulations of the Graduate School as given in the Graduate Catalog as well as the specific rules and regulations of the Department of Physics and Astronomy.

Each student has an individual responsibility to know and understand the rules and regulations of the Graduate School and of the Department and the requirements for the degree that he or she is pursuing.  Students are encouraged to consult with their faculty advisors or the department chairperson if these requirements are not clearly understood.  Much valuable and up-to-date information can be found on the Graduate School website, graduate.ua.edu. You should also be familiar with the departmental site, physics.ua.edu.  Each graduate student will be assigned an academic advisor when the student initially enrolls in the Department.  After a student has chosen a research advisor (as described elsewhere in this manual), then the research advisor will replace the academic advisor as the student's faculty advisor (unless they are the same).

# II.  ACADEMIC POLICIES AND REQUIREMENTS

## A.  SCHOLASTIC REQUIREMENTS

### 1. Master's vs. Ph.D. programs

Formal entry into our Ph.D. program is gained by passing the Qualifier Exam (see below).  The Graduate Advising Committee will assess whether individual international degrees are equivalent to our Master's degree.

### 2. Academic Advising

Before registering for classes each semester, students must discuss their academic schedules with an advisor, to help insure that appropriate classes are taken in a timely way (as well as confirm that PH597 or AY597 is enrolled in each semester and, if relevant, insure the appropriate research course is taken).  Students must obtain an advisor's signature on the departmental advising worksheet before registering for classes each semester.  Students must also obtain an advisor's signature on the departmental drop/add form before dropping or adding courses. These forms are available on the departmental web site.

3

UA Production - 000003

### 3. Minimum GPA

According to the Graduate Catalog, a student must maintain a cumulative average of not less that "B" (3.0 on a 4.0 scale) in the graduate courses undertaken at The University of Alabama, and at least 75% of these hours must be completed with grades of not less than "B". Courses in which a student has made a grade of "P" or "S" are not considered in evaluations of academic standing. Students who do not meet these requirements (after having earned 12 semester hours of credit) are placed on academic warning. Warning status must be removed by raising the overall grade point average to "B" or better during the next 12 hours of graduate course work. *Students may not hold an assistantship while on academic warning.* Students who are conditionally admitted must maintain a "B" average during their 12 hours. (PH 597, AY 597, PH 598, and PH 698 can be taken only as pass/fail and cannot be used in computing GPA.) Failure to remove either a warning or conditional status within the prescribed time will result in the student being dropped from the graduate program.

### 4. Research

Students are encouraged to engage in research as soon as possible and may explore short-term projects with a variety of faculty before solidifying a thesis or dissertation project. When involved in research, students are expected to enroll in one of several possible research courses, depending on their stage in the program. These research courses, along with their constraints, are as follows:

| | | |
|---|---|---|
| PH 598 – Non-thesis research | (before Qualifier passed) | [P/F] |
| PH 590 – Research Techniques | (after core courses completed) | [graded] |
| PH 599 – Thesis research | | [P/F] |
| PH 698 – Non-dissertation research | (after Qualifier passed, before Prelim passed) | [P/F] |
| PH 699 – Dissertation research | (after Prelim passed; must enroll continuously) | [P/F] |

For example, PH 598 is appropriate for a short-term research project undertaken before a student has passed the Qualifying Exam. PH 698 is appropriate for dissertation-related research before a student has passed the Preliminary Exam. These research courses are described further below.

### 5. Good Academic Standing

Graduate students are required to maintain good academic standing within the Department. **Students who are not in good academic standing may have their financial support reduced or withdrawn, or may be dismissed from the program.** The Departmental requirements for maintaining good academic standing supplement the Graduate School requirements; together, these requirements include (but are not limited to) the following:

- all students must make satisfactory progress toward a degree, meaning that:
  - M.S. and Ph.D. students must:
    - maintain a GPA of at least 3.0 in all graduate work;
    - meet every semester with one's academic advisor;
    - take a sufficient number of courses (including research courses) each semester to satisfy degree requirements in a timely way;
    - regularly attend classes and colloquia;

4

UA Production - 000004

- make timely progress towards completing the research component of their degrees;
- Ph.D. students must additionally:
  - pass the Qualifying Exam (see §III.B.1) within 2 years (+1 month) of arrival and pass at least one (as yet) un-passed section of each exam administered, starting at the beginning of the second semester;
  - pass the Preliminary Exam (see §III.B.2) within four years of arrival.

- M.S. students who wish to be considered for financial support must also pass the Qualifying Exam (see §III.B.1) within 2 years (+1 month) of arrival and pass at least one (as yet) un-passed section of each exam administered.

- all students must perform their TA or RA duties conscientiously;

- international students must also pass the ITAP language exam within 2 semesters of arrival.

The maintenance of good academic standing with the Department also requires that graduate students conduct themselves responsibly and respectfully towards other members of our academic community. Indeed, the University has a vital interest in the character of its students, and therefore regards behavior at any location (on-campus or off-campus) as a reflection of a student's character and fitness to be a member of the student body. Accordingly, in addition to the relevant academic thresholds, a student's standing with the Department is also contingent on compliance with the Code of Student Conduct and adherence to the Capstone Creed.

## B. ENROLLMENT POLICIES FOR GRADUATE TEACHING/RESEARCH ASSISTANTS

The following is a summary of the current graduate school policies regarding course loads for all teaching assistants and research assistants. Physics and Astronomy students should usually enroll in 9-10 credit hours per semester, including courses, research hours (if applicable), and seminar (PH/AY 597) when in residence, in order for degree requirements to be completed in a reasonable time.

Graduate assistants must be full-time graduate students during all periods in which they receive financial assistance from the University or associated agencies. The Graduate School imposes the following enrollment limitations:

| TA/RA AWARD | MIN-MAX GRADUATE ENROLLMENT |
|---|---|
| 0.25 FTE | 9-15 semester hours |
| 0.50 FTE | 6-12 semester hours |

In addition it should be noted that immigration regulations limit international students to a maximum of 20 hours per week of employment during the academic year, including any combinations of on- and off-campus positions.

A fellowship, as a non-service award, is outside the scope of these policies. Fellows, by the terms of their appointments, are required to undertake full-time graduate study.

Enrollment during the summer is not mandatory for graduate teaching and research assistants.

5

UA Production - 000005

## C. POLICIES ON FINANCIAL SUPPORT

### 1. *Maintaining Good Academic Standing*

A graduate student must maintain good academic standing within the Department (as described in §II.A.5.); consequences of **not** maintaining good academic standing are described in §II.A.5.

### 2. *Conditional Admissions*

When an applicant's entrance exam or GPA score is not up to University minimum requirements, admission is "**conditional**." There are two important consequences of this: 1) if you do not maintain a graduate GPA of 3.0 or better while in conditional status, you will lose your assistantship; 2) if your GPA is below 3.0 at the end of the term in which you complete your 12th credit hour, you will be dismissed from the program. These two policies are applied rigorously by the Graduate School, so you are urged to apply yourself diligently to your coursework your first year if you are admitted conditionally.

### 3. *Teaching Assistantships*

A new graduate student who has been awarded a teaching assistantship can normally expect to have the TA renewed as long as s/he is in good academic standing (see §II.A.5.), as stipulated by the student's advisor and the department chairperson, and as long as funds are available. There are time limits, however, on the total number of years that a student may hold a TA. A student working toward a M.S. degree will normally be expected to complete the degree requirements within two years, and financial support will not routinely continue beyond that period. In special cases, upon petition and approval of the department chairperson, financial support may be continued for up to three years. A maximum of six years of TA support is allowed for Ph.D. students. This does *not* mean, however, that students are automatically guaranteed six years of support. Students are encouraged to graduate in a timely manner, and support will not be continued if it is decided that the student is not making adequate progress. Students who are required to pass the International Teaching Assistant Program (ITAP) exam must do so by the end of their second semester in order to receive continued TA support.

### 4. *Research Assistantships*

Students are encouraged to start research as soon as practical, by discussing opportunities for research with faculty in their area of interest. Many students are supported on research assistantships after their first or second year in residence. This enables a student to focus on research, and make speedier progress toward his or her degree. RAs are generally funded by external grants obtained by faculty members. The amount of the RA stipend varies somewhat, but is usually at least as much as a TA stipend. Continuation of a research assistantship is contingent on the student's satisfactory progress and maintenance of good academic standing, as well as on the availability of funds, which may change from year to year. When a student's research assistantship is not renewed, he or she will be considered for a teaching assistantship, using the criteria of length of time in the graduate program, academic standing (including progress toward degree; see §II.A.5.), and availability of TA funds.

6

UA Production - 000006

### 5. *Fellowships*

The Graduate School has several fellowship programs for which students may apply. Graduate Council Regular Fellowships are primarily awarded to exceptional incoming students. Graduate Council Research Fellowships are for students doing research that is funded externally, or may lead to external funding. Dissertation Fellowships are for students in the final stages of the research leading to their dissertation. Physics and Astronomy students have been rather successful in receiving these fellowships, especially the latter two, which carry nice stipends and a certain amount of prestige. Students do not apply directly for these fellowships, but must be nominated by the department. Let your advisor know if you are interested. Check the Graduate School website for more information.

### 6. *Summer Support*

For first-year students in good academic standing, summer support is guaranteed by the department during the summer following their first spring semester. **For international students, this support is contingent upon passing the ITAP exam by the end of their second semester.** The support may be in the form of a RA or a TA. In subsequent years, support is not guaranteed, but almost all students are supported on some sort of assistantship or fellowship. Students interested in summer RA support should approach faculty in their area of interest to see if support is available. Students do not need to register for courses during the summer, and are encouraged to spend as much time on research as possible.

### 7. *Jobs outside the Department*

Teaching and research assistants who hold a 0.5 FTE or greater appointment are not allowed to hold additional employment outside the Department, with the exception of tutoring, without special permission from the department chairperson. The Department's policy is that time not taken up by assistantship duties should be devoted to course work, research, and other degree requirements. Since tutoring aids graduate students in learning the fundamentals of their discipline, a maximum of 5 hours of tutoring per week is allowed. Tutoring students for pay in a course in which you are assigned is not allowed.

### D. Time Limits

**Master's:** All requirements for the Master's degree must be completed during the six years (18 fall, spring, and summer semesters) immediately preceding the date on which the degree is to be awarded.

**Ph.D.:** All requirements for the doctoral degree must be completed within the seven-year period (21 fall, spring, and summer semesters) following admission to the doctoral program. A single one semester extension may be granted in compelling extenuating circumstances. If the time limit is exceeded, the student will need to reapply to the Ph.D. program and, upon readmission, retake classes that were taken more than 7 years previously.

UA Production - 000007

# III. REQUIREMENTS FOR THE Ph.D. DEGREE

## A. COURSE REQUIREMENTS

Course requirements for the Ph.D. in Physics or with Astronomy specialization (totaling 48 semester hours of coursework and 24 semester hours of research) consist of 5 components:

1. Core Courses  (18 semester hours)
2. Sub-Area Courses  (12 semester hours)
3. Research Techniques and approved electives  (9 semester hours)
4. Seminars, Research Techniques, or approved electives  (9 semester hours)
5. Dissertation Research – PH 699  (24 semester hours)

**Advising Worksheet:** A Graduate Student Advising Worksheet must be kept on file with the department office beginning the second semester of enrollment. The worksheet on file should be updated each subsequent semester, to keep current. Worksheets for each degree program and sub-area can be found at http://physics.ua.edu/grad/advising/. An "Outline of Ph.D. Program (Plan of Study)" form based on this worksheet must be submitted to the Graduate School by the semester in which 30 hours have been earned.

