UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| ALI AMIRI., | } |
| **Plaintiff,** | } |
| v. | } Case No.: 7:18-cv-00425-RDP |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

This case is before the court on pro se Plaintiff Ali Amiri's Motion to Stop Detention and Deportation by Homeland Security (Doc. # 58), which the court construes as a motion for a preliminary injunction, *see* Fed. R. Civ. P. 65. The court heard argument on the motion by telephone on July 23, 2019. After careful consideration, and for the reasons explained below, the court concludes that the motion is due to be denied.

**I.     Background**

Plaintiff is an Iranian national who began a PhD program in physics at the University of Alabama in August 2011. (Doc. # 28 at ¶ 5). Following the spring 2017 academic semester, Plaintiff was dismissed from the physics graduate program based on his "demonstrated lack of progress in research and disrespectful conduct towards faculty advisers, colleagues and members of the academic community." (Doc. # 45-6 at 45). Plaintiff subsequently sued the Board of Trustees of the University of Alabama, claiming that the University failed to afford him procedural due process in dismissing him from the PhD program. (Doc. # 28).

Plaintiff and the University have been litigating this lawsuit since March 2018. The University moved to dismiss Plaintiff's procedural due process claim, but the court denied the

motion and held that Plaintiff had plausibly alleged a procedural due process violation. (Doc. # 33 at 7-8). The parties have since engaged in discovery, and the Board has filed a motion for summary judgment that is currently pending before the court. (Doc. # 43). The parties have briefed the summary judgment motion and submitted evidence in support of their positions. (Docs. # 44, 45, 48, 50, 52, 53, 56).

On July 17, 2019, after briefing on the summary judgment motion was complete, a federal agent from the Department of Homeland Security contacted Plaintiff regarding his immigration status. (Doc. # 58 at ¶ 2). On July 22, 2019, Plaintiff met with the Homeland Security agent to review his immigration documents. (*Id.* at 1, ¶ 3). Plaintiff represents that all of his immigration documents were valid and up to date except for one document issued by the University—Immigration and Customs Enforcement Form I-20. (*Id.* at 1-2, ¶ 3). That form is used to show that Plaintiff is an enrolled student at the University of Alabama, a status which is a condition of his continued lawful presence in the United States. (*Id.* at 11). Plaintiff's Form I-20, however, expired on July 31, 2018—just over a year after Plaintiff was dismissed from his PhD program, and about four months after he filed this lawsuit. (*Id.*). The Homeland Security agent informed Plaintiff that, unless he presents documentation showing that he has been reinstated as a student at the University of Alabama, he will be detained without bond beginning Friday, July 26, 2019, and subsequently removed from the United States. (*Id.* at 2, ¶ 5).

The day after his meeting with Homeland Security, Plaintiff filed the emergency motion currently before the court. (Doc. # 58). The court interprets the motion to seek a court order directing the University of Alabama to provisionally reinstate him as a student at the University pending a final determination regarding whether the University violated the Due Process Clause of the Fourteenth Amendment when it dismissed him from his PhD program. (Doc. # 58 at 2-3).

Further, the court deems the motion to seek this preliminary relief so that Plaintiff may avoid being arrested and deported before the court adjudicates his procedural due process claim on the merits. Given the highly time-sensitive nature of Plaintiff's motion, the court treats his request as a motion for a preliminary injunction under Federal Rule of Civil Procedure 65.

## II. Legal Standard

The posture of Plaintiff's motion for a preliminary injunction is somewhat unique. Motions for temporary restraining orders and preliminary injunctions are typically filed at the outset of a case, before a court has much of an evidentiary record before it. Plaintiff's motion, by contrast, comes after the completion of initial discovery and summary judgment briefing in this case. Given the unique posture of this case, it is especially important to review the governing legal standard.

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (internal quotation marks omitted). "A preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *Id.* (brackets and internal quotation marks omitted).

Importantly, a preliminary injunction provides for extraordinary relief. If entered, it awards a plaintiff injunctive relief before that plaintiff carries his burden of proof to show he is entitled to any relief at all. For this reason, a plaintiff seeking a preliminary injunction must

3

establish he is entitled to that extraordinary relief, including making the merits showing required to obtain a preliminary injunction. That showing is significantly higher than what is required to survive a motion for summary judgment. To obtain a preliminary injunction, a plaintiff must show that he "has a *substantial likelihood* of success on the merits." *Id.* (emphasis added). By contrast, to survive a summary judgment motion and get to a jury on a claim, a plaintiff need only offer evidence from which a reasonable jury *could* return a verdict in his favor. *Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019). Thus, even where a plaintiff creates a genuine issue of material fact for a jury to resolve, he may still fall short of showing that it is substantially likely a jury *would* resolve the issue in his favor. And, in that circumstance, the plaintiff is not entitled to a preliminary injunction.