### 1. Core courses  (18 hours)

The core courses consist of:

PH 501  – Classical Dynamics
PH 531  – Electromagnetic Theory I
PH 532* – Electromagnetic Theory II
PH 541  – Quantum Mechanics I
PH 542* – Quantum Mechanics II
PH 571  – Statistical Physics

Courses marked with * may be substituted by some sub-area courses (see below).

The customary schedule for completing these core courses is to take two each semester, starting in the first semester, in the following sequence:

First Fall:      PH 501, PH 531
First Spring:   PH 541, PH 532* and/or PH 571
Second Fall:   PH 542*

The completion of any of the above courses (or the equivalent, as approved by the graduate director or department chair) with a grade of B (3.0/4.0) or better prior to enrolling as a graduate student in this department may fulfill the requirement for that course (see §V. Transfer Credit).

### 2. Sub-Area Courses  (12 hours)

Students must take 4 courses (12 semester hours) in their chosen sub-area. These should be chosen in consultation with and approved by the student's research advisor (if chosen) or the graduate advisor responsible for their sub-area. Substitution of courses within the sub-area

8

UA Production - 000008

courses other than those listed here should be made only at the recommendation of the student's research advisor and should represent a similar level substitution which is more applicable to the student's research specialty. The suggested courses for each sub-area are as follows:

Condensed Matter Physics
      1. PH 581 – Solid State Physics
      2. PH 585 – Magnetism and Magnetic Materials
      3. PH 586 – Advanced Magnetism and Magnetic Phenomena
      4. PH 681 – Advanced Solid State Physics
      — frequently taken additional courses:
        PH 591 – Advanced Laboratory
        PH 534 – Digital Electronics

High Energy Particle Physics Theory
      1. PH 523 – Relativity
      2. PH 561 – Nuclear & Elementary Particle Physics
      3. PH 641 – Relativistic Quantum Mechanics
      4. PH 642 – Quantum Field theory
      — frequently taken additional courses:
        PH 661 – High Energy Physics
        PH 662 – High Energy Physics II

Experimental Particle Physics
      1. PH 561 – Nuclear & Elementary Particle Physics
      2. PH 641 – Relativistic Quantum Mechanics
      3. PH 642 – Quantum Field Theory   OR   PH 591 – Advanced Lab
      4. PH 661 – High Energy Physics

Astrophysics (within Astronomy specialization)
      — core substitutions:

| AY 640* – Radiative Processes | in lieu of PH 532 (E&M II) |
| AY 521* – Theoretical Astrophysics | in lieu of PH 542 (QM II) |

      1. AY 533 – Observational Techniques
      2. AY 550 – Stars & Stellar Evolution
      3. AY 620 – Extragalactic Astrophysics
      4. AY 630 – Galaxy & Stellar Dynamics
      — frequently taken additional courses:
        AY 580 – Cosmology
        PH 523 – Relativity

Astroparticle Physics (within Astronomy specialization)
      — optional core substitution:

| AY 640* – Radiative Processes  OR  PH 532 (E&M II) |

      1. AY 521 – Theoretical Astrophysics
      2. AY 580 – Cosmology

UA Production - 000009

3. PH 523 – Relativity
4. PH 561 – Nuclear & Elementary Particle Physics

Courses marked with * may be taken in lieu of the indicated core course only by students within the indicated sub-area. Students must submit a plan of study indicating their sub-area before opting out of the relevant core course.

In some sub-areas, courses past the 4 required sub-area courses are those commonly taken instead of Research Techniques courses (see below). Students should consult their advisor as to which of these they should take.

Typically, one sub-area course is taken each semester, along with core courses, so they are completed by the end of a student's 4th semester. Many of these courses are offered only every other year, so students should consult with their advisor for appropriate scheduling.

### 3. Research Techniques and Approved Electives    (9 hours)

In addition to the core and sub-area courses, an additional 9 semester hours of graded work is required. This will typically consist of Research Techniques (PH 590) taken with the student's chosen research advisor **after core courses are completed**. This 3-hour course can be repeated. The intention is for the student to learn, in an interactive research-oriented setting, research techniques and background even more specific to the sub-field in which they are working than the sub-area courses. It is allowable to instead take additional elective courses pertaining to this goal (with the consent of the student's advisor), as long as a total of 9 semester hours of graded coursework results.

### 4. Seminars, Research Techniques, or Approved Electives    (9 hours)

For each semester in residence, full-time students are required to enroll for one hour of PH 597 (Physics Seminar) or AY 597 (Astrophysics Seminar), which are graded on a pass/fail basis. Up to 9 semester hours of seminars (PH 597 or AY 597), can be counted toward the Ph.D. degree. Thus, this requirement will typically be satisfied automatically. If otherwise necessary, these hours may be fulfilled by additional coursework, including Non-thesis Research (PH 598), Non-Dissertation Research (PH 698), additional instances of Research Techniques (PH 590), and approved electives. Note that no more than 9 semester hours of pass/fail coursework (AY 597, PH 597, PH 598, PH 698) can be counted toward the Ph.D. degree.

**Physics Seminar** requirements include attending at least 10 sub-area seminars (e.g., MINT or Theory) and/or departmental colloquia. First-year physics students must attend a minimum of one MINT and one Theory seminar. For students in the second year and beyond, the division among seminars and departmental colloquia will be determined by the student's advisor, in consultation with the student. Students in the 2nd year and beyond must also make one presentation each semester.

**Astrophysics Seminar** requirements include attending weekly astronomy seminars, departmental colloquia, and making presentations, starting in the first semester.

10

UA Production - 000010

**Other course requirements:** Of the 18 hours taken under A.3 and A.4, a maximum of 12 hours may be taken outside the department. These courses, which must be at the graduate level and relevant to their research, should be from the following departments: Mathematics, Computer Science, Chemistry, Biology, Geology, and departments within the College of Engineering.

### 5. Dissertation Research    (24 hours)

Students are required to earn at least 24 hours of dissertation research (PH 699). However, a student cannot gain credit for Dissertation Research (PH 699) before passing the Preliminary Exam. Note that, once initiated, enrollment in PH 699 must be continuous until the Ph.D. is awarded. (See also §III.D below.)

## B. QUALIFYING AND PRELIMINARY EXAMINATIONS

There are two separate exams that a prospective Ph.D. candidate must pass. The first of these, the Qualifying Exam, is given early in the student's career and covers primarily advanced undergraduate physics; **passing the Qualifying Exam is a requirement for formally entering the Ph.D. program.** The second exam, the Preliminary Exam, is given before the dissertation research is begun and is more closely related to the student's research area; passage of this exam formally admits one to candidacy for the Ph.D.

### 1. *Qualifying Examination*

The Qualifying Exam is given in part each January and August. Students who do not pass by January of their 3rd year are no longer eligible for the Ph.D. (students entering in January have until August of their $3^{nd}$ year). Passing the Qualifying Exam in a timely way is necessary (but not sufficient) to maintain good academic standing (see §II.A.5.). Entering students are encouraged to take the exam offered at the beginning of their first semester, but, as noted in §II.A.5, there is no minimum performance required to maintain good academic standing until the beginning of the second semester. As an alternative to passing the Qualifying Exam, **entering** students can submit a Physics GRE score of at least 70th percentile.

The Qualifying Exam is a written test consisting of four parts covering four areas of undergraduate Physics: the January exam covers Electricity & Magnetism (Part I) & Classical Mechanics (Part II); the August exam covers Quantum Mechanics (Part III) & Thermal Physics (Part IV). Each part must be passed separately with a score of at least 70%. Passing an individual part means it does not need to be repeated in subsequent tries (if subsequent tries are necessary). Students can appeal only in borderline cases (if a student makes 65% or more). The committee will review appeals and make final decisions.

### 2. *Preliminary Examination*

The Preliminary Exam focuses on the student's area of specialization, and may include areas of graduate-level physics related to the research. The student in consultation with his/her research advisor chooses a committee consisting of four faculty members. The advisor will not be a member of the committee but will be invited to observe the examination. The department chairperson must

11

approve the committee. A form to be used in selecting the committee is provided on the department website. No more than one committee member can be from outside the department. Students without a research advisor will not be allowed to take the exam.

The Preliminary exam should be passed as early as possible once the student has finished all core courses and sub-area courses and has begun actual dissertation research (normally before the end of a student's 7th semester and no later than the end of the student's 8th semester). The exam consists of two parts: a written research plan and an oral examination. The written research plan (normally 2000-3000 words) developed with the research advisor must be submitted to the committee members two weeks before the oral exam. The research plan should include a description of the problem to be addressed, a literature survey, the approach that will be undertaken to tackle the problem, and a discussion of expected results. The oral examination will consist of a forty-minute presentation of the research plan followed by questions from the committee on the research plan and the application of graduate level coursework to the proposed research. The decision to pass or fail will be based on these two criteria: 1) the student's knowledge of graduate-level physics and 2) the feasibility of the proposed research plan. No more than one dissenting vote is allowed for a pass.

The Preliminary Exam chairperson will notify the department chairperson in writing of the committee decision after the student attempts the exam. After the student has passed the exam, the Preliminary Exam Committee will sign the Application for Admission to Candidacy form. Only two attempts of the Preliminary Exam are permitted. Passing the Preliminary Exam within four years of arrival is necessary (but not sufficient) to maintain good academic standing (see §II.A.5.). Consequences of not maintaining good academic standing are described in §II.A.5.

## C. MASTER'S DEGREE ENROUTE TO THE Ph.D.

Once a student has successfully passed the Preliminary Exam, s/he has automatically satisfied the requirements for the Plan II Master's Degree. This is because the Preliminary Exam can be substituted for the comprehensive master's exam. In order to receive the M.S. degree, the student need only submit two forms: an online Application for Degree (through mybama), and the Master's Comprehensive Exam form.

## D. RESEARCH AND DISSERTATION

### 1. *Selecting a research area and a research advisor*

The selection of a research area and advisor should be made as soon as possible after the student has passed the Qualifying Examination. A student cannot gain credit for Dissertation Research (PH 699) before s/he passes the Preliminary Exam. The student should first interview several faculty members whose research may be of interest to the student, and the faculty members will describe potential research projects. The selection of a research area and a research advisor will then be made by agreement between the student and the advisor. As soon as the selection is made, both the student and the advisor must notify the department chairperson in writing. If a student and research

12

UA Production - 000012

advisor mutually agree to end their relationship. the student and advisor must both notify the department chairperson in writing of this action. The student must then begin the selection process again. The Department requires that all students doing research toward a degree be supervised by a research advisor approved by the Department. The student must keep his/her advisor fully and regularly informed of the progress of his/her research. Failure to do so could result in the dissertation not being approved.