## III. Analysis

Plaintiff's motion for a preliminary injunction is due to be denied because he cannot establish the first required showing: that he is substantially likely to prevail on his claim that the University of Alabama denied him procedural due process when it dismissed him from the physics graduate program.

"[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The University concedes that it is a state actor. (Doc. # 44 at 19). Additionally, the University does not dispute that Plaintiff had a constitutionally protected liberty or property interest in continued enrollment in his PhD program, and the court assumes Plaintiff had such an interest for purposes of its decision. However, Plaintiff has not shown a substantial likelihood of

success on the third element of his procedural due process claim: that the University of Alabama gave him constitutionally inadequate process when it dismissed him from the physics program.

The amount of process the Fourteenth Amendment requires when a public educational institution dismisses a student depends on whether the dismissal was for academic or disciplinary reasons. "[A] student dismissed from a public educational institution for academic reasons is entitled to less process than a student dismissed for disciplinary reasons." *Rollins v. Bd. of Trustees of the Univ. of Ala.*, 647 F. App'x 924, 929 (11th Cir. 2016) (citing *Haberle v. Univ. of Ala.*, 803 F.2d 1536, 1539 (11th Cir. 1986)). When a student is dismissed for academic reasons, due process simply requires that the school engage in a "careful and deliberate" decisionmaking process. *Haberle*, 803 F.2d at 1539 (quoting *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85 (1978)). It does not require a pre-dismissal hearing at which the student may contest the basis for an academic dismissal. *Horowitz*, 435 U.S. at 87-90. By contrast, when a student is dismissed for disciplinary reasons based on alleged misconduct, a pre-dismissal hearing typically is required. *See Barnes v. Zaccari*, 669 F.3d 1295, 1305-06 (11th Cir. 2012) (due process required that student who was expelled from university for longer than ten days receive notice of the charges against him and a hearing prior to his dismissal); *Goss v. Lopez*, 419 U.S. 565, 581 (1975) (explaining that in the context of high school student suspensions, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story"); *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158 (5th Cir. 1961) ("[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct.").

5

In this case, the evidence in the summary judgment record amply supports the conclusion that the University afforded Plaintiff constitutionally adequate process if his dismissal was for academic reasons. A committee of five faculty concluded that Plaintiff should be dismissed from the physics program based on his "demonstrated lack of progress in research and disrespectful conduct towards faculty advisers, colleagues and members of the academic community." (Doc. # 45-6 at 45). Prior to the committee's meeting to review Plaintiff's academic standing, they were made aware of the breakdown in the research relationship between Plaintiff and his advisors, including: (1) Plaintiff's requests to use lab equipment without adequate justification; (2) his intellectual property claims for a "memory device"; (3) his claims that Dr. Gupta was harming his career; and (4) other general claims of misconduct by faculty, including "a plot to destroy" Plaintiff's work. (Doc. # 45-13 at 18, ¶ 6). As the Supreme Court observed in *Horowitz*, "[t]he educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute." 435 U.S. at 90 (internal quotation marks omitted). Plaintiff's disrespectful behavior[1] toward his faculty advisers doubtless contributed to the breakdown of their working relationship and impaired his ability to succeed academically in his PhD program. Though, as discussed below, some of Plaintiff's actions might be labeled as "misconduct," any alleged misconduct by Plaintiff (for example, using academic resources and equipment for non-academic reasons while he should have been working on his PhD program work, rudeness to his advisers, and false accusations leveled against his advisers) was thoroughly intertwined with his academic endeavors at the University. The committee was

---

[1] To be clear, in the telephonic hearing, Plaintiff asserted he was not disrespectful. But the record evidence is to the contrary.

justified in concluding that, in addition to his lack of research progress, this other conduct by Plaintiff would impair his ability to succeed academically in his PhD program.

Plaintiff has not shown a substantial likelihood that the committee's decision to recommend his dismissal, which was made after an in-person meeting to review Plaintiff's academic good standing (*id.* at 40-41), was the result of anything other than a "careful and deliberate" decisionmaking process. *Haberle*, 803 F.2d at 1539. Additionally, the committee's conclusion is reinforced by Plaintiff's own statements and other record evidence. As early as April 2016, Plaintiff himself stated, "I have got not much scientific results." (Doc. # 45-13 at 5). Moreover, Plaintiff was informed that he had the right to appeal his dismissal through the University's academic grievance procedures, but he chose not to avail himself of that process. (Docs. # 45-6 at 44; 45-1 at 53-54). The faculty committee's careful and deliberate decision to dismiss Plaintiff, in combination with the availability of a post-dismissal grievance hearing, afforded Plaintiff sufficient procedural protections if his dismissal was for academic reasons.