## 2. *The dissertation committee*

The student, in consultation with his/her advisor and the department chairperson, will form a Dissertation Committee soon after the Preliminary Examination is passed (by the end of the same semester). The committee will consist of five members of the Graduate Faculty, including the research advisor as committee chairperson, three other faculty members from the Department of Physics and Astronomy, and one faculty member of another department. (The external committee member may be from another institution if prior approval is obtained from the Dean of the Graduate School.) The chair must be a full member of the Graduate Faculty. Students doing theoretical (experimental) dissertations are advised to have at least one faculty member on the committee who is an experimentalist (theorist). At least one departmental member of the committee should be from an area outside the student's major research concentration. If the research advisor is not a regular member of the department (either external or adjunct), a regular member of the department must serve as co-chair. An advisor from outside the department would also serve as the external member of the committee. A form to use in selecting the committee is available on the department website. **The student is required to meet with the Dissertation Committee at least once a year for assistance in monitoring and guiding the student's research.**

## 3. *Final version of the dissertation*

A final version of the dissertation will be given to each of the five members of the Dissertation Committee at least two weeks before the oral defense. The student is responsible for all aspects of the production of the dissertation, including the preparation, typing, reproduction, dissemination to the committee members, and all costs involved. Departmental resources cannot be utilized for the production of the dissertation. Please submit a clean, unbound copy of your completed dissertation to the office after your defense, for our permanent records.

## 4. *Oral examination*

A final oral examination must be passed after completion of the dissertation. This examination follows a public presentation by the candidate on the results of his or her research. The examination will be primarily on the candidate's research work as embodied in the dissertation, but it may also encompass the complete program for the degree. The examining committee will be the Dissertation Committee previously described. No more than one dissenting vote is allowed for a pass. The student may take the oral examination only once.

# IV.  M.S. DEGREE

## A.  Qualifying Exam

UA Production - 000013

M.S. students are not required to pass the Ph.D. Qualifying Exam (see §III.B.1) in order to earn the M.S. degree. However, to remain in good academic standing, M.S. students must pass the Qualifying Exam within 2 years (+1 month) of arrival and pass at least one (as yet) un-passed section of each exam administered. Consequences of **not** maintaining good academic standing are described in §II.A.5.

## B. M.S. IN PHYSICS  (Thesis Option – Plan I)

### 1. *Course requirements*

A total of 24 semester hours of coursework is required, in addition to 6 semester hours of research.

Course requirements for the M.S. (with thesis) consist of 5 components:

    a. Core Courses  (12 semester hours)
    b. Electives  (6-9 semester hours)
    c. Research Techniques  (0-3 semester hours)
    d. Seminars  (3 semester hours)
    e. Thesis Research – PH 599  (6 semester hours)

**Advising Worksheet:** A Graduate Student Advising Worksheet must be kept on file with the department office beginning the second semester of enrollment. The worksheet on file should be updated each subsequent semester, to keep current. Worksheets for each degree program and sub-area can be found at http://physics.ua.edu/grad/advising/.

### a. Core courses   (12 hours)

The four Physics M.S. core courses consist of:

    PH 501  – Classical Dynamics
    PH 531  – Electromagnetic Theory
    PH 541  – Quantum Mechanics
    PH 571  – Statistical Physics

The customary schedule for completing the M.S. core courses is to take two each semester, starting in the first semester, in the following sequence:

    First Fall:     PH 501, PH 531
    First Spring:  PH 541, PH 571

### b. Electives   (6-9 hours)

Students must take at least graded 2 electives (6 semester hours). As many as 2 Ph.D. core courses (beyond the M.S. core) may be taken as electives. Electives should be chosen in consultation with and approved by the student's advisor (if chosen) or a member of the Graduate Advising Committee. These electives, which must be at the graduate level, should be from the following departments: Physics, Mathematics, Computer Science, Chemistry, Biology, Geology, and departments within the College of Engineering. A maximum of 6 credit hours from outside the department can count for the M.S. degree.

14

UA Production - 000014

- **c. Research Techniques**   (0-3 hours)

Up to 3 semester hours of Research Techniques (PH 590), taken with the student's chosen research advisor after the core courses are completed, can be counted toward the M.S. degree.

**d. Seminars and pass/fail electives**   (3 hours)

For each semester in residence, full-time students are required to enroll for one hour of PH 597 (Physics Seminar), which are graded on a pass/fail basis. Up to 3 semester hours of seminars (PH 597) can be counted toward the M.S. degree. Thus, this requirement will typically be satisfied automatically. Note that no more than 3 semester hours of pass/fail coursework (PH 597, PH 598) can be counted toward the M.S. degree.

**e. Thesis Research**   (6 hours)

Students are required to earn at least 6 semester hours of thesis research (PH 599), discussed further below.

**2. *Selecting a research area and a research advisor***

A student should first interview several faculty members whose research may be of interest to the student, and the faculty members will describe potential research projects. The selection of a research area and a research advisor will then be made by agreement between the student and the advisor. As soon as the selection is made, both the student and the advisor should notify the department chairperson of the decision in writing. The selection should be done before or during the second semester of graduate study. The Department chairperson must also be notified in writing of any change of research advisor.

**3. *The thesis committee***

After selection of a research advisor and research area, the student, in consultation with his/her advisor and department chairperson, will form a Thesis Committee. The committee will consist of at least three members, including the research advisor as committee chairperson, one other faculty member from the Department of Physics and Astronomy, and one faculty member from another department. (The external committee member may be from another institution if prior approval is obtained from the Graduate Dean.) A form to use in selecting the committee is available on the department web site.

**4. *The final version of the thesis***

A final version of the thesis will be given to each of the members of the Thesis Committee at least two weeks before the oral defense. The student is expected to be responsible for all aspects of the production of the thesis, including the preparation, typing, reproduction, dissemination to the committee members, and all costs involved. Departmental resources cannot be utilized for the production of the thesis.

15

UA Production - 000015

### 5. *Oral examination*

A final oral examination must be passed after completion of the thesis. The examination will be both a comprehensive examination on the master's degree program as well as an examination of the candidate's research work as embodied in the thesis. The examining committee will be the Thesis Committee previously described. No more than one dissenting vote is allowed for a pass. The student may take the oral examination only once.

## C. M.S. IN PHYSICS (Non-Thesis Option – Plan II)

### 1. *Course requirements*

A total of 30 semester hours of course work is required. The course requirements are the same as for the M.S. degree with thesis (§IV.A.1) except that, in place of PH 599 (Thesis Research), the student will take 6 additional hours of advisor-approved electives. These 6 hours must be graded Physics courses (not P/F) and cannot include PH 590 – Research Techniques.

### 2. *Oral examination*

A comprehensive oral examination on the course content of the M.S. (non-thesis) program must be passed during the last semester of study. The committee will consist of at least three members of the department to be chosen by the department chairperson in consultation with the student. No more than one dissenting vote is allowed for a pass. The student may take the oral examination no more than twice. Note: A student en route to a doctoral degree may substitute the Preliminary Exam for this M.S. oral exam.

## D. M.S. IN PHYSICS WITH ASTRONOMY SPECIALIZATION (Thesis Option – Plan I)

### 1. *Course requirements*

A total of 24 semester hours of coursework is required, in addition to 6 semester hours of research.

Course requirements for the M.S. in Physics with Astronomy Specialization (with thesis) consist of 5 components:

    a. Core Courses (12 semester hours)
    b. Electives (6-9 semester hours)
    c. Research Techniques (0-3 semester hours)
    d. Seminars (3 semester hours)
    e. Thesis Research – PH 599 (6 semester hours)

**Advising Worksheet:** A Graduate Student Advising Worksheet must be kept on file with the department office beginning the second semester of enrollment. The worksheet on file should be updated each subsequent semester, to keep current. Worksheets for each degree program and sub-area can be found at http://physics.ua.edu/grad/advising/.

16

**a. Core courses**   (12 hours)

The four M.S. core courses consist of:

> PH 501 – Classical Dynamics
> PH 531 – Electromagnetic Theory
> PH 541 – Quantum Mechanics
> AY 521 – Theoretical Astrophysics    OR    AY 533 – Observational Techniques

**b. Electives**   (6-9 hours)

Students must take at least 2 electives (6 semester hours).  As many as 2 Ph.D. core courses (beyond the M.S. core) may be taken as electives.  Electives should be chosen in consultation with and approved by the student's advisor (if chosen) or a member of the Graduate Advising Committee.  These electives, which must be at the graduate level, should be from the following departments: Physics, Mathematics, Computer Science, Chemistry, Biology, Geology, and departments within the College of Engineering.  A maximum of 6 credit hours from outside the department can count for the M.S. degree.

**c. Research Techniques**   (0-3 hours)

Up to 3 semester hours of Research Techniques (PH 590), taken with the student's chosen research advisor after the core courses are completed, can be counted toward the M.S. degree.

**d. Seminars and pass/fail electives**   (3 hours)

For each semester in residence, full-time students are required to enroll for one hour of AY 597 (Astronomy Seminar), which are graded on a pass/fail basis.  Up to 3 semester hours of seminars (AY 597) can be counted toward the M.S. degree.  Thus, this requirement will typically be satisfied automatically.  Note that no more than 3 semester hours of pass/fail coursework (AY 597, PH 598) can be counted toward the M.S. degree.

**e. Thesis Research**   (6 hours)

Students are required to earn at least 6 semester hours of thesis research (PH 599).

**2. Research and thesis**

The general rules concerning research and the thesis that apply to the M.S. in Physics also apply to the M.S. in Physics with Astronomy specialization.

17

UA Production - 000017

## E. M.S. IN PHYSICS WITH ASTRONOMY SPECIALIZATION
## (Non-Thesis Option – Plan II)

### 1. *Course requirements*

A total of 30 hours of graduate course work is required. The course requirements are the same as for the M.S. degree in Physics with Astronomy Specialization (thesis option; §IV.C.1) except that, in place of PH 599 (Thesis Research), the student will take 6 additional hours of advisor-approved electives. These 6 hours must be graded Astronomy courses (not P/F) and cannot include PH 590 – Research Techniques.

### 2. *Oral examination*

The student must pass an oral examination as described under the M.S. in Physics (without thesis) described in §B.2 above.

# V.  TRANSFER CREDIT

Students are allowed to apply for transfer of graduate credit earned at another institution. In order for a course to be considered for transfer credit, the student must have earned a minimum grade of "B" on the course. In addition, the student must have achieved an overall average of "B" or better on all courses attempted at the institution from which transfer credit is being requested. The Graduate School must have an official transcript of the credit involved. Up to 1/2 of the required course work for a Ph.D. or M.S. degree is allowed to be transferred, with the approval of the department and the dean of the Graduate School. All credit toward the Master's degree must have been earned during the six years immediately preceding the date on which the degree is awarded. All credit toward the Ph.D. degree must have been earned during the six-year period preceding admission to the doctoral program. A form is available on the department website for submission to the Graduate School in applying for transfer credit.

In some cases, the Graduate School will be unable to grant transfer credit based on the information they have, and may suggest the student submit his or her transcripts to World Education Services (www.wes.com). Upon the recommendation of the department's Graduate Advising Committee, the department will cover the $125 fee for the WES services.