If, however, Plaintiff's dismissal was in fact for disciplinary reasons rather than academic ones, there is a substantial question whether the University failed to provide constitutionally adequate process. That is so because it is undisputed that Plaintiff was not given notice and at least an informal opportunity to be heard before he was dismissed. The question is thus whether Plaintiff is likely to show that he was in fact dismissed for non-academic, disciplinary reasons (*e.g.*, alleged misconduct), rather than for reasons related to his academic performance. A pre-dismissal hearing was required only if he was dismissed for non-academic, disciplinary reasons.

There is certainly evidence in the summary judgment record from which a reasonable jury could conclude that the University believed that, in his academic pursuits, Plaintiff engaged in forms of misconduct. On Friday, April 21, 2017, Plaintiff accused Dr. Arun Gupta and Dr.

7

Patrick LeClair (both University faculty members who were on Plaintiff's dissertation committee and who served as his advisers) of committing "plagiarism and fabrication" of his works, and submitted those allegations to the Office of Research Compliance. (Doc. # 45-3 at 5, ¶ 16). The following week, on the afternoon of Thursday, April 27, 2017, Dr. LeClair (the chair of the physics department), sent the following email to the members of the physics department's graduate advising committee: "The graduate advising committee needs to meet before lunchtime on Monday to discuss an urgent and serious matter. I will brief as many of you as I can on it individually." (Doc. # 45-6 at 38). The committee members responded that they could meet the following day, April 28, 2017, at 10:00 am. (*Id.* at 39). At about 10:00 pm that evening, Dr. LeClair responded that he would "drop by for the start of the meeting to give some background information, but should not be part of the discussion for reasons that will quickly become obvious." (*Id.* at 39).

A few hours later, at 1:37 am on April 28, 2017, Dr. LeClair sent another email to Dr. Luoheng (the Senior Associate Dean of the College of Arts and Sciences), Tanta Myles (Director and Research Compliance Officer), and Dr. Conor Henderson (the Graduate Director of the physics department and a member of the graduate advising committee). (*Id.* at 40). The email read, in pertinent part:

> My departmental graduate advising committee will meet Friday morning 4/28 to discuss Ali Amiri's situation. They will specifically consider recent correspondence he has had with his advisors (including myself) and administrators, as well has [sic] his progress in research thus far. Their task is in short to determine if Ali is currently in good academic standing in our department, and make a recommendation regarding his financial support. I will not be a part of this review.
>
> I will brief the committee on the basic and documented facts of the situation, but will recuse myself at that point from their discussion and decision process. I am not offering them any opinion of the situation, as chair I am only charging them

8

with coming up with an independent recommendation of Mr. Amiri's standing in the department. . . .

The committee is charged with considering three matters: (1) is Ali in good academic standing in our department right now, (2) if not, should he continue to be supported by the department financially . . . , and (3) if they do not suggest supporting him financially, does the committee recommend he be removed from the program, or is he allowed to continue if he can provide his own funding.

I have given the committee a hard copy (and no electronic copy) of recent email correspondences between Ali and myself, Arun Gupta, Takau Suzuki, and later forwards to Tanta Myles and Carl Pinkert. They will also interview parties that were present at recent meetings, including grad students and faculty members in our department. I will have no part in this process either, I only informed them who was present at the most recent meetings that they might want to talk to.

. . .

I should also say that I passed the email exchanges noted above along to March Huey, Compliance, Ethics, and Regulatory Affairs Coordinator . . . . I am deferring to the judgment of A&S and Research Compliance as to whether legal council [sic] should be involved, I'm clearly out of my depth.

I do want to point out some relevant text in our department's graduate handbook: . . . "The maintenance of good academic standing with the Department also requires that graduate students conduct themselves responsibly and respectfully towards other members of our academic community. Indeed, the University has a vital interest in the character of its students, and therefore regards behavior at any location (on-campus or off-campus) as a reflection of a student's character and fitness to be a member of the student body. Accordingly, *in addition to the relevant academic thresholds, a student's standing with the Department is also contingent on compliance with the Code of Student Conduct and adherence to the Capstone Creed*."

This last paragraph is of particular relevance, and it is one factor the committee will consider.

(*Id.* at 40-41) (emphasis added).