UA Production - 000018



PLAINTIFF'S
EXHIBIT
6



Office of the Vice President for
Research & Economic Development

May 23, 2017

Mr. Ali Amiri
Box 870324
Aamiri1@crimson.ua.edu

Dear Mr. Amiri:

The information you submitted to the Office of Research Compliance the week of April 24 for allegations of misconduct has been carefully reviewed. The information you provided was in support of your allegations of plagiarism and fabrication against Dr. Arun Gupta and Dr. Patrick LeClair. At this time, it has been determined that the information provided does not support claims of plagiarism and fabrication. However, if you would like to submit any additional documentation related to this matter to support your claim, I am willing to review the additional information to provide an assessment.

Related to intellectual property ownership, students who are University employees are obligated to adhere to the university policies and procedures pertaining to patents as delineated in the Faculty Handbook (Appendix G) and The University of Alabama Patent Policy. Please note: ownership of creative works and inventions derived from activities directly related to a student's employment at UA belongs to the university.

Furthermore, according to the University of Alabama's Data Retention Policy, scientific records for research and sponsored projects belong to UA. Conversely, members of the research team will be allowed reasonable access to the data, and any materials with which they have been working and research personnel must ensure that PIs are provided with copies of all data generated by the grant-supported project.

The Office of the Vice President for Research and Economic Development provides oversight for allegations of research misconduct. Claims associated with academic progress must be handled through University Academic Grievance Procedures provided in the University of Alabama Graduate Catalog.

Should you have additional questions or concerns about research misconduct, please contact Ms. Tanta Myles.

Sincerely,

Carl A. Pinkert, Ph.D.
Vice President for Research and Economic Development

C:     Dr. Patrick LeClair
       Mr. Mike Spearing
       Ms. Tanta Myles



Ali Amiri <aamiri1@crimson.ua.edu>

# **CONFIDENTIAL**

**Ali Amiri** <aamiri1@crimson.ua.edu>                     Wed, May 31, 2017 at 11:21 PM
To: "Pinkert, Carl" <cap@ua.edu>
Cc: "Leclair, Patrick" <pleclair@ua.edu>, "Spearing, Michael" <mspearing@uasystem.edu>,
Carpantato Myles <cmyles@research.ua.edu>


Dr. Pinkert,


I have received your opinion on the reported research misconduct. Unfortunately the opinion
is not appropriately related to the subject matter. The main problems with your opinion are as
below:

1)      There is a false accusation against Dr. Patrick LeClair. There has been no claim against
Dr. LeClair in my report. *I think Ms. Tanta should apologize to Dr. LeClair for her mistake.*
This is an unacceptable mistake and has created a chaos in the physics department. (I have
recorded the full report, and the audio file is of very good quality)

2)      The main purpose of the report was to get access to an instrument called Pulse Laser
Deposition System (PLD), which is necessary to publish my scientific findings, and get
graduated. This was emphasized several times during the report. You even did not mention
this subject in your opinion. This was the main subject!

3)      The second important subject was prevention of research data leakage, and I have
provided concrete information in this regard. You did not mention this important issue in your
report as well. If the technology I have discovered leaks to another university or another
county, the lawsuit will not be less than 500 million dollars.

4)      The last thing was my claim about plagiarism and fabrication against Dr. Arunava
Gupta. I told that I am willing to drop these charges ONLY if I get access to PLD in a week or
so. Then I have presented clear and solid facts, and also, I have asked for further
investigation. Your investigation took more than a month, and your conclusion is incorrect.
*Can you please provide me with a more detailed report of your investigation?*

Since, more than a month is past from the report, and my access to the labs was completely
restricted, which is another strange reaction. I will not drop these charges anymore.


**Regard the intellectual property:**

I have been in contact with Office of Technology Transfer from January 2017, and we have
had several meetings. Including a meeting I had with the director, Dr. Rick Swatloski with this
regard. We have communicated the conditions for patenting and industrialization in details.

(Here I should appreciate Dr. LeClair for giving me the right information about the patent procedure. Although he did not support my idea for this device, and he has rejected my ideas, but he was still genuine enough to tell me the right information regard patenting).

We should move forward and prepare the ownership documents. Based on the university patent policy (Appendix G - Section four), the President of the University will authorize and sign this document. I will send a separate email to the President Dr. Stuart Bell with this regard. I would expect to receive my ownership documents within a week. And I will try to have my contract with industry before the end of this summer, preferably through OTT of the UA.


**NSF Report:**

Yesterday, I have received an email from the National Science Foundation. It was about a report and inquiry about the possibility of discrimination based on race, etc.

Although my project is funded by NSF, this is my first contact with NSF. And they have contacted me, which means there has been a report from UA to NSF with this regard. I have not responded to this email yet, but I will do so in the next few days.

Could you please submit your investigation results to the NSF Office of Inspector General? So they can continue and complete the investigation.

Also, if you don't mind, can I send the audio file of my report to Ms. Tanta to them? (I have listened to this audio file several times, and I think it is a clear and perfect report for this research misconduct).


Thanks,

Ali



[Quoted text hidden]
--
Ali Amiri
Doctoral Candidate
Center for Materials for Information Technology
Department of Physics and Astronomy
University of Alabama

PLAINTIFF'S
EXHIBIT
7
PENGAD 800-631-6989

The OTA would be happy to meet and further discuss this matter if deemed appropriate.
Please advise of any additional questions and/or comments.
Regards,
Charlie Dorsey
**Charles Dorsey**
Director, Office of Threat Assessment

The University of Alabama
office 205-348-2834
cdorsey@fa.ua.edu | http://threatassessment.ua.edu

**From:** Carvalho, Susan [mailto:scarvalho@ua.edu]
**Sent:** Friday, June 23, 2017 4:35 PM
**To:** Charles Dorsey <cdorsey@fa.ua.edu>; rmwilsie@bama.ua.edu
**Cc:** Pagani, Cathy <cathy@ua.edu>; Han, Luoheng <luoheng.han@ua.edu>
**Subject:** FW: Five Topics for One Dissertation!

Dear Dir. Dorsey and Sgt. Wilsie – after discussion today with Dean Olin of A&S, and Associate Dean
Cathy Pagani of the Graduate School, I am forwarding the email chain below, and its attachments,
from graduate student Ali Amiri. The College of A&S is concerned that Mr. Amiri has not responded
to messages that direct him toward appropriate academic grievance channels, and is instead
reaching out directly to the president and provost with his repeated accusations of misconduct.
Can you clarify for me whether this particular message should be handled through regular academic
channels, or whether it should be handled in concert with your office? The specific academic
questions are the following (associate dean Luoheng Han of A&S or Cathy Pagani, both cc'd here,
may add other concerns to this list):

- The two faculty members who have been directing Mr. Amiri's doctoral research no longer
  wish to direct his project, due to his failure to progress along the lines they have laid out for
  his research. Should we proceed to identify other directors, since a student cannot continue
  doctoral research without direction?
- Will his lack of further access to research facilities interfere with his academic standing in the
  program? Or do you consider that he is still an enrolled doctoral student, but without a lab?
- Is the Office of Legal Counsel involved in this case, and will they or you be making a
  determination about his continued status as a UA doctoral student? Or should we discuss this
  with Legal Counsel ourselves?
- Do you have suggestions or a plan to urge him to cease sending further messages to those
  who are not involved in the grievance hierarchy? Or should we proceed with addressing that?

We are available to discuss this in person or by phone. Since we understand that your office has
been involved with this student in the past, we don't want to pursue separate channels until
consulting with you. Thanks,
Susan Carvalho

UA Production - 000944



PLAINTIFF'S
EXHIBIT
8
PENGAD 800-631-6989

| | |
|---|---|
| From: | Han, Luoheng |
| To: | Carvalho, Susan |
| Cc: | Greer, Jennifer |
| Subject: | FW: FW: Graduate support status |
| Date: | Tuesday, June 27, 2017 12:16:58 AM |

FYI.

On 6/27/17, 12:10 AM, "Patrick Leclair" <pleclair@mint.ua.edu> wrote:

Luoheng,

We do not have much in writing unfortunately. Most of the assessment
(until the 7th year is approaching) has been done in face-to-face
discussions with research advisors, the dissertation committee members,
etc. I usually met with Ali about once a week to discuss research in my
office. I will see if I can find some relevant emails, but I doubt there
is much that will be helpful. I can say that one of the main metrics the
department uses is the number of publications the student has, which is
zero in Ali's case.

The department did do a formal assessment of his research progress this
spring, when the graduate advising committee considered the progress of
all students in or about to enter their 7th year. That is what led to the
letter from the graduate advising committee.

Beyond that, the only other departmental assessment of his research
progress was his preliminary examination, which he passed in March 2015. A
couple of points about that. One, that exam is only a _proposal_ for a PhD
dissertation, indicating that the student has a plausible plan. It does
not require having significant preliminary data, publications, etc.
Failing to complete the prelim is clearly a sign that progress is not
being made, but passing it does not automatically indicate everything is
OK either - it just indicates that there is a plausible plan in place that
the student still has to execute. Two: in March 2015 we did consider that
Ali was making good progress, but he has not progressed since then.

I discussed today with Conor Henderson (our grad director), and indicated
that from this point forward that we need a written progress report for
all doctoral students each semester so we have a record of their progress.
It has usually been the case that students are given the benefit of the
doubt if they are not close to their 7 year deadline and their advisor
will vouch for them. This is something I have been eager to change since I
started as chair, and we will be much more rigorous about establishing a
record of progress from this point on.

-patrick


Dr. Patrick R. LeClair
Assistant Professor
Undergraduate Director
Department of Physics and Astronomy
Box 870324
University of Alabama



PLAINTIFF'S
EXHIBIT
9

Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8283 | Mobile 205-239-8192
amg@ua.edu | http://graduate.ua.edu

he University of Alabama



**Twitter | Facebook | YouTube**

**From:** Susan Carvalho <scarvalho@ua.edu>
**Date:** Monday, July 3, 2017 at 11:14 AM
**To:** "Williams, Libby" <lwilliam@aalan.ua.edu>, Angela Abrams <ayabrams@bama.ua.edu>, "Taylor, Ashley" <abtaylor4@ua.edu>, "Mason, Margaret" <mcmason1@ua.edu>, "Fuller, Patrick" <patrick.d.fuller@ua.edu>, "Stewart, Aubrey" <alstewart4@ua.edu>, "Goodliffe, Andrew" <amg@ua.edu>
**Subject:** Ali Amiri, CWID 

Hi all – the student referenced above has been dismissed from his doctoral program (Physics). He is an international student. If he submits an application to any other graduate program in the coming weeks, please let me know.
Thanks,
Susan Carvalho

**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile 859-618-4399
scarvalho@ua.edu | http://graduate.ua.edu

he University of Alabama

| | |
|---|---|
| **From:** | Carvalho, Susan |
| **To:** | Goodliffe, Andrew; Williams, Libby; Angela Abrams; Taylor, Ashley; Mason, Margaret; Fuller, Patrick; Stewart, Aubrey |
| **Subject:** | Re: Re: Ali Amiri, CWID 11342916 |
| **Date:** | Tuesday, July 04, 2017 6:02:51 PM |
| **Attachments:** | image001.png |

Yes, it has now. The department did not notify us at the time of dismissal - they just notified us last week. Beth has sent the letter informing him of the hold. Charter spoke with him by phone and thinks he will want to find a way to stay in the US. Other issues in his case make me want to stay informed. Thanks!
Susan


Susan Carvalho, Ph.D.
Associate Provost and Dean of the Graduate School
University of Alabama
102 Rose Administration Bldg.
Tuscaloosa AL 35487
205-348-5921 (office)
859-618-4399 (mobile)


-------- Original message --------
From: "Goodliffe, Andrew"
Date: 7/4/17 5:10 PM (GMT-06:00)
To: "Carvalho, Susan" , "Williams, Libby" , Angela Abrams , "Taylor, Ashley" , "Mason, Margaret" , "Fuller, Patrick" , "Stewart, Aubrey"
Subject: Re: Ali Amiri, CWID 11342916

Susan,
Do you know if a hold has been put on the student in Banner – this is usually how we catch these sorts of cases.
Andy

**Andrew M. Goodliffe**
**Assistant Dean and Associate Professor of Geophysics**

Graduate School
The University of Alabama
102 Rose
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8283 | Mobile 205-239-8192
amg@ua.edu | http://graduate.ua.edu

he University of Alabama

Twitter | Facebook | YouTube

| From: | Han, Luoheng |
|---|---|
| To: | Carvalho, Susan |
| Cc: | Pagani, Cathy |
| Subject: | Re: Re: Ali Amiri |
| Date: | Friday, June 23, 2017 5:17:43 PM |
| Attachments: | image001.png |

I am going to forward you the letter Dr. Suzuki sent to Ali, which explains the reasons for taking his keys to the lab back.

**From:** "Carvalho, Susan" <scarvalho@ua.edu>
**Date:** Friday, June 23, 2017 at 5:00 PM
**To:** Luoheng Han <luoheng.han@ua.edu>
**Cc:** "Pagani, Cathy" <cathy@ua.edu>
**Subject:** Ali Amiri

Hi Luoheng                                                                    . Can you briefly tell me the
specific grounds on which his access to the lab was taken away – was it because of failure to make
progress on the research? Or what was the justification I should convey to Legal Counsel? (brevity is
fine here)

Thanks,
Susan


**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280| Mobile 859-618-4399
scarvalho@ua.edu| http://graduate.ua.edu

The University of Alabama

UA Production - 000917

**From:** Carvalho, Susan
**To:** "cdorsey@fa.ua.edu"
**Subject:** FW: FW: Destruction of the scientific data
**Date:** Friday, June 23, 2017 5:34:00 PM
**Attachments:** Letter (Ali Amiri).pdf
image001.jpg

Dear Dir. Dorsey – one further item on Amiri – the letter from the lab director, containing rationale for denial of access to the lab. Can you let me know whether I should proceed to consult with Legal Counsel on the academic options at this point?

Thanks,

Susan Carvalho

Carvalho signature block no logo



**From:** Han, Luoheng
**Sent:** Friday, June 23, 2017 5:19 PM
**To:** Carvalho, Susan
**Cc:** Pagani, Cathy
**Subject:** FW: Destruction of the scientific data

FYI.

Luoheng

**From:** Takao Suzuki <TakaoSuzuki@mint.ua.edu>
**Date:** Tuesday, June 20, 2017 at 10:02 AM
**To:** Ali Amiri <aamiri1@crimson.ua.edu>
**Cc:** Carl Pinkert <cap@ua.edu>, Robert Olin <olin@ua.edu>, "pleclair@mint.ua.edu"
<pleclair@mint.ua.edu>, Luoheng Han <luoheng.han@ua.edu>, Michael Buettner
<mbuettner@mint.ua.edu>
**Subject:** FW: Destruction of the scientific data

Dear Mr. Ali Amiri:

Please find attached the letter.

With my best regards,

Takao

Dr. Takao Suzuki
Endowed Chair
Director for Center for Materials for Information Technology (MINT Center)
Professor of Electrical and Computer Engineering, and
Metallurgical and Materials Engineering
University of Alabama



THE UNIVERSITY OF
## ALABAMA
MINT CENTER

Dr. Takao Suzuki, *IEEE Fellow*
Endowed Chair, Director of Center for Materials for Information Technology (MINT)
Professor of the Department of Metallurgical and Materials Engineering
Professor of the Department of Electrical and Computer Engineering
Box 870209, Tuscaloosa, Alabama 35487-0209
Tel/Fax: (205) 348-2508 / (205) 348-2346
takaosuzuki@mint.ua.edu

June 20, 2017

Dear Mr. Ali Amiri:

Following the e-mail sent on June 19, 2017 to you by Dr. Patrick LeClair who is Chair of Department of Physics and Astronomy, and he is also your supervisor,   I am writing this letter in response to concerns at hand.

According to Dr. LeClair, you are no longer working on a research work under his supervision at MINT since May 15, 2017.    Also, to our record, you are not currently being supervised by any other MINT faculty.    Furthermore, you are not being supported by any research funds for this summer.    What this means is that you are not a MINT student at present.   ("MINT student" is a student who is being supervised by a MINT faculty member.)

Therefore, as MINT Director, it is my request to you that you must return all the keys that have been provided to you, and that you return them to Dr. Michael Buettner (MINT Facility Manager) at your earliest convenience, but by no later than June 23 (F) 3:00PM, 2017.    (The keys are listed below).

Of course, when you again become a MINT student, with your supervisor's approval you may request access.

Should you have any questions, please let me know.

With my best regards,

*Takao Suzuki*

Dr. Takao Suzuki
Director for Center for Materials for Information Technology (MINT Center)

1

UA Production - 000892



PLAINTIFF'S
EXHIBIT

//

To:       Walker, R.B.
          Carvalho, Susan
Subject:  FW: FW: The necessity of a proper action
Date:     Thursday, July 20, 2017 2:23:38 PM

He enrolled?

---

**R.B. WALKER | Director of Government Relations**
334-467-4512 | rbwalker@uasystem.edu

**From:** "Taylor, Bryan" <Bryan.Taylor@governor.alabama.gov>
**Date:** Monday, July 17, 2017 at 10:09 PM
**To:** "R.B. Walker" <rbwalker@uasystem.edu>
**Subject:** FW: The necessity of a proper action

RB -- Can you confirm whether this person is in fact a doctoral candidate at UA Dept of Physics?

**BRYAN M. TAYLOR**
**General Counsel**
Office of Governor Kay Ivey
Alabama State Capitol
600 Dexter Avenue
Montgomery, Alabama 36104

From: Chesnutt, Pam <pam.chesnutt@governor.alabama.gov>
Date: July 17, 2017 at 10:35:37 AM
To: Taylor, Bryan <bryan.taylor@governor.alabama.gov>
CC: Lee, Teresa <teresa.lee@governor.alabama.gov>
Subject: FW: The necessity of a proper action

More information from Ali Amiri -

Pam Chesnutt
Paralegal, Legal Office Administrator, and
Executive Assistant to Chief Deputy General Counsel

Office of Governor Kay Ivey
Alabama State Capitol
600 Dexter Avenue. Suite N-203
Montgomery, Alabama 36130
Office: 334-242-7120
Fax:    334-242-2335
pam.chesnutt@governor.alabama.gov

This electronic transmission contains information of a legal nature that may be protected as confidential and privileged in accord with the attorney-client privilege. The information is intended strictly for the use of the individuals or entities shown as addressees above. If you are not the

| From: | Yarbrough, Beth |
| To: | Carvalho, Susan |
| Subject: | RE: RE: Graduate support status |
| Date: | Wednesday, June 28, 2017 2:45:36 PM |
| Attachments: | image004.jpg |
| | image001.png |

The hold is in place.  Let me know later about the letter.

Beth

## Beth Yarbrough
Registrar

Graduate School
The University of Alabama
102 Rose Administration Building, Tuscaloosa, AL 35487
office 205-348-5921
beth.yarbrough@ua.edu | http://graduate.ua.edu

Description: The University of Alabama

**From:** Carvalho, Susan
**Sent:** Wednesday, June 28, 2017 2:00 PM
**To:** Yarbrough, Beth
**Subject:** FW: Graduate support status

Hi Beth – Mr. Ali Amiri was dismissed from the Physics doctoral program on 5/26 (see email below), following the department advisory committee's April review (attached). Will you place a hold on his registration for Fall 2017, if he has not already registered?

I will let you know when we can send the letter to him, informing him of this hold – we should not send it yet.
Thanks,
Susan

UA000081

| From: | Morris, Charter |
|---|---|
| To: | Carvalho, Susan |
| Subject: | RE: RE: Ali Amiri |
| Date: | Wednesday, August 30, 2017 8:08:02 AM |
| Attachments: | RE Request to Meet.msg |
| | image002.gif |
| | image003.jpg |

Hi Dean Carvalho,

He hasn't been in touch with me at all outside of the short email exchange from late June in the attachment.

He told me by phone that he would not be transferring his record or filing for a change-of-status or any of the other options I gave him. He made clear that he was suing the University and that he would fight this. I made clear that we would have to terminate his SEVIS record in fall – either for the dismissal from the program or for failure to enroll depending on the circumstances at the beginning of the semester.

I did give him until August 23, but we haven't terminated his SEVIS record yet. I had planned on doing that after today, since today is the last day of drop/add. I wanted to wait until now because I was unsure if his petition to be reinstated to the program would be approved or not.

Do you know if the Provost will respond to him today?

If not, I will terminate for his dismissal from the program and notify him.


**Charter Morris**
Director
International Student & Scholar Services
Capstone International Center
The University of Alabama
105 BB Comer, Box 870254
Tuscaloosa, AL 35487
Office 205-348-5402 | Fax 205-348-5406
charter.morris@ua.edu | http://international.ua.edu/isss/

Description: The University of Alabama

Twitter | Facebook | Instagram


From: Carvalho, Susan
Sent: Tuesday, August 29, 2017 10:28 PM
To: Morris, Charter <cmorris6@ua.edu>
Subject: Ali Amiri

> Hi Charter – can you update me on whether you have had any further conversations with Ali Amiri (Physics student dismissed in July), since your email to him on 6/30/2017?
>
> And has the information of his dismissal been communicated to SEVIS?
>
> I ask because he is seeking for the provost to reinstate him as a student. I wonder if he will have received any communication from SEVIS himself?
>
> Thanks,
> Susan

UA000090

PLAINTIFF'S
EXHIBIT
_13_


**From:** Carvalho, Susan
**To:** Morris, Charter
**Subject:** Graduate School letter to Ali Amiri
**Date:** Friday, June 30, 2017 9:23:00 AM
**Attachments:** 0967_001.pdf
image001.png

Hi Charter—just FYI, I learned today that the letter from the Graduate School to Ali Amiri, confirming the hold on his Fall registration and his dismissal from UA (attached), was sent via regular mail, not email, yesterday. So he will not have received it – he only received the communication from his department chair.
Because there was some ambiguity in the way that department email was written, I hope he understands that the department did not just withdraw financial support for the coming year, but actually dismissed him from the program.

The Graduate School letter would clarify that—but he hasn't received it. So if you can assess whether he understands the situation or not, that would be helpful all around. I just didn't want you to assume that he is fully aware, as he might not be. If I need to clarify this with him right away, please let me know.
Thanks,
Susan

**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile 859-618-4399
scarvalho@ua.edu | http://graduate.ua.edu

The University of Alabama



UA Production - 000915


PLAINTIFF'S EXHIBIT

_14_

Director

International Services
Capstone International Center
The University of Alabama
105 BB Comer, Box 870254
Tuscaloosa, AL 35487
Office 205-348-5402 | Fax 205-348-5406
charter.morris@ua.edu | http://is.ua.edu/

Description: The University of Alabama

### Twitter | Facebook | Instagram

**From:** Greer, Jennifer [mailto:jdgreer@ua.edu]
**Sent:** Tuesday, June 27, 2017 12:47 PM
**To:** 'charter.morris@ua.edu' <charter.morris@ua.edu>
**Subject:** FW: Graduate support status
Jennifer D. Greer, Ph.D.
Associate Provost for Administration
University of Alabama
254 Rose Administration
Box 870114
Tuscaloosa, AL, 35487-0114
Direct line (205) 348-6304
Main office line (205) 348-4890
jdgreer@ua.edu

**From:** Carvalho, Susan
**Sent:** Monday, June 26, 2017 4:18 PM
**To:** Greer, Jennifer
**Subject:** FW: Graduate support status
Hi Jennifer – the attached Grad Committee assessment and the chair's email below effectively terminate Ali Amiri's student status. Do you want to run this by Norma during your regular meetings, do we do this by email, or shall I consult with her? Let me know best next step in making sure we are able to communicate this clear decision to him and make sure he understands it, as well as notifying the visa office.
Thanks,
Susan

The University of Alabama


**Twitter | Facebook | Instagram**


On Jun 30, 2017, at 10:08 AM, Ali Amiri <aamiri1@crimson.ua.edu> wrote:

> I just called your office and realized that you have another meeting right now. Please let me
> know if you have another time for a brief meeting today.
> On Jun 30, 2017 10:02 AM, "Ali Amiri" <aamiri1@crimson.ua.edu> wrote:

>> Hi, I am on my way. I will be in your office in 10 min. Is it OK?
>> On Jun 30, 2017 9:58 AM, "Morris, Charter" <cmorris6@ua.edu> wrote:

>>> Dear Ali,
>>> I hope everything is okay. We had an appointment for 9 am this morning, but when
>>> you didn't show up, I just wanted to make sure that there wasn't a misunderstanding
>>> about the time or any other issue.
>>> To follow up on what I had hoped to discuss, as I noted, I have been informed that
>>> you have been dismissed from your program in Physics, which will likely lead to
>>> dismissal from the PhD program. As you know, your F-1 student visa status is tied
>>> to your studies and program.
>>> What I wanted to do is to explore your options. Based on my understanding that you
>>> aren't being immediately dismissed but rather won't be allowed to continue in the
>>> program this fall, you have a little time to make some decisions. We won't have to
>>> terminate your F-1 SEVIS Record until the start of the fall semester, either when
>>> your dismissal goes into effect or when you fail to be able to enroll in coursework for
>>> the fall semester. That means that you have until August 23 to take action, with your
>>> options being the following:

>>> 1. Get admitted to a new program at UA and update your I-20. If you get admitted to
>>> a new program of study at UA, you would just need to complete an updated I-20
>>> request with proof of funding for the new program, and we would update your I-20
>>> to reflect that change in studies - http://is.ua.edu/wp-content/uploads/2016/07/I-
>>> 20_DS-2019_Request_Form.pdf

>>> 2. Get admitted to another school and transfer your SEVIS Record to them -
>>> http://is.ua.edu/currentstudents/maintaining-student-visa-status/transfer-out-of-
>>> sevis-record/

>>> 3. Apply for a change-of-status to another visa category, such as a B-1/B-2 visitor -
>>> https://www.uscis.gov/i-539;
>>> https://www.uscis.gov/sites/default/files/USCIS/Resources/C2en.pdf

>>> 4. If all other options fail, you can file for an Authorized Early Withdrawal, giving you
>>> a 15-day grace period to prepare to depart the U.S. -
>>> http://is.ua.edu/currentstudents/maintaining-student-visa-status/leave-of-absence/.
>>> This can be done just shortly before the August 23 deadline to maximize your
>>> amount of time to prepare to leave.

>>> I know that this is a tough time for you, and I just want you to know that we will help
>>> you in any way we can. While my office has no control over the academic decisions
>>> of the institution, we are here to make sure you have all the options necessary to
>>> make a decision about your next steps.

UA Production - 000960

the recommendation of the committee. And he attached the committee recommendation, which I attach here to this email. That document contained the names of the faculty members who made the recommendation for dismissal, and that is the reason that both Dr. Henderson and Dr. Townsley expressed their concerns about the implicit threat in the email, of "seeing the consequences" of the action.

I hope this helps clarify the chain of communication; glad to answer any further questions.
Susan
Carvalho signature block no logo

**From:** Charles Dorsey [mailto:cdorsey@fa.ua.edu]
**Sent:** Thursday, June 29, 2017 1:52 PM
**To:** Carvalho, Susan
**Cc:** Ronnie Robertson
**Subject:** RE: Five Topics for One Dissertation!
Dr. Carvalho,
While reading your email, I became somewhat confused. Has AMA (CWID: ██████) been officially dismissed from UA, or just denied funding for the Fall 2017 semester ?
Also, I have a call into UAPD Inv. Davis to ensure he and I each have the most up-to-date information concerning this matter.
Regards,
Charlie Dorsey
**Charles Dorsey**
Director, Office of Threat Assessment

The University of Alabama
office 205-348-2834
cdorsey@fa.ua.edu | http://threatassessment.ua.edu

**From:** Carvalho, Susan [mailto:scarvalho@ua.edu]
**Sent:** Thursday, June 29, 2017 11:31 AM
**To:** Charles Dorsey <cdorsey@fa.ua.edu>
**Cc:** Ronnie Robertson <rrobertson@fa.ua.edu>; Robert Wilsie <rwilsie@uapd.ua.edu>; Lemley, Norma <nlemley@uasystem.edu>
**Subject:** RE: Five Topics for One Dissertation!
Dear Mr. Dorsey – thank you for the note below, regarding Ali Amiri, recently dismissed from the Physics doctoral program. I met today with the chair of the Physics department, Patrick Leclair, who shared with me the attached email he received from Ali Amiri on June 1, in relation to the

UA Production - 000942



PLAINTIFF'S EXHIBIT
15

**Ali Amiri <aamiri1@crimson.ua.edu>**

## Audiotape of a group meeting

**Ali Amiri** <aamiri1@crimson.ua.edu>                                        Fri, Jun 23, 2017 at 4:46 PM
To: president <president@ua.edu>, kwhitaker@ua.edu, "Pinkert, Carl" <cap@ua.edu>, Takao Suzuki
<takaosuzuki@mint.ua.edu>, William Butler <wbutler@mint.ua.edu>

> **Group Meeting on April 7th 2017.wav**

Dear Professors,

The attached audiotape is from our group meeting on the April 7th, 2017. It is a full audiotape including the full length of discussion without any changes.

Let me describe it, a little bit:

In the first 3 minutes, I am talking about "Research Topic #5". This research was defined based on Dr. Ivan Schuller's recent work on the proximity effect. I was able to reproduce their results and get some new findings. But Dr. Gupta was not willing to let me finish these series of experiments and publish them.

In _minute 3_, Dr. Gupta uses the term "Dead End" which he usually uses when I talk about my career or my publication and so on. In _minute 17_ he repeats this term again.

From minute 3 to minute 5, I am talking about a great discovery I have made in correlated electron systems. (This is not from any of those Five Research Topics). I have found these results based on my own theoretical studies and few simple experiments. I have some good data on this research. To get a complete set of data, I have designed another experiment, which should prove my theory, and it will take 2-3 weeks to be done.

In minute 5, Dr. Gupta reminds me "the strain paper" which is rejected two times. (It was a combination of two unrelated sets of data, and Dr. Gupta did not let me write two papers, or dismiss one set of those data).

Please notice that: in some parts I am saying "that is true". It is obvious that this is not a confirmation. This is just a polite sentence to calm down people, to continue the discussion, in order to reach to a result.

If you have any question, please send me an email.

Again, I sincerely appreciate your time and patience. And sorry for inconvenience.

Best Regards,
Ali Amiri
--
Doctoral Candidate
Center for Materials for Information Technology
Department of Physics and Astronomy
University of Alabama


PLAINTIFF'S
EXHIBIT
16

| | |
|---|---|
| **From:** | Greer, Jennifer |
| **To:** | Carvalho, Susan |
| **Subject:** | RE: RE: Ali Amiri |
| **Date:** | Thursday, June 29, 2017 2:08:03 PM |
| **Attachments:** | image001.png |

I would think it best that Carl nor anyone in his office see this. That way they can't be accused of mishandling the second claim he has made because he calls the first report "faulty."

If the NSF Inspector General wants to look into it, we could tell Carl at that time.

My general stance is not to share criticisms and threats of lawsuits or grievances with those who will ultimately make the decision unless there's a compelling reason to do so.

Jennifer D. Greer, Ph.D.
Associate Provost for Administration
University of Alabama
254 Rose Administration
Box 870114
Tuscaloosa, AL, 35487-0114
Direct line (205) 348-6304
Main office line (205) 348-4890
jdgreer@ua.edu

**From:** Carvalho, Susan
**Sent:** Thursday, June 29, 2017 1:14 PM
**To:** Greer, Jennifer
**Subject:** Ali Amiri

Hi Jennifer – regarding the attached email from Ali Amiri from 6/1 – he mentions that "The NSF Inspector General will handle this case." Do you think I should forward this email to Carl Pinkert, both because of our own internal investigation and because of the reference to NSF involvement?

Let me know—thanks,
Susan

**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile 859-618-4399
scarvalho@ua.edu | http://graduate.ua.edu



PLAINTIFF'S EXHIBIT

17

PENGAD 800-831-6989

| | |
|---|---|
| **From:** | Carvalho, Susan |
| **To:** | Han, Luoheng |
| **Cc:** | Pagani, Cathy |
| **Subject:** | Behavioral Assessment Team (BIT) and Ali Amiri |
| **Date:** | Friday, June 23, 2017 1:02:00 PM |
| **Attachments:** | image001.png |
| **Importance:** | High |

Hi Luoheng (cc Cathy) – Cathy Pagani will be attending a Behavioral Assessment Team (BIT) meeting today at 3:30, and it would be best to discuss Ali Amiri's situation with them if you feel that he is in any way a danger to himself or others. As context for that conversation, can you forward Cathy any of the emails that you consider to indicate that he is reaching a danger level in his behavior, threats, etc.? She just needs one example.

Thanks so much,

Susan

**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile 859-618-4399
scarvalho@ua.edu | http://graduate.ua.edu

The University of Alabama

🔲

UA Production - 000886

PENGAD 800-631-6989

**EXHIBIT**
**_18_**

| | |
|---|---|
| **From:** | Carvalho, Susan |
| **To:** | "Charles Dorsey" |
| **Cc:** | "Ronnie Robertson" |
| **Subject:** | RE: RE: Five Topics for One Dissertation! |
| **Date:** | Friday, June 30, 2017 9:24:00 AM |
| **Attachments:** | image001.jpg |
| | image002.gif |

Thanks so much—

Susan
Carvalho signature block no logo

**From:** Charles Dorsey [mailto:cdorsey@fa.ua.edu]

**Sent:** Friday, June 30, 2017 9:06 AM

**To:** Carvalho, Susan

**Cc:** Ronnie Robertson

**Subject:** RE: Five Topics for One Dissertation!

Dr. Carvalho,

AMA is meeting this morning with UA's International Services Director Charter Morris to discuss his options based on his F-1 Visa. I spoke with Charter and briefed him on the current status of AMA. I also notified UAPD to ensure their situational awareness.

More to follow,

Charlie Dorsey

**Charles Dorsey**
Director, Office of Threat Assessment

The University of Alabama
office 205-348-2834
cdorsey@fa.ua.edu | http://threatassessment.ua.edu

**From:** Carvalho, Susan [mailto:scarvalho@ua.edu]

**Sent:** Thursday, June 29, 2017 5:44 PM

**To:** Charles Dorsey <cdorsey@fa.ua.edu>

**Cc:** Ronnie Robertson <rrobertson@fa.ua.edu>

**Subject:** RE: Five Topics for One Dissertation!

Hi Charles – AMA has been dismissed from the university in addition to the denial of funding. While Dr. Leclair did not reiterate the program dismissal in his email, he did reference that he would follow

UA Production - 000941

the recommendation of the committee. And he attached the committee recommendation, which I attach here to this email. That document contained the names of the faculty members who made the recommendation for dismissal, and that is the reason that both Dr. Henderson and Dr. Townsley expressed their concerns about the implicit threat in the email, of "seeing the consequences" of the action.

I hope this helps clarify the chain of communication; glad to answer any further questions.
Susan
Carvalho signature block no logo

**From:** Charles Dorsey [mailto:cdorsey@fa.ua.edu]
**Sent:** Thursday, June 29, 2017 1:52 PM
**To:** Carvalho, Susan
**Cc:** Ronnie Robertson
**Subject:** RE: Five Topics for One Dissertation!
Dr. Carvalho,
While reading your email, I became somewhat confused. Has AMA (CWID: 11342916) been officially dismissed from UA, or just denied funding for the Fall 2017 semester ?
Also, I have a call into UAPD Inv. Davis to ensure he and I each have the most up-to-date information concerning this matter.
Regards,
Charlie Dorsey
**Charles Dorsey**
Director, Office of Threat Assessment

The University of Alabama
office 205-348-2834
cdorsey@fa.ua.edu | http://threatassessment.ua.edu

**From:** Carvalho, Susan [mailto:scarvalho@ua.edu]
**Sent:** Thursday, June 29, 2017 11:31 AM
**To:** Charles Dorsey <cdorsey@fa.ua.edu>
**Cc:** Ronnie Robertson <rrobertson@fa.ua.edu>; Robert Wilsie <rwilsie@uapd.ua.edu>; Lemley, Norma <nlemley@uasystem.edu>
**Subject:** RE: Five Topics for One Dissertation!
Dear Mr. Dorsey – thank you for the note below, regarding Ali Amiri, recently dismissed from the Physics doctoral program. I met today with the chair of the Physics department, Patrick Leclair, who shared with me the attached email he received from Ali Amiri on June 1, in relation to the

notification of his dismissal.

Yesterday or today, Dr. Leclair also shared this email and photograph with the faculty members on the advisory committee, who wrote the recommendation for Mr. Amiri's dismissal. Two of the faculty members – Dr. Dean Townsley and Dr. Conor Henderson, told him that they felt threatened by the content of the email, the tone, and the reference to the artwork. Specifically, they pointed to his statement that "they will be held responsible" and "they will see the consequences of their unethical action."

As a result, Dr. Leclair reported the email and the faculty members' concern to Officer Davis at UAPD, as this relates to MINT Center research.

I wanted to make sure you are in this communication loop.

Mr. Charter Morris in the Office of International Student & Scholar Services will be meeting this week with Mr. Amiri, to discuss his options at this point, related to student visa eligibility, since he is an international student and has been officially dismissed from the University. He is also being notified today that he will not be allowed to register for Fall courses, based on this dismissal. He has been informed of the processes for appeal of the decision.

We look forward to your input as these processes move forward.

Sincerely,

Susan Carvalho

Carvalho signature block no logo



**From:** Charles Dorsey [mailto:cdorsey@fa.ua.edu]

**Sent:** Friday, June 23, 2017 6:26 PM

**To:** Carvalho, Susan

**Cc:** Pagani, Cathy; Han, Luoheng; Ronnie Robertson; Robert Wilsie

**Subject:** RE: Five Topics for One Dissertation!

Dr. Carvalho,

On 04/26/2017, the Office of Threat Assessment (OTA) became involved in this matter at the request of UA's Compliance, Ethics, and Regulatory Affairs Coordinator Dr. Marcy Huey. Based on this inquiry, the OTA conducted its standard background examination regarding AMA (CWID: 11342916) from a Behavioral Threat Assessment perspective. After a thorough review of all available, documented information, AMA's risk of committing a violent and/or assaultive act was placed at the LOW level. On 04/27/2017, this information was provided to Dr. Huey and UA Research Compliance Officer, Director Tanta Myles.

Based on the provided information-to-date, the OTA has no reason to change AMA's behavioral risk level. Regarding your other questions, the stated mission of the OTA has no responsibility to become involved in academic misconduct decisions. The current policies of the Department of Physics and Astronomy should dictate the status/future status of AMA within that Department.

UA Production - 000943

**The OTA would be happy to meet and further discuss this matter if deemed appropriate.**
**Please advise of any additional questions and/or comments.**
**Regards,**
**Charlie Dorsey**
**Charles Dorsey**
Director, Office of Threat Assessment

The University of Alabama
office 205-348-2834
cdorsey@fa.ua.edu | http://threatassessment.ua.edu

**From:** Carvalho, Susan [mailto:scarvalho@ua.edu]
**Sent:** Friday, June 23, 2017 4:35 PM
**To:** Charles Dorsey <cdorsey@fa.ua.edu>; rmwilsie@bama.ua.edu
**Cc:** Pagani, Cathy <cathy@ua.edu>; Han, Luoheng <luoheng.han@ua.edu>
**Subject:** FW: Five Topics for One Dissertation!

Dear Dir. Dorsey and Sgt. Wilsie – after discussion today with Dean Olin of A&S, and Associate Dean
Cathy Pagani of the Graduate School, I am forwarding the email chain below, and its attachments,
from graduate student Ali Amiri. The College of A&S is concerned that Mr. Amiri has not responded
to messages that direct him toward appropriate academic grievance channels, and is instead
reaching out directly to the president and provost with his repeated accusations of misconduct.
Can you clarify for me whether this particular message should be handled through regular academic
channels, or whether it should be handled in concert with your office? The specific academic
questions are the following (associate dean Luoheng Han of A&S or Cathy Pagani, both cc'd here,
may add other concerns to this list):

- The two faculty members who have been directing Mr. Amiri's doctoral research no longer
  wish to direct his project, due to his failure to progress along the lines they have laid out for
  his research. Should we proceed to identify other directors, since a student cannot continue
  doctoral research without direction?
- Will his lack of further access to research facilities interfere with his academic standing in the
  program? Or do you consider that he is still an enrolled doctoral student, but without a lab?
- Is the Office of Legal Counsel involved in this case, and will they or you be making a
  determination about his continued status as a UA doctoral student? Or should we discuss this
  with Legal Counsel ourselves?
- Do you have suggestions or a plan to urge him to cease sending further messages to those
  who are not involved in the grievance hierarchy? Or should we proceed with addressing that?

We are available to discuss this in person or by phone. Since we understand that your office has
been involved with this student in the past, we don't want to pursue separate channels until
consulting with you. Thanks,
Susan Carvalho

UA Production - 000944

Recycled ♺ Stock # DO-25-SS



PLAINTIFF'S
EXHIBIT
19

## Miller, Jared

| | |
|---|---|
| **Subject:** | Phone call re Ali Amiri |
| **Location:** | Susan will call |
| **Start:** | Mon 6/26/2017 2:30 PM |
| **End:** | Mon 6/26/2017 3:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Organizer:** | Carvalho, Susan |
| **Required Attendees:** | Han, Luoheng |

Hi Luoheng – can I call you at 2:30 to discuss Ali Amiri? Thanks,
Susan

**Miller, Jared**

| | |
|---|---|
| **Subject:** | Discussion re Ali Amiri |
| **Location:** | 102 Rose |
| | |
| **Start:** | Thu 6/29/2017 11:00 AM |
| **End:** | Thu 6/29/2017 11:30 AM |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Meeting organizer |
| | |
| **Organizer:** | Carvalho, Susan |
| **Required Attendees:** | Han, Luoheng; Leclair, Patrick |

1

UA000084



PLAINTIFF'S
EXHIBIT
20

Ali Amiri
Doctoral Candidate
Center for Materials and Information Technology
Department of Physics and Astronomy
University of Alabama



This statement is created by Dr. Gary Mankey in spring 2016.





PLAINTIFF'S
EXHIBIT
21

# Mumper Ready to Empower More Research at UA

📅 January 17th, 2019

By Adam Jones (mailto:adam.jones@ua.edu)

Dr. Russell J. Mumper wants to foster a sustainable environment that empowers research across campus to perform even more transformative work.

As he settles into his new role as vice president for research and economic development at The University of Alabama, Mumper is meeting with colleagues to understand the research enterprise on campus, and he's not hesitating to explore opportunities to enhance those efforts.

"I'm extremely impressed with the work here on campus and the involvement of students in leading-edge research," Mumper said.

He joined UA Jan. 4 after serving about four years as vice provost for academic affairs at the University of Georgia.



(https://www.ua.edu/news/wp
content/uploads/2019/01/19(
WEB.jpg)
**Dr. Russell J. Mumper**

Selected in October (https://www.ua.edu/news/2018/10/ua-names-vice-president-for-research/) after a national search, Mumper provides leadership for advancing UA's research and economic development efforts, fulfilling one of the primary goals of UA's Strategic Plan.

Mumper will spend the first few months of his tenure working on a collaborative strategic plan to expand the University's research enterprise consistent with UA's Strategic Plan.

"It's critical to work closely with faculty and academic units because they are the foundation for the success of this campus's research endeavors," he said.

He wants to continue to support the institutes on campus that broadly encourage faculty and researchers to collaborate in the areas of transportation, water, cyber and the human condition.

"Focus creates opportunity," Mumper said. "These are broad themes that include a lot of people, but are narrow enough to articulate areas where we excel."

The institutes are the Alabama Transportation Institute, Alabama Water Institute, Alabama Cyber Institute and the Alabama Life Research Institute. "Organizing around these themes will help in strategic faculty hires, student recruitment, external funding and partnerships with industry," he said.

He expects more institutes are likely to form, as there is critical mass in other areas on campus.

"I applaud what has been done, and we need to foster a culture that embraces this approach," Mumper said. "It is critical that all faculty envision themselves in one or more of these focus areas, and, if not, we should pursue options to create additional collaborative opportunities as appropriate."

While putting together a more detailed plan continues this spring, Mumper said there are initiatives he knows will help.

He would like to motivate research by strengthening the infrastructure for securing external funding including eliminating any barriers that remain to faculty writing and submitting grants, investing in more grant coordinators and defining best practices for submissions.

Mumper would also like to find ways to provide investments and rewards to faculty. Investments could include more seed funding, faculty hires, more endowed professorships and possibly a return of more funds to faculty, centers and academic units to provide additional resources for more innovations.

"To ensure sustainability of research activity, UA can explore rewarding innovation that results in invention disclosures, copyrighted materials and patents, high-impact publications, creative works, start-up companies, technology transfer agreements and economic development," he said.

"We must create a culture of UA being a destination for faculty to develop and reach their full potential as innovators and scholars," Mumper said.

🏷 Faculty & Staff (https://www.ua.edu/news/category/faculty/), Research (https://www.ua.edu/news/category/research/)


*The University of Alabama, the state's oldest and largest public institution of higher education, is a student-centered research university that draws the best and brightest to an academic community committed to providing a premier undergraduate and graduate education. UA is dedicated to achieving excellence in scholarship, collaboration and intellectual engagement; providing public outreach and service to the state of Alabama and the nation; and nurturing a campus environment that fosters collegiality, respect and inclusivity.*

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
22

From: **Araujo, Paulo** paulo.t.araujo@ua.edu
Subject: Re: grad advising needs to meet ASAP
Date: April 27, 2017 at 7:27 PM



To: Henderson, Conor conor.henderson@ua.edu, Dean Townsley Dean.M.Townsley@ua.edu, Nair, Preethi preethi.nair@ua.edu, Leclair, Patrick pleclair@ua.edu
Cc: Paulo Araujo ptaraujo@ua.edu, Okada, Nobuchika okadan@ua.edu, Sanjoy Sarker ssarker@bama.ua.edu

I can make it tomorrow at any time but from 11 to noon since I will be teaching that time.

Paulo T. Araujo, Ph.D.
Physics Department, U. of Alabama.
Center for Materials for Info. Tech. - MINT, U. of Alabama
    Tom Bevill Research Bldg, Room 2050.
    The University of Alabama, Tuscaloosa, AL 35401
    Office number: +1(205) 348-2878
    E-mail: paulo.t.araujo@ua.edu
Visiting Professor at UFPA, Belem, PA, Brazil.
Editor in Chief: Book Series Carbon Nanostructures, Springer.

**From:** Conor Henderson <conor.henderson@ua.edu>
**Sent:** Thursday, April 27, 2017 6:53:32 PM
**To:** Dean Townsley; Nair, Preethi; Leclair, Patrick
**Cc:** Paulo Araujo; Okada, Nobuchika; Sanjoy Sarker
**Subject:** Re: grad advising needs to meet ASAP

I could meet any time tomorrow after 10am, and almost any time Monday.

So far it sounds like 10am Friday works for the people who have
responded already. Is there anyone for which this does not work?

Conor.


On 4/27/2017 5:37 PM, Dean Townsley wrote:
> I am available 10-4 tomorrow, and pretty much any time on Monday morning.
>
> Dean
>
>
> On 04/27/2017 04:38 PM, Nair, Preethi wrote:
>> Hi Patrick, et al.
>>
>> I can meet between 9:00 - 11:00 a.m. tomorrow.
>> I have office hours with AY101 students after that plus class at 2:00
>> p.m. followed by more help sessions.
>>
>> I can also meet on Monday nearly anytime.
>>
>> Cheers,
>>
>> -Preethi
>>
>>

**From:** Leclair, Patrick pleclair@ua edu
**Subject:** Re: grad advising needs to meet ASAP
**Date:** April 28, 2017 at 9:37 AM
**To:** Preethi Nair preethi nair@ua edu
**Cc:** Sarker, Sanjoy ssarker@ua edu, Conor Henderson conor henderson@ua edu, Dean Townsley Dean M Townsley@ua edu, Paulo Araujo ptaraujo@ua edu, Nobuchika Okada okadan@ua.edu, Sanjoy Sarker ssarker@bama ua edu

Yes, and you should discuss the support and standing of all students in their 5th or 6th year who are getting close to their PhD deadline. You should also discuss anticipated graduation dates for these students so we can predict how many grad offers we might need to make in the spring.

-patrick

Are we having a meeting Friday morning (10 am)?

----------
**From:** Sarker, Sanjoy <ssarker@ua.edu>
**Sent:** Friday, April 28, 2017 8:05:05 AM
**To:** Leclair, Patrick; Nair, Preethi; Paulo Araujo; Okada, Nobuchika; Sanjoy Sarker
**Cc:** Dean Townsley;
**Subject:** Re: grad advising needs to meet ASAP

I am available Friday and Monday.

As it stands, everyone is available Monday.
Friday: We can try 10-11 am.

----------
**From:** Patrick LeClair <pleclair@ua.edu>
**Sent:** Thursday, April 27, 2017 10:11:17 PM
**To:** Henderson, Conor
**Cc:** Dean Townsley; Nair, Preethi; Paulo Araujo; Okada, Nobuchika; Sanjoy Sarker
**Subject:** Re: grad advising needs to meet ASAP

I will drop by for the start of the meeting to give some background information, but should not be part of the discussion for reasons that will quickly become obvious.

Looks like 10am Friday does work, let's go ahead with that unless someone objects in the next hour or so ...

-patrick

> On Apr 27, 2017, at 6:53 PM, Conor Henderson <conor henderson@ua.edu> wrote:
>
> I could meet any time tomorrow after 10am, and almost any time Monday.
>
> So far it sounds like 10am Friday works for the people who have responded already. Is there anyone for which this does not work?
>
> Conor.
>
>
> On 4/27/2017 5:37 PM, Dean Townsley wrote:
>> I am available 10-4 tomorrow, and pretty much any time on Monday morning.
>>
>> Dean
>>
>>
>> On 04/27/2017 04:38 PM, Nair, Preethi wrote:
>>> Hi Patrick, et al.
>>>
>>> I can meet between 9:00 - 11:00 a.m. tomorrow.
>>> I have office hours with AY101 students after that plus class at 2:00 p.m. followed by more help sessions.
>>>
>>> I can also meet on Monday nearly anytime.
>>>
>>> Cheers,
>>>
>>> -Preethi
>>>
>>>
>>>
>>>> On Apr 27, 2017, at 4:34 PM, Patrick LeClair <pleclair@ua.edu> wrote:
>>>>
>>>> Hi,
>>>>
>>>> The graduate advising committee needs to meet before lunchtime on Monday to discuss an urgent and serious matter. I will brief as many of you as I can on it individually

From: **Leclair, Patrick** pleclair@ua edu
Subject: Re: grad advising needs to meet ASAP
Date: April 27, 2017 at 10:11 PM
To: Conor Henderson conor henderson@ua.edu
Cc: Dean Townsley Dean M Townsley@ua edu, Preethi Nair preethi nair@ua edu, Paulo Araujo ptaraujo@ua edu, Nobuchika Okada okadan@ua edu, Sanjoy Sarker ssarker@bama ua edu



I will drop by for the start of the meeting to give some background information, but should not be part of the discussion for reasons that will quickly become obvious.

Looks like 10am Friday does work, let's go ahead with that unless someone objects in the next hour or so ...

-patrick

On Apr 27, 2017, at 6:53 PM, Conor Henderson <conor.henderson@ua.edu> wrote:

I could meet any time tomorrow after 10am, and almost any time Monday.

So far it sounds like 10am Friday works for the people who have responded already. Is there anyone for which this does not work?

Conor.

On 4/27/2017 5:37 PM, Dean Townsley wrote:
> I am available 10-4 tomorrow, and pretty much any time on Monday morning.
>
> Dean
>
>
> On 04/27/2017 04:38 PM, Nair, Preethi wrote:
>> Hi Patrick, et al.
>>
>> I can meet between 9:00 - 11:00 a.m. tomorrow.
>> I have office hours with AY101 students after that plus class at 2:00 p.m. followed by more help sessions.
>>
>> I can also meet on Monday nearly anytime.
>>
>> Cheers,
>>
>> -Preethi
>>
>>
>>
>>> On Apr 27, 2017, at 4:34 PM, Patrick LeClair <pleclair@ua.edu> wrote:
>>>
>>> Hi,
>>>
>>> The graduate advising committee needs to meet before lunchtime on Monday to discuss an urgent and serious matter. I will brief as many of you as I can on it individually.
>>>
>>> -patrick

--
Dr. Conor Henderson
Associate Professor & Graduate Director
Department of Physics & Astronomy
University of Alabama

**PLAINTIFF'S EXHIBIT 23**

PENGAD 800-631-6989

**From:** Pagani, Cathy
**To:** Carvalho, Susan
**Cc:** Yarbrough, Beth
**Subject:** Re: Re: Error in cc line of Amiri dismissal letter
**Date:** Monday, February 12, 2018 9:40:04 AM

Agreed!

On Feb 12, 2018, at 9:36 AM, Carvalho, Susan <scarvalho@ua.edu> wrote:

We definitely do not want to send a new one to the student, as this is likely to go to litigation; we will just leave it as is, and produce the corrected letter if asked. I have already sent in the current version, to our Legal Counsel.

It may not make any difference; we do know that the student was notified of his suspension, and that is the primary thing!
Thanks,
Susan

**Susan Carvalho**
Associate Provost and Dean

Graduate School
The University of Alabama
102 Rose Administration Bldg.
Box 870118
Tuscaloosa, AL 35487
Phone 205-348-8280 | Mobile 859-618-4399
scarvalho@ua.edu | http://graduate.ua.edu

**From:** Yarbrough, Beth
**Sent:** Monday, February 12, 2018 9:29 AM
**To:** Pagani, Cathy
**Cc:** Carvalho, Susan
**Subject:** RE: Error in cc line of Amiri dismissal letter

I am waiting on the department chair (Dr. Leclaire) to call me back.

Beth

**Beth Yarbrough**
Registrar

# University Registrar

# November 2017

---

# University of Alabama

Skip Module Navigation Links

| Personal Information | | Faculty Services | Employee |
|---|---|---|---|

Search Search [          ] [Go]

RETURN TO MENU | SITE MAP | HELP | EXIT

## Registration Status

11342916 Ali Amiri
Spring 2018
Nov 23, 2017 10:42 pm

---

You may register during the following times

| From | Begin Time | To | End Time |
|---|---|---|---|
| Oct 30, 2017 07:00 am | | Apr 03, 2018 11:59 am | |

⚠ Advising Status: You must see your advisor prior to registration.

⚠ You have Holds which will prevent registration.

✔ Your Academic Standing is Good Standing which permits registration.

✔ Your Student Status permits registration.

Your Class for registration purposes is Graduate Student.

Earned Credit

| Level | Type | Hours |
|---|---|---|
| Graduate | Institutional | 95.000 |
| Undergraduate | Institutional | 4.000 |

# University Registrar

# March 2018

---

## University of Alabama

Skip Module Navigation Links

**Personal Information**  **Faculty Services**  **Employee**

Search Search [_____] [Go]          RETURN TO MENU | SITE MAP | HELP | EXIT

---

### Registration Status

11342916 Ali Amiri
Fall 2018
Mar 13, 2018 12:30 am

---

✔ You have no Registration Time Ticket. You may register at any time.

✔ Advising Status: Advising requirement cleared.

⚠ You require re-admission prior to registration.

⚠ You have Holds which will prevent registration.

✔ Your Academic Standing is Good Standing which permits registration.

✔ Your Student Status permits registration.

Your Class for registration purposes is Graduate Student.

| | Earned Credit | |
|---|---|---|
| **Level** | **Type** | **Hours** |
| Graduate | Institutional | 95.000 |

Undergraduate Institutional 4.000