The following morning, at 8:50 am on April 28, 2017, Myles responded to the email chain by asking Dr. LeClair: "Is the meeting scheduled only to discuss Mr. Amiri's status or a meeting to discuss support and standing for all students?" (*Id.* at 42). A few minutes later, Myles sent the following email to Dr. Carl Pinkert, Vice President for Research and Economic

9

Development: "Based on Mr. Amiri's reporting of possible misconduct, unless this meeting is to discuss the status of all graduate students or was scheduled prior to our notification about the matter this could be considered retaliation based on the timing." (*Id.*). Ten minutes after that email, at 9:12 am, Dr. LeClair sent the following email to Dr. Henderson, the leader of the graduate advising committee who would be reviewing Plaintiff's academic standing in approximately 45 minutes: "Conor, just as a reminder this is a normal end-of-semester meeting of the grad advising committee to discuss the support and standing of all students in their 5th or 6th year who are getting close to their PhD deadline. You should also discuss anticipated graduation dates for these students so we can predict how many grad offers we might need to make the in the spring." (*Id.* at 43).

As scheduled, the committee met at 10:00 am on April 28, 2017. Later that day, Dr. Henderson submitted a letter to Dr. LeClair reporting the results of the meeting. (*Id.* at 45). According to the letter, the committee recommended that Plaintiff be dismissed from the physics graduate program "based on the student's demonstrated lack of progress in research and disrespectful conduct towards faculty advisers, colleagues and members of the academic community. (*Id.*). The letter also stated: "We are aware that [Plaintiff] has made allegations of research misconduct by faculty members. If UA's Office of Research Compliance finds there is merit to these allegations, then the Physics Department Graduate Advising Committee may review the above recommendation." (*Id.*).

The Office of Research Compliance ultimately found that Plaintiff's allegations of plagiarism and fabrication against Dr. Gupta and Dr. LeClair were unfounded. (Doc. # 45-6 at 60). Shortly thereafter, Dr. LeClair notified Plaintiff that the graduate advising committee had recommended his dismissal from the physics program, and that he was obliged to follow the

committee's recommendation. (*Id.* at 44-45). The Graduate School became aware of Plaintiff's dismissal in June, and on June 29, 2017, Susan Carvalho (Associate Provost and Dean of the Graduate School) informed Plaintiff that, as a result of his dismissal from the physics department, he had been suspended from the Graduate School. (Doc. # 45-11 at 3).

Given the timing of events and the email correspondence between Dr. LeClair and other University employees, a reasonable jury could certainly conclude that the real reason the graduate advising committee recommended that Plaintiff be dismissed from the physics program was not his failure to make academic progress, but instead that he falsely accused their colleagues of plagiarism and fabrication. If the real reason Plaintiff was dismissed was false accusations of plagiarism and fabrication, then he would be entitled to notice of that charge and at least an informal opportunity to present his side of the story before being dismissed. *See Barnes v. Zaccari*, 669 F.3d at 1305-06; *Goss*, 419 U.S. at 581; *Dixon*, 294 F.2d at 158. But though the court concludes that a reasonable jury *could* find in Plaintiff's favor on this point, it cannot conclude that Plaintiff has shown a substantial likelihood that a jury *would* find that the real reason for his dismissal was false accusations of plagiarism and fabrication.

As discussed above, there is ample evidence supporting the committee's conclusion that Plaintiff was failing to make satisfactory academic progress toward his PhD program. At the telephone hearing on July 23, 2019, Plaintiff admitted that, despite having been in the program for six years, he never submitted a dissertation to his faculty advisers. Indeed, he told his advisers he was able to defend his dissertation without ever submitting it. Further, the committee expressly stated that its recommendation of dismissal was contingent on the University determining that there was no merit to Plaintiff's accusations of research misconduct by University faculty, and Plaintiff was not notified of his dismissal until after the University

11

determined that his accusations were unfounded. (Doc. # 45-6 at 44-45). A careful review of the evidence before the court reveals that the reasons Plaintiff was dismissed from the program were his failure to make satisfactory academic progress, his inability to accept constructive feedback from his advisers, and his unwillingness to work cooperatively with faculty.

A physics PhD program occupies a spot at the highest levels of education. Academic progress at that level is not measured simply by grade point average or the completion of assignments. Rather, a PhD candidate must also work collaboratively with his faculty advisers in completing the program requirements. Here, the evidence indicates that Plaintiff did not even complete a draft dissertation. But it also shows that he failed to work with his advisers who were trying to shepherd him through the program. That failure is clearly intertwined with his lack of progress, and the record evidence indicates it is part and parcel of his academic failure. Because Plaintiff has not shown a substantial likelihood that the University's real reasons for dismissing him were other than academic, he is not entitled to a preliminary injunction.

## IV. Conclusion

After careful review, the court concludes that Plaintiff's motion for a preliminary injunction (Doc. # 58) is due to be denied. An order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this July 24, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